# EXHIBIT A

Hearing Date: No hearing scheduled
Location: <<CourtRoomNumber>>
Judge: Calendar, 10

# SUMMONS

IN THE STATE OF ILLINOIS, CIRCUIT COURT

☐ **Alias Summons**

*Check if this is not the 1ˢᵗ Summons issued for this Defendant/Respondent.*

**COUNTY:** Cook

*County Where You Are Filing the Case*

Enter the case information as it appears on your other court documents.

**PLAINTIFF/PETITIONER OR IN RE:** Archer Western Contractors, LLC
*Who started the case.*              *First, Middle, and Last Name, or Business Name*

**DEFENDANTS/RESPONDENTS:** National Fire & Marine Insurance
*Who the case was filed against.* Company

*First, Middle, and Last Name, or Business Name*

FILED
6/17/2026 11:09 AM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2026CH05725
Calendar, 10
38603718

2026CH05725

**Case Number**

## The Defendant/Respondent named above has been sued. Read this form for information about how to respond to this lawsuit. Also see page 4 for next steps.

**For the person filling out this form: Read all instructions in this box.**

This *Summons* can only be used for certain types of cases. See the *How To Serve a Summons* Instructions for more information: ilcourts.info/how-to-summons.

Check 1 if this is a 30-day summons or check 2 if this is a date certain summons. Fill in all the information in 1 or 2.

- Use a **date certain summons** if you are asking for money of $50,000 or less or recovery of your personal property that you think the Defendant has, and for some mandatory arbitration cases. In 2, fill in your court date and how to go to court. You may get the court date when you e-file or you may need to ask the Circuit Clerk's office.

- Use a **30-day summons** for most other case types.

Complete the rest of the form with the Defendant/Respondent's information and information about the lawsuit.

**If you are suing more than 1 Defendant/Respondent**, attach an *Additional Defendant/Respondent Address and Service Information* form for **each** additional Defendant/Respondent.

## ☑ 1. 30-DAY SUMMONS

To participate in this case, you must **file** your *Appearance* and *Answer/Response* forms with the court within 30 days after you are served with this *Summons* (not counting the day of service) by e-filing or at:

Court Address: Richard J. Daley Center, 50 W. Washington St., Chicago, IL 60602
*Courthouse Street Address*

**- or -**

## ☐ 2. DATE CERTAIN SUMMONS

*Your court date is listed below. Information about getting a court date and how to attend is available from the Circuit Clerk. You can find their contact information at ilcourts.info/clerks.*

To respond to this *Summons*, you must **attend court** in one of the ways checked below on:

_____ at _____ ☐ a.m. ☐ p.m. in _____.
*Month, Day, Year*          *Time*                                *Courtroom Number*

*This form is approved by the Illinois Supreme Court and is required to be accepted in all Illinois Circuit Courts. Forms are free at ilcourts.info/forms.*

ATJ 1503.8                         Page 1 of 6                         (08/25)

FILED DATE: 6/17/2026 11:09 AM   2026CH05725

*Case Number* 2026CH05725

## Going to Court for a Date Certain Summons

Court dates may be in-person, remote, or a combination of in-person and remote.

[ ] **In person** at: _____
  *Courtroom Address*              *Courtroom Number*

[ ] **Remotely** (video or telephone)

  **By video conference** at: _____
        *Video Conference Website*

  Log-in information: _____
        *Video Conference Log-in Information, Meeting ID, Password, etc.*

  **By telephone** at: _____
        *Call-in Number for Telephone Remote Appearance*

To find out more about remote court options:

Phone: _____   or   Website: _____
  *Circuit Clerk's Phone Number*              *Website URL*

## 3. ADDITIONAL INFORMATION ABOUT THE LAWSUIT

a. I am asking for the following amount of money in my *Complaint/Petition*: $ 10,000,000.00 .
  *(Enter 0 if you are not asking for money)*

b. I am asking for the return of tangible personal property (items in the Defendant/Respondent's possession) in my *Complaint/Petition.*
  [ ] Yes   [✓] No

## 4. DEFENDANT/RESPONDENT'S INFORMATION

a. Number of Defendants/Respondents being served:

  [✓] I am having 1 Defendant/Respondent served and their information is on this form below.

  [ ] I am having more than 1 Defendant/Respondent served. The first is listed below. I have attached *Additional Defendant/Respondent Address and Service Information* forms for the following number of additional Defendants/Respondents: _____.
        *Number*

b. First Defendant/Respondent's **primary address/information** for service:

Name: National Fire & Marine Insurance Company
  *First, Middle, and Last Name, or Business Name*

Registered Agent's Name *(if you are serving the Registered Agent of a business)*:

_____
  *First, Middle, and Last Name*

Street Address: 1314 Douglas Street, Suite 1400
        *Street, Apt #*

City, State, ZIP: Omaha, Nebraska 68102-1944
        *City*              *State*      *Zip*

Telephone: _____   Email: _____

*Case Number* 2026CH05725

c. **Second address** for this Defendant/Respondent:

☐ I do **not** have another address where the Defendant/Respondent might be found.

☐ I have another address where this Defendant/Respondent might be found. It is:

Street Address: _____
*Street, Apt #*

City, State, ZIP: _____
*City*                               *State*            *Zip*

Telephone: _____ Email: _____

d. Person who will serve your documents on this Defendant/Respondent:

☐ Sheriff in Illinois  ☑ Special process server  ☐ Licensed private detective

☐ Sheriff outside Illinois: _____
*County & State*

**PLAINTIFF/PETITIONER INFORMATION:**

*Enter your information below.*

Name Archer Western Contractors, LLC _____
*First, Middle and Last Name*

Registered Agent's name, if any Peter Glimco _____
*First, Middle and Last Name*

Street Address 929 W Adams Street _____
*Street, Apt #*

City, State, ZIP: Chicago, Illinois 60607 _____
*City*                               *State*            *Zip*

Telephone: (312) 626-1888 _____ Email: dg@glgchicago.com _____

Be sure to **check your email every day** so you do not miss important information, court dates, or documents from other parties.

---

🛑 **STOP** | The Circuit Clerk and officer or process server will fill in this section.

**To be filled in by the Circuit Clerk:**

Witness this Date: _____

Clerk of the Court: _____
6/17/2026 11:09 AM Mariyana T. Spyropoulos

**To be filled in by an officer or process server:**

Date of Service: _____

*Fill in the date above and give this copy of the Summons to the person served.*

---

**Note to officer or process server:**

- If **1** is checked, this is a 30-day *Summons* and must be served within 30 days of the witness date.
- If **2** is checked, this is a date certain *Summons* and must be served at least 21 days before the court date, unless **3b** is checked yes.
  - If **2** is checked **and 3b** is checked yes, the *Summons* must be served at least 3 days before the court date.
- Fill in the date above and give this copy of the *Summons* to the person served.
- You must also complete the attached *Proof of Service* form and file it with the court or return it to the Plaintiff.

FILED DATE: 6/17/2026 11:09 AM 2026CH05725



*Case Number* 2026CH05725

# WHAT'S NEXT

## NEXT STEPS FOR PERSON FILLING OUT THIS FORM:

When you file a lawsuit, you must notify the person or business you are suing of the court case by having the *Summons* and Complaint or Petition delivered to them. This is called "serving" them.

File your *Summons* and Complaint or Petition with the Circuit Clerk in the county where your court case should be filed. The Circuit Clerk will "issue" the *Summons* by putting a court seal on the form.

Have the sheriff or a private process server serve the *Summons* and a copy of the Complaint or Petition on the Defendant/Respondent. You cannot serve the *Summons* yourself.



> Learn more about each step in the process and how to file in the instructions:
> ilcourts.info/how-to-summons.

## NEXT STEPS FOR PERSON RECEIVING THIS DOCUMENT:

**You have been sued:**
- Read all documents attached to this *Summons*.
- All documents referred to in this *Summons* can be found at ilcourts.info/forms. Other documents may be available from your local Circuit Court Clerk's office or website.
- You may be charged filing fees, but if you cannot pay them, you can file an *Application for Waiver of Court Fees (Civil)*.
- When you go to court, it is possible that the court will allow you to attend the first court date in this case in-person or remotely by video or phone. Contact the Circuit Court Clerk's office or visit the Court's website to find out whether this is possible and, if so, how to do this.

**If Section 1 on page 1 of this *Summons* is checked (30-day summons):**
- You **must** file official documents called an *Appearance* and an *Answer/Response* with the court within 30 days of the date you were served with this *Summons*.
- If you do not file an *Appearance* and *Answer/Response* on time, the judge may decide the case without hearing from you. This is called "default." As a result, you could lose the case.
- After you fill out the necessary documents, you need to electronically file (e-file) them with the court. To e-file, you must create an account with an e-filing service provider. For more information, go to ilcourts.info/efile. If you cannot e-file, you can get an exemption that allows you to file in-person or by mail.
- You should be notified of any future court dates.

**If Section 2 on page 1 of this *Summons* is checked (date certain summons):**
- You **must** attend court on the date listed in Section 2 of this *Summons*.
- If you do not attend that court date, the judge may decide the case without hearing from you. This is called "default." As a result, you could lose the case.

**Need Help? ¿Necesita ayuda?**
- Call or text Illinois Court Help at 833-411-1121 or go to ilcourthelp.gov for information about going to court, including how to fill out and file documents.
- Llame o envíe un mensaje de texto a Illinois Court Help al 833-411-1121, o visite ilcourthelp.gov para obtener información sobre los casos de la corte y cómo completar y presentar formularios.
- You can also get free legal information and legal referrals at illinoislegalaid.org.
- If there are any words or terms that you do not understand, please **visit Illinois Legal Aid Online** at ilao.info/glossary. You may also find more information, resources, and the location of your local legal self-help center at: ilao.info/lshc-directory.

FILED DATE: 6/17/2026 11:09 AM 2026CH05725

*Case Number* 2026CH05725

**PROOF OF SERVICE OF SUMMONS AND COMPLAINT/PETITION**

IN THE STATE OF ILLINOIS, CIRCUIT COURT

☐ **Alias Summons**

*Check if this is not the 1ˢᵗ Summons issued for this Defendant/Respondent.*

**COUNTY:** Cook

*County Where You Are Filing the Case*

*Enter the case information as it appears on your other court documents.*

**PLAINTIFF/PETITIONER OR IN RE:** Archer Western Contractors, LLC
*Who started the case.*          *First, Middle, and Last Name, or Business Name*

**DEFENDANTS/RESPONDENTS:** National Fire & Marine Insurance
*Who the case was filed against.* Company

*First, Middle, and Last Name, or Business Name*

2026CH05725
**Case Number**

🛑 **STOP** Do not complete the rest of the form. **The sheriff or special process server will fill in the form.**
Give them one copy of this blank *Proof of Service* form for each Defendant/Respondent who will be served.

My name is _____ and I state:
          *Officer/Process Server First, Middle, Last Name*

## SERVICE INFORMATION

Defendant/Respondent: _____
          *First, Middle, Last Name, or Business Name*

☐ I was not able to serve the *Summons* and Complaint/Petition on the Defendant/Respondent named above.

**- or -**

☐ I served the *Summons* and Complaint/Petition on the Defendant/Respondent named above as follows:

☐ **Personally** on the Defendant/Respondent:
☐ Male ☐ Female ☐ Non-Binary  Approx. Age: _____ Race: _____

On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.

Address, Unit#: _____

City, State, ZIP: _____

☐ On **someone else at the Defendant/Respondent's home** who is at least 13 years old and is a family member or lives there:
Name of person served: _____
          *First, Middle, Last Name*
☐ Male ☐ Female ☐ Non-Binary  Approx. Age: _____ Race: _____

On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.

Address, Unit#: _____

City, State, ZIP: _____
and by sending a copy to this Defendant/Respondent in a postage-paid, sealed envelope to the above
address on this date: _____.

ATJ 1503.8          Page 5 of 6          (08/25)

FILED DATE: 6/17/2026 11:09 AM   2026CH05725

Case Number 2026CH05725

☐ On the **Business's agent:** _____

*First, Middle, Last Name*

☐ Male ☐ Female ☐ Non-Binary   Approx. Age: _____   Race: _____

On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.

Address, Unit#: _____

City, State, ZIP: _____

## SERVICE ATTEMPTS

I made the following attempts to serve the *Summons* and Complaint/Petition on the Defendant/Respondent:

**First Attempt:** On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.

Address, Unit#: _____

City, State, ZIP: _____
Other information about service attempt:

_____

_____

_____

**Second Attempt:** On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.

Address, Unit#: _____

City, State, ZIP: _____
Other information about service attempt:

_____

_____

_____

**Third Attempt:** On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.

Address, Unit#: _____

City, State, ZIP: _____
Other information about service attempt:

_____

_____

_____

---

## SIGN

I certify under 735 ILCS 5/1-109 that:

1) everything in this document is true and correct, or I have been informed or I believe it to be true and correct, and

2) I understand that making a false statement on this form is perjury and has penalties provided by law.

Your Signature /s/ _____   Print Your Name _____

You are: ☐ Sheriff in Illinois                    ☐ Special process server
☐ Sheriff outside Illinois: _____   ☐ Licensed private detective, license number: _____
*County and State*                                                                                *License number*

**FEES:**
Service and Return: $_____   Miles: $_____   Total: $ 0.00 _____

FILED DATE: 6/17/2026 11:09 AM   2026CH05725

# SUMMONS

IN THE STATE OF ILLINOIS, CIRCUIT COURT

☐ **Alias Summons**

*Check if this is not the 1ˢᵗ Summons issued for this Defendant/Respondent.*

**COUNTY:** Cook

*County Where You Are Filing the Case*

*Enter the case information as it appears on your other court documents.*

**PLAINTIFF/PETITIONER OR IN RE:** Archer Western Contractors, LLC

*Who started the case.*      *First, Middle, and Last Name, or Business Name*

**DEFENDANTS/RESPONDENTS:** National Fire & Marine Insurance Company

*Who the case was filed against.*

*First, Middle, and Last Name, or Business Name*

2026CH05725

**Case Number**

## The Defendant/Respondent named above has been sued. Read this form for information about how to respond to this lawsuit. Also see page 4 for next steps.

**For the person filling out this form: Read all instructions in this box.**

This *Summons* can only be used for certain types of cases. See the *How To Serve a Summons* Instructions for more information: ilcourts.info/how-to-summons.

Check 1 if this is a 30-day summons or check 2 if this is a date certain summons. Fill in all the information in 1 or 2.

- Use a **date certain summons** if you are asking for money of $50,000 or less or recovery of your personal property that you think the Defendant has, and for some mandatory arbitration cases. In 2, fill in your court date and how to go to court. You may get the court date when you e-file or you may need to ask the Circuit Clerk's office.

- Use a **30-day summons** for most other case types.

Complete the rest of the form with the Defendant/Respondent's information and information about the lawsuit.

**If you are suing more than 1 Defendant/Respondent**, attach an *Additional Defendant/Respondent Address and Service Information* form for **each** additional Defendant/Respondent.

☑ **1. 30-DAY SUMMONS**

To participate in this case, you must **file** your *Appearance* and *Answer/Response* forms with the court within 30 days after you are served with this *Summons* (not counting the day of service) by e-filing or at:

Court Address: Richard J. Daley Center, 50 W. Washington St., Chicago, IL 60602

*Courthouse Street Address*

**- or -**

☐ **2. DATE CERTAIN SUMMONS**

*Your court date is listed below. Information about getting a court date and how to attend is available from the Circuit Clerk. You can find their contact information at ilcourts.info/clerks.*

To respond to this *Summons*, you must **attend court** in one of the ways checked below on:

_____ at _____ ☐ a.m. ☐ p.m. in _____.
*Month, Day, Year*      *Time*      *Courtroom Number*

*This form is approved by the Illinois Supreme Court and is required to be accepted in all Illinois Circuit Courts. Forms are free at ilcourts.info/forms.*

ATJ 1503.8      Page 1 of 6      (08/25)

Case Number 2026CH05725

## Going to Court for a Date Certain Summons

Court dates may be in-person, remote, or a combination of in-person and remote.

☐ **In person** at: _____

               *Courtroom Address*               *Courtroom Number*

☐ **Remotely** (video or telephone)

    **By video conference** at: _____

                   *Video Conference Website*

      Log-in information: _____

               *Video Conference Log-in Information, Meeting ID, Password, etc.*

    **By telephone** at: _____

             *Call-in Number for Telephone Remote Appearance*

To find out more about remote court options:

Phone: _____ or Website: _____

    *Circuit Clerk's Phone Number*          *Website URL*

_____ 🛡️ _____

## 3. ADDITIONAL INFORMATION ABOUT THE LAWSUIT

a. I am asking for the following amount of money in my *Complaint/Petition*: $ 10,000,000.00 .

              *(Enter 0 if you are not asking for money)*

b. I am asking for the return of tangible personal property (items in the Defendant/Respondent's possession) in my *Complaint/Petition*.

    ☐ Yes   ☑ No

## 4. DEFENDANT/RESPONDENT'S INFORMATION

a. Number of Defendants/Respondents being served:

    ☑ I am having 1 Defendant/Respondent served and their information is on this form below.

    ☐ I am having more than 1 Defendant/Respondent served. The first is listed below. I have attached *Additional Defendant/Respondent Address and Service Information* forms for the following number of additional Defendants/Respondents: _____.

                  *Number*

b. First Defendant/Respondent's **primary address/information** for service:

Name: National Fire & Marine Insurance Company _____

    *First, Middle, and Last Name, or Business Name*

Registered Agent's Name *(if you are serving the Registered Agent of a business)*:

_____

    *First, Middle, and Last Name*

Street Address: 1314 Douglas Street, Suite 1400 _____

         *Street, Apt #*

City, State, ZIP: Omaha, Nebraska 68102-1944 _____

         *City*            *State*       *Zip*

Telephone: _____ Email: _____

*Case Number* <u>2026CH05725</u>

c. **Second address** for this Defendant/Respondent:

☐ I do **not** have another address where the Defendant/Respondent might be found.

☐ I have another address where this Defendant/Respondent might be found. It is:

Street Address: _____
*Street, Apt #*

City, State, ZIP: _____
*City*      *State*    *Zip*

Telephone: _____ Email: _____

d. Person who will serve your documents on this Defendant/Respondent:

☐ Sheriff in Illinois ☑ Special process server ☐ Licensed private detective

☐ Sheriff outside Illinois: _____
*County & State*

## PLAINTIFF/PETITIONER INFORMATION:

*Enter your information below.*

Name <u>Archer Western Contractors, LLC</u>
     *First, Middle and Last Name*

Registered Agent's name, if any <u>Peter Glimco</u>
       *First, Middle and Last Name*

Street Address <u>929 W Adams Street</u>
     *Street, Apt #*

City, State, ZIP: <u>Chicago, Illinois 60607</u>
     *City*      *State*    *Zip*

Telephone: <u>(312) 626-1888</u>    Email: <u>dg@glgchicago.com</u>

Be sure to **check your email every day** so you do not miss important information, court dates, or documents from other parties.

**STOP** The Circuit Clerk and officer or process server will fill in this section.

**To be filled in by the Circuit Clerk:**

Witness this Date: _____      *Seal of Court*

Clerk of the Court: _____

**To be filled in by an officer or process server:**

Date of Service: _____

*Fill in the date above and give this copy of the Summons to the person served.*

**Note to officer or process server:**

◎ If **1** is checked, this is a 30-day *Summons* and must be served within 30 days of the witness date.

◎ If **2** is checked, this is a date certain *Summons* and must be served at least 21 days before the court date, unless 3b is checked yes.

    ▪ If **2** is checked **and 3b** is checked yes, the *Summons* must be served at least 3 days before the court date.

◎ Fill in the date above and give this copy of the *Summons* to the person served.

◎ You must also complete the attached *Proof of Service* form and file it with the court or return it to the Plaintiff.



Case Number 2026CH05725

# WHAT'S NEXT

## NEXT STEPS FOR PERSON FILLING OUT THIS FORM:

When you file a lawsuit, you must notify the person or business you are suing of the court case by having the *Summons* and Complaint or Petition delivered to them. This is called "serving" them.

File your *Summons* and Complaint or Petition with the Circuit Clerk in the county where your court case should be filed. The Circuit Clerk will "issue" the *Summons* by putting a court seal on the form.

Have the sheriff or a private process server serve the *Summons* and a copy of the Complaint or Petition on the Defendant/Respondent. You cannot serve the *Summons* yourself.



| Learn more about each step in the process and how to file in the instructions: ilcourts.info/how-to-summons. |
|---|



## NEXT STEPS FOR PERSON RECEIVING THIS DOCUMENT:

**You have been sued:**
- Read all documents attached to this *Summons*.
- All documents referred to in this *Summons* can be found at ilcourts.info/forms. Other documents may be available from your local Circuit Court Clerk's office or website.
- You may be charged filing fees, but if you cannot pay them, you can file an *Application for Waiver of Court Fees (Civil)*.
- When you go to court, it is possible that the court will allow you to attend the first court date in this case in-person or remotely by video or phone. Contact the Circuit Court Clerk's office or visit the Court's website to find out whether this is possible and, if so, how to do this.

**If Section 1 on page 1 of this *Summons* is checked (30-day summons):**
- You **must** file official documents called an *Appearance* and an *Answer/Response* with the court within 30 days of the date you were served with this *Summons*.
- If you do not file an *Appearance* and *Answer/Response* on time, the judge may decide the case without hearing from you. This is called "default." As a result, you could lose the case.
- After you fill out the necessary documents, you need to electronically file (e-file) them with the court. To e-file, you must create an account with an e-filing service provider. For more information, go to ilcourts.info/efile. If you cannot e-file, you can get an exemption that allows you to file in-person or by mail.
- You should be notified of any future court dates.

**If Section 2 on page 1 of this *Summons* is checked (date certain summons):**
- You **must** attend court on the date listed in Section 2 of this *Summons*.
- If you do not attend that court date, the judge may decide the case without hearing from you. This is called "default." As a result, you could lose the case.

**Need Help? ¿Necesita ayuda?**
- Call or text Illinois Court Help at 833-411-1121 or go to ilcourthelp.gov for information about going to court, including how to fill out and file documents.
- Llame o envíe un mensaje de texto a Illinois Court Help al 833-411-1121, o visite ilcourthelp.gov para obtener información sobre los casos de la corte y cómo completar y presentar formularios.
- You can also get free legal information and legal referrals at illinoislegalaid.org.
- If there are any words or terms that you do not understand, please **visit Illinois Legal Aid Online** at ilao.info/glossary. You may also find more information, resources, and the location of your local legal self-help center at: ilao.info/lshc-directory.

*Case Number* 2026CH05725

# PROOF OF SERVICE OF SUMMONS AND COMPLAINT/PETITION

IN THE STATE OF ILLINOIS, CIRCUIT COURT

☐ **Alias Summons**

*Check if this is not the 1ˢᵗ Summons issued for this Defendant/Respondent.*

**COUNTY:** Cook

*County Where You Are Filing the Case*

*Enter the case information as it appears on your other court documents.*

**PLAINTIFF/PETITIONER OR IN RE:** Archer Western Contractors, LLC

*Who started the case.*          *First, Middle, and Last Name, or Business Name*

**DEFENDANTS/RESPONDENTS:** National Fire & Marine Insurance Company

*Who the case was filed against.*

*First, Middle, and Last Name, or Business Name*

2026CH05725

**Case Number**

🛑 **STOP** Do not complete the rest of the form. **The sheriff or special process server will fill in the form.** Give them one copy of this blank *Proof of Service* form for each Defendant/Respondent who will be served.

My name is _____ and I state:

*Officer/Process Server First, Middle, Last Name*

## SERVICE INFORMATION

Defendant/Respondent: _____

*First, Middle, Last Name, or Business Name*

☐ I was not able to serve the *Summons* and Complaint/Petition on the Defendant/Respondent named above.

**- or -**

☐ I served the *Summons* and Complaint/Petition on the Defendant/Respondent named above as follows:

☐ **Personally** on the Defendant/Respondent:

☐ Male ☐ Female ☐ Non-Binary Approx. Age: _____ Race: _____

On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.

Address, Unit#: _____

City, State, ZIP: _____

☐ On **someone else at the Defendant/Respondent's home** who is at least 13 years old and is a family member or lives there:

Name of person served: _____

*First, Middle, Last Name*

☐ Male ☐ Female ☐ Non-Binary Approx. Age: _____ Race: _____

On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.

Address, Unit#: _____

City, State, ZIP: _____

and by sending a copy to this Defendant/Respondent in a postage-paid, sealed envelope to the above

address on this date: _____ .

*Case Number* 2026CH05725

☐ On the **Business's agent:** _____

*First, Middle, Last Name*

☐ Male ☐ Female ☐ Non-Binary  Approx. Age: _____ Race: _____

On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.

Address, Unit#: _____

City, State, ZIP: _____

## SERVICE ATTEMPTS

I made the following attempts to serve the *Summons* and Complaint/Petition on the Defendant/Respondent:

**First Attempt:** On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.

Address, Unit#: _____

City, State, ZIP: _____
Other information about service attempt:

_____
_____
_____

**Second Attempt:** On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.

Address, Unit#: _____

City, State, ZIP: _____
Other information about service attempt:

_____
_____
_____

**Third Attempt:** On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.

Address, Unit#: _____

City, State, ZIP: _____
Other information about service attempt:

_____
_____
_____

## SIGN

I certify under 735 ILCS 5/1-109 that:

1) everything in this document is true and correct, or I have been informed or I believe it to be true and correct, and

2) I understand that making a false statement on this form is perjury and has penalties provided by law.

Your Signature */s/* _____  Print Your Name _____

You are: ☐ Sheriff in Illinois              ☐ Special process server
          ☐ Sheriff outside Illinois: _____   ☐ Licensed private detective, license number: _____
                          *County and State*                                        *License number*

**FEES:**
  Service and Return: $_____  Miles: $_____  Total: $ 0.00 _____

Hearing Date: 8/17/2026 10:30 AM
Location: Court Room 2302
Judge: Moreland, Caroline Kate

FILED
6/15/2026 5:13 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2026CH05725
Calendar, 10
38570629

**Chancery Division Civil Cover Sheet**
**General Chancery Section**

**(12/01/24) CCCH 0623**

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

Archer Western Contractors, LLC

Plaintiff

v.

National Fire & Marine Insurance Company

Defendant

Case No: **2026CH05725**

## CHANCERY DIVISION CIVIL COVER SHEET
## GENERAL CHANCERY SECTION

A Chancery Division Civil Cover Sheet – General Chancery Section shall be filed with the initial complaint in all actions filed in the General Chancery Section of Chancery Division. The information contained herein is for administrative purposes only. Please check the box in front of the appropriate category which best characterizes your action being filed.

**Only one (1) case type may be checked with this cover sheet.**

| | | |
|---|---|---|
| 0005 ☐ Administrative Review | 0017 ☐ Mandamus | |
| 0001 ☐ Class Action | 0018 ☐ Ne Exeat | |
| 0002 ☑ Declaratory Judgment | 0019 ☐ Partition | |
| 0004 ☐ Injunction | 0020 ☐ Quiet Title | |
| | 0021 ☐ Quo Warranto | |
| 0007 ☐ General Chancery | 0022 ☐ Redemption Rights | |
| 0010 ☐ Accounting | 0023 ☐ Reformation of a Contract | |
| 0011 ☐ Arbitration | 0024 ☐ Rescission of a Contract | |
| 0012 ☐ Certiorari | 0025 ☐ Specific Performance | |
| 0013 ☐ Dissolution of Corporation | 0026 ☐ Trust Construction | |
| 0014 ☐ Dissolution of Partnership | 0050 ☐ Internet Take Down Action (Compromising Images) | |
| 0015 ☐ Equitable Lien | | |
| 0016 ☐ Interpleader | ☐ Other (specify) _____ | |

● Atty. No.: 63632 _____   ○ Pro Se 99500

Atty Name: David B. Goodman

Atty. for: Archer Western Contractors, LLC

Address: 20 North Clark Street, Suite 3300

City: Chicago   State: IL

Zip: 60602

Telephone: (312) 626-1888

Primary Email: dg@glgchicago.com

Pro Se Only: ☐ I have read and agree to the terms of the Clerk's Clerk's Office Electronic Notice Policy and choose to opt in to electronic notice from the Clerk's office for this case at this email address:

Email: _____

**Mariyana T. Spyropoulos, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourt.org**
Page 1 of 1

Hearing Date: 8/17/2026 10:30 AM
Location: Court Room 2302
Judge: Moreland, Caroline Kate

**12-Person Jury**

For updated information about your case, including hearings, subsequent filings
and other case information, please visit our Online Case Search
and search for your case: https://casesearch.cookcountyclerkofcourt.org

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

ARCHER WESTERN CONTRACTORS,
LLC,

        Plaintiff,

        v.

NATIONAL FIRE & MARINE INSURANCE
COMPANY,

        Defendant.

Case No. **2026CH05725**

**JURY DEMANDED**

FILED
6/15/2026 5:13 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2026CH05725
Calendar, 10
38570629

## COMPLAINT

Plaintiff Archer Western Contractors, LLC ("Archer Western"), by and through its attorneys, Goodman Law Group | Chicago, and for its Complaint for Declaratory Judgment against Defendant National Fire & Marine Insurance Company ("National"), states as follows:

### NATURE OF THE CASE

1. This litigation arises from National's failure to fulfill its contractual obligation to defend its insured, Archer Western, after Archer Western timely tendered to National the defense of a lawsuit filed against The Walsh Group, d/b/a Archer Western Contractors, LLC by Zion Jacksonville, LLC ("Zion") filed in the Circuit Court, Fourth Judicial Circuit, in and for Duval County, Florida (the "Lawsuit"). After the Circuit Court stayed the Lawsuit and compelled the Zion's claims against Archer Western to arbitration, Zion commenced an arbitration against Archer Western (the "Arbitration") arising from the same underlying claims and conduct that were the subject of the Lawsuit.

2. In the Lawsuit, Zion asserted claims against the Walsh Group and Archer Western in *Zion Jacksonville, LLC v. The Walsh Group, d/b/a Archer Western Contractors, LLC et al.*, case

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

no. 16-2022-CA-006818 filed in the Circuit Court of Duval County, Florida (the "Complaint"). A true and correct copy of the Complaint is attached as **Exhibit 1**.

3.       Zion subsequently demanded arbitration against Archer Western in the matter that is currently pending as *Zion v. Jacksonville, LLC et al. v. Archer Western Contractors, LLC,* American Arbitration Association Case No. 01-25-0003-0970 (the "Arbitration Complaint"). A true and correct of the Arbitration Complaint is attached as **Exhibit 2**.

4.       Through the Complaint and Arbitration Complaint, Zion asserted pollution claims against Archer Western arising out of the excavation and removal of fill material which Archer Western, directly and through its subcontractors, performed on property owned by Zion.

5.       The Walsh Group and Archer Western timely tendered the defense of the Lawsuit and, subsequently, of the Arbitration to National (the "Claim").

6.       National denied the Claim and has refused to reimburse Archer Western for the defense costs incurred by it, to date, in the Lawsuit and the Arbitration, and has refused to defend Archer Western in the Arbitration on a going forward basis.

7.       Walsh now seeks a declaration that National is obligated to fulfill its contractual obligations and provide a defense to Archer Western in connection with the Arbitration and to reimburse it for the defense costs Archer Western has incurred to date in connection with the Lawsuit and in the Arbitration.

## THE PARTIES

8.       Archer Western is a Delaware limited liability company with its principal place of business at 929 W. Adams St., Chicago, IL 60607.

9.       National is a Nebraska Corporation with its principal place of business located at 1314 Douglas Street, Ste. 1400, Omaha, Nebraska.

2

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

## JURISDICTION AND VENUE

10.     Jurisdiction is proper in this Court pursuant to 735 ILCS 5/2-209(a)(1), (4) and (7) because the cause of action arises from the transaction of business in Illinois; a contract to insure any person, property, or risk located within Illinois at the time of contracting; and the making or performance of any contract or promise substantially connected with Illinois.

11.     In particular, National issued a renewal Contractor's Pollution Legal Liability Insurance Policy, Policy No. 42-CPL-305322-03 (the "Policy") to The Walsh Group, Ltd. A true and correct copy of the Policy is attached as **Exhibit 3**.

12.     The Policy was issued to The Walsh Group, Ltd. at its office in Chicago, Illinois.

13.     Archer Western is a subsidiary of and affiliated with The Walsh Group, Ltd.

14.     Venue is proper pursuant to 735 ILCS 5/2-101 as some part of the transaction out of which the cause of action arose occurred in Cook County as the insurance policy at issue was entered into by The Walsh Group, Ltd. and Archer Western in Cook County, Illinois.

## GENERAL ALLEGATIONS

### A. The Policy

15.     The Policy was effective beginning June 1, 2020 and running through June 1, 2021.

16.     Archer Western is a Named Insured under the Policy including pursuant to an Additional Named Insured Endorsement to the Policy.

17.     Through the Policy, National agreed to cover "'property damage' or 'clean-up costs' because of 'environmental damage' that result from an 'occurrence' of 'pollution' caused by 'covered operations.'"

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

18.     The Policy defines "Property damage" as "[p]hysical injury to or destruction of tangible property of parties other than the insured, including the resulting loss of use and diminution in value thereof."

19.     "Environmental damage" is defined as "physical damage to soil, surface water or groundwater, atmosphere, structures or plant or animal life caused by 'pollution' and giving rise to 'clean-up costs.'"

20.     "Occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general or harmful conditions."

21.     "Pollution" is defined in relevant part as "[t]he discharge, emission, dispersal, seepage, migration, release or escape of 'pollutants.'"

22.     "Pollutants" is defined as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, electromagnetic fields, 'low level radioactive waste', silt and sediments, 'biological matter' and waste. Waste includes medical, infectious and pathological waste, as well as, materials to be recycled, reconditioned, or reclaimed."

23.     "Covered operations" is defined in relevant part as "[t]hose activities performed by the 'named insured' or on the 'named insured's' behalf for a third party for a fee at a job site[.]"

**B. The Project and Site**

24.     In late 2016, Archer Western entered into a contract with the Florida Department of Transportation ("FDOT") to construct FDOT's North Interchange Operational Improvements Project ("North I Project"). Complaint, ¶ 11; Arbitration Complaint, ¶ 25.

25.     In support of its work on the North I Project, on or about February 6, 2017, Archer Western entered into another contract with Zion (the "Purchase Order") pursuant to which Archer

Western would excavate an estimated 850,000 cubic yards of A-3 grade Select-Fill material from a plot of undeveloped land owned by Zion (the "Zion Property"). Complaint, ¶¶ 37-38; Arbitration Complaint, ¶¶ 31-32.

26.     Archer Western's excavation of fill material was to terminate approximately three feet above the normal level of groundwater on the Zion Property. Complaint, ¶ 37; Arbitration Complaint, ¶ 33.

27.     Archer Western engaged several commercial trucking companies as subcontractors to haul construction materials in connection with the North I Project. Complaint, ¶ 13; Arbitration Complaint, ¶ 47.

C.      **The Underlying Claim**

28.     On or about December 15, 2020, Zion alleges that dump trucks with the insignia and USDOT number of Florida Roads, an Archer Western subcontractor on the North I Project, hauled a dark colored, sludge-like material and dumped it on part of the Zion Property referred to as Phase VI. Complaint, ¶¶ 67-69; Arbitration Complaint, ¶¶ 61-62.

29.     Zion further alleges that a pit was excavated below the level permitted by the Purchase Order on the Zion Property, breaching the water table, and it also alleges that construction excavators deposited and spread the sludge-like material in and about the pit. Complaint, ¶¶ 70-71; Arbitration Complaint, ¶ 63.

30.     A subsequent geotechnical report commissioned by Zion allegedly concluded that the sludge-like material "is not considered suitable for use as structural fill nor has the potential to be blended to form a suitable soil." Complaint, ¶¶ 72-73; Arbitration Complaint, ¶¶ 65-66.

31.     Zion alleges that Archer Western pumped water from the pit at which it had breached the water table into an adjacent wetland on the Zion Property in order to remove the sludge-like material. Complaint, ¶¶ 74-75; Arbitration Complaint, ¶ 67

5

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

32. Zion further alleges the dumping which occurred in Phase VI was due to the actions of a rogue employee. Complaint, ¶¶ 80-82; Arbitration Complaint, ¶¶ 70-72.

33. Zion alleges that sludge-like material, similar to that which was deposited in Phase VI, and other construction debris was also deposited in Phases I, II, III, IV, and V. Complaint, ¶¶ 84-85, 90-94; Arbitration Complaint, ¶¶ 73-74.

34. Archer Western denied having any knowledge that sludge like material had been deposited in Phases I, II, III, IV, or V of the Zion Property.

**D.     National's Improper Denial of the Claim**

35. Zion filed the Complaint on November 29, 2022 alleging claims against The Walsh Group, d/b/a Archer Western Contractors, LLC for violation of Florida Litter Law, § 403.413; Trespass; Organized Fraud; Gross Negligence; Breach of Contract; Unjust Enrichment; and Declaratory Judgment.

36. Archer tendered its defense of the Claim to National on December 7, 2022 of the claims asserted against it by Zion.

37. On February 27, 2023, National denied the Claim.

38. Zion also sought relief through arbitration and submitted the Arbitration Complaint as part of an American Arbitration Association proceeding on June 27, 2025, alleging claims for violation of Florida Litter Law, § 403.413; Trespass; Organized Fraud; Gross Negligence; Breach of Contract; Unjust Enrichment; and Punitive Damages against Archer Western.

39. To date, National has refused to provide a defense to Archer Western in connection with the Claim and has declined to reimburse Archer Western for the defense costs it has incurred in defense of the Claim.

40. Archer Western has incurred defense costs that exceed the Self-Insured Retention identified in the Policy.

6

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

## COUNT I
## DECLARATORY JUDGMENT

41.     Archer Western reasserts and realleges the allegations of paragraph 1 through 40 as the allegations of this paragraph.

42.     The Claim asserted against Archer Western by Zion in the Complaint and the Arbitration Complaint are potentially within the coverage of the Policy.

43.     National has a duty to defend Archer Western for the Claims asserted in the Complaint and Arbitration Complaint because claims asserted in those pleadings include claims potentially within the Policy's coverage.

44.     Zion asserted claims against Archer Western that seek recovery for negligent conduct.

45.     Zion alleges that Archer Western negligently excavated the Zion Property deeper than permitted resulting in breach of the water table and environmental damage.

46.     Zion alleges claims that Archer Western, through its subcontractors and by its own employees, discharged pollutants on property owned by Zion causing environmental damage to that property.

47.     Zion alleges that the actions of a rogue former Archer Western employee resulted in environmental damage to Zion's property.

48.     Zion alleges that Archer Western's conduct caused sludge-like material, which is unsuitable for use as structural fill, to be deposited on the Zion Property resulting in environmental damage.

49.     The sludge-like material that Zion alleges that the actions by Archer Western, its subcontractors, or its rogue former employee caused to contaminate the Zion Property constitutes "property damage" under the meaning of the Policy because it allegedly alters the characteristics

7

of the Zion Property such that it no longer possesses the same characteristics it had prior to the dumping of sludge-like material.

50. The dumping of soil, as alleged in the Arbitration Complaint is an "occurrence" as the damage allegedly resulting from the actions alleged by Zion was unforeseen by Archer Western. In particular, Zion does not allege that the actions on which its claims against Archer Western rest were undertaken to damage Zion's property.

51. The allegedly excessive excavation which exposed ground water on the Zion Property is an "occurrence" as it is not alleged that Archer Western intended to breach the water table nor is it alleged that the damage resulting from its alleged conduct was foreseen or expected by Archer Western.

52. Furthermore, some of the alleged acts on which Zion's claims against Archer Western are predicated were performed by third-parties on behalf of Archer Western for a fee on a job site and constitute "covered operations."

53. Archer Western timely tendered the Claim to National.

54. Accordingly, National has an obligation to provide a defense to Archer Western for the Claim pursuant to the Policy.

55. National disputes the aforesaid claims by Archer Western.

56. An actual controversy exists between the parties, and pursuant to 735 ILCS § 5/2-701, this Court is empowered to declare the rights and obligations of the parties.

WHEREFORE, Archer Western asks that this Court enter an order finding that National is obligated to provide a defense to Archer Western for the Lawsuit and for the Arbitration; that National is obligated to reimburse Archer Western for the defense costs it has incurred to date

8

FILED DATE: 6/15/2026 5:13 PM 2026CH05725

excess of any potentially applicable Self-Insured Retention in connection with the Lawsuit and Arbitration; and for such other and further relief as this Court deems just and proper.

**JURY DEMANDED**

Dated: June 15, 2026

Respectfully submitted,

ARCHER WESTERN CONTRACTORS, LLC

By: /s/ David B. Goodman
    One of its attorneys

David B. Goodman – dg@glgchicago.com
Kalli K. Nies – kn@glgchicago.com
Michael J. Hutcherson – mh@glgchicago.com
Goodman Law Group | Chicago
20 North Clark Street, Suite 3300
Chicago, Illinois 60602
Tel: (312) 626-1888
Firm No. 63632

9

Hearing Date: 8/17/2026 10:30 AM
Location: Court Room 2302
Judge: Moreland, Caroline Kate

FILED
6/15/2026 5:13 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2026CH05725
Calendar, 10
38570629

# EXHIBIT 1

16-2022-CA-006818-XXXX-MA Div: CV-E

Filing # 162039651 E-Filed 11/29/2022 05:01:37 PM

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

IN THE CIRCUIT COURT, FOURTH JUDICIAL CIRCUIT, IN AND FOR DUVAL COUNTY, FLORIDA

CASE NO:
DIVISION:

ZION JACKSONVILLE, LLC, a Delaware limited liability company,

       Plaintiff,

v.

THE WALSH GROUP, d/b/a ARCHER WESTERN CONTRACTORS, LLC, a Delaware limited liability company; FLORIDA ROADS TRUCKING, LLC, a Florida limited liability company; GEC TRUCKING & CONSTRUCTION, INC., f/k/a GEC TRUCKING, INC., a Florida corporation; CAPPS LAND MANAGEMENT AND TRUCKING, INC., a Florida corporation; JASON'S HAULING, INC., a Florida corporation; MURUGAN TRUCKING & EXCAVATING, INC., a Florida corporation,

       Defendants.

_____/

## COMPLAINT

Plaintiff, ZION JACKSONVILLE, LLC ("Zion"), by and through undersigned counsel, sues Defendants THE WALSH GROUP, d/b/a ARCHER WESTERN CONTRACTORS, LLC, a Delaware limited liability company ("Archer Western"); FLORIDA ROADS TRUCKING, LLC, a Florida limited liability company, ("Florida Roads"); CAPPS LAND MANAGEMENT AND TRUCKING, INC., a Florida corporation ("Capps"); GEC TRUCKING & CONSTRUCTION, INC., f/k/a GEC TRUCKING, INC., a Florida corporation ("GEC"); JASON'S HAULING, INC.,

ACCEPTED: DUVAL COUNTY, JODY PHILLIPS, CLERK, 11/30/2022 03:12:38 PM

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

a Florida corporation ("JHI"); and MURUGAN TRUCKING & EXCAVATING, INC., a Florida corporation ("Murugan") (collectively, the "Defendants"), and alleges as follows:

## SUMMARY OF LAWSUIT

*This lawsuit arises from a violation of "Florida Litter Law" §403.413, Florida Statutes, concerning the intentional deceptive dumping and concealment practices of both a commercial contractor and several commercial trucking companies engaged in the construction of the I-95 North Interchange Operational Improvements Project under a $176.8 Million Design-Build Contract with the State of Florida, Department of Transportation.*

*Although having a Purchase Order Contract to excavate and remove approximately 850,000 cubic yards of high-quality fine sand to an elevation of EL + 10.0 with the landowner of a 913-acre tract of land situated between the Broward River and Dunn Creek along the St. Johns River, Duval County, it is alleged that the contractor and related trucking companies deceptively used the property without consent of the landowner to dump imported, unsuitable, non-native fill material and construction debris from existing, half-century old stormwater ponds associated with the demolition of both the I-95/I-295 and U.S. 17 (Main Street)/I-295 interchanges. The highest and best use of the 913-acre tract is for the development of a master-planned industrial intermodal park or "superport." It is alleged that the imported materials dumped and buried on the property result in a stigmatization concerning the property's subgrade soil profile which is of significant importance to potential purchasers or joint venture partners.*

*In violating Florida's Litter Law, the landowner alleges that the contractor and trucking companies employed what was a legitimate purpose for being present upon and using their private property as a "front" or "cover" for what was an illegitimate purpose in importing pond-bottom material and burying it so that it would remain hidden. Both the contractor and the trucking*

2

*companies acted under commercial purpose and for their own economic gain. The landowner alleges such intentional deceptive dumping and concealment practice stigmatizes the property or makes the use of the property uncertain so as to cause damages.*

*The lawsuit sets forth claims for relief pursuant to the Florida Litter Law, §403.413, Florida Statutes, violation of private property rights sounding in trespass, organized fraud, gross negligence, breach of contract, and unjust enrichment. It further seeks declaratory relief from this Court, in light of the particular facts and circumstances of this case, so as not to have the terms and provisions of the commercial contract between the contractor and landowner apply to all claims or controversies between the parties arising from the ultra vires conduct of the contractor which was entirely removed from the parties' contemplations at the time they entered into their contract. This is particularly the case as it relates to a unilateral right of the offending party to elect arbitration and decide its rules. The landowner alleges that such extension of the terms and conditions of the parties' commercial contract is unjust and, further, that such extension of the terms and conditions thwarts public policy, circumvents Legislative intent, and rewards deception.*

## JURISDICTION AND VENUE

1. This is an action for damages that exceeds $30,000.00, exclusive of interest, costs, and attorney fees.

2. This action concerns or otherwise relates to a 913.043-acre property that is located in Jacksonville, Duval County, Florida.

3. At all material times, all named parties resided and/or conducted business in Jacksonville, Duval County, Florida.

3

4. Jurisdiction and venue are proper in Jacksonville, Duval County, Florida given that each cause of action arose and/or accrued in Duval County and the aforementioned 913.043-acre property is located in Duval County.

## PARTIES

5. Plaintiff Zion is a multi-generational, family-owned, foreign limited liability company with a place of business located in Duval County, Florida and is engaged in business activity in Jacksonville, Duval County, Florida.

6. More particularly, Plaintiff Zion owns as 913.043-acre property located in Duval County, Florida situated between the Broward River and Dunn Creek along the St. Johns River ("Zion Property").

7. The Zion Property was acquired by predecessor company, also family-owned, in and about 1983. Until recently, the property has been held for investment in silviculture by the Zion family for nearly forty years awaiting development based-upon its intermodal characteristics (highway, rail, deep-water port). It is one of the last available properties on the St. Johns River with potential for development as a "superport."

8. Defendant The Walsh Group is also a multi-generational, family-owned company and is made-up of three divisions respectively d/b/a Walsh Construction, Archer Western, and Walsh Canada.

9. Defendant Archer Western, one of The Walsh Group's three divisions, is, itself, a foreign limited liability company with a regional office and place of business in Tampa, Florida and is engaged in and doing business in Jacksonville, Duval County, Florida.

FILED DATE: 6/15/2026 5:13 PM 2026CH05725

4

FILED DATE: 6/15/2026 5:13 PM    2026CH05725

10. Defendant Archer Western is a commercial contractor providing construction services for a broad range of project types, including civil, transportation, water treatment, and industrial projects for both the public and private sector clients.

11. On or about June 23, 2016, Archer Western and the design engineering firm Reynolds, Smith & Hill, Inc. ("RS&H") entered into a "Design-Build Contract" (Contract No. E2U46) with the State of Florida, Department of Transportation ("FDOT") to construct FDOT's North Interchange Operational Improvements Project ("North I Project") for $176.8 million.

12. FDOT's North I Project contemplated both the demolition and subsequent reconstruction of the I-95/I-295 and U.S. 17 (Main Street)/I-295 interchanges.

13. As the contractor for the North I Project, Defendant Archer Western engaged several commercial trucking companies, collectively "Trucking Companies," identified below, to provide construction services including the hauling of construction materials and debris.

14. Defendant Florida Roads is a Florida limited liability company with a place of business located in Duval County, Florida and is engaged in business activity in Jacksonville, Duval County, Florida.

15. Defendant Florida Roads is a contractor providing development and construction services, including hauling construction materials and debris.

16. Defendant Capps is a Florida corporation with a place of business located in Duval County, Florida and is engaged in business activity in Jacksonville, Duval County, Florida.

17. Defendant Capps is a contractor providing development and construction services, including hauling construction materials and debris.

18. Defendant GEC is a Florida corporation with a place of business located in Duval County, Florida and is engaged in business activity in Jacksonville, Duval County, Florida.

5

FILED DATE: 6/15/2026 5:13 PM 2026CH05725

19.     Defendant GEC is a contractor providing development and construction services, including hauling construction materials and debris.

20.     Defendant JHI is a Florida corporation with a place of business located in Tampa, Florida and is engaged in business activity in Jacksonville, Duval County, Florida.

21.     Defendant JHI provides construction transportation services, including hauling construction materials and debris.

22.     Defendant Murugan is a Florida corporation with a place of business located in Middleburg, Florida and is engaged in business activity in Jacksonville, Duval County, Florida.

23.     Defendant Murugan provides construction transportation services, including hauling construction materials and debris.

## GENERAL ALLEGATIONS

### The Zion Property

24.     Zion owns and has exclusive possession of the Zion Property.

25.     The Zion Property consists of approximately 913 acres of undeveloped land that is uniquely and strategically located with logistical connection to road, rail, and deep-water access to the St. Johns River.

26.     The Zion Property's road frontage includes both Zoo Parkway, also known locally as SR 105 or Hecksher Drive, and Eastport Road which are within close proximity to two nearby interstate interchanges with I-295 at Pulaski Road and Zoo Parkway/SR 105. The northern portion of the property has rail connectivity with CSX Railroad. The southern portion of the property fronts the deep-water channel of the St. Johns River. The entire property forms a peninsula with abutting waterways including the Broward River, Dunn Creek, and the St. Johns River. *See attached and incorporated* **Exhibit A** *(March 2020 Land Use Study prepared by Landtec/Prosser).*

6

27. The Zion Property is well-positioned and presently zoned for industrial development of all types, but offers the characteristics of intermodal connection and critical mass that other competing properties lack.

28. Ultimately, the target market includes end-users who seek develop the largest of distribution warehouses with floor slab areas of 1,000,000 square feet or more and with high static and dynamic load bearing capacities needed for block stacking and material handling equipment operation.

29. The Zion Property is also well-known in the marketplace – as noted in the published strategic plan of the Jacksonville Port Authority ("Jaxport") – that the property is one of the last remaining undeveloped properties of its size with deep-water access to the St. Johns River having both master-planned industrial intermodal park and "superport" potential.

30. While the highest and best use of the property is for a master-planned industrial intermodal park and "superport" potential, the property is presently put to an interim use for silviculture.

31. Another fairly rare site characteristic of the Zion Property is that its subgrade soils predominantly consist of high-quality fine sand to a significant depth. The deposits of high-quality fine sand have a consistent gray to bleached-white or gold-tan appearance that show, once vegetative cover is removed, on the surface of the land and in soil borings.

32. From a geotechnical perspective, such high-quality fine sand is desirable for construction due to its granular-size distribution, dense and uniform proportion, permeability, compressibility, and shear strength.

33. These characteristics all relate to high-quality fine sand's ability to uniformly hold heavy structural loads. Subgrade soils are considered problem soils when they are highly

7

expansive or highly compressible such as silts, clays, or organic soils that do not provide reasonable uniform support.

34. For development purposes, high-quality fine sand is considered to have a premium over all other soil types such as stone, gravel, silt, clay, or organic materials.

35. For example, high-quality fine sand is classified by the American Association of State Highway and Transportation Officials ("AASHTO") to be A-3, Select-Fill. Within AASHTO's seven classified soil groups, A-3 soil rates higher than, say, "A-1-a" soil consisting of stone fragments or gravel or "A-2-4" soil consisting of silty or clayey gravel sand.

36. The Zion Property had substantial subgrade deposits of this high-quality A-3, Select Fill above the normal groundwater table in certain interior portions of the overall 913-acre tract.

### "Purchase Order Contract" Between Zion (Seller) and Archer Western (Buyer)
Earthwork Project on the Zion Property

37. In order to advance potential development and pursue the marketing of the Zion Property for master-planned industrial intermodal park and "superport" potential, Zion entered into a "Purchase Order Contract" (Agreement No. 216063P02) with Archer Western on or about February 6, 2017 ("Purchase Order Contract"). *See attached and incorporated* **Exhibit B** *(A True and Correct Copy of the Purchase Order Contract Between Zion and Archer Western).*

38. According to the Purchase Order Contract, Zion agreed to allow Archer Western to excavate and remove for export an estimated 850,000 cubic yards of A-3, Select Fill from approximately 150-acres within the Zion Property to an elevation of no less than EL + 10.0 which, importantly, is approximately three feet above normal groundwater on the site. Following excavation, all disturbed areas were to be prepared for silviculture plantings of pine tree seedlings.

8

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

39.     According to the Purchase Order Contract, Zion designated and obtained sub-tracts of about 20-acres, m.o.l., that made up six phases of the earthwork project. Once Zion cleared the vegetative cover, this, in turn, allowed Archer Western to excavate and remove the A-3, Select Fill. *See Figure 1 (Aerial Photograph Depicting Earthwork Phases I-VI).*

**Zion Property**
**Earthwork Phases I-VI**



Phase I
Phase II
Phase III
Phase IV
Phase V
Phase VI

40.     The 20-acre sub-tracts selected for the earthwork project were centrally located and had the highest elevations within the Zion Property having substantial subgrade deposits of A-3, Select Fill.

41.     Importantly, the Purchase Order Contract only authorized Archer Western to excavate and remove A-3, Select Fill from the Zion Property, but did not authorize Archer Western to bring in any other type of materials whatsoever into the Zion Property.

9

42. By clearing the former vegetative cover and creating a level topography with expanded silviculture plantings, it was anticipated that the property's site characteristics would be better "showcased" to potential buyers or joint venture partners.

43. Moreover, Zion would also receive market-based compensation for exported A-3, Select Fill removed by Archer Western for use in FDOT's North I Project.

44. At the completion of each of the six phases, the parties agreed to rely upon topographic surveys shot by Arc Survey & Mapping, Inc. using before and after excavation to "true-up" the volume of fill material that Archer Western was obligated to pay for.

45. Arc Survey & Mapping, Inc. used both traditional surveying as well as emerging innovative technologies such as aerial drone georeferenced photogrammetric surveys, terrestrial laser scanning surveys, and multibeam swath depth surveys to confirm topographic elevations.

46. According to the Purchase Order Contract, the A-3, Select Fill was priced at $5.50/CY, for an estimated total contract price of $4,675,000 over the duration of the multi-phased earthwork project at the estimated 850,000 cubic yards.

<u>"Design-Build Contract" Between FDOT and Archer Western</u>
FDOT North I Project

47. Because certain FDOT specifications for highway infrastructure requires A-3, Select Fill over all other soil types, Archer Western required a nearby source from which it could import large quantities of A-3, Select Fill for the North I Project.

48. In securing the award of its $176.8 million Design-Build Contract with FDOT, Archer Western competed with two other design-build consortiums to construct the public infrastructure project.

10

FILED DATE: 6/15/2026 5:13 PM 2026CH05725

49. To advance its competitive score, Archer Western touted its "proven experience in soil remediation" by identifying past projects in which geotechnical challenges were overcome with innovative soil improvement techniques.

50. To advance its competitive position, Archer Western based its technical proposal and estimated project bid price, in part, on reducing the volume of fill material exported from the FDOT project site.

51. In so doing, instead of exporting fill material away from FDOT's project, Archer Western represented it would excavate and re-use fill material from the existing stormwater ponds of both the I-95/I-295 and U.S. 17 (Main Street)/I-295 interchanges within FDOT's project.

52. By including this in its technical proposal and estimated project bid price, Archer Western repeatedly referred to the North I Project as being an "import project" rather than an "export project."

<u>Geotechnical Analysis</u>

53. Prior to Archer Western excavating and removing fill material from the Zion Property, the FDOT required that extensive geotechnical analyses, including over 100 test borings, to ensure that the fill material from the Zion Property was of sufficient quality for use on FDOT's project.

54. The pre-excavation test borings on the Zion Property showed a predominance of A-3, Select Fill material for elevations both above and below EL + 10.0.

55. Prior to commencing construction of the North I Project, FDOT also required extensive geotechnical analyses, including test borings, be performed on the existing stormwater ponds associated with both the I-95/I-295 and U.S. 17 (Main Street)/I-295 interchanges.

11

FILED DATE: 6/15/2026 5:13 PM 2026CH05725

56. Archer Western received the results of the geotechnical analysis prior to preparing its technical proposal and bid price for the project.

57. During the course of the North I Project, Archer Western's geotechnical engineering consultant, Universal Engineering Services ("UES"), also performed its own geotechnical analysis, including test borings, that identified soil types within the existing stormwater ponds associated with both the I-95/I-295 and U.S. 17 (Main Street)/I-295 interchanges.

58. UES concluded that some of the fill material in the existing stormwater ponds could potentially be used for the North I Project as suitable for construction *if and only if* a variety of methods or techniques to surcharge and monitor any soil settlement were implemented; however, without application of such methods or techniques the fill material originating from the existing stormwater ponds would be *unsuitable* for construction within the North I Project.

<u>Timelines Between Projects</u>

59. Archer Western commenced construction of the North I Project on July 22, 2016.

60. As of the date of the filing of this Complaint, the North I Project is now scheduled for completion in Spring 2024.

61. The earthwork project on the Zion Property, involving both the excavation and removal of fill material, proceeded concurrently with the North I Project as follows:

12

FILED DATE: 6/15/2026 5:13 PM   2026CH05725



## ARCHER WESTERN FILL PROJECT

- PHASE I    -    Apr. 2017 – Jan. 2018
- PHASE II   -    Feb. 2018 – Oct. 2018
- PHASE III  -    Oct. 2018 – Apr. 2019
- PHASE IV   -    Apr. 2019 – Feb. 2020
- PHASE V    -    Feb. 2020 – Oct. 2020
- PHASE VI   -    Oct. 2020 – Incomplete

Dates Approximate Per ES Leasing Truck Count

62.     Consistent with the foregoing, the six sub-tracts associated with the earthwork project on the Zion Property were designated as Phase I, Phase II, Phase III, Phase IV, Phase V, and Phase VI respectively.

### Master-Planning and Marketing of the Zion Property

63.     In order to advance the master planning and marketing of the Zion Property, Zion vetted and engaged a team of highly reputable and experienced land developers, land planners, engineers, and real estate appraisers.

64.     While preparing to commence both planning and marketing efforts, the consortium's primary recommendation was for Zion to begin master environmental and stormwater permitting for the entirety of the site once the earthwork project was completed by Archer Western.

65.     Timing was of the essence in relation to the economic and market conditions relating to both the property's master-planned industrial intermodal park and "superport" potential.

13

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

66.     The real estate market for master-planned industrial intermodal park, particularly, has been vibrant and strong in both 2021 and 2022.

### Discovery of Intentional Deceptive Dumping and Concealment Practices

67.     On or about December 15, 2020, a member of the Zion family was visiting the Zion Property and observed numerous dump trucks hauling mass quantities of what appeared to be a dark-colored, sludge-like material and dumping the material on Phase VI.

68.     The dump trucks had insignia and USDOT numbers belonging to Florida Roads, one of the Trucking Companies working on FDOT's North I Project.

69.     The Zion family member took a series of photographs, some of which appear as follows:



FILED DATE: 6/15/2026 5:13 PM   2026CH05725





70.     The Zion family member further observed that an enormous pit had been excavated on Phase VI, apparently below the water table, and that construction excavators were being operated so as to deposit and spread the dark-colored, sludge-like material in and about the pit.

71.     The Zion family member observed that the construction equipment being operated so as to deposit and spread the dark-colored, sludge-like material in and about the pit had insignia belonging to Archer Western.

FILED DATE: 6/15/2026 5:13 PM   2026CH05725



72. Later that week, on December 21, 2020, Zion retained UES to perform a geotechnical analysis on the dark-colored, sludge-like material deposited and spread in and about the pit area.

16

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

73. Subsequently, UES issued a report confirming that the "imported material is not considered suitable for use as structural fill nor has the potential to be blended to form a suitable soil."

74. After confronting Archer Western with the Zion family member's discovery, Archer Western — acting without notice, approval, or authority from Zion — began pumping the water from the pit it had excavated into an adjacent wetland on the Zion Property.

75. Later, after further questioning from Zion, Archer Western explained to Zion that in order to remove the imported, non-native, unsuitable fill material from the Zion Property the pit required further dewatering.

76. Consequently, Archer Western sought permission and authorization from Zion to pump vast quantities of water into wetland areas within the Zion Property outside of Phase VI.

77. Archer Western represented to Zion that such action would not require any approvals or permit from any governmental authorities.

78. Upon further investigation and research with retained consultants, Zion declined to give its permission or authorization to Archer Western to dewater the pit and further gave notice to Archer Western to cease and desist all further activities on the earthwork project on the Zion Property until further notice.

79. Such further investigation and research including taking drone photographs, some of which appear as follows:

17

FILED DATE: 6/15/2026 5:13 PM   2026CH05725





80.     Additionally, Zion asked Archer Western if any similar importing and dumping practices occurred on Phase I, Phase II, Phase III, Phase IV, or Phase V, which had already been completed.

81.     Archer Western denied having knowledge of any similar importing and dumping practices occurring on prior Phase I, Phase II, Phase III, Phase IV, or Phase V.

82.     Archer Western confirmed that the imported, unsuitable, non-native fill material was exported from an existing stormwater pond in one of the North I Project's sub-basin and that the dumping practices on Phase VI resulted from independent rogue actions of one of Archer Western's project managers who was no longer with the company.

18

83. Nevertheless, the dumping practices observed on Phase VI raised concern with Zion and resulted in further investigation and research regarding Phase I, Phase II, Phase III, Phase IV, and Phase V.

84. Interviews with several knowledgeable sources suggested that Archer Western had engaged in similar importing and dumping practices involving over excavating and importing non-native, unsuitable fill material and construction debris to prior phases. It was suspected that the dark-colored, sludge-like material originated from the bottom of several of the old stormwater ponds within the I-95/I-295 and U.S. 17 (Main Street)/I-295 interchanges.

85. After investigating multiple sources that provide public access to satellite imagery, Zion discovered historic aerial photographs that seemed to evidence that Archer Western had not only excavated below EL + 10.0 and into the groundwater table in prior phases, but also showed significant truckloads of imported fill material with a dark soil profile that was in high contrast to gray to bleached-white or gold-tan appearance of A-3, Select Fill.

86. For example, Zion discovered the aerial photographs below which, when pieced together, show activities occurring within Phase I on or about December 2017:

19

FILED DATE: 6/15/2026 5:13 PM   2026CH05725



20

## Stigma and Uncertainty

87. While Zion's chief motivation for entering into the Purchase Order Contract with Archer Western was to advance potential development and pursue the marketing of the Zion Property for master-planned industrial intermodal park and "superport" potential and, upon completion of the earthwork project to "showcase" the property's site characteristics to potential or joint venture partners, the importing and dumping practices discovered on Phase VI and the potential that similar dumping practices may have occurred on Phase I, Phase II, Phase III, Phase IV, and Phase V resulted instead in leaving the Zion Property with negative market perception, risk, uncertainty, and/or stigma.

88. On a practical basis, considering reasonable and prudent expectations in the real estate market, Zion's efforts to develop or market the Zion Property, including advancing a master environmental and stormwater permitting on the Zion Property, were held in check and substantially impaired as a result of negative market perception, risk, uncertainty, and/or stigma.

89. Additionally, the impaired condition of Phase VI and the questions raised concerning Phase I, Phase II, Phase III, Phase IV, and Phase V, both handicapped and suspended marketing and the ability to respond to the more serious inquiries from sophisticated market participants including representatives of both potential purchasers or joint venture partners relating to the development potential of any parcels that would include portions of the Zion Property within Phase I, Phase II, Phase III, Phase IV, Phase V, and Phase VI. One of the primary areas of inquiry for such market participants is the quality of subgrade soils.

90. Initial site inspections of each of the respective Phase I, Phase II, Phase III, Phase IV, and Phase V revealed instances where debris were found at shallow surface levels including chunks of concrete or asphalt or rebar.

21

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

91.     Photographs below are representative of those taken to document the field observations occurring in and about August 2021.



92.     Having witnessed dumping activities relating to the imported, unsuitable, non-native fill material on Phase VI and then discovering historic aerial photographs that seemed to indicate that similar dumping practices may have occurred on Phase I, Phase II, Phase III, Phase IV, and Phase V, Zion established a due diligence program and protocol with its geotechnical consultant, Meskel & Associates Engineering, Inc. ("MAE"), for a pattern of test borings for each of the respective Phase I, Phase II, Phase III, Phase IV, and Phase V.

93.     Zion and Archer Western both participated in the test borings occurring in and about September 2021 with UES performing the actual test borings on behalf of Archer Western and MAE jointly observing and taking its own grab samples on behalf of Zion.

94.     To a varying extent, the test borings showed the presence of imported, non-native fill material throughout Phase I, Phase II, Phase III, Phase IV, and Phase V. Although not as egregious as what was discovered to have occurred in Phase VI, it appeared to Zion that the imported, unsuitable, non-native soil was mixed with native A-3, Select Fill resulting in creating layers or pockets of soil with more A-2-4 soil characteristics consisting of silty or clayey gravel sand. It appeared that such layers or pockets were more prevalent in Phase I and Phase V than in

22

FILED DATE: 6/15/2026 5:13 PM 2026CH05725

Phase II, Phase III, and Phase IV. These layers or pockets presented potential subgrade soil problems with respect to uniform compression and ultimate load bearing capacities.

95. Without Archer Western or any of its respective Trucking Companies admitting to or otherwise informing Zion of any similar dumping practices may have occurred on Phase I, Phase II, Phase III, Phase IV, and Phase V, Zion considered it reasonably necessary to conduct further due diligence concerning the subgrade soils within Phase I, Phase II, Phase III, Phase IV, and Phase V. Zion would not be able to represent to potential purchasers or joint venture partners what the quality of subgrade soils were on its own property if not knowing for itself whether the subgrade profile had been compromised through suspected dumping practices by Archer Western and its respective Trucking Companies.

96. Based on the test borings and shallow surface observations, Zion established both a further due diligence program and protocol with MAE for a pattern of exploratory trenching for each of the respective Phase I, Phase II, Phase III, Phase IV, Phase V, and Phase VI.

97. Zion proceeded to perform exploratory trenching in and about January 2022 with MAE performing the actual trenching on behalf of Zion.

98. The exploratory trenching further exposed, in some places, layers or seams of imported, non-native fill material and, in other places, a mixing of imported, non-native fill material with the native A-3, Select Fill.

FILED DATE: 6/15/2026 5:13 PM   2026CH05725



99.    In some places, trenching revealed pockets of more deeply buried construction debris with imported, non-native fill including concrete, asphalt, rebar, wood, tires, and metal strapping characteristic of FDOT's highway embankments.



24

FILED DATE: 6/15/2026 5:13 PM 2026CH05725



100. MAE developed a trenching map that catalogs both the location of each trench within Phase I, Phase II, Phase III, Phase IV, Phase V, and Phase VI and also the field data and measurements obtained from each exploratory trench.



25

101. The results of the exploratory trenching evidences an intention to conceal what was buried within areas that were over-excavated and then back-filled.

102. To further identify likely origin or source areas from which Archer Western imported the non-native, unsuitable fill material, Zion requested public records from FDOT concerning the North I Project.

103. Copies of certain invoices and truck tickets associated with some of the Trucking Companies were made available to Zion in response to public record requests it submitted to FDOT pursuant to Chapter 119, Florida Statutes.

104. For example, certain invoices evidence the "exporting" of loads originating from the North I Project's sub-basins to a destination synonymous with the Zion Property (like "Eastport Pit") and "importing" of loads originating from the Zion Property to a destination within the North I Project.

105. Accordingly, such "exporting" of loads from the North I Project to the Zion Property include descriptions of work like "Haul Demo Concrete/Unsuitable Material Off-Site" or descriptions of contents like "Unsuitable," "Broken Asphalt," "Clay," or "Mud." Changing direction, such "importing" of loads from the Zion Property to the North I Project include descriptions of work like "Haul Import Fill from Burrow Site at 3762 Wastport Road" or descriptions of contents like "Sand."

Change Orders

| OWNER ITEM # | Cost Code | DESCRIPTION OF WORK | WM | SUB C.O. QUANTITY |
|---|---|---|---|---|
| CO-01.01 | 31.2309.00.30.09 | Haul Onsite + Excavated Material | HR. | 5000 |
| CO-01.02 | 31.2309.00.30.09 | Hourly Trucking + Haul Material On-Site | HR. | 4645.33 |
| CO-01.03 | 02.4116.09.20.09 | Hourly Trucking-Haul Demo Concrete/Unsuitable Material Off-Site | HR. | 3951 |
| CO-01.04 | 34.7105.05.10.09 | Hourly Trucking Haul Wet Paving concrete | HR | 1500 |
| CO-01.05 | 32.3200.00.10.09 | Trucking By Load-Haul Import Fill from Burrow Site at 3762 Wastport Road | LD | 10500.74 |
| CO-01.06 | 32.1200.00.00.09 | Deliver Base (Limerock) Material from Beaver Buck's P4 | TN | 49069.37 |

26

FILED DATE: 6/15/2026 5:13 PM    2026CH05725



106. All of this, of course, is contrary to and departs from Archer Western's earlier representation to FDOT when competing for the Design-Build Contract that its project was an "import project" rather than an "export project."

107. In fact, Archer Western did not put its "proven experience in soil remediation" to work when confronted with geotechnical challenges in the North I Project and did not implement "innovative soil improvement techniques" like surcharging or monitoring any soil settlement when excavating and re-using fill material from the existing stormwater ponds associated within both the I-95/I-295 and U.S. 17 (Main Street)/I-295 interchanges.

108. Instead, Archer Western and its employees, representatives, and/or agents of Archer Western, including the Trucking Companies, dumped the imported, unsuitable, non-native fill material from the existing stormwater ponds associated with both the I-95/I-295 and U.S. 17 (Main Street)/I-295 interchanges within Phase I, Phase II, Phase III, Phase IV, Phase V, and Phase VI on the Zion Property in excavation pits below EL + 10.0 and into the groundwater table which were subsequently backfilled with native A-3, Select Fill.

109. Alternatively, Archer Western and its employees, representatives, and/or agents of Archer Western, including the Trucking Companies, dumped the imported unsuitable, non-native fill material from the existing stormwater ponds associated with both the I-95/I-295 and U.S. 17

27

(Main Street)/I-295 interchanges within Phase I, Phase II, Phase III, Phase IV, Phase V, and Phase VI on the Zion Property closer to the surface and mixing the imported, unsuitable, non-native fill material with native A-3, Select Fill which resulted in soil with more A-2-4 soil characteristics consisting of silty or clayey gravel sand.

110. In either case, after dumping the imported unsuitable, non-native fill material from the existing stormwater ponds associated with both the I-95/I-295 and U.S. 17 (Main Street)/I-295 interchanges within the Phase I, Phase II, Phase III, Phase IV, Phase V, and Phase VI of the Zion Property, Archer Western and its employees, representatives, and/or agents of Archer Western, including the Trucking Companies, dressed the top layer of soil at the surface in each phase with gray to bleached-white, native A-3, Select Fill with the intent to conceal any traces of it dumping the imported, unsuitable, non-native fill material.

111. The scope and scale of the intentional deceptive dumping and concealment practices did not result from some plan hatched by a single, rogue project manager.

112. Rather, the scope and scale of the intentional deceptive dumping and concealment practices reflect both organization and coordination between companies and those companies' employees, representatives, agents, or others within their respective control.

113. Such was the *modus operandi* of Archer Western and employees, representatives, and/or agents of Archer Western, including the Trucking Companies, over the course of its provision of contracting and construction services related to the North I Project.

114. Archer Western and employees, representatives, and/or agents of Archer Western, including the Trucking Companies, used the Zion Property for more than just the borrow of A-3, Select Fill. Archer Western and employees, representatives, and/or agents of Archer Western,

28

including the Trucking Companies, used the Zion Property as a hidden dump site for unsuitable material and construction debris from the North I Project.

115. Under such false pretense, Archer Western and employees, representatives, and/or agents of Archer Western, including the Trucking Companies, cheated FDOT and the taxpaying public when being awarded the $176.8 Million Design-Build Contract.

116. When it comes to contractors who dump building or construction materials in such an unauthorized manner, the Florida Legislature adopted the "Florida Litter Law" §403.413, Florida Statutes, to hold accountable those who dump, throw, discard, place, deposit, or dispose of building construction materials on private property without the consent of the owner and to provide relief to those whose private property is so taken advantage of by providing a means by which monies to remove or render harmless the litter, repair or restore the property damaged, or pay damages arising out of dumping litter may be recovered from the offending party.

117. Archer Western and employees, representatives, and/or agents of Archer Western, including the Trucking Companies, littered when dumping the imported unsuitable, non-native fill material from the existing stormwater ponds within the Phase I, Phase II, Phase III, Phase IV, Phase V, and Phase VI on the Zion Property to advance its commercial purpose and to seek an economic gain.

118. Archer Western and employees, representatives, and/or agents of Archer Western, including the Trucking Companies, in engaging in the aforementioned dumping practices, also acted in an intentionally fraudulent and deceptive manner toward Zion.

119. Because neither Archer Western nor its respective Trucking Companies admitted to or otherwise informed Zion of their dumping the imported, unsuitable, non-native material and debris from the North I Project within Phase I, Phase II, Phase III, Phase IV, Phase V on the Zion

29

Property, Zion lost time and suffered delay in having to proceed with due diligence programs and protocols to determine whether or not imported, unsuitable, non-native material and debris had been dumped and then buried on the Zion Property.

120. As a direct result of Archer Western and its respective Trucking Companies violating Zion's private property rights and dumping the imported, unsuitable, non-native fill material or dumping debris from the North I Project within Phase I, Phase II, Phase III, Phase IV, Phase V on the Zion Property, Zion has been frozen or held in check in being able to proceed with environmental and stormwater permitting on the entire Zion Property; handicapped and suspended Zion's efforts to both develop its master-planned industrial intermodal park and market the property to potential buyers or joint venture partners; required to expend monies for due diligence programs and protocols to determine whether or not imported, unsuitable, non-native material from the existing stormwater ponds associated with both the I-95/I-295 and U.S. 17 (Main Street)/I-295 interchanges or debris from the North I Project had been dumped and then buried on the Zion Property and, if so, to what extent; and, finally, if determining that same is economically feasible, Zion will be required to expend further monies to establish and implement a plan to remove or render harmless the litter and repair or restore the property damaged.

121. Regarding Phase VI, it appears that, as part of a plan to remove or render harmless the litter and repair or restore the property damaged, Zion will have to establish and implement a remediation plan for the removal of all of the imported, unsuitable, non-native fill materials.

122. Regarding Phase I, Phase II, Phase III, Phase IV, and Phase V, it appears that, as part of a plan to remove or render harmless the litter and repair or restore the property damaged, Zion will have to establish and implement a remediation plan which, at a minimum, will include (a) proof-rolling the entire area within each phase with heavily loaded, rubber-tired dump truck to

30

locate any soft clayey soils or pockets of debris in the near-surface soils; (b) root raking in selected areas to a depth of 12 to 18 inches to remove large pieces of debris; (c) over excavation and replacement of soil in selected areas to remove debris which are discovered to be at greater depths than the 12 to 18 inches which have been root raked; (d) compaction of the entire area within each phase with a vibratory drum roller accomplished in 12-inch lifts; (e) off-site disposal of any unsuitable fill material or debris; and, finally, (f) taking a series of quality control test borings to verify remediation results for each phase.

123. While the time and monies expended above in 2021 and 2022 due diligence programs and protocols have resolved a measure of the stigma and uncertainty introduced by Archer Western's and its respective Trucking Companies' intentional deceptive dumping and concealment practices, there remains a measure of the stigma or uncertainty associated with each respective Phase I, Phase II, Phase III, Phase IV, Phase V, and Phase VI for which the Zion Property continues to be damaged until remediation plans are established and ultimately implemented.

124. Even so, to some extent even after remediation is implemented, a comparison between FDOT's pre-earthwork test borings and MAE's post-earthwork test borings underscored the difference between the former subgrade profile in which A-3, Select Fill was predominant and the later subgrade profile where there are layers or pockets of soil with more A-2-4 soil characteristics consisting of silty or clayey gravel sand. In such manner, the appearance of the subgrade soil profile having a predominance of premium A-3, Select Fill has been diminished.

125. Without Archer Western's or its respective Trucking Companies' intentional deceptive dumping and concealment practices, Zion would have been able to "showcase" the Zion Property's uniform and consistent subgrade profile made of a predominance of A-3, Select Fill.

31

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

## Appropriateness of Zion's Claims for Relief

126.    Upon information and belief, Archer Western contracted with numerous hauling companies, including the Trucking Companies, to export the excavated fill material from the Zion Property to the North I Project.

127.    Archer Western and employees, representatives, and/or agents of Archer Western, including the Trucking Companies, were not authorized to enter to Zion Property for any purpose other than what was explicitly spelled out in the Purchase Order Contract. *See* **Exhibit B.**

128.    Archer Western and employees, representatives, and/or agents of Archer Western, including the Trucking Companies, were never authorized, by contract or otherwise, to dump imported, unsuitable, non-native fill material, or debris of any kind (collectively, "Material"), on the Zion Property.

129.    The Purchase Order Contract was for the *export* of A-3, Select Fill from the Zion Property and not for the *import* of any other type of materials whatsoever to the Zion Property.

130.    Archer Western's or its respective Trucking Companies' intentional deceptive dumping and concealment practices and other tortious conduct, were entirely outside of the consideration, contemplation, or expectation of the parties to the Purchase Order Contract.

131.    Archer Western and employees, representatives, and/or agents of Archer Western, including the Trucking Companies, acted, collectively, *ultra vires* to violate Zion's private property rights.

132.    Yet, it was the Purchase Order Contract, and the authorization to be present upon and use the Zion Property in order to remove and export A-3, Select Fill material from the Zion Property, that provided a "front" or "cover" for Archer Western and its respective Trucking Companies to use the Zion Property as a hidden dump site.

32

FILED DATE: 6/15/2026 5:13 PM    2026CH05725

133.    Zion, as the owner of private property, never gave its *consent* to Archer Western and employees, representatives, and/or agents of Archer Western, including the Trucking Companies, to dump the imported, unsuitable, non-native fill material or debris.

134.    Archer Western and employees, representatives, and/or agents of Archer Western, including the Trucking Companies, exceeded the authorization granted in the Purchase Order Contract to use the Zion Property in a completely different manner and for a completely different purpose than what was explicitly spelled out in the Purchase Order Contract.

135.    Archer Western and employees, representatives, and/or agents of Archer Western, including the Trucking Companies, violated Zion's *property rights* by trespassing on the Zion Property, exceeding the authorization granted to use the property pursuant to the Purchase Order Contract, and dumping imported, unsuitable, non-native fill material and debris from the North I Project.

136.    Archer Western and employees, representatives, and/or agents of Archer Western, including the Trucking Companies, in engaging in the aforementioned dumping and concealment practices, also acted in an intentionally *fraudulent* and *deceptive* manner toward Zion.

137.    So too, it was the Purchase Order Contract, and the authorization to be present upon and use the Zion Property in order to remove and export A-3, Select Fill material from the Zion Property, that provided a "front" or "cover" for Archer Western and its respective Trucking Companies to deceive Zion by invoking Zion's trust and reliance in what was legitimate so as not to be able to discern, until a happenstance discovery, what was illegitimate. Archer Western and employees, representatives, and/or agents of Archer Western, including the Trucking Companies, had a reason to be on the Zion Property, but exceeded such reason when committing their wrongdoing. Instead of *enhancing* the use and value of its property through performance of a

33

FILED DATE: 6/15/2026 5:13 PM    2026CH05725

contract, Zion received the *exact opposite* through Archer Western's deceptive dumping practices which were entirely outside of any of the contract's provisions.

138. Archer Western should not be permitted to use the Purchase Order Contract to sidestep the accountability imposed upon companies which dump, throw, discard, place, deposit, or dispose of building construction materials on private property without the consent of the owner intended by the Florida Legislature when adopting the "Florida Litter Law" §403.413, Florida Statutes, or negate liability for violating the property rights of a private property owner who never gave its consent to dump imported materials or debris from a government interstate highway project on its property.

139. Likewise, Archer Western should not be permitted to use the Purchase Order Contract to avoid a jury trial, and evade public scrutiny by seeking to have contractual provisions relating to the terms and conditions governing over the parties' contractual relationship apply to all claims or controversies arising between the parties even though such claims or controversies may be entirely *outside* of the contract, *ultra vires*, or completely *unexpected* when considering what were the reasonable expectations of the parties at the time of contract.

140. The extension of contractual provisions to claims and controversies, particularly as it relates to a unilateral right of the offending party to elect *arbitration* and decide its rules, in light of the particular facts and circumstances of this case, thwarts public policy, stifles the administration of justice, and rewards deception.

141. The terms and conditions of a commercial contract, specific to a particular commercial enterprise, should not give cause to circumvent the greater concerns of public policy or protections afforded to private property ownership as set forth in §403.413, Florida Statutes.

142. Zion has retained the law firms of Murphy & Anderson, P.A. and Brigham Property Rights Law Firm, PLLC, to represent it in connection with this action and has agreed to pay reasonable fees and expenses, for which Defendants are liable pursuant to applicable Florida law.

143. All conditions precedent to the bringing of this action, both legal and contractual, have been performed, excused, or waived.

## COUNT I
### Violation of Florida Statutes 403.413 (2020) (Against Archer Western)

144. Zion reasserts, realleges and incorporates by reference Paragraphs 1-143 as though set forth fully herein.

145. This is an action pursuant to the Florida Litter Law, §403.413 Florida Statutes.

146. Archer Western, through its employees, representatives, agents, or others within its control, intentionally and illegally dumped and disposed of litter and Materials on Zion's private property.

147. The amount of the litter and Materials illegally dumped on Zion's private property exceeds 500 pounds in weight or 100 cubic feet in volume and was done using commercial vehicles for commercial purposes.

148. Archer Western dumped and disposed of the litter and Materials for economic gain, including but not limited to, economic gain related to the FDOT Project.

149. Zion never granted Archer Western permission to dump or dispose of the litter and Materials on its property.

150. As a result of Archer Western's illegal dumping of litter and Materials on Zion's private property, Zion has suffered damages, including the loss of value to its property, loss of enjoyment of its property, loss of use of its property, cost of repairing or restoring its property,

35

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

attorneys' fees, experts' fees, costs, and diminution in value relating to stigma, delay damages, and lost profits resulting from Zion's inability to develop or sell the Zion Property.

WHEREFORE, Plaintiff, Zion Jacksonville, LLC, requests this Court enter judgment in its favor against Defendant, Archer Western Contractors, LLC, for all damages resulting from the violation of the Florida Litter Law, including treble damages and attorneys' fees, costs, and interest pursuant to Florida Statute §403.413, and such other relief as this Court deems just and proper.

### COUNT II
### Violation of Florida Statutes 403.413 (2020) (Against Florida Roads)

151.     Zion reasserts, realleges and incorporates by references Paragraphs 1-143 as though set forth fully herein.

152.     This is an action pursuant to the Florida Litter Law, §403.413 Florida Statutes.

153.     Florida Roads intentionally and illegally dumped and disposed of litter and Materials on Zion's private property.

154.     The amount of litter and Materials illegally dumped on Zion's private property exceeds 500 pounds in weight or 100 cubic feet in volume and was done using commercial vehicles for commercial purposes.

155.     Florida Roads dumped and disposed of the litter and Materials for economic gain.

156.     Zion never granted Florida Roads permission to dump or dispose the litter and Materials on its property.

157.     As a result of Florida Roads' illegal dumping of litter and Materials on Zion's private property, Zion has suffered damages, including the loss of value to its property, loss of enjoyment of its property, loss of use of its property, cost of repairing or restoring its property,

36

attorneys' fees, experts' fees, costs, and diminution in value relating to stigma, delay damages, and lost profits resulting from Zion's inability to develop or sell the Zion Property.

WHEREFORE, Plaintiff, Zion Jacksonville, LLC, requests this Court enter judgment in its favor against Defendant, Florida Roads Trucking, LLC, for all damages resulting from the violation of the Florida Litter Law, including treble damages and attorneys' fees, costs, and interest pursuant to Florida Statute §403.413, as well as the forfeiture of Florida Roads' trucks and equipment used as the instrumentality for the violation, and such other relief as this Court deems just and proper.

## COUNT III
### Violation of Florida Statutes 403.413 (2020) (Against GEC)

158.    Zion reasserts, realleges and incorporates by references Paragraphs 1-143 as though set forth fully herein.

159.    This is an action pursuant to the Florida Litter Law, §403.413 Florida Statutes.

160.    GEC intentionally and illegally dumped and disposed of litter and Materials on Zion's private property.

161.    The amount of litter and Materials illegally dumped on Zion's private property exceeds 500 pounds in weight or 100 cubic feet in volume and was done using commercial vehicles for commercial purposes.

162.    GEC dumped and disposed of the litter and Materials for economic gain.

163.    Zion never granted GEC permission to dump or dispose the litter and Materials on its property.

164.    As a result of GEC's illegal dumping of litter and Materials on Zion's private property, Zion has suffered damages, including the loss of value to its property, loss of enjoyment

37

of its property, loss of use of its property, cost of repairing or restoring its property, attorneys' fees, experts' fees, costs, and diminution in value relating to stigma, delay damages, and lost profits resulting from Zion's inability to develop or sell the Zion Property.

WHEREFORE, Plaintiff, Zion Jacksonville, LLC, requests this Court enter judgment in its favor against Defendant, GEC Trucking & Construction, Inc., for all damages resulting from the violation of the Florida Litter Law, including treble damages and attorneys' fees, costs, and interest pursuant to Florida Statute §403.413, as well as the forfeiture of GEC's trucks and equipment used as the instrumentality for the violation, and such other relief as this Court deems just and proper.

## COUNT IV
### Violation of Florida Statutes 403.413 (2020) (Against Capps)

165. Zion reasserts, realleges and incorporates by references Paragraphs 1-143 as though set forth fully herein.

166. This is an action pursuant to the Florida Litter Law, §403.413 Florida Statutes.

167. Capps intentionally and illegally dumped and disposed of litter and Materials on Zion's private property.

168. The amount of litter and Materials illegally dumped on Zion's private property exceeds 500 pounds in weight or 100 cubic feet in volume and was done using commercial vehicles for commercial purposes.

169. Capps dumped and disposed of the litter and Materials for economic gain.

170. Zion never granted Capps permission to dump or dispose the litter and Materials on its property.

171. As a result of Capps' illegal dumping of litter and Materials on Zion's private property, Zion has suffered damages, including the loss of value to its property, loss of enjoyment

38

of its property, loss of use of its property, cost of repairing or restoring its property, attorneys' fees, experts' fees, costs, and diminution in value relating to stigma, delay damages, and lost profits resulting from Zion's inability to develop or sell the Zion Property.

WHEREFORE, Plaintiff, Zion Jacksonville, LLC, requests this Court enter judgment in its favor against Defendant, Capps Land Management and Trucking, Inc., for all damages resulting from the violation of the Florida Litter Law, including treble damages and attorneys' fees, costs, and interest pursuant to Florida Statute §403.413, as well as the forfeiture of Capps' trucks and equipment used as the instrumentality for the violation, and such other relief as this Court deems just and proper.

## COUNT V
### Violation of Florida Statutes 403.413 (2020) (Against JHI)

172.     Zion reasserts, realleges and incorporates by references Paragraphs 1-143 as though set forth fully herein.

173.     This is an action pursuant to the Florida Litter Law, §403.413 Florida Statutes.

174.     JHI intentionally and illegally dumped and disposed of litter and Materials on Zion's private property.

175.     The amount of litter and Materials illegally dumped on Zion's private property exceeds 500 pounds in weight or 100 cubic feet in volume and was done using commercial vehicles for commercial purposes.

176.     JHI dumped and disposed of the litter and Materials for economic gain.

177.     Zion never granted JHI permission to dump or dispose the litter and Materials on its property.

39

FILED DATE: 6/15/2026 5:13 PM 2026CH05725

178. As a result of JHI's illegal dumping of litter and Materials on Zion's private property, Zion has suffered damages, including the loss of value to its property, loss of enjoyment of its property, loss of use of its property, cost of repairing or restoring its property, attorneys' fees, experts' fees, costs, and delay damages and diminution in value relating to stigma, delay damages, and lost profits resulting from Zion's inability to develop or sell the Zion Property.

WHEREFORE, Plaintiff, Zion Jacksonville, LLC, requests this Court enter judgment in its favor against Defendant, Jason's Hauling, Inc., for all damages resulting from the violation of the Florida Litter Law, including treble damages and attorneys' fees, costs, and interest pursuant to Florida Statute §403.413, as well as the forfeiture of JHI's trucks and equipment used as the instrumentality for the violation, and such other relief as this Court deems just and proper.

## COUNT VI
### Violation of Florida Statutes 403.413 (2020) (Against Murugan)

179. Zion reasserts, realleges and incorporates by references Paragraphs 1-143 as though set forth fully herein.

180. This is an action pursuant to the Florida Litter Law, §403.413 Florida Statutes.

181. Murugan intentionally and illegally dumped and disposed of litter and Materials on Zion's private property.

182. The amount of litter and Materials illegally dumped on Zion's private property exceeds 500 pounds in weight or 100 cubic feet in volume and was done using commercial vehicles for commercial purposes.

183. Murugan dumped and disposed of the litter and Materials for economic gain.

184. Zion never granted Murugan permission to dump or dispose the litter and Materials on its property.

185. As a result of Murugan's illegal dumping of litter and Materials on Zion's private property, Zion has suffered damages, including the loss of value to its property, loss of enjoyment of its property, loss of use of its property, cost of repairing or restoring its property, attorneys' fees, experts' fees, costs, and diminution in value relating to stigma, delay damages, and lost profits resulting from Zion's inability to develop or sell the Zion Property.

WHEREFORE, Plaintiff, Zion Jacksonville, LLC, requests this Court enter judgment in its favor against Defendant, Murugan Trucking & Excavating, Inc., for all damages resulting from the violation of the Florida Litter Law, including treble damages and attorneys' fees, costs, and interest pursuant to Florida Statute §403.413, as well as the forfeiture of Murugan's trucks and equipment used as the instrumentality for the violation, and such other relief as this Court deems just and proper.

## COUNT VII
### Trespass (Against Archer Western)

186. Zion reasserts, realleges and incorporates by reference Paragraphs 1-143 as though fully set forth herein.

187. At all material times, Zion was the rightful owner of the Zion Property.

188. The right and authority of Archer Western and its employees, representatives, agents, or others within its control to enter the Zion Property was limited to excavating fill material to elevation EL +10 feet.

189. On multiple occasions, Archer Western, through its employees, agents, representatives, or others within its control, intentionally entered the Zion Property for purposes that were totally unauthorized and without Zion's knowledge or consent and caused unauthorized Materials to be dumped, disposed of, and/or buried on the Zion Property.

41

FILED DATE: 6/15/2026 5:13 PM    2026CH05725

190. In addition, on multiple occasions, Archer Western, its employees, representatives, agents, or others within its control, intentionally entered the Zion Property without Zion's knowledge or consent for the unauthorized purpose of excavating areas of the Zion Property below the acceptable elevation.

191. As a result of the trespass, Zion has suffered damages, including the loss of value to its property, loss of enjoyment of its property, loss of use of its property, injury to the property, cost of repairing or restoring its property, attorneys' fees, experts' fees, costs, and diminution in value relating to stigma, delay damages, and lost profits resulting from Zion's inability to develop or sell the Zion Property.

WHEREFORE, Plaintiff, Zion Jacksonville, LLC, requests this Court enter judgment against Defendant, Archer Western Contractors, LLC, for all damages resulting from the trespass, attorneys' fees, costs, and such other relief as this Court deems just and proper. In addition, Zion respectfully requests this Court permit Plaintiff leave to amend this claim to seek punitive damages in the event record evidence is presented which would satisfy an award of such damages.

## COUNT VIII
### Trespass (Against Florida Roads)

192. Zion reasserts, realleges and incorporates by reference Paragraphs 1-143 as though fully set forth herein.

193. At all material times, Zion was the rightful owner of the Zion Property.

194. Florida Roads' right and authority to enter the Zion Property was limited to loading and removing excavated fill material from designated portions of the Zion Property.

42

195. On multiple occasions, Florida Roads intentionally entered the Zion Property for purposes that were totally unauthorized without Zion's knowledge or consent and caused unauthorized Materials to be dumped, disposed of, and/or buried on the Zion Property.

196. As a result of the trespass, Zion has suffered damages, including the loss of value to its property, loss of enjoyment of its property, loss of use of its property, injury to the property, cost of repairing or restoring its property, attorneys' fees, experts' fees, costs, and diminution in value relating to stigma, delay damages, and lost profits resulting from Zion's inability to develop or sell the Zion Property.

WHEREFORE, Plaintiff, Zion Jacksonville, LLC, requests this Court enter judgment against Defendant, Florida Roads Trucking, LLC, for all damages resulting from the trespass, attorneys' fees, costs, and such other relief as this Court deems just and proper. In addition, Zion respectfully requests this Court permit Plaintiff leave to amend this claim to seek punitive damages in the event record evidence is presented which would satisfy an award of such damages.

## COUNT IX
### Trespass (Against GEC)

197. Zion reasserts, realleges and incorporates by reference Paragraphs 1-143 as though fully set forth herein.

198. At all material times, Zion was the rightful owner of the Zion Property.

199. GEC's right and authority to enter the Zion Property was limited to loading and removing excavated fill material from designated portions of the Zion Property.

200. On multiple occasions, GEC intentionally entered the Zion Property for purposes that were totally unauthorized without Zion's knowledge or consent and caused unauthorized Materials to be dumped, disposed of, and/or buried on the Zion Property.

43

FILED DATE: 6/15/2026 5:13 PM    2026CH05725

201.     As a result of the trespass, Zion has suffered damages, including the loss of value to its property, loss of enjoyment of its property, loss of use of its property, injury to the property, cost of repairing or restoring its property, attorneys' fees, experts' fees, costs, and diminution in value relating to stigma, delay damages, and lost profits resulting from Zion's inability to develop or sell the Zion Property.

WHEREFORE, Plaintiff, Zion Jacksonville, LLC, requests this Court enter judgment against Defendant, GEC Trucking & Construction, Inc., for all damages resulting from the trespass, attorneys' fees, costs, and such other relief as this Court deems just and proper. In addition, Zion respectfully requests this Court permit Plaintiff leave to amend this claim to seek punitive damages in the event record evidence is presented which would satisfy an award of such damages.

## COUNT X
### Trespass (Against Capps)

202.     Zion reasserts, realleges and incorporates by reference Paragraphs 1-143 as though fully set forth herein.

203.     At all material times, Zion was the rightful owner of the Zion Property.

204.     Capps' right and authority to enter the Zion Property was limited to loading and removing excavated fill material from designated portions of the Zion Property.

205.     On multiple occasions, Capps intentionally entered the Zion Property for purposes that were totally unauthorized without Zion's knowledge or consent and caused unauthorized Materials to be dumped, disposed of, and/or buried on the Zion Property.

206.     As a result of the trespass, Zion has suffered damages, including the loss of value to its property, loss of enjoyment of its property, loss of use of its property, injury to the property,

44

cost of repairing or restoring its property, attorneys' fees, experts' fees, costs, and diminution in value relating to stigma, delay damages, and lost profits resulting from Zion's inability to develop or sell the Zion Property.

WHEREFORE, Plaintiff, Zion Jacksonville, LLC, requests this Court enter judgment against Defendant, Capps Land Management and Trucking, Inc., for all damages resulting from the trespass, attorneys' fees, costs, and such other relief as this Court deems just and proper. In addition, Zion respectfully requests this Court permit Plaintiff leave to amend this claim to seek punitive damages in the event record evidence is presented which would satisfy an award of such damages.

## COUNT XI
### Trespass (Against JHI)

207. Zion reasserts, realleges and incorporates by reference Paragraphs 1-143 as though fully set forth herein.

208. At all material times, Zion was the rightful owner of the Zion Property.

209. JHI's right and authority to enter the Zion Property was limited to loading and removing excavated fill material from designated portions of the Zion Property.

210. On multiple occasions, JHI intentionally entered the Zion Property for purposes that were totally unauthorized without Zion's knowledge or consent and caused unauthorized Materials to be dumped, disposed of, and/or buried on the Zion Property.

211. As a result of the trespass, Zion has suffered damages, including the loss of value to its property, loss of enjoyment of its property, loss of use of its property, injury to the property, cost of repairing or restoring its property, attorneys' fees, experts' fees, costs, and diminution in

45

value relating to stigma, delay damages, and lost profits resulting from Zion's inability to develop or sell the Zion Property.

WHEREFORE, Plaintiff, Zion Jacksonville, LLC, requests this Court enter judgment against Defendant, Jason's Hauling, Inc., for all damages resulting from the trespass, attorneys' fees, costs, and such other relief as this Court deems just and proper. In addition, Zion respectfully requests this Court permit Plaintiff leave to amend this claim to seek punitive damages in the event record evidence is presented which would satisfy an award of such damages.

## COUNT XII
### Trespass (Against Murugan)

212. Zion reasserts, realleges and incorporates by reference Paragraphs 1-143 as though fully set forth herein.

213. At all material times, Zion was the rightful owner of the Zion Property.

214. Murugan's right and authority to enter the Zion Property was limited to loading and removing excavated fill material from designated portions of the Zion Property.

215. On multiple occasions, Murugan intentionally entered the Zion Property for purposes that were totally unauthorized without Zion's knowledge or consent and caused unauthorized Materials to be dumped, disposed of, and/or buried on the Zion Property.

216. As a result of the trespass, Zion has suffered damages, including the loss of value to its property, loss of enjoyment of its property, loss of use of its property, injury to the property, cost of repairing or restoring its property, attorneys' fees, experts' fees, costs, and diminution in value relating to stigma, delay damages, and lost profits resulting from Zion's inability to develop or sell the Zion Property.

46

FILED DATE: 6/15/2026 5:13 PM 2026CH05725

WHEREFORE, Plaintiff, Zion Jacksonville, LLC, requests this Court enter judgment against Defendant, Murugan Trucking & Excavating, Inc., for all damages resulting from the trespass, attorneys' fees, costs, and such other relief as this Court deems just and proper. In addition, Zion respectfully requests this Court permit Plaintiff leave to amend this claim to seek punitive damages in the event record evidence is presented which would satisfy an award of such damages.

## COUNT XIII
### Organized Fraud (Against Archer Western)

217. Zion reasserts, realleges, and incorporates by reference Paragraphs 1-143 as though set forth fully herein.

218. This is an action for Organized Fraud pursuant to Florida Statutes, §817.034.

219. Archer Western, through its systematic, ongoing course of conduct and/or the course of conduct of its employees, representatives, agents, or others within its control for which Archer Western is vicariously liable, engaged in a scheme to defraud Zion.

220. In order to carry out its scheme to defraud Zion, Archer Western communicated through the transfer of signs, signals, writing, sounds, images, data, or intelligences, in whole or in part by mail, wire, radio, electromagnetic, photoelectronic, or photo-optical systems, with known and unknown individuals, including representatives, employees, or agents, of the Trucking Companies.

221. Through its scheme to defraud Zion, Archer Western used the Zion Property, without the knowledge or consent of Zion, as a dumping ground, and thereby obtained disposal services without paying for said services.

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

222. Upon information and belief, the aggregate value of the disposal services Archer Western obtained through its Organized Fraud is $50,000.00 or more.

223. As a result of Archer Western's scheme to defraud, Zion has suffered damages.

224. As a result of Archer Western's or its respective Trucking Companies' deceptive dumping practices, Zion did not receive from Archer Western payment for any A-3, Select Fill exported from the Zion Property which did not otherwise account for the amount of imported, non-native fill material used to backfill any over-excavated areas to elevation of EL + 10.0 feet

WHEREFORE, Plaintiff, Zion Jacksonville, LLC, requests this Court enter judgment against Defendant, Archer Western Contractors, LLC, for all damages resulting from the organized fraud, including attorneys' fees, costs, and such other relief as this Court deems just and proper.

## COUNT XIV
### Gross Negligence (Against Archer Western)

225. Zion reasserts, realleges, and incorporates by reference Paragraphs 1-143 as though set forth fully herein.

226. In addition to the obligations imposed by the terms of the contract between Archer Western and Zion, Archer Western owed a heightened duty of care to Zion because Archer Western was in actual or constructive control of the instrumentality that caused the harm and/or the person or persons who committed the unauthorized dumping and/or trespassing.

227. Archer Western breached its legal duty to Zion and failed to exercise reasonable care and acted with reckless, willful, and wanton disregard for Zion by importing and dumping non-native, unsuitable Materials and litter on the Zion Property, breaching the water table on the Zion Property, by pumping excess water into other areas within the Zion Property, and/or entering the Zion Property for those unauthorized purposes.

48

228. Archer Western knew or should have known that its willful and reckless conduct would result in the foreseeable damages to the Zion Property.

229. As a direct and proximate result of Archer Western's reckless conduct, Zion has suffered damages, including the cost of repairing and remediating the property, loss of value of its property, the loss of enjoyment of its property, the loss of use of its property, attorneys' fees, experts' fees, costs, and diminution in value relating to stigma, delay damages, and lost profits resulting from Zion's inability to develop or sell the Zion Property.

WHEREFORE, Plaintiff, Zion Jacksonville, LLC, requests this Court enter judgment against Defendant, Archer Western Contractors, LLC, for all damages resulting from the gross negligence, including attorneys' fees, costs, and such other relief as this Court deems just and proper. In addition, Zion respectfully requests this Court permit Plaintiff leave to amend this claim to seek punitive damages in the event record evidence is presented which would satisfy an award of such damages.

## COUNT XV
### Breach of Contract (Against Archer Western)

230. Zion reasserts, realleges, and incorporates by reference Paragraphs 1-143 as though set forth fully herein.

231. Zion and Archer Western entered into a contract, Agreement No. 216063P02 (the "Subject Contract"), for Archer Western to purchase fill material from Zion. *See* **Exhibit B**.

232. As more accurately stated in the terms, conditions, and specifications of the Subject Contract, Archer Western agreed to purchase approximately 850,000 cubic yards of fill material and was authorized to excavate that fill material only from designated areas and only to specified elevations.

49

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

233. Archer Western breached its contract with Plaintiff by failing to remove the fill material in accordance with the contractual provisions, including, but not limited to, by over excavating the specified phases below the elevations of EL +10.0 and by backfilling the over excavated areas with non-native and unsuitable, unauthorized Material, thereby causing damage to Zion.

234. As a direct and proximate cause of Archer Western's breach, Zion has suffered damages and will continue to suffer damages. These damages include, but are not limited to, loss of value of its property, the loss of enjoyment of its property, the loss of use of its property, the costs of retaining consultants to investigate and provide remedial recommendations, the costs to correct and/or remediate the damage/defects, and diminution in value relating to stigma, delay damages, and lost profits resulting from Zion's inability to develop or sell the Zion Property.

WHEREFORE, Plaintiff, Zion Jacksonville, LLC, requests this Court enter judgment against Defendant, Archer Western Contractors, LLC, for all damages resulting from the breach of contract, attorneys' fees, costs, and such other relief as this Court deems just and proper.

## COUNT XVI
### Unjust Enrichment (Against Archer Western)

235. Zion reasserts, realleges, and incorporates by reference Paragraphs 1-143 as though set forth fully herein.

236. This is an action, in the alternative, for unjust enrichment.

237. Zion conferred certain benefits on Archer Western, specifically, the benefit of the use of the Zion Property to obtain fill material based on specifications agreed upon by both parties.

238. Archer Western was authorized to excavate fill material only from designated areas and only to specified elevations.

50

239. Archer Western voluntarily accepted and retained this benefit.

240. Archer Western was supposed to provide a post-excavation survey to Zion after excavating each of the six phases. The purpose of the surveys was to verify the amount of fill removed from the site and to calculate payments owed to Zion.

241. Archer Western over excavated areas at the Zion Property and obtained fill material from Zion below the elevations of EL +10.0, which was contrary to the specifications agreed upon by both parties.

242. Archer Western filled in over excavated areas with foreign Materials and failed to pay Zion for all of the fill material removed from the Zion Property.

243. Archer Western obtained and used the fill material taken from Zion's property for its economic gains associated with the Project.

244. Archer Western has also been unjustly enriched to the extent that it received compensation from FDOT (via the taxpayers) to dispose of Project Materials at official disposal sites, which it would have to pay to do, and then avoided paying the disposal fees by dumping the Materials on the Zion Property without compensating Zion for such use.

245. Zion and the Zion Property have been damaged by Archer Western's actions and omissions.

246. The circumstances are such that it is inequitable for Archer Western to retain the benefits conferred by Zion without paying the value thereof to Zion.

WHEREFORE, Plaintiff, Zion Jacksonville, LLC, requests this Court enter judgment against Defendant, Archer Western Contractors, LLC, for all damages resulting from the unjust enrichment, and such other relief as this Court deems just and proper.

51

FILED DATE: 6/15/2026 5:13 PM    2026CH05725

## COUNT XVII
### Declaratory Relief Regarding Arbitrability of Zion's Claims Against Archer Western

247.    Zion reasserts, realleges, and incorporates by reference Paragraphs 1-143, 186-191, and 217-246 as though set forth fully herein.

248.    The Subject Contract between Zion and Archer Western contains an arbitration provision, which states in pertinent part: "Any controversy or claim of Buyer [Archer Western] against Seller [Zion] or Seller against Buyer or its surety shall, at the option of Buyer or Buyer's surety and at any time, be resolved by arbitration pursuant to rules determined by the Buyer [Archer Western]." *See* **Exhibit B, Article 11.2**.

249.    Zion never anticipated, contemplated, or expected that Archer Western or its employees, representatives, agents, or others within its control, would act outside the scope of the contract to unjustly enrich itself, violate its private property rights, commit intentional torts, including, but not limited to, violations of Florida's Litter Law (Florida Statutes §403.413), Trespass, Organized Fraud, and/or Gross Negligence (collectively, "Unanticipated Actions").

250.    The contract between Zion and Archer Western never contemplated that Archer Western or its employees, representatives, agents, or others within its control, would take such Unanticipated Actions.

251.    Zion never intended to agree to arbitrate any claims arising from or relating to such Unanticipated Actions or non-contractual claims

252.    The Unanticipated Actions, private property rights violations, and intentional torts by Archer Western or its employees, representatives, agents, or others within its control committed against Zion are independent of, and do not implicate the duties of Archer Western under the Subject Contract.

52

253. The duties that Archer Western its employees, representatives, agents, or others within its control violated in the commission of the Unanticipated Actions, private property rights violations, and intentional torts are general duties that do not emanate from the parties' contractual relationship.

254. This Court has jurisdiction to declare rights, status, and other equitable or legal resolutions between the parties.

255. As a result of the facts described in the foregoing paragraphs, an actual, substantial controversy of sufficient immediacy exists between Zion and Archer Western, who have adverse legal interests, as to whether Zion's claims against Archer Western are arbitrable.

256. Specifically, Zion is in doubt as to an arbitrator's jurisdiction to determine whether Archer Western or its employees, representatives, agents, or others within its control committed acts to unjustly enrich Archer Western, violated Zion's private property rights, and/or committed intentional torts against Zion, including, violations of Florida's Litter Law (Florida Statutes §403.413), Trespass, Organized Fraud, and/or Gross Negligence.

257. As Zion did not anticipate or contemplate Archer Western's conduct, Zion did not intend and agree to arbitrate the private property rights violations and intentional torts committed by, or at the direction of, Archer Western.

258. Archer's Western's conduct breaches duties that do not arise out of the Subject Contract between the parties, but, rather, are general duties that are separate and apart from the Subject Contract. Thus, the claims that flows from the violations of those general duties are not arbitrable.

259. Zion seeks a declaratory judgment under Fla. Stat. §86.011 *et seq.* declaring that the claim for Unjust Enrichment, private property rights violations, and the intentional tort claims,

53

including violations of Florida's Litter Law (Florida Statutes §403.413), Trespass, Organized Fraud, and/or Gross Negligence that Zion has asserted against Archer Western are not arbitrable issues, and that the arbitrator does not have jurisdiction to hear this matter.

260.    Zion also seeks declaratory judgment under Fla. Stat. §86.011 *et seq.* declaring that the arbitration provision contained in the Subject Contract is unenforceable as a matter of public policy because it gives one party, Archer Western, who was the drafter of the Subject Contract, sole and absolute discretion to elect arbitration and to determine what arbitration rules will apply.

WHEREFORE, Zion requests that this Court declare that the arbitration provision is unenforceable and that the claims asserted by Zion are not arbitrable issues, as well as any other relief this Court deems just and proper.

## COUNT XVIII
### Declaratory Relief Regarding the Parameters of Arbitration

261.    Zion reasserts, realleges, and incorporates by reference Paragraphs 1-143, 186-191, and 217-260, as though fully set forth herein.

262.    This Court has jurisdiction to declare rights, status, and other equitable or legal resolutions between the parties.

263.    As a result of the facts described in the foregoing paragraphs, an actual, substantial controversy of sufficient immediacy exists between Zion and Archer Western, who have adverse legal interests, as to whether Zion's claims against Archer Western are arbitrable and, if so, what rules and parameters apply.

264.    Should the Court determine that the arbitration provision is enforceable and that there is an arbitrable dispute between the parties, Zion is in doubt as to the interpretation of the Subject Contract regarding the parameters of the arbitration provision of the Subject Contract.

54

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

265. Specifically, the applicable provision of the Subject Contract reads "arbitration pursuant to rules determined by [Archer Western]" without further definition or information.

266. Should the parties be ordered to arbitration, Zion is in doubt as to the interpretation and parameters of the arbitration given the lack of information contained within the Subject Contract.

267. Specifically, Zion does not know which body or organization will conduct the arbitration and therefore is unable to ascertain other parameters of the arbitration, including, but not limited to, what rules and regulations will apply, the number of arbitrators to be selected, the process for selecting the arbitrator(s), the scope of permissible discovery, what rules of evidence will apply, the form of the arbitration award, and what the administrative fees and costs will be.

268. As such, Zion is unable to ascertain its powers or rights under the arbitration provision of the Subject Contract.

269. Should the Court order the parties to arbitration, Zion seeks a declaratory judgment under Fla. Stat. §86.011 *et seq.* declaring which administrative organization shall conduct the arbitration and what rules shall apply.

WHEREFORE, Zion requests that, in the event this Court determines the arbitration provision is enforceable and there are arbitrable issues between Zion and Archer Western, the Court determine the arbitration body or organization that will conduct said arbitration and what rules or regulations will apply, as well as any other relief this Court deems just and proper

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all issues so triable.

FILED DATE: 6/15/2026 5:13 PM    2026CH05725

Dated: November 29, 2022

**BRIGHAM PROPERTY RIGHTS LAW FIRM, PLLC**

/s/ Andrew Prince Brigham
**Andrew Prince Brigham**
Florida Bar No. 903930
abrigham@propertyrights.com
blaing@propertyrights.com
Trevor S. Hutson
Florida Bar No. 106017
thutson@propertyrights.com
2963 Dupont Avenue, Suite #3
Jacksonville, FL 32217
904-730-9001 (phone)
904-733-7633 (fax)
*Attorneys for Plaintiff Zion Jacksonville, LLC*

**MURPHY & ANDERSON, P.A.**

/s/ Niels P. Murphy
**NIELS P. MURPHY**
Florida Bar No. 0065552
nmurphy@murphyandersonlaw.com
scassidy@murphyandersonlaw.com
**DAVIS D. BALZ**
Florida Bar No. 0099285
dbalz@murphyandersonlaw.com
gherman@murphyandersonlaw.com
1501 San Marco Boulevard
Jacksonville, Florida 32207
904-598-9282 (phone)
904-598-9283 (fax)
*Attorneys for Plaintiff Zion Jacksonville, LLC*

56

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

**Exhibit A**

FILED DATE: 6/15/2026 5:13 PM   2026CH05725



# ZION PROPERTY JACKSONVILLE

February 5, 2020 Meeting

Landtec

PROSSER

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

Zion Property

## Jacksonville Metro Area Regional Context

© 2020 Prosser, Inc.

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

# Port Area-Transportation

## Vehicular Access

⑪ Interstate Interchanges

❷ Dames Point Bridge

❸ SR 105 - Zoo Parkway / Heckscher Dr.

❹ SR 105 Bridges-Dunn Creek and Broward River

❺ Eastport Road

© 2020 Prosser, Inc.

FILED DATE: 6/15/2026 5:13 PM   2026CH05725



Pulaski/I-295 Interchange to Eastport Road



SR 105/I-295 Interchange



SR 105 (Zoo Parkway)

# Port Area-Transportation

## Vehicular Access

⑪ Interstate Interchanges

③ SR 105 - Zoo Parkway / Heckscher Dr.

© 2020 Prosser, Inc.

FILED DATE: 6/15/2026 5:13 PM   2026CH05725



## Port Area-Transportation

Rail Corridors ━━━━━━

St. John Rivers Channel ------



© 2020 Prosser, Inc.

FILED DATE: 6/15/2026 5:13 PM   2026CH05725



# Port Area-Transportation

**North Jacksonville
Rail Corridor**
*Potential Route*

© 2020 Prosser, Inc.

FILED DATE: 6/15/2026 5:13 PM   2026CH05725



## Port Area-Land Uses

- ❶ Jaxport Blount Island Marine Terminal
- ❷ Jaxport Dames Point Marine Terminal
- ❸ Carnival Cruise Terminal
- ❹ Seminole Kraft-Stone Container Corp.
- ❺ Buckeye Terminal TECO
- ❻ Blanchard Terminal
- ❼ Bostwick Trust
- ❽ CEFL Inc.
- ❾ Gate Petroleum
- ❿ USA-Navy Fuel Depot
- ⓫ Imeson Industrial Park

© 2020 Prosser, Inc.

FILED DATE: 6/15/2026 5:13 PM   2026CH05725



**TECO Crossing**



**Blanchard Terminal Crossing**

# Port Vicinity-Land Uses

Buckeye Terminal TECO
Blanchard Terminal

Pipeline Crossings

© 2020 Prosser, Inc.

FILED DATE: 6/15/2026 5:13 PM   2026CH05725



## Land Use

☐ **LI**    Light Industrial
☐ **WD**   Water Dependent Industrial
☐ **LDR**   Low Density Residential

© 2020 Prosser, Inc.

FILED DATE: 6/15/2026 5:13 PM   2026CH05725



## Zoning

☐ **IBP** Industrial Business Park
☐ **IL** Light Industrial
☐ **RR** Rural Residential
☐ **IW** Industrial Water Related

© 2020 Prosser, Inc.



## Zion Property Aerial

© 2020 Prosser, Inc.



# Existing Conditions

## Vehicular Access
- Eastport Road
- SR 105 - Zoo Parkway
- Kraft Road
- Pulaski/I-295 Interchange

◁ **Limited Vehicular Access**

© 2020 Prosser, Inc.

FILED DATE: 6/15/2026 5:13 PM  2026CH05725



Intersection - Eastport Road and Zoo Parkway



Eastport Road

# Major Vehicular Access

SR 105 - Zoo Parkway / Heckscher Dr.

Eastport Road

© 2020 Prosser, Inc.

15/2026 5:13 PM    2026CH05725



## Existing Conditions & Opportunities

© 2020 Prosser, Inc.



# Existing Conditions & Opportunities

## Vehicular Access

- Eastport Road
- SR 105 - Zoo Parkway
- Kraft Road
- Pulaski/I-295 Interchange

## Rail

## St. Johns River Frontage

## Adjacent Land Uses

- Buckeye Terminal TECO
- Kraft-Stone Container
  (147 ac. East of Eastport Rd.)

© 2020 Prosser, Inc.



## Existing Conditions & Opportunities

### Vehicular Access

- Eastport Road
- SR 105 - Zoo Parkway
- Kraft Road
- Pulaski/I-295 Interchange

### Rail

### St. Johns River Frontage

### Adjacent Land Uses

- Buckeye Terminal TECO
- Kraft-Stone Container
  (147 ac. East of Eastport Rd.)

© 2020 Prosser, Inc.



## Existing Conditions & Opportunities

### Open Water (St. Johns River) and Tidal Wetlands

© 2020 Prosser, Inc.

FILED DATE: 6/15/2026 5:13 PM 2026CH05725



View south of Dunn Creek frontage from I-295

View north of Dunn Creek frontage from Zoo Parkway

# Existing Conditions & Opportunities

## Open Water (St. Johns River) and Tidal Wetlands



| | |
|---|---|
| Open Water & Tidal Marsh | 116 ac. |
| St. Johns River Open Water | 41 ac. |

© 2020 Prosser, Inc.

5/2026 5:13 PM    2026CH05725



# Jurisdictional Wetlands

## Preliminary Desktop Review

| | |
|---|---|
| Open Water & Tidal Marsh | 116 ac. |
| St. Johns River Open Water | 41 ac. |
| Other Wetlands | 157 ac. |
| **TOTAL WETLANDS** | 314 ac. |
| **UPLANDS** | 599 ac. |
| **TOTAL AREA** | 913 ac. |

© 2020 Prosser, Inc.

15/2026 5:13 PM 2026CH05725



# Jurisdictional Wetlands

## Possible Permitting Strategy Discussion

 Potential Wetland Impacts (est. 49 ac.)

 Study Area for Potential Piers and/or Waterfront Development

© 2020 Prosser, Inc.

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

**Page 158 of the Jacksonville Port Authority Strategic Plan:**

*In addition to these existing terminal sites, there are also several greenfield sites that could be used for <u>future terminal development</u>, although channel access is less desirable than the current terminal sites. For example, these include the **Zion Property** with water side access, the Bostwick Property, portions of the Navy Fuel Dock and Marine Corps Property on Blount Island, the Jacksonville Electric Authority (JEA) Property.....*

**Page 158 of the Jacksonville Port Authority Strategic Plan:**

*Development of an <u>auto/RoRo terminal at other sites</u> such as the the **Zion Property** and the Bostwick site is possible, but the development costs would be greater given the current lack of infrastructure, and land acquisition prices would also be required. When comparing the five development options to expand auto and RoRo capacity in the future, as well as in the near term, the development of a facility at the Dames Point Cruise Terminal is the least costly, followed by the construction of a 5-6 story garage at Blount Island.*

# Jaxport Strategic Plan

## Potential Sites for New Terminal Development

## Development of an Auto/RoRo Terminal

Jacksonville Port. Authority: Strategic Master Plan



© 2020 Prosser, Inc.



## Development Scenario and Parcel Plan

- ☐ Development Parcels
- ☐ Master Stormwater Lake
- ◣ Study Area for Potential Piers and/or Waterfront Development

© 2020 Prosser, Inc.

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

**Exhibit B**

FILED DATE: 6/15/2026 5:13 PM   2026CH05725



# Attachment A

Archer Western Contractors, LLC and Zion Jacksonville, LLC
PROJECT: Jax I-95/I-295 North Interchange DB
AGREEMENT NUMBER: 216063P02

The following line items shall be incorporated into and supersede the language related to the specific provisions within...

## SPECIFIC PROVISIONS TO EXHIBIT "A" - TERMS AND CONDITIONS

1. **Article 1.1: Scope of Work Conditions:** Notwithstanding anything contained in this Agreement to the contrary, Buyer acknowledges and agrees that Seller is not furnishing equipment or performing work, but instead making fill material available to Buyer for removal from Seller's property by Buyer pursuant to the terms of this Agreement. Buyer is responsible for excavating and removing the fill material and confirming that the fill material is suitable for Buyer's purposes and suitable to the Owner. Accordingly, Seller shall have no responsibility to Owner with respect to the fill material excavated and removed by Buyer pursuant to this Agreement. The third paragraph of Sub-Article 1.1 of the Agreement is hereby deleted in its entirety.

2. **Article 2: Schedule of Work:** Nothing in Sub-Article 2.1 shall require Seller to agree to change the timing of Seller's obligations to obtain permitting and provide acreage for Buyer's excavation activities as set forth in this Agreement. A work schedule for making property available to Buyer for excavation is inapplicable, and, accordingly, Sub-Article 2.2 is deleted and its entirety.

3. **Article 3.2:** Progress Payment Application: Buyer agrees that it will not require progress payment applications from Seller.

4. **Article 3.3:** Retainage: Strike the Sub-Article and replace with "No retainage shall be withheld from payments to Seller."

5. **Article 3.5:** Stored Materials: This Sub-Article is not applicable and hereby deleted.

6. **Article 3.8:** Tariffs, Surcharges, Taxes, and Duties: Buyer agrees to pay any sales tax which may be due on the sale of the fill material pursuant to this Agreement.

7. **Article 3.13:** Final Payment Requirements: Buyer acknowledges and agrees that provisions related to lien waivers, closeout procedures, and other requirements are not relevant to the supply of fill material, and Buyer agrees not to limit Buyer's payment requirements accordingly.

8. **Article 4.2:** Claims: The procedures and timing with respect to Claims in this Sub-Article shall not prevent the ability for Seller to conduct an independent survey of the site to verify Buyer's before and after cross-section survey. Seller shall have 30 days after receipt of Buyer's survey in which to perform Seller's own survey.

PURCHASE ORDER #216063P02

FILED DATE: 6/15/2026 5:13 PM   2026CH05725



9. **Article 4.3: Delay:** Seller shall not have liability for delays in providing a location for Buyer's fill extraction arising from delays of permitting agencies in approving permits required for Seller's land clearing operations.

10. **Article 7.6: Provision For Inspection:** Notwithstanding anything contained in this Sub-Article to the contrary, Buyer shall be deemed to have accepted the fill material at such time as the fill material is removed from Seller's property. Buyer shall not be entitled to return any such fill material Buyer later determines is unsuitable, nor shall Buyer be entitled to not pay for such removed fill material or obtain a refund.

11. **Article 7.7: Warranty Provisions:** Notwithstanding anything contained in this Agreement to the contrary, Seller makes no representation or warranty whatsoever with respect to the quantity, quality, condition, and ease of removal of any of the fill material being sold pursuant to this Agreement. Once the fill material has been removed from the Seller's property, the fill material is not subject to return or refund, even if Buyer or Owner later determines that it is not of the quality desired. In no event shall Seller be obligated to remove hazardous materials from excavation sites or remedy existing contamination. If environmental problems are encountered during Buyer's excavation operations with respect to a particulate site, Seller shall be entitled to cause Buyer to cease excavation operations and relocate such operations to a different site as designated by Seller.

12. **Article 7.8: Safety:** The following sentence is hereby added at the end of Sub-Article 7.8: "Buyer shall indemnify, defend and hold harmless Seller (including its officers, directors, managers, members, agent and employees) from claims, damages, costs, attorney's fees, liability and loss, and including claims pertaining to injury, death, or property, caused or alleged to have been caused by: (i) a violation or infraction by Buyer, or any party Buyer is responsible for, of any law, order, regulation or statute relating to safety, of (ii) Buyer's entry onto the Seller's property and activities undertaken thereon pursuant to this Agreement."

13. **Article 7.9: Compliance With Laws:** The following sentence is hereby added at the end of Sub-Article 7.9: "Buyer agrees to be bound by, and at its own cost, comply with all federal, state and local laws, ordinances and regulations applicable to Buyer's entry onto the property of Seller and the removal of the fill material."

14. **Article 7.10: Bond and Letter of Credit:** Seller shall not be obligated to obtain and furnish surety bonds or a letter of credit pursuant to Sub-Article 7.10.

15. **Article 8.1: Failure of Performance and Default:** Sub-Articles 8.1 and 8.2 are hereby replaced with: "If the Seller fails to make acreage available to Buyer for Buyer's excavation activities in violation of the terms of this Agreement, Buyer shall be entitled to provide Seller with notice of default. If Seller does not take commercially reasonable steps to remedy such default and such default remains uncured for 30 days, Buyer shall be entitled to terminate this Agreement as Buyer's sole remedy. Buyer acknowledges and agrees that Seller's inability to obtain permits and approvals for the fill removal activities after making commercially reasonable efforts shall not be a default under this Agreement."

PURCHASE ORDER #216063P02

CON_PET'S 1ST RFP_0002200

FILED DATE: 6/15/2026 5:13 PM 2026CH05725



16. <u>Article 8.6:</u> Termination for Convenience by Buyer: Notwithstanding anything contained in Sub-Article 8.6 and Sub-Article 8.7 to the contrary, Buyer shall not be entitled to terminate this Agreement if Buyer intends to do so in order to obtain fill material from another source unless Seller has failed to make excavation sites available to Buyer in accordance with the terms of this Agreement. In addition, in the event of a termination by Buyer for convenience, Seller shall be entitled to recover from Buyer all costs and expenses incurred in connection with this Agreement.

17. <u>Article 9.1:</u> Indemnification: Strike Paragraph One in its entirety and replace with "TO THE EXTENT DIRECTLY CAUSED BY A PARTY'S NEGLIGENT ACTS OR OMISSIONS, SUCH PARTY SHALL INDEMNIFIY, AND SHALL HAVE THE RIGHT BUT NOT THE DUTY TO DEFEND, THE OTHER PARTY FOR DAMAGES, EXCLUDING SPECIAL, INCIDENTAL, CONSEQUENTIAL, AND/OR LIQUIDATED, RESULTING FROM THIRD PARTY CLAIMS FOR BODILY INJURY AND PROPERTY DAMAGE."

18. <u>Article 10 – Insurance:</u> Notwithstanding anything contained in Article 10 to the contrary, Seller shall not be required to maintain insurance pursuant to this Agreement. In addition, Buyer shall be obligated to maintain insurance with respect to Buyer's entry up on Seller's property and the excavation of the material meeting the requirements set forth in Article 10 with "Buyer" being substituted for "Seller" and "Seller" being substituted for "Buyer" where such terms appear in Article 10.

19. <u>Article 11.3:</u> Owner Related Disputes: Notwithstanding anything contained in Sub-Article 11.3 to the contrary, Seller shall have no liability to Owner pursuant to this Agreement. Any claims Seller may have against Buyer pursuant to this Agreement are unrelated to and not contingent upon Buyer's agreement with Owner. Any claims that Buyer has against Owner shall not reduce, impair, or otherwise affect Buyer's obligations to Seller under this Agreement and claims Seller may have against Buyer.

**SPECIFIC PROVISIONS TO EXHIBIT "B" -SCOPE, CLARIFICATION, ALTERNATES and UNIT PRICES**

20. <u>Inclusions, Line Item 15:</u> Add "Such payment will be due thirty (30) days after the end of each month. Notwithstanding anything contained herein or in the Agreement to the contrary, Buyer's obligation to pay Seller is not contingent upon Buyer's receipt of payment from Owner."

<u>PURCHASE ORDER #216063P02</u>

CON_PET'S 1ST RFP_0002201

FILED DATE: 6/15/2026 5:13 PM   2026CH05725



## GENERAL PROVISIONS

Notwithstanding anything contained in this Agreement to the contrary, Seller shall not be required to comply with the terms and conditions of the Prime Contract and the Contract Documents unless such terms and conditions are specifically set forth in this Agreement.

If either party breaches this Agreement, the prevailing party in any action or arbitration related to or arising out of this Agreement shall be entitled to its attorney's fees and costs incurred in seeking to enforce this Agreement.

SELLER:
Zion Jacksonville, LLC

Signature: _____

Printed Name: Joshua Zion

Title: Managing Member

Date: 1-26-17

BUYER:
Archer Western Contractors, LLC

Signature: _____

Printed Name: _____

Title: BGL

Date: 2/6/17

PURCHASE ORDER #216063P02

CON_PET'S 1ST RFP_0002202

FILED DATE: 6/15/2026 5:13 PM 2026CH05725



Archer Western Contractors LLC
929 W. Adams
Chicago IL 60607

## PURCHASE ORDER ("Agreement" or "Purchase Order")   Agreement No. 216063P02

| **Seller:** ZION JACKSONVILLE, LLC<br>220 MAHOPAC ACENUE<br>YORKTOWN HEIGHTS, NY 10598<br>Phone: 239-848-8408<br>Fax: | Date of Agreement: November 04, 2016<br>**Project:** Jax I-95/I-295 North Interchange DB<br><br>Project Address:<br><br>Jacksonville, FL |
|---|---|
| Job #: 216063 | Owner: FLORIDA DEPT. OF TRANSPORTATION<br>Architect/Engineer: RS&H, INC |

Archer Western Contractors LLC ("Buyer") and Seller hereby agree as follows:
Furnish all materials, equipment, insurance, and taxes as required to fully fabricate, deliver F.O.B. to project location, unless other destination specified, all A-3 Select Fill as more completely described in the exhibits attached hereto, in strict compliance with the plans and specifications and as directed by Buyer.

Unless noted otherwise, the estimated amount of this Agreement is in US Dollars.

The estimated total Agreement Amount of : **$4,955,550.00**

| The following documents are attached and hereby expressly incorporated into this Agreement: | EXHIBIT A - TERMS & CONDITIONS.<br>EXHIBIT B - SCOPE, CLARIFICATION, ALTERNATES and UNIT PRICES.<br>EXHIBIT C - CONTRACT DOCUMENTS.<br>EXHIBIT D - INTENTIONALLY OMITTED.<br>EXHIBIT E - STANDARD OPERATING PROCEDURES (NOT USED)<br>EXHIBIT F - PROCEDURES FOR PROGRESS PAYMENTS (NOT USED).<br>EXHIBIT G - SAFETY REQUIREMENTS (NOT USED)<br>EXHIBIT H - PAYMENT and PERFORMANCE BOND FORMS (NOT USED)<br>EXHIBIT H.1 - DUAL OBLIGEE BOND (NOT USED)<br>EXHIBIT I - PARTIAL and FINAL WAIVER and RELEASE FORMS<br>EXHIBIT J - BUILDING INFORMATION MODELING (NOT USED)<br>EXHIBIT K - FEDERAL ACQUISITIONS REGULATIONS (FAR)<br>EXHIBIT L - DAVIS-BACON and RELATED ACTS (NOT USED)<br>EXHIBIT M - SUBCONTRACTOR / SELLER QUALITY REQUIREMENTS |
|---|---|

By executing this Agreement, the Seller certifies that it is fully familiar with all the terms of the Agreement. The Seller also understands that this Agreement is expressly contingent on both the Buyer executing a contract with the Owner for the Project, and the Owner approving the Seller. Seller is not authorized to perform any Work under this Agreement until Buyer enters into a Prime Contract with Owner and any Work performed or preparations to perform Work by Seller prior to such time shall be at the sole expense of the Seller.

Accepted By: ZION JACKSONVILLE, LLC ("Seller"):          Archer Western Contractors LLC ("Buyer")

| Signed by: | _Spalim Zw_ | Signed by: | _[signature]_ |
|---|---|---|---|
| Printed Name: | Joshua Zion | Printed Name: | Kevin McGlinchey |
| Title: | Managing Member | Title: | Business Group Leader |
| Date: | 1-26-17 | Date: | 2/6/17 |

Invoices Received Without Purchase Order Number Will Be Returned Unpaid.

**PLEASE SIGN AND RETURN ALL ORIGINALS**

CON_PET'S 1ST RFP_0002203

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

ZION JACKSONVILLE, LLC
Agreement Number: 216063P02

## EXHIBIT A

### TERMS and CONDITIONS
Archer Western Contractors LLC
Contractor for: FLORIDA DEPT. OF TRANSPORTATION
Project: Jax I-95/I-295 North Interchange DB
Archer Western Contractors LLC Project No. 216063

### ARTICLE 1 - SCOPE OF WORK CONDITIONS

1.1 Seller's Work. This Agreement is contingent upon the Buyer entering into the Prime Contract with the Owner for the project ("Prime Contract") and contingent upon the Owner's approval and acceptance of the Seller. Seller is not authorized to perform any Work under this Agreement until Buyer enters into a Prime Contract with Owner and any work performed or preparations to perform work by Seller prior to such time shall be at the sole expense of Seller.

The Seller agrees to be bound by the following Prime Contract documents: (i) the contract drawings and (ii) the requirements of the specific technical sections of the specifications pertaining to Seller's work and (iii) the general conditions, as they apply to the material and equipment being provided by Seller, including but not limited to, testing, start up, delay, owner-related dispute/claim procedures, warranties, shop drawings and samples (collectively referred to as the "Contract Documents").

Seller shall perform fully the work and furnish the materials describe herein within the general classification of the work to the same extent that Buyer is required to perform such work under the Prime Contract. Seller shall perform the work at the price or prices set forth opposite each item of work within the times required by Buyer. Those prices shall remain firm for the duration of this Project unless specifically stated otherwise on the face hereof.

Commencing performance or making shipments or deliveries hereunder or any acknowledgement hereof by Seller, notwithstanding any proposals or terms and conditions additional to or different from those contained herein, shall be deemed an acceptance by Seller hereof and Buyer shall be bound only be the terms and conditions of this purchase order. Whenever Buyer is not the ultimate user of the materials or equipment to be furnished hereunder, all rights, benefits and remedies conferred upon Buyer shall accrue and be available to and are for the express benefit of the successors in interest to the materials, including the Owner. Seller is not, and shall not, be deemed to be a third-party beneficiary of the Prime Contract between the Owner and Buyer or any other agreement relating to the Project to which it is not a party.

### ARTICLE 2 - SCHEDULE OF WORK

2.1 THE TIME OF SELLER'S PERFORMANCE IS OF THE ESSENCE. Seller shall proceed with Seller's Work in accordance with Buyer's schedules as amended by Buyer from time to time. Buyer shall have the right to direct the sequence and pace of Seller's Work, including overtime, without monetary compensation to Seller, except as compensation is provided for herein. Failure of the Seller to make timely and prompt delivery of the materials as directed by the Buyer will be a material breach by the Seller.

2.2 Work Schedules. Seller shall, immediately after the award of the Purchase Order, prepare and submit for Buyer's information an estimated progress schedule for the Seller's Work in a form acceptable to Buyer. The schedule shall be revised as required by the status and conditions of the Seller's Work and the overall Project, and shall be subject to Buyer's approval. Seller shall promptly inform Buyer of any delays encountered or anticipated in the schedule and shall be presented at the project meetings. Buyer's receipt, review and/or acceptance of Seller's schedules shall not constitute an amendment to this Agreement nor satisfy any notice requirements of this Agreement or of the Contract Documents.

### ARTICLE 3 - PAYMENT

3.1 Schedule of Values. If required by the Buyer, the Seller shall provide a schedule of values satisfactory to the Buyer and the Owner no more than fifteen (15) days, unless Buyer agrees otherwise, from the date of execution of this Agreement. Unless stated otherwise, the prices in the Purchase Order are in United States dollars.

3.2 Progress Payment Application. If required by the Buyer, the Sellers' progress payment application shall be submitted to the Buyer in a form and with content and documentation acceptable to Buyer and Owner.

3.3 Retainage. The amount of retainage shall be the amount retained from the Buyer's payment from Owner for the Seller's Work. Such retainage shall be in addition to such other sums which Buyer has a right to withhold pursuant to this Agreement and the Contract Documents. If any materials are specially manufactured to meet the specific requirements of this order, payment for such material is subject to a 10% retainage until such time as the Buyer can determine that such specially manufactured materials will satisfactorily meet the specific requirement of this order.

3.4 Cash Discounts. When invoices, subject to cash discount, are offered by the Seller, the discount period will begin at the time the material is accepted by the Buyer.

3.5 Stored Materials. If approved in advance by the Owner, applications for payment may include materials and equipment not incorporated in the Seller's Work, conditioned upon the satisfaction of procedures satisfactory to the Owner and Buyer. Approval and payment by the Owner to the Buyer for said stored material and stored equipment is an absolute express condition precedent to payment by Buyer to Seller. The Buyer, at its sole discretion, shall require one of the following from the Seller as part of the Stored Material process:

> 1. Warehouse Agreement and Non-Negotiable Warehouse Receipt. The goods to be stored shall be placed into the possession of a warehouseman subject to a warehouse lease or agreement, which document shall be provided by the Buyer. The warehouseman shall not be in the business of buying and selling the goods of the nature to be stored. The liability of the warehouseman for failure to deliver shall be covered by insurance or a performance bond acceptable to the Buyer. Upon placing the goods into the possession of the warehouseman, a non-negotiable warehouse receipt, in a form acceptable to the Buyer, shall be issued to the Buyer. The warehouse receipt must provide the goods are to be delivered only at the Buyer's written direction and follow the Buyer's written instruction.

CON_PET'S 1ST RFP_0002204

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

*ZION JACKSONVILLE, LLC*
Agreement Number: 216063P02

2. Bill of Sale with Additional Storage Provisions. Although less desirable, at its sole discretion, the Buyer may allow, in lieu of a Warehouse Agreement and Non-Negotiable Warehouse Receipt, the Seller to provide Buyer a Bill of Sale for the material to be stored and not in the possession of the Buyer, in a form provided by the Buyer. Seller shall separate the stored material from any other goods in the possession of Seller which are either identical or of a similar nature. Seller shall maintain the separate and exclusive storage of the stored material in an open and notorious manner providing public notice that the stored material is the property of Buyer. Seller shall maintain the stored material in a condition such that at all times the stored material are ready for immediate delivery and incorporation into the construction project upon demand of Buyer. Seller represents and warrants that the stored material shall remain free and clear from any security interest, lien, pledge, encumbrance, option, conditional sales contract, lease or other title retention agreement, or any other adverse claim whatsoever. Seller shall specifically, permanently, mark the stored material covered by the Bill of Sale as the exclusive property of the Buyer. Seller shall procure insurance on the goods for the full value of the stored material, in a form satisfactory to the Buyer, naming the Buyer and Owner as insured.

3. UCC Financing Statement. At a minimum and least desirable to the Buyer, in lieu of a Warehouse Agreement and Non-Negotiable Warehouse Receipt, or a Bill of Sale with Additional Storage Provisions, and in the event title to the stored material will not pass to the Buyer at the time of payment to the Seller, the Buyer may require the Seller to properly file a UCC Financing Statement Form 1 with the Secretary of State's Office.

If required by the Buyer, Seller shall submit a separate invoice for the quantity of material and equipment placed in storage. The Owner and/or Buyer shall determine, at their sole discretion, the acceptability of the storage conditions and Seller shall correct any noted deficiencies. By submitting its invoice for stored materials or equipment to Buyer, Seller expressly represents and warrants that no security interest by a lending institution or any other entity exists in the stored materials or equipment covered by such invoice.

Regardless of any dispute between Buyer and Seller, if Buyer has partially or fully paid Seller for material or equipment as part of this Agreement, either as stored material or otherwise, upon written demand by Buyer, Seller shall immediately ship, as directed by the Buyer, the material or equipment to be purchased under this Agreement. The Seller acknowledges and agrees that the Buyer may have no adequate remedy at law for Seller's refusal to immediately ship the material or equipment as directed by Buyer, and that Buyer shall be entitled to enforce its demand for immediate shipment against Seller by temporary or permanent injunctive relief or mandamus obtained in any court of competent jurisdiction, without posting any bond or other security, and without prejudice to or diminution of any other rights or remedies which may be available to Buyer at law or in equity, and any attorneys' fees and costs incurred by Buyer in such instance shall be due from Seller.

Invoicing for stored material or equipment off-site must reflect a minimum of ten percent (10%) withholding for transportation costs associated with delivery to the jobsite, which shall be withheld until the stored material or equipment has been incorporated into the Project and accepted by the Owner. Regardless of any payment, the risk of loss for stored materials or equipment at all times shall remain upon Seller until final acceptance of the Project by Owner. Notwithstanding that the risk of loss for stored materials or equipment remains upon Seller, and regardless of which entity maintains or controls any location(s) where materials or equipment are stored, Seller acknowledges and agrees that Buyer and/or Owner have and shall be deemed to have exclusive possession of all stored materials or equipment included within any invoice submitted by Seller. Seller shall defend, indemnify, and hold harmless Buyer, Buyer's surety, and Owner against all claims, judgments, settlements, damages, losses, demands, suits, actions, liability, fines, penalties, costs and expenses (including but not limited to attorneys and expert fees and costs of litigation, arbitration, or mediation) arising out of or relating in any way to any third party's assertion of a lien, encumbrance or interest in stored materials or equipment.

3.6 Time of Payment. Without impairing Seller's mechanic's lien and payment bond rights, if any, to the fullest extent permitted by law, if Seller is in compliance with this Purchase Order, and if, and only if, Owner pays Buyer, which is an express condition precedent to Buyer's duty to pay Seller. Progress Payments shall be due to Seller no later than fifteen (15) days after receipt of payment from Owner by Buyer provided Seller remains in compliance with the terms of this Agreement. Should the forgoing condition precedent be unenforceable in the jurisdiction where the Project is located, Seller agrees that Buyer shall have a reasonable period of time within which to tender payment, and such "reasonable period" includes, but is not limited to, the time necessary for the Owner to process and make a progress or final payment, to fully adjudicate any disputes, claims, causes of action or other matters associated with or related to this Agreement and/or the Prime Contract. For purposes of this section, "fully adjudicate" means the completion of mediations, arbitrations, trials or any combinations thereof, together with such appeals as may be taken from any decisions, orders, judgments, opinions or such similar rulings as may result therefrom. The Seller shall file no mechanics lien nor make any claim on the Buyer's payment bond for which the Owner has not paid the Buyer whether in regards to progress payments, final payments, claims, or owner related disputes. No Final or Progress Payment made under this Agreement shall be considered an acceptance of Seller's Work, in whole or in part. Buyer may, at its sole discretion, pay all or any part of the Purchase Order price in a greater amount or at an earlier time than otherwise allowed, required, or specified herein, either as an advance or otherwise, in which event, all other terms and conditions hereof, and any bonds furnished hereunder by the Seller, even if such payment is prejudicial to the Seller's surety, shall be unaffected thereby and shall remain in full force and effect.

Payment will be made by Buyer only after: (i) inspection and acceptance of the goods or services; (ii) receipt by Buyer of the executed original copy of this Purchase Order and insurance and bond required from the Seller and warehouseman if payment is for Stored Material; (iii) receipt of Seller's invoice; (iv) receipt of waivers and affidavits from Seller and Seller's lower tiers as required elsewhere by this Agreement; (v) consent of surety to payment, if required by Buyer; and (vi) receipt by Buyer, of payment from Owner, for Seller's work.

3.7 Unit Price Work. Where this Agreement anticipates that the Seller's Work, or a portion thereof, shall be paid for at an agreed rate per unit of work, then the Seller agrees that unit prices stated herein shall represent full payment for the Work covered including Seller's overhead and profit and that the Owner, Engineer or Buyer may make a final and binding determination of the quantity of Work to be paid for. All quantities stated herein are approximate. Actual payment quantities are subject to field verification by Owner and/or Buyer and acceptance of required documentation, and may vary significantly from original estimated quantities. Quantity variation will not be reason to renegotiate a unit price, unless required by Owner. Buyer's rights shall also include the right to increase or decrease quantities at the unit price shown prior to receipt of the complete order at the job site. In the event of any overpayments, Seller shall reimburse Buyer for any such overpayments after final quantities have been determine by Buyer or Owner.

3.8 Tariffs, Surcharges, Taxes, & Duties. The prices herein specified shall, unless otherwise expressly stated, include all permits, fees, licenses, tariffs, surcharges, taxes and duties of any kind levied by federal, state, municipal, or other governmental authority, which either party is required to pay with respect to the production, sale or shipment of the materials or equipment covered by this Agreement. In the event of the imposition of any tax on the goods and services herein furnished which must be borne by the Buyer, Seller agrees to remit to the Buyer any taxes collected by the Seller that should be borne by the Buyer. In addition, the Seller agrees to remit to the Buyer any refund which Seller might receive by reason of the collection of such tax.

3.9 Payment Use Restriction. All payments made by Buyer, its surety, or the Owner, to Seller are made to, and accepted by Seller as trustee for the benefit of Seller's employees, material suppliers and lower tier subcontractors. All payments received by the Seller shall first be used to satisfy any indebtedness owed by the Seller to persons or entities furnishing labor or materials for use in performing or incorporation into the Seller's Work. The Buyer shall have the right at all times to contact the Seller's subcontractors and suppliers to ensure that they are being paid by the Seller.

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

**ZION JACKSONVILLE, LLC.**
**Agreement Number: 216063P02**

3.10 Waivers and Affidavits. When required by the Buyer, and as a prerequisite for payment, the Seller shall provide, waivers and affidavits from the Seller in a form as shown in an Exhibit of this Agreement and as specified by applicable statute, and as required by the Owner and Owner's lender, and consent from Seller's surety. When required by the Buyer, Seller must present unconditional waivers, in a form as shown in an Exhibit to this Agreement, from all of its lower tier subcontractors, suppliers, or other entities arising from the Seller's work for the immediately preceding pay estimate before the Seller is entitled to be paid by Buyer for the current pay estimate.

Seller and Seller's surety shall indemnify, defend and hold Buyer, the Owner, the Project funds, Project site and Buyer's surety harmless from and against any claim for, or notice of, lien, encumbrance, payment bond claim, or other claim for payment or notice of non-payment (collectively "Lien"), and from any costs, which arises in connection with Seller's Work ("Seller's Lien Costs"). Buyer may discharge the Lien or withhold from Seller's Progress or Final Payment any Seller's Lien Costs incurred or anticipated to be incurred to defend and discharge any Lien and Seller and Seller's surety shall reimburse Buyer for any Seller's Lien Costs incurred to discharge or defend any Lien.

3.11 Seller Payment Failure. In the event Buyer has reason to believe that labor, material or other obligations incurred in the performance of the Seller's Work are not being, or may not be, paid, the Buyer may take any steps Buyer deems necessary to ensure that such obligations are paid including, but not limited to direct payment to such person or entity unless Seller supplies evidence to the satisfaction of the Buyer that such obligations have been satisfied. Any such payments made by the Buyer shall be credited against funds otherwise due Seller under this Agreement.

3.12 Right of Set Off. Buyer may withhold and unilaterally deduct amounts otherwise due under this Agreement or any other agreement between the parties to cover Buyer's reasonable estimate of any costs, damages, or liability Buyer has incurred or may incur for which Seller may be responsible or have caused, including any agreement between Seller and any joint venture or other entity in which Buyer has an ownership interest or corporate affiliation.

3.13 Final Payment Requirements. Before the Buyer shall be required to make final payment to the Seller, the Seller shall submit to the Buyer: (i) an affidavit that all payrolls, bills for materials and equipment, and other indebtedness connected with the Seller's Work have been paid, and unconditional final waivers, in a form as shown in an Exhibit to this Agreement, from all of Seller's lower tier subcontractors, suppliers, or other entities arising from the Seller's work; (ii) consent of surety to final payment, if required by Buyer; (iii) satisfaction of required close-out procedures and documentation; and (iv) other data if required by the Buyer or Owner, such as receipts, releases, and waivers of liens to the extent and in such form as may be designated by the Buyer or Owner.

## ARTICLE 4 - CHANGES, CLAIMS AND DELAYS

4.1 Changes. When the Buyer so orders in writing, the Seller shall make changes in the Seller's Work which are within the general scope of this Agreement. Adjustments in the Purchase Order Amount or Schedule of Work, if any, resulting from such changes shall be set forth in a Change Order. Buyer shall make an appropriate equitable adjustment therefore in the price and time of performance. No such adjustment shall be made for any such changes performed by the Seller that have not been so ordered by the Buyer in writing. An express condition precedent to payment to Seller on account of changes made or directed by Owner, shall be that Buyer shall have received such payment from Owner for Seller's changed Work.

4.2 Claims. A "Claim" is a Seller's demand or assertion seeking an increase in Purchase Order Amount, an extension in the time for performance of Seller's Work, coverage under an insurance policy related to the Project, or relief with respect to the terms of the Contract Documents. All Claims must be made by written notice to the Buyer at least one (1) week prior to the beginning of the Seller's affected or additional work, or by two (2) days prior to the date by which Buyer is obligated to give notice to the Owner with respect to such claim, or within one (1) week of the Seller's first knowledge of the event giving rise to the Claim, whichever shall first occur, otherwise, such claims shall be deemed waived. With respect to written notice required for a Claim, Seller's written notice must be via letter, email or fax is not sufficient notice. Seller expressly acknowledges and agrees that the preceding notice requirements are a material term of this Purchase Order, and are necessary for the Buyer to mitigate adverse consequences arising out of or related to Seller's Claim, and that the Buyer will be prejudiced if the notice requirements are not followed by the Seller. Pending final resolution of a Claim or any other dispute between Seller and Buyer, unless otherwise agreed in writing, the Seller shall proceed diligently with performance of the Seller's Work, disputed or otherwise, and without interruption, deficiency, or delay. If Buyer is the prevailing party, even partially, against the Seller's Claim, Seller shall reimburse all of the Buyer's attorneys' fees and costs incurred to defend against the Seller's Claim. Seller shall permit Buyer to inspect and copy any of Seller's documents pertaining to Claim, failure of which shall be deemed a waiver of such Claim. Seller waives its right to recover incidental and consequential damages, legal fees and interest arising from this Project or a Claim.

4.3 Delay. If the progress of the Seller's Work is substantially delayed, hindered or interfered with through no fault or responsibility of the Seller, or if Buyer fails to take delivery or accept performance of services or portions thereof when due, then the Buyer shall either (i) extend the time for the performance of Seller's Work by Change Order, but such extension shall be limited to that amount of time which will enable Buyer to meet its obligation to Owner to complete the Project in accordance with the Contract Documents, or (ii) require Seller to accelerate or complete its Work with additional manpower and the expediting of materials, but Buyer shall be obligated to pay only for the costs of expediting material and costs recovered under the Owner-Related Disputes provisions of this Agreement.

Except for the costs of expediting materials at the order of Buyer pursuant to the previous paragraph, and except for acts of the Owner or third party for which the Seller's remedy shall be as stated in the Owner-Related Dispute provisions of this Agreement, the Buyer and its surety shall not be liable to the Seller for any damages or additional compensation for a Claim or otherwise, as a consequence of delay, inefficiency, schedule revisions, hindrance, interference or other similar event, caused by Buyer, or by reason of fire, casualty, act of God or any other reason beyond the Buyer's control. Seller and Buyer agree that the language in this article shall not be interpreted as no damages for delay.

## ARTICLE 5 - INTENTIONALLY OMITTED

## ARTICLE 6 - INTENTIONALLY OMITTED

## ARTICLE 7 - PURCHASE ORDER PROVISIONS

7.1 Assignment. The Seller shall not assign this Agreement or its proceeds nor subcontract the whole or any part of the Seller's Work without prior approval of the Buyer, which shall not be unreasonably withheld, and any assignment not approved by the Buyer is void, and the assignees in such cases shall acquire no rights to the proceeds pertaining to this Purchase Order. Assignment by the Seller without the consent of the Buyer is a material breach of this Purchase Order.

7.2 Submittals. Approval of submittals by Buyer will not relieve Seller of its obligation to perform the Seller's Work in strict compliance with the Contract Documents or the proper matching and fitting of the contiguous work.

7.3 Labor Conditions. Seller shall not use any class of workmen, materials, or methods, including improper classification of employees as independent contractors, which may cause strikes, bannering, labor disturbances, labor demonstrations, project delay, or which do not comply with the Contract Documents and applicable law.

CON_PET'S 1ST RFP_0002206

FILED DATE: 6/15/2026 5:13 PM 2026CH05725

**ZION JACKSONVILLE, LLC**
Agreement Number: 216063P02

**7.4 Deliveries.** If Seller is delivering material as part of this Purchase Order to a port, included in the Seller's scope, are: (i) shipping to a port as directed by the Buyer; (ii) fumigation of shipping containers; (iii) all customs fees and bonds; (iv) Insurance for all material in transit to said port. Buyer shall be the loss payee, evidence of Insurance shall be given by Seller within 10 days of execution of this Purchase Order, or such failure to provide such insurance may be deemed by the Buyer to be a Default by the Seller. The prices herein specified shall, unless otherwise expressly stated, include transportation charges, packing, loading and shipping.

**7.5 Substitutions.** No substitutions shall be made in the Seller's Work unless permitted in the Contract Documents and only then upon the Seller first receiving all approvals required under the Contract Documents for substitutions. In the event a substitution results in additional cost to the Buyer or other entities, Seller shall be responsible for such additional costs.

**7.6 Provision for Inspection.** Buyer and Owner shall have the right to inspect and test the materials at Seller's plant any time prior to shipment, and to final inspection at the jobsite. The materials shall not be deemed accepted until after such final inspection. The making or failure to make any inspection of, or payment for, or acceptance of the material in no way relieve Seller from its obligations to perform its Work in strict accordance with the Contract Documents, or impair Buyer's right to reject nonconforming goods, to recover damages or exercise any other remedies to which Buyer may be entitled, notwithstanding Buyer's knowledge of the nonconformity, its substantiality, or the ease of is discovery. Seller shall be liable for all inspection, reshipment, return, and re-inspection costs on nonconforming goods. The risk of loss shall pass to Buyer only after Buyer makes its final inspection of the materials. Seller's delivery to a carrier or to an intermediate party shall not be deemed actual delivery of goods to the Buyer.

Damage found during the inspection will be deemed to have occurred prior to or during shipment by the Seller unless substantial evidence to the contrary proves otherwise. In the event materials or equipment are delivered to the job site in a damaged condition, Buyer may accept the damaged materials and equipment if Buyer determines that portions of the materials and equipment are usable and advantageous to the progress of the work. In accepting damaged materials and equipment, In addition to set-off, Buyer may repair the damage or any part thereof at Seller's expense and/or demand replacement of the damaged parts from Seller, at Seller's expense; Buyer may purchase the damaged parts elsewhere at Seller's expense in event Seller does not replace the damaged parts within fifteen (15) calendar days after notice is given by the Buyer.

**7.7 Warranty Provisions.** The Seller warrants its Work against all deficiencies and defects in materials and/or workmanship, for a period as called for in the Prime Contract, or one (1) year after the Project's substantial completion, if a warranty is not required by the Prime Contract. This warranty, certification, and guarantee survives the termination or suspension of this Agreement or Seller's final payment, and shall only be extinguished by limitation periods imposed by applicable law.

**7.8 Safety.** In addition to safety requirements imposed by law, Seller shall comply with all safety requirements imposed by Buyer, Owner or the Architect/Engineer. In the event the Buyer is cited or penalized due to the Seller's actions or failure to comply with the Occupational Safety and Health Act, Seller shall hold the Buyer harmless from any costs, expenses, suits, penalties or damages (including legal fees and costs) arising from any such citations or penalties and such sums shall be deducted from amounts due under the Purchase Order. Seller shall not be held liable for violations of the Buyer provided the Seller has no liability.

Seller shall indemnify, defend and hold harmless Buyer, Buyer's surety and insurer, and Owner, (including their officers, directors, managers, members, agent and employees) from claims, damages, costs, attorney fees, liability and loss, and including claims pertaining to injury, death, or property, caused or alleged to have been caused by an violation or infraction by Seller, or any party Seller is responsible for, of any law, order, regulation or statute relating to safety.

**7.9 Compliance with Laws.** The Seller agrees to be bound by, and at its own cost, comply with all federal, state and local laws, ordinances and regulations (hereinafter collectively referred to as "Laws") applicable to the Seller's Work including, but not limited to, equal employment opportunity, minority business enterprise, women's business enterprise, disadvantaged business enterprise, provisions of Executive Order 11246, as amended, and the implementing regulations at 41 CFR Parts 60-1 through 60-50; Section 503 of the Rehabilitation Act of 1973, as amended, and the implementing regulations at 41 CFR part 60-741; the non-discrimination and affirmative action provisions of the Vietnam Era Veterans' Readjustment Assistance Act of 1974, as amended; 38 USC 4212, and the implementing regulations at 41 CFR Part 60-300; the Immigration Reform and Control Act of 1986, as amended; Title 1 of the Americans with Disabilities Act of 1990, as amended; Title VII of the Civil Rights Acts of 1866, 1870, 1964, 1991, as amended, and any subsequent years; the Fair Labor Standards Act of 1938, as amended; and such implementing rules and regulations as may be established by the Secretary of Labor, and all other laws and Executive Orders with which the Buyer must comply according to the Contract Documents.

Buyer and Seller shall abide by the requirements of 41 CFR 60-300.5(a). This regulation prohibits discrimination against qualified protected veterans, and requires affirmative action by covered prime contractors and subcontractors to employ and advance in employment qualified protected veterans. Buyer and Seller shall abide by the requirements of 41 CFR 60-741.5(a). This regulation prohibits discrimination against qualified individuals on the basis of disability, and requires affirmative action by covered buyers and sellers to employ and advance in employment qualified individuals with disabilities.

Seller specifically agrees that Seller is an independent contractor and employing unit subject to all applicable federal, state and local statutes, laws and regulations. Seller agrees to comply with all laws, ordinances and regulations relating to its supply of the Goods, including without limitation, any regulations of the storage, transport, disposal or labeling of hazardous substances. If this Project is subject to Federal Highway Authority (FHWA) 1273 or subsequent provision, Seller agrees to comply with the Contract Provisions of FHWA 1273 and to cooperate fully with Buyer, by agreeing to periodic inspections, reviews and submission of documents and/or reports that may be required to ensure Supplier's and Buyer's compliance with the Contract Provisions of FHWA 1273.

**7.10 Bond and Letter of Credit.** Unless noted otherwise in this Agreement, if the total estimated value of this Purchase Order is equal to or greater than $500,000, Seller, at its expense, shall immediately upon execution of this Agreement, obtain and furnish surety bonds or a letter of credit in such form as provided by Buyer or detailed by Exhibit of this Agreement or as required by the Owner. If the Seller does not furnish such surety bonds or letter of credit within three (3) business days of execution of this Agreement, the parties agree that such failure constitutes a material breach and default under Article 8.1 of this Agreement for which the damages shall include but not be limited to termination and the Buyer's cost to secure a replacement Seller. Surety bonds shall be in the amount of one hundred percent (100%) of the Purchase Order price guaranteeing full performance of this Purchase Order and that Seller will promptly and fully pay for all work, labor and materials and other charges or costs in connection with the Seller's Work. A letter of credit shall be in the amount as required by the Buyer. Payment bonds and performance bonds must be provided by a company listed in Federal Register Circular 570, latest revision, Surety Companies Acceptable on Federal Bonds, and a Financial Rating of A V or better as published by Best's Key Rating Guide, latest edition, and admitted in the state where the Work is to be performed and shall conform to such other and further restrictions and conditions as Buyer shall require. If the company issuing the Seller's surety bonds falls below the criteria listed herein, the Seller shall immediately notify the Buyer and within fourteen (14) days of the bonds falling below the criteria, or upon demand by the Buyer, replace its surety bonds with bonds which meet the criteria contained herein.

Report POACTV Ver. Date: 01-JUL-2016    An Equal Opportunity Employer, Disability/Veteran.    Page 5

Printed on: 12-12-2016

CON_PET'S 1ST RFP_0002207

FILED DATE: 6/15/2026 5:13 PM 2026CH05725

ZION JACKSONVILLE, LLC
Agreement Number: 216063P02

If (i) the bank issuing the Letter of Credit (the "Issuing Bank") ceases to remain a "Qualified Bank" (as defined herein) or (ii) Buyer has reasonable grounds to believe that Issuing Bank may cease to remain a Qualified Bank, Buyer may draw on the Letter of Credit immediately. The term "Qualified Bank" means a federally insured state or national bank which is well capitalized under FDIC capital adequacy guidelines and is not under any supervisory order or subject to supervisory proceedings and is otherwise acceptable to Buyer as reasonably determined by it.

Seller's failure to comply with any of the terms of this Article shall be deemed a material breach of this Agreement.

**7.11 Small or Disadvantaged Business Enterprises.** For the purposes of this Agreement, "Small or Disadvantaged Business Enterprise" includes, but is not limited to, small business enterprise, small business concern, minority business enterprise, women owned business enterprise, disadvantaged business enterprise and any other socio-economically disadvantaged entity or enterprise identified within the Contract Documents. Seller hereby acknowledges that it is thoroughly familiar with all Small or Disadvantaged Business Enterprise requirements pertaining to the Project. If the Seller claims status as a Small or Disadvantaged Business Enterprise, the Seller shall take all steps necessary and shall make all necessary records available to the Buyer and the Owner to assure that Seller is in compliance with such requirements, including but not limited to, the performance of a commercially useful function on the Project. In the event that any lower tier subcontractor or supplier of the Seller is designated as or is required to be a Small or Disadvantaged Business Enterprise, Seller agrees to be responsible for ensuring that said lower tier subcontractor or supplier meets all applicable requirements. Seller acknowledges that Buyer is relying upon Seller's representations regarding the validity of Seller's status, if any, as a Small or Disadvantaged Business Enterprise and that misrepresentation of the status of Seller or any of its lower tier subcontractors or material suppliers is a material breach of this Agreement and grounds for immediate termination. In the event of termination as the result of material misrepresentation of the status of the Seller as a Small or Disadvantaged Business Enterprise, Seller shall not be entitled to any compensation not already paid, and shall be liable for all damages to Buyer caused by Seller's misrepresentation and breach.

## ARTICLE 8 - RECOURSE BY BUYER

**8.1 Failure of Performance and Default.** If the Buyer determines at its sole discretion that the Seller has: (i) refused or failed to supply enough proper materials, or maintain the Schedule of Work; (ii) failed to make prompt payment for, or failed to prevent claims of non-payment from, its workers, subcontractors or suppliers of any lien; (iii) disregarded Laws or orders of any public authority having jurisdiction; (iv) otherwise materially breached, a provision of this Agreement; or (v) if Buyer has a reasonable doubt that this Agreement can be completed for the balance then unpaid, the Seller shall be in default of this Agreement. If the Seller fails within seventy-two (72) hours after receipt of written notice (facsimile, email, or letter), shall constitute sufficient written notice and declaration of default) to commence and continue satisfactory correction of such default with diligence and promptness, the Seller shall have materially breached this Agreement, and the Buyer, without prejudice to any other rights or remedies, shall have the right to any or all of the following remedies: (i) supply such quantity of materials, equipment and other facilities as the Buyer deems necessary for the completion of the Seller's Work, or any part thereof, and charge the cost thereof to the Seller; (ii) contract with one or more additional contractors to perform such part of the Seller's Work as the Buyer shall determine will provide the most expeditious completion of the total Work and charge the cost thereof to the Seller; (iii) discharge the claim of non-payment; (iv) withhold payment of any moneys due the Seller pending corrective action; and/or (v) cover. Any costs or damages incurred by Buyer under this article, including attorney fees, shall be unilaterally deducted from funds otherwise due Seller under this Agreement. Buyer may use any materials, implements, equipment, appliances or tools furnished by or belonging to the Seller to complete the Seller's Work. Seller shall provide its surety with all notices, letters, or email, from the Buyer referred to in this paragraph.

If Buyer shall have reasonable grounds to question Seller's intent or ability to perform, Buyer may, in writing, demand that Seller give adequate assurance, in writing, of its intent or ability to perform. If such a demand is made and no written assurance adequate to the Buyer is given within five (5) calendar days, Buyer may treat this failure to give such adequate assurance as a default or an anticipatory repudiation of the contract.

**8.2 Failure of Performance-Termination for Default by Buyer.** If the Seller fails to commence and satisfactorily continue correction of a default within seventy-two (72) hours after the notice of default is received, then the Buyer may terminate this Agreement or a portion thereof, and use any materials, implements, equipment, appliances or tools furnished by or belonging to the Seller to complete the Seller's Work. All of the costs incurred by the Buyer in so performing the Seller's Work shall be deducted from any moneys due or to become due the Seller.

**8.3 Insolvency, Receivership, Changes in Title to Assets, Bankruptcy - Termination.** Upon the Seller becoming insolvent, upon the appointment of a receiver for the Seller, or upon the Seller making an assignment for the benefit of creditors, this Agreement shall, without notice or right to cure, be terminated unless Buyer waives its right to such automatic termination and Buyer shall be deemed to have declared, and Seller agrees, that Seller is in default of this Agreement.

**8.4 Bankruptcy-Interim Remedies.** If the Seller is not performing in accordance with the Schedule of Work at the time of entering an order for relief, or at any subsequent time, the Buyer may avail itself of such remedies under this Article as are reasonably necessary to maintain the Buyer's Schedule. The Buyer has the right of recoupment and may also offset against any sums due or to become due the Seller all costs incurred in pursuing any of the remedies provided herein. The Seller and/or any successor(s) thereto, including any estates, Bankruptcy or otherwise, and Seller's surety shall be liable to Buyer for the payment of any amount by which such expense may exceed the unpaid balance of the Purchase Order Amount.

**8.5 Suspension/Termination of Prime Contract.** Should any part of the Buyer's work which includes the Seller's Work be suspended or terminated, or should Owner direct the Buyer to terminate the Seller's Agreement, the Buyer shall so notify the Seller in writing, and the Seller shall immediately stop that portion of the Seller's Work. In the event of such Owner suspension or termination, the Buyer's liability to the Seller is limited to the extent of the Buyer's recovery on the Seller's behalf as provided in the Owner-Related Dispute section of this Agreement.

**8.6 Termination for Convenience by Buyer.** Buyer shall have the right to terminate for convenience Seller's performance of all or a part of the Seller's Work by providing Seller with a written notice of termination for convenience, which shall be effective upon receipt by Seller. If Buyer's contract with Owner has not been terminated and the Seller is not in default on any provision of this Agreement, Seller shall be paid the reasonable value to Buyer of Seller's Work performed prior to termination plus reasonable direct close-out costs, less set offs, but in no event shall Seller be entitled to unabsorbed overhead, lost profits, or indirect or consequential damages of any kind.

**8.7 Wrongful Exercise of Termination.** If Buyer wrongfully exercises Buyer's remedy options under this Article, that action shall be treated as a deductive change. If Buyer wrongfully exercises Buyer's termination options under this Article, that termination for default shall be treated as a deductive change order, and shall be considered a termination for Buyer's convenience and Seller shall be entitled to the applicable compensation provided for in the Termination for Convenience by Buyer provisions of this Agreement. Seller's remedies under this paragraph shall be exclusive.

CON_PET'S 1ST RFP_0002208

FILED DATE: 6/15/2026 5:13 PM 2026CH05725

*ZION JACKSONVILLE, LLC.*
*Agreement Number: 216063P02*

8.8 Conditional Assignment. Seller, by execution of this Agreement, contingently assigns to Buyer all Seller's subcontracts and purchase orders relating to the Project, and consents to this Purchase Order being assigned to the Owner in accordance with the terms of the Prime Contract. The assignment of each of Seller's subcontracts and purchase orders shall take effect only upon Buyer's affirmative acceptance of the assignment of the specific subcontract or purchase order by written notice to Seller and Seller's subcontractor or material supplier.

8.9 Buyer's Rights Survive Termination. Termination of this Agreement by Buyer or abandonment by Seller shall not relieve Seller from Seller's obligations in connection with Seller's Work performed prior to termination or abandonment nor will such termination or abandonment abrogate any obligations of Seller under, or rights or remedies afforded to Buyer by this Agreement or the Contract Documents including without limitation, Seller's indemnity obligations.

**ARTICLE 9 - INDEMNIFICATION**

9.1 Indemnification. To the fullest extent permitted by law, Seller shall indemnify, defend (with counsel reasonably satisfactory to Buyer), and save harmless Owner, Owner's Representative, Architect/Engineer, Buyer, and Buyer's surety, as well as any individual and/or entity that Buyer is required by contract to indemnify, defend and/or hold harmless; and their partners, insurers, parents, members, subsidiaries, related corporations, officers, directors, agents and employees, and each of them, (hereafter collectively "Indemnified Parties" and individually "Indemnified Party"), against claims, costs and expenses which are in any manner caused, or claimed to be caused, through any act, or omission of Seller, anyone acting under its direction, control, or on its behalf or for which it is legally responsible, in connection with the Seller's Work. Seller's obligation to provide a defense for an Indemnified Party shall arise regardless of the merits of the matter and shall continue until a final determination of fault is made.

Seller, however, shall be relieved of and shall have no further obligation to indemnify an Indemnified Party under this Agreement upon a final determination that the Seller, was not liable or any determination by the court that any single indemnitee is solely negligent, which shall not include any dismissal pursuant to settlement regardless of the entry of an order of dismissal pursuant to said settlement. Buyer shall be entitled to recover actual attorney fees and court costs and all other costs, expenses and liabilities incurred by Buyer in an action brought to enforce all or any part of this Article. Seller's indemnity obligations shall be limited to the extent necessary to comply with governing state and federal law ("Governing Law") and to the extent any such Governing Law limits the indemnity provided herein, Sellers' obligations shall be deemed to be limited so as to comply with such Governing Law. Seller shall maintain such insurance as is necessary to fully cover Seller's indemnity obligations hereunder.

9.2 Indemnification Independent from Insurance and Survive Termination. Seller's indemnification obligations shall survive termination of this Purchase Order, shall extend to claims occurring after termination of this Purchase Order, and are independent from, and not limited in any manner by the Seller's insurance coverage required by this Agreement.

**ARTICLE 10 - INSURANCE**

10.1 Seller's Insurance. In the event that Seller or its employees, agents, sub-subcontractors/sellers, carriers, or material delivery vendors are required to come onto a jobsite or project of Buyer in connection with the sale of goods or the rendering of services under this Purchase Order, including delivery of materials, unless other limits are required herein or required of the Seller in the Owner Agreement, which are hereby incorporated; Seller agrees to carry and maintain, and require its sub-subcontractors/sellers, carriers, and material delivery vendors to carry and maintain at a minimum: (i) comprehensive general liability insurance covering personal injury (including death) and damage to property in an amount not less than $ 1 million per occurrence, $2 million aggregate; (ii) and automobile liability insurance in an amount not less than $1,000,000 per occurrence Seller further agrees to provide and maintain Worker's Compensation insurance in conformity with the laws of any state in which their employees perform services on their behalf. Prior to Seller's entrance on the jobsite or delivery of materials, Certificate(s) of Insurance stating the limits and coverages required by Buyer shall be executed by Seller's insurance carrier(s) and provided to the Buyer. Should the Buyer allow entry onto the site prior to the execution and receipt of such certificate, such entry shall not constitute a waiver by the Buyer of the requirements. If the work of the Seller requires entry onto the project site by employees of the Seller, Seller shall provide Additional Insured status to the Buyer for such entry, and as a condition of license to enter the property. Such Additional Insurance shall be in the form of ISO CG 20 10 10 01 and ISO CG 20 37 10 01, or equivalent coverage, on a Primary and Non-Contributory basis. The insurance requirements set out herein or by exhibit hereto, are independent from all other obligations of Seller under this Purchase Order and apply whether or not required by any other provision of this Purchase Order.

10.2 Cancellation, Renewal or Modification. The Seller shall maintain in effect all insurance coverage required under this Agreement at the Seller's sole expense and with insurance companies acceptable to the Buyer. Coverage shall be maintained without interruption until date of final payment and shall maintain Completed Operations coverage for a minimum of three years subsequent to Final Payment. Seller shall ensure that any cancellation or non-renewal of the policies required by the Agreement or, the Contract Documents shall not occur unless the Seller has first given thirty (30) days notice to the Buyer of such cancellation, non-renewal or change in policy. Failure to provide the necessary notice will be constitute as a material breach of this Agreement.

Certificates of insurance, or certified copies of policies acceptable to the Buyer shall be filed with the Buyer prior to the Seller's Work arriving on the jobsite and again with any renewal, extension or alteration of all or any part of the insurance, by way of a Certificate of Insurance or Certified Copy of the Policy. Buyer's failure to request a Certificate of Insurance shall not be a waiver of Seller's duty to procure Insurance. Seller shall produce a certified copy of the applicable insurance policy within (15) days of any request by Buyer. In the event the Seller fails to obtain or maintain any insurance coverage required under this Agreement, the Buyer may purchase such coverage and charge the expense thereof to the Seller, or terminate this Agreement.

10.3 Waiver of Subrogation. Seller waives all rights against Buyer, Owner, and the Architect/Engineer and their agents, officers, directors and employees for recovery of damages to the extent these damages are covered by commercial general liability, automobile liability insurance, contractual liability insurance and worker's compensation insurance. The policies shall provide such similar waivers of subrogation by endorsement or otherwise. Seller shall remain solely responsible for the deductible or Self-insured Retention on any and all policies; including on any Builder's Risk policy in pro rata to their interests on any loss.

10.4 Carrier Qualifications. All insurance policies purchased shall be maintained with insurance companies licensed to do business in the state where the Project is located and shall have a policyholder rating of "A" or better in the most current Best's Key Rating Guide.

CON_PET'S 1ST RFP_0002209

FILED DATE: 6/15/2026 5:13 PM    2026CH05725

*ZION JACKSONVILLE, LLC.*
*Agreement Number: 216063P02*

## ARTICLE 11 - LAWS AND DISPUTE RESOLUTION

11.1 Law and Effect. This Agreement shall be governed by the law of the state, Washington, D.C., or United States territory, ("collectively called the "State") in which the Project is situated. The Seller hereby agrees to accept jurisdiction of and service of process in the State in which the Project is situated and any action or proceeding under or in connection with this Purchase Order or bond issued pursuant to the Project shall, unless stated otherwise in this Agreement, be brought in the local state courts or United States Courts within the State in which the Project is situated; Seller further agrees to consent to the recognition and enforcement of any final order or final judgment issued by a court of competent jurisdiction as described herein in any other state, country, territory, tribal or other legal system, without regard to sovereign immunity or other defense. If the Project is located in more than one state, then the Buyer shall solely decide the state applicable for purposes of this paragraph. FURTHER, THE PARTIES HEREBY WAIVE THEIR RIGHTS TO A TRIAL BY JURY IN ANY AND ALL DISPUTES OR CLAIMS ARING OUT OF OR IN RELATION TO THIS AGREEMENT OR BOND PROVIDED BY THE BUYER. In the event of a material breach of this Agreement by one party, the other party possesses independent and distinct breach of contract and breach of warranty actions against the breaching party. The Seller also consents that the Buyer has standing to bring and pursue an award of judgment in the court system of the Seller's home country, and that the Seller waives all statutory defenses which the Seller may have in the court system of his home country against Buying pursing collection on the judgment, including, but not limited to, Buyer's standing, jurisdiction, venue, Seller's lack of due process, lack of notice, or inability to defend in previous proceeding in the United States court system. All provisions pertaining to Laws and Dispute Resolution in this Agreement shall apply to, and bind, Seller's surety to the same extent the provision applies to, and binds, Seller.

11.2 Arbitration. Any controversy or claim of Buyer against Seller or Seller against Buyer or its surety shall, at the option of Buyer or Buyer's surety and at any time, be resolved by arbitration pursuant to rules determined by Buyer. The Buyer and Seller agree to equally split the administrative costs, fees, and other similar expenses charged by the arbitrator or arbitration agency. At the Buyer's option, the arbitration may be consolidated with any arbitration between the Buyer and Owner or other entity associated with the Project.

Seller waives to the fullest extent permitted by law any objection that they may now or may hereafter have to having arbitration proceedings conducted in the state or United States territory in which the Project is located, including any claim that it is an inconvenient forum for such arbitration or court proceedings. The award rendered by the arbitrator(s) shall be conclusive and binding upon the parties and shall be enforceable in any court of competent jurisdiction of any Contracting State pursuant to the Convention on the Recognition and Enforcement of Foreign Arbival Awards (330 UNTS 3; 9 U.S.C. 201, et seq.).

11.3 Owner Related Disputes. In case of any dispute between Buyer and Seller, which in the Buyer's reasonable opinion, is in any way relating to or arising from any act or omission of the Owner or third-party or involving the Contract Documents, Seller agrees to be bound to Buyer to the same extent that Buyer is bound to Owner or third-party, by the terms of the Contract Documents, and by any and all preliminary and final decisions, determinations or agreements made by or between Buyer, third-party or Owner or so authorized in the Contract Documents or by the court or arbitrator designated in the Contract Documents whether or not Seller is a party to such agreement or proceeding. In the event of any such dispute, Seller shall continue to perform the Seller's Work, disputed or otherwise, without interruption, deficiency or delay in a diligent manner. The Seller shall certify its Claim in the same manner that the Buyer is required to certify a claim to the Owner. Seller shall defend, indemnify, and hold harmless Buyer and Buyer's surety from allegations of false claim or similar allegations arising out of Seller's Claims, regardless of whether the Buyer has certified the Seller's Claims. If the Buyer cannot in good faith certify or submit this Seller's Claims, the Buyer cannot be required to submit the Seller's Claims, and in such case Seller waives its right to seek compensation from Buyer or Buyer's surety for the Seller's Claims. Buyer and Buyer's surety shall not be liable to Seller in excess of any sum actually received from Owner or third-party on behalf of Seller and Buyer and Buyer's surety shall only be required to pay Seller if, and only if, Owner or third-party pays Buyer, which is an express condition precedent to Buyer's and its surety's duty to pay Seller. Buyer shall have the sole and full authority to settle, prosecute, or appeal the Seller's Claim.

In the event the Buyer has a claim with the Owner or third-party which includes the Seller's Claim, and which is resolved on a global basis, Seller's recovery for the Seller's Claim will be computed on a pro-rata basis after the Buyer's costs (including but not limited to attorney, consultant, and expert fees and costs) arising from pursuing the Buyer's claim with the Owner or third-party, and Buyer's overhead and profit markup on the Seller's Claim are subtracted from the offer or award. In the event Buyer's contract balance is included in the global offer or award, the Buyer's contract balance will be subtracted from the global offer or award prior to the pro-rata computation. In the event the Seller's Claim is resolved for a specific dollar amount, Seller's recovery for the Seller's Claim will be computed after the Buyer's costs (including but not limited to attorney, consultant, and expert fees and costs) arising from pursuing the Seller's Claim with the Owner or third-party, and Buyer's overhead and profit markup on the specific dollar amount are subtracted from the specific dollar amount. Seller agrees to toll and stay its rights under the Buyer's bond and this Agreement until such time as the Buyer has exhausted its dispute provisions with the Owner or third-party.

Buyer may, at Buyer's option, (i) present to the Owner, third-party or any court or arbitrator, in Buyer's name, or (ii) authorize Seller to present to the Owner, third-party or any court or arbitrator in Buyer's name, all or some of Seller's Claims, and to answer the claims of third-party or the Owner involving Seller or Seller's Work. If the Seller's Claim is presented, prosecuted or defended by Buyer, the Seller, at Seller's own expense, agrees to furnish all documents, statements, witnesses, and other information required by Buyer and to pay or reimburse Buyer for all costs incurred by Buyer in connection with the dispute including, without limitation, attorneys', experts' and consultants' fees.

## ARTICLE 12 - INTENTIONALLY OMITTED

## ARTICLE 13 - MISCELLANEOUS PROVISIONS

13.1 Inconsistencies and Omissions. Any of the Seller's Work shown in the specifications and not on the drawings, or shown on the drawings and not in the specifications shall be performed by the Seller as part of this Agreement. Dimensions given on the drawings and the specifications are approximations only, and the Seller shall take such measures at the Project site as will insure the proper matching and fitting of the work covered by this Agreement with contiguous work.

Seller represents and warrants that it has received and has reviewed all of the Contract Documents in advance of the execution of this Agreement. Any error, ambiguity, inconsistency or omission therein, of which Seller had, or should have had knowledge, may not be a basis for an increase in the Purchase Order Amount or time to perform the Seller's Work or any other relief under the Contract Documents.

13.2 Severability and Waiver. The partial or complete invalidity of any one or more provisions of this Agreement shall not affect the validity or continuing force and effect of any other provision, and any invalid provision shall be modified so as to be valid but give the Buyer the maximum protection allowed by law pertaining to the provision. The failure of either party hereto to insist, in any one or more instances, upon the performance of any of the terms, covenants or conditions of this Agreement, or to exercise any right herein, shall not be construed as a waiver or relinquishment of such term, covenant, condition or right as respects further performance.

13.3 Interpretation. In the event of a conflict between or among modifications to any of the body of this Agreement, any exhibit thereto, or a Contract Document, the later in date shall prevail; in the event of a conflict between or among the terms of this Agreement, the higher standard, shorter notice period, or greater requirement for Seller shall prevail; and in the event of a conflict between or among the terms of the Contract Documents, the higher standard, shorter notice period, or greater requirement for Seller shall prevail. The deletion of any printed, typed, or other portion of this Agreement shall not evidence an intention to contradict such deleted portion, and such contradictory language to the deletion shall not be deemed to have been inserted into this Agreement.

13.4 Titles. The titles given to the Articles of this Agreement are for ease of reference only and shall not be relied upon or cited for any other purpose.

13.5 Entire Agreement. This Agreement represents the entire and integrated agreement between the parties hereto and supersedes all prior negotiations, representations, or agreements, either written or oral. The terms in this Purchase Order can only be modified by written Change Order. Terms on any other written documents, whether signed by representatives of the parties or not, such as signed delivery tickets, etc., are not binding on the Buyer and Seller.

CON_PET'S 1ST RFP_0002210

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

*ZION JACKSONVILLE, LLC*
**Agreement Number: 216063P02**

**13.6 Buyer's Surety and Third Party Beneficiaries.** Except as expressly provided herein, no party is a third-party beneficiary to this Agreement. Notwithstanding the preceding sentence, the Buyer's surety is an express third-party beneficiary to this Agreement, and said surety has, notwithstanding any statutes or laws to the contrary, all defenses, rights and remedies the Buyer has toward the Seller. Seller's execution of this Agreement evidences Seller's awareness of any and all statutes, laws or judicial opinions that may prevent said surety from relying upon all defenses, rights and remedies of the Buyer, and Seller nonetheless knowingly consents to said surety's reliance upon such defenses, rights and remedies.

. END OF EXHIBIT A

CON_PET'S 1ST RFP_0002211

FILED DATE: 6/15/2026 5:13 PM 2026CH05725

*ZION JACKSONVILLE, LLC*
*Agreement Number: 216063P02*

# EXHIBIT B

## SCOPE, CLARIFICATION, ALTERNATES and UNIT PRICES
**Archer Western Contractors LLC**
Contractor for: FLORIDA DEPT. OF TRANSPORTATION
Project: Jax I-95/I-295 North Interchange DB
Archer Western Contractors LLC Project No: 216063

---

**Scope of Work:**
Furnish A-3 Select Fill

**Inclusions:**

| LINE | DESCRIPTION |
|---|---|
| 1 | The Buyer will purchase approximately 850,000 CY of A-3 Select Fill, to the extent suitable fill material is available at such site as of the date of this Agreement, from the Seller's borrow site property located off Eastport Road and Heckscher Drive for the referenced project. |
| 2 | The Buyer will be responsible for the excavation of the Select Fill material from the site, constructing and maintaining all hauls roads into the site, and the trucking of the material to the project. |
| 3 | The Seller will be responsible for obtaining all Federal, State and Local permits required for the excavation of the Select Fill material. The Buyer will be responsible for obtaining FDOT approval for the site as a job specific Borrow Site. |
| 4 | The Seller will be responsible for the investigation of endangered species on the site, including the Gopher Tortoise. If tortoises are found, the Seller will be responsible for their removal. |
| 5 | The Seller will make available to the Buyer approximately 150 acres, with an estimated 1,000,000 cy of material, for the Buyer's use. The Seller will designate such limits to the Buyer. Additionally, it is agreed between the Buyer and the Seller that the work will be performed in approximate 20-acre sections. Upon completion of the excavation of Select Fill and the restoration of the removed topsoil in a 20-acre section, the Buyer shall proceed to the next 20-acre section. |
| 6 | The Seller is responsible for all taxes associated with the property. |
| 7 | Buyer shall provide not less than 60 days prior written notice to Seller that Buyer wishes to enter Seller's property and excavate fill therefrom, or that the current excavation site will be depleted and another site will become necessary in 60 days. During such 60 day period, Seller shall make commercially reasonable efforts to obtain the required permits in connection therewith and to clear an approximately 20 acre section for Buyer's excavation activities. Upon completion of such permitting and clearing, Seller shall provide written notice to Buyer that such parcel is available for Buyer's excavation activities. |
| 8 | Upon notification by the Seller to the Buyer that a 20-Acre section is clear of Gopher Tortoises; and before excavation begins, the Buyer will install perimeter Silt Fencing to prevent the migration of Tortoises into the work area. |
| 9 | The Buyer will excavate the Select Fill to an anticipated Elevation of EL. +10.0, which is approximately 3' above groundwater. The Seller and Buyer will mutually agree to a Final Elevation based on field conditions. The Buyer will grade each 20-acre site to the agreed elevation +/- 3' before proceeding to the next 20-acre section. |
| 10 | The Seller will be responsible for Clearing of each 20-acre site prior to the Buyer's use. The Seller will also be responsible for the replanting of trees as each area is completed. |
| 11 | The Buyer will access the site off Eastport Road. The Buyer will be required to construct a haul road to the designated excavation areas for trucking. The Buyer will maintain such roads throughout the life of use. |
| 12 | The Seller will allow the Buyer to stage a small amount of construction materials and equipment on the property inside of the designated entrance gate. Additionally, the Buyer may also be allowed to place a small construction trailer on the site for the utilization of the Buyer's personnel working the site. |
| 13 | Quantities listed in the Unit Price Schedule (below) are approximate and are subject to change. The final quantity of Select Fill to be purchased by the Buyer will be determined by the Final Design requirements of the project. |
| 14 | The final quantity of Select Fill for payment will be based on a Before and After cross-section survey taken of the borrow site. The Seller may at his discretion conduct an independent survey of the site to verify the Buyer's survey. |
| 15 | The Seller will be paid Monthly for Select Fill material removed from the site. Basis of payment will be by truck load count. It is assumed that each truckload hauls 11.0 cy of material. The Buyer will periodically verify the 11.0 cy capacity, and make adjustments if necessary. The Buyer and Seller will mutually agree to such adjustments. |
| 16 | The Buyer will perform Quarterly cross-section surveys, if deemed necessary, to verify the accuracy of the Select Fill material removed by load counts. Such surveys performed by Buyer are subject to verification by Seller and Seller's performance of its own surveys. The Buyer will make adjustments to the Pay Quantity based on those surveys, and compensate the Seller accordingly. |
| 17 | The Buyer will record on a daily basis the number of truckloads of Select Fill removed from the borrow site. The Buyer will provide the Seller with copies of those daily load counts on a weekly basis. |
| 18 | It is anticipated, based on the Buyer's preliminary construction schedule, that the majority of the Select Fill material will be removed from the site within a three-year period beginning in Spring 2017. In no event shall the term of this Agreement extend beyond the fourth anniversary of the effective date hereof, unless extended by mutual agreement of Seller and Buyer, which may be withheld at either party's discretion. |
| 19 | Unit Prices shown in the Unit Price Schedule are firm for the duration of the project and will not be subject to escalation. |
| 20 | Sales Tax shall be billed on a separate line item on each invoice, and such sales tax shall be paid by the Buyer. |
| 21 | The applicable requirements of form FHWA 1273 (revised May 1, 2012) - Required Contract Provisions for Federal Aid Construction Contracts, are hereby incorporated by reference into this agreement. |

**Exclusions:**

| LINE | DESCRIPTION |
|---|---|
| 1 | The Seller will not be responsible for any Maintenance of Traffic (MOT) either within or beyond the Seller's property. |
| 2 | The Seller will not be responsible for any Erosion Control located either within or beyond the Seller's property. The Buyer will install Soil Tracking Devices, if deemed necessary, to prevent soil tracking onto local streets. |
| 3 | The Seller will not be responsible for maintaining the Buyer's entrance gate into the property off Eastport Road. However, the Seller will be responsible for maintaining the other gates which currently front Eastport Road. |
| 4 | The Seller will not be responsible for any damage that may occur to equipment and/or materials working within or leaving the Seller's property. |

---

CON_PET'S 1ST RFP_0002212

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

**Alternates:**

The Alternates listed herein shall be considered as options to the Buyer. Seller shall be bound to perform any or all of the Alternates for the price or prices indicated if the Buyer, in Buyer's sole discretion, exercises his right to Seller's performance of any or all of the Alternates listed.

| LINE | DESCRIPTION | | | | TYPE | AMOUNT |
|------|-------------|--|--|--|------|--------|

**Unit Price Schedule:**

If this is a unit price Agreement, quantities provided are estimates only and may vary. There is no guarantee that any or all quantity of any item will be realized.

Subject to Retention of:          0%

Unless noted otherwise, the Amounts shown are listed in US Dollars

| ITEM NUMBER | DESCRIPTION | PHASE CODE | U.O.M. | QTY. | UNIT PRICE | AMOUNT |
|-------------|-------------|------------|--------|------|-----------|--------|
| 001 | Purchase A3 Select Fill | 32.3200.00.10 - 08 | CY | 850,000.000 | $5.500 | $4,675,000.00 |
| 002 | Florida State Sales Tax | 32.3200.00.10 - 08 | % | 4,675,000.000 | $0.060 | $280,500.00 |
| 003 | Duval County Sales Tax | 32.3200.00.10 - 08 | % | 5,000.000 | $0.010 | $50.00 |

| Total Estimated Value of Unit Price Purchase Order: | $4,955,550.00 |
|---|---|

End of Exhibit B - except see following attachments as described in this Exhibit.

CON_PET'S 1ST RFP_0002213

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

ZION JACKSONVILLE,LLC
Agreement Number: 216063P02

# EXHIBIT C

## CONTRACT DOCUMENTS

Archer Western Contractors LLC
Contractor for: FLORIDA DEPT. OF TRANSPORTATION
"Project": Jax I-95/I-295 North Interchange DB
Archer Western Contractors LLC Project No. 216063

**Addenda**
    **ID#**        **DESCRIPTION**

**Project Specifications**
    **ID#**        **DESCRIPTION**

**Project Drawings**
    **ID#**        **DESCRIPTION**

End of Exhibit C - except see following Attachments if described in this Exhibit C.

Report EXHIBIT C Ver. Date: 14-APR-2010
Printed on: 11-04-2016

Page 1

CON_PET'S 1ST RFP_0002214

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

*ZION JACKSONVILLE,LLC*
Agreement Number: 216063P02

# EXHIBIT I

## PARTIAL and FINAL WAIVER and RELEASE FORMS

**Archer Western Contractors LLC**
Contractor for: FLORIDA DEPT. OF TRANSPORTATION
"Project": Jax I-95/I-295 North Interchange DB
Archer Western Contractors LLC Project No. 216063

As stated in Article 3.10 – Waivers and Affidavits, in Exhibit A, attached are the project specific waivers and affidavits, subject to change at the Contractors option.

End of Exhibit I – except PARTIAL and FINAL WAIVER and RELEASE FORMS are attached hereafter and/or available upon request

CON_PET'S 1ST RFP_0002215

FILED DATE: 6/15/2026 5:13 PM 2026CH05725

## FINAL WAIVER AND RELEASE OF CLAIMS FOR PAYMENT
## UNCONDITIONAL – ARCHER WESTERN CONSTRUCTION, LLC

STATE OF _____

COUNTY OF _____

TO WHOM IT MAY CONCERN:

WHEREAS, the undersigned ("Undersigned") has been employed by ____ ("Contractor") to furnish and install ____ for the project known as I-95 and I-295 North Interchange, Jacksonville, FL ("Project") of which Florida Department of Transportation, District 2 is the owner ("Owner") and on which Archer Western Contractors, LLC is a contractor (herein referred to as the "General Contractor").

The Undersigned, for and in consideration of ____ ($  ) Dollars and in consideration of such and other good and valuable considerations, the receipt whereof is hereby acknowledged, do(es) for it heirs, executors, and administrators, herby waive and release the General Contractor, the General Contractor's surety, the Owner, and each of their insurers, parents, subsidiaries, affiliates, members, past and present officers, directors, heirs, and administrators, from any and all suits, debts, demands, torts, charges, causes of action and claims for payment, including claims under the laws or statutes of the municipality, State or Federal Government relating to Payment Bonds, the Miller Act, or other Act or statute including Prompt Payment statutes, or Bonds relating to the Project, and in addition all lien, or claim of, or right to, lien under municipal, State or Federal alws or statutes, relating to Mechanics' Liens, with respect to and on said above-described Project, and the improvements thereon, and on the material relating to Mechanics' Liens, Payment Bonds, the Miller Act or other law, Act or statute, with respect to and on said above-described premises, and on the material, fixtures, apparatus or machinery furnished, and on the moneys, funds or other considerations due or to become due from the Owner, on account of, arising out of or relating in any way to the labor, services, material, fixtures, equipment, apparatus or machinery furnished by the Undersigned, on the above-described Project from the beginning of time or any time hereafter, including extras. The Undersigned certifies, warrants, and guarantees that all work it has performed on the Project has been performed in accordance with its contract documents on the Project.

Date: _____          Name of Company: _____
                                              (Undersigned)

Signature: _____          Subscribed and sworn before me this ____ day of ____ ; 20 ____

Printed Name: _____          Notary Signature and Seal: _____

Title of Person Signing: _____

NOTE: *Extras include but are not limited to changes, both oral and written, to the contract, and Claims as defined in the Undersigned's contract with the Prime Contractor or Contractor. All waivers and releases must be for the full amount paid. If waiver and release is for a corporation, corporate name should be used, corporate seal affixed and title of officer signing waiver and release should be set forth. If waiver and release is for a partnership, the partnership name should be used, partner should sign and designate himself as partner.

## CONTRACTOR'S AFFIDAVIT

STATE OF _____

COUNTY OF _____

TO WHOM IT MAY CONCERN:

THE Undersigned, being duly sworn, deposes and says that (s)he X_____ of ____ ; who is the Contractor for the: ____ work on the project ("Project") located at I-95 and I-295 North Interchange, Jacksonville, FL, owned by Florida Department of Transportation, District 2 ("Owner") and on which Archer Western Contractors, LLC is also a contractor (known herein as the "Prime Contractor").

That the total amount of the contract including extras is $ ____ on which it has received payment of $ ____ prior to this payment. That all waivers and releases are true, correct and genuine and delivered unconditionally and that there is no claim either legal or equitable to defeat the validity of said waivers or releases. That the following are the names of all parties who have furnished material, equipment, services, or labor for said work and all parties having contracts or subcontracts for specific portions of said work or for material entering into the construction thereof and the amount due or to become due each and that the items mentioned included all labor, equipment services, and material required to complete said work according to plans and specifications. The Contractor agrees to indemnify, defend, and hold harmless, the General Contractor, the General Contractor's surety, and the Owner from any and all claims for alleged payment made by the Contractor's suppliers or subcontractors pertaining to the Project, whether or not listed below.

| NAMES | WHAT FOR | CONTRACT PRICE | PREVIOUSLY PAID | THIS PAYMENT | BALANCE DUE |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
| TOTAL LABOR, EQUIPMENT, SERVICES, AND MATERIAL TO COMPLETE |  |  |  |  |  |

That there are no other contracts for said work outstanding, and that there is nothing due or to become due to any person for material, labor or other work of any kind done or to be done upon or in connection with said work other than above stated.

Date: _____          Name of Company: _____
                                              (Undersigned)

Signature: _____          Subscribed and sworn before me this ____ day of ____ , 20 ____

Printed Name: _____          Notary Signature and Seal: _____

Title of Person Signing: _____

Revised September 1, 2011

CON_PET'S 1ST RFP_0002216

**PARTIAL WAIVER AND RELEASE OF CLAIMS FOR PAYMENT**
**UNCONDITIONAL – ARCHER WESTERN CONSTRUCTION, LLC**

STATE OF _____
COUNTY OF _____

TO WHOM IT MAY CONCERN:

WHEREAS, the undersigned ("Undersigned") has been employed by _____ ("Contractor") to furnish and install _____ for the project known as I-95 and I-295 North Interchange, Jacksonville, FL "Project") of which Florida Department of Transportation, District 2 is the owner ("Owner") and on which Archer Western Contractors, LLC is a contractor (herein referred to as the "General Contractor").

The Undersigned, for and in consideration of _____ ($ ____ ) Dollars, and in consideration of such sum and other good and valuable considerations, the receipt whereof is hereby acknowledged, do(es) for its heirs, executors, and administrators, hereby waive and release the General Contractor, the General Contractor's surety, the Contractor, the Contractor's surety, the Owner, and each of their insurers, parents, subsidiaries, related entities, affiliates, members, past and present officers, directors, heirs, and administrators from any and all suits, debts, demands, torts, charges, causes of action and claims for payment, including claims under the laws or statutes of the municipality, state or federal government relating to payment bonds, the Miller Act, or other act or statute including prompt payment statutes, or bonds relating to the Project, and in addition all lien, or claim, of, or right to lien, under municipal, state or federal laws or statutes, relating to mechanics' liens, with respect to and on said above described Project, and the improvements thereon, and on the material relating to mechanics' liens, payment bonds, the Miller Act or other law, act or statute, with respect to and on said above described premises, and on the material, fixtures, apparatus or machinery furnished, and on the moneys, funds or other considerations due or to become due from the Owner, on account of, arising out of or relating in any way to the labor, services, material fixtures, equipment, apparatus or machinery furnished by the Undersigned on the above described Project from the beginning of time through the date indicated below, including extras".

The Undersigned certifies, warrants, and guarantees that all work it has performed on the Project has been performed in accordance with its contract documents on the Project.

Date: _____     Name of Company: _____
                                                       (Undersigned)

Signature: _____     Subscribed and sworn before me this _____ day of _____, 20 _____

Printed Name: _____     Notary Signature and Seal: _____

Title of Person Signing: _____

NOTE: *Extras include but are not limited to changes, both oral and written, to the contract, and Claims as defined in the Undersigned's contract with the General Contractor or Contractor. All waivers and releases must be for the full amount paid. If waiver and release is for a corporation, corporate name should be used, corporate seal affixed and title of officer signing waiver and release should be set forth. If waiver and release is for a partnership, the partnership name should be used, partner should sign and designate himself as partner.

---

**CONTRACTOR'S AFFIDAVIT**

STATE OF _____
COUNTY OF _____

TO WHOM IT MAY CONCERN:

THE Undersigned, being duly sworn, deposes and says that (s)he X_____ of _____ who is the Contractor for the _____ work on the project ("Project") located at I-95 and I-295 North Interchange, Jacksonville, FL owned by Florida Department of Transportation, District 2 ("Owner") and on which Archer Western Contractors, LLC is also a contractor (known herein as the "General Contractor").

That it has received payment of $ ____ prior to this payment.

That all waivers and releases are true, correct and genuine and delivered unconditionally and that there is no claim either legal or equitable to defeat the validity of said waivers or releases. That the following are the names of all parties who have furnished material, equipment, services, or labor for said work and all parties having contracts or subcontracts for specific portions of said work or for material entering into the construction thereof and the amount due or to become due each, and that the items mentioned include all labor, equipment, services, and material required to complete said work according to plans and specifications. The Undersigned agrees to indemnify, defend, and hold harmless, the General Contractor, the General Contractor's surety, and the Owner from any and all alleged payment made by the Undersigned's suppliers or subcontractors pertaining to the Project, whether or not listed below.

| NAMES | WHAT FOR | CONTRACT PRICE | PREVIOUSLY PAID | THIS PAYMENT | BALANCE DUE |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
| TOTAL LABOR, EQUIPMENT, SERVICES, AND MATERIAL TO COMPLETE |  |  |  |  |  |

That there are no other contracts for said work outstanding, and that there is nothing due or to become due to any person for material, labor or other work of any kind done or to be done upon or in connection with said work other than above stated.

Date: _____     Name of Company: _____
                                                       (Undersigned)

Signature: _____     Subscribed and sworn before me this _____ day of _____, 20 _____

Printed Name: _____     Notary Signature and Seal: _____

Title of Person Signing: _____

Revised September 1, 2011

CON_PET'S 1ST RFP_0002217

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

ZION JACKSONVILLE,LLC
Agreement Number: 216063P02

# EXHIBIT K

## FEDERAL ACQUISITION REGULATIONS (FAR) – PURCHASE ORDERS

Archer Western Contractors LLC
Buyer for: FLORIDA DEPT. OF TRANSPORTATION
"Project": Jax I-95/I-295 North Interchange DB
Archer Western Contractors LLC Project No. 216063

### INCORPORATION OF FAR CLAUSES

If this Purchase Order involves funds from a Federal government contract, or funds at any tier relating to a Federal government contract, the following clauses from the Federal Acquisition Regulation and Code of Federal Regulations (collectively referred to herein as "FAR") are incorporated into the Purchase Order by reference where applicable and form a part of the terms and conditions of the Purchase Order. The full text of the FAR clauses may be found at http://www.acquisition.gov/far/. Seller agrees to flow down all applicable FAR clauses to lower-tier suppliers.

FAR clause 52.233-1 ("Disputes") shall only apply to any dispute between Buyer and Seller in any way relating to or arising from any act or omission of the Owner or its agents; Seller agrees to be bound to Buyer to the same extent that Buyer is bound to Owner, by the terms of the Contract Documents.

FAR 52.232-17 Interest, if incorporated into this Purchase Order, is incorporated only with respect to payments from the Owner which flow down to the Seller.

Where necessary to make the language of the FAR clauses applicable to the Seller, the term "contractor" or "offeror" in FAR shall mean "Seller", the term "contract" or "offer" in FAR shall mean "Purchase Order", and the terms "government", "contracting officer", and equivalent terms and phrases in FAR shall mean "Buyer".

If the date or substance of any of the FAR clauses listed below is different from the date or substance of the FAR clauses actually incorporated in the Prime Contract (meaning the contract between Buyer and the U.S. Government or between Buyer and its higher-tier contractor who has a contract with the U.S. Government), the date and/or substance of the clause incorporated by said Prime Contract shall apply instead.
In the event any of the listed FAR clauses specifically do NOT apply to Seller's Work or this Purchase Order, Buyer may, at its sole and exclusive option, waive the requirements of the specific FAR clause, but only after written notice from Seller seeking such waiver.

It is the specific intent of Buyer and Seller to include in this Purchase Order all FAR clauses, and any agency specific regulations (such as Defense Department, NASA FARS, and other agency specific regulations) applicable to the Work of this Purchase Order performed by Seller as required by the Prime Contract and the FAR. Seller acknowledges and represents to Buyer that it is familiar with the FAR (and any agency specific regulations) and its application to the Work of Seller and this Purchase Order. Therefore, to the extent the below non-exhaustive list of FAR clauses does not include all the FAR clauses required to be incorporated and flowed down in the Purchase Order in accordance with the Prime Contract and/or FAR, SELLER SPECIFICALLY AGREES THAT ANY NON-LISTED AND REQUIRED FAR (OR OTHER AGENCY REGULATIONS) CLAUSES ARE DEEMED INCORPORATED BY REFERENCE INTO, AND ARE A FULLY-INTEGRATED PART OF, THIS PURCHASE ORDER.

1. FAR FLOWDOWN CLAUSES INCORPORATED BY REFERENCE INTO THIS PURCHASE ORDER (in order of Procedence in case of any conflict between FAR's):
    a. All FAR and agency specific regulations incorporated by reference into Prime Contract;

    b. If this Purchase Order involves funds from a Federal government contract, or funds at any tier relating to a Federal government contract, the following FAR clauses:

        I. FAR Clauses Incorporated Into All Purchase Orders
        52.203-3 Gratuities

        52.203-5 Covenant Against Contingent Fees

        52.203-8 Cancellation, Rescission, and Recovery of Funds for Illegal or Improper Activity

        52.203-10 Price or Fee Adjustment for Illegal or Improper Activity

        52.204-9 Personal Identity Verification of Contractor Personnel

CON_PET'S 1ST RFP_0002218

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

*ZION JACKSONVILLE,LLC*
Agreement Number: 216063P02

52.219-8 Utilization of Small Business Concerns. (Seller also agrees, as part of this Purchase Order, to submit a Small Business Self-Certification specific to this Purchase Order. A blank, project specific, Small Business Certification form can be obtained from the Buyer upon request.)

52.222-4 Contract Work Hours and Safety Standards Act-Overtime Compensation

CONTRACT WORK HOURS AND SAFETY STANDARDS ACT.- OVERTIME COMPENSATION (JULY 2005)
(a) Overtime requirements. No Contractor or subcontractor employing laborers or mechanics (see Federal Acquisition Regulation 22.300) shall require or permit them to work over 40 hours in any workweek unless they are paid at least 1 and 1/2 times the basic rate of pay for each hour worked over 40 hours.

(b) Violation; liability for unpaid wages; liquidated damages. The responsible Contractor and subcontractor are liable for unpaid wages if they violate the terms in paragraph (a) of this clause. In addition, the Contractor and subcontractor are liable for liquidated damages payable to the Government. The Contracting Officer will assess liquidated damages at the rate of $10 per affected employee for each calendar day on which the employer required or permitted the employee to work in excess of the standard workweek of 40 hours without paying overtime wages required by the Contract Work Hours and Safety Standards Act.

(c) Withholding for unpaid wages and liquidated damages. The Contracting Officer will withhold from payments due under the contract sufficient funds required to satisfy any Contractor or subcontractor liabilities for unpaid wages and liquidated damages. If amounts withheld under the contract are insufficient to satisfy Contractor or subcontractor liabilities, the Contracting Officer will withhold payments from other Federal or federally assisted contracts held by the same Contractor that are subject to the Contract Work Hours and Safety Standards Act.

(d) Payrolls and basic records.
(1) The Contractor and its subcontractors shall maintain payrolls and basic payroll records for all laborers and mechanics working on the contract during the contract and shall make them available to the Government until 3 years after contract completion. The records shall contain the name and address of each employee, social security number, labor classifications, hourly rates of wages paid, daily and weekly number of hours worked, deductions made, and actual wages paid. The records need not duplicate those required for construction work by Department of Labor regulations at 29 CFR 5.5(a)(3) implementing the Davis-Bacon Act.
(2) The Contractor and its subcontractors shall allow authorized representatives of the Contracting Officer or the Department of Labor to inspect, copy, or transcribe records maintained under paragraph (d)(1) of this clause. The Contractor or subcontractor also shall allow authorized representatives of the Contracting Officer or Department of Labor to interview employees in the workplace during working hours.

(e) Subcontracts. The Contractor shall insert the provisions set forth in paragraphs (a) through (d) of this clause in subcontracts that may require or involve the employment of laborers and mechanics and require subcontractors to include these provisions in any such lower tier subcontracts. The Contractor shall be responsible for compliance by any subcontractor or lower-tier subcontractor with the provisions set forth in paragraphs (a) through (d) of this clause.

(End of clause)

52.222-21 Prohibition of Segregated Facilities

52.222-22 Previous Contracts and Compliance Reports

52.222-26 Equal Opportunity

52.222-38 Compliance with Veterans' Employment Reporting Requirements

52.222-50 Combating Trafficking in Persons

52.222-54 Employment Eligibility Verification

52.223-6 Drug-Free Workplace

52.223-18 Contractor Policy to Ban Text Messaging While Driving

52.224-2 Privacy Act

52.225-1 Buy American Act - Supplies

52.225-3 Buy American Act- Free Trade Agreements - Israeli Trade Act

52.225-5 Trade Agreements

CON_PET'S 1ST RFP_0002219

FILED DATE: 6/15/2026 5:13 PM    2026CH05725

ZION JACKSONVILLE LLC
Agreement Number: 216063P02

52.225-8 Duty-Free Entry

52.225-9 Buy American Act Construction Materials

52.225-13 Restriction on Certain Foreign Purchases

52.225-20 Prohibition on Conducting Restricted Business Operations in Sudan – Certification

52.225-21 Required Use of American Iron, Steel, and Manufactured Goods-Buy American Act-Construction Materials

52.225-23 Required Use of American Iron, Steel, and Manufactured Goods-Buy American Act-Construction Materials Under Trade Agreements

52.225-25 Prohibition on Engaging in Sanctioned Activities Relating to Iran-Certification

52.227-9 Refund of Royalties

52.227-10 Filing of Patent Applications – Classified Subject Matter

52.232-27 Prompt Payment for Construction Contracts

52.232-40 Providing Accelerated Payments to Small Business Subcontractors

52.233-1 Disputes

52.236-13 Accident Prevention

52.242-13 Bankruptcy

52.245-1 Government Property

52.247-63 Preference for U.S. Flag Air Carriers

52.247-64 Preference for Privately Owned U.S. Flag Commercial Vessels

II. FAR Clauses Incorporated If this Purchase Order equals or exceeds $10,000:

52.222-23 Notice of Requirement for Affirmative Action to Ensure Equal Employment Opportunity for Construction.

52.222-27 Affirmative Action Compliance Requirements for Construction

52.222-40 Notification of Employee Rights Under the National Labor Relations Act

29 CFR Part 471, Appendix A to Subpart A: Notification of Employee Rights Under Federal Labor Laws

III. FAR Clauses Incorporated If this Purchase Order equals or exceeds $15,000:

52.222-36 Affirmative Action for Workers with Disabilities

iv. FAR Clauses Incorporated If this Purchase Order equals or exceeds $25,000:

52.204-10 Reporting Executive Compensation and First-Tier Subcontract Awards

v. FAR Clauses Incorporated If this Purchase Order equals or exceeds $100,000:

52.222-35 Equal Opportunity for Special Disabled Veterans, Veterans of the Vietnam Era and Other Eligible Veterans

52.222-37 Employment Reports on Special Disabled Veterans, Veterans of the Vietnam Era and Other Eligible Veterans

52.223-13 Certification of Toxic Chemical Release Reporting

52.223-14 Toxic Chemical Release Reporting

CON_PET'S 1ST RFP_0002220

ZION JACKSONVILLE,LLC
Agreement Number: 216063P02

vi. **FAR Clauses Incorporated if this Purchase Order equals or exceeds the Simplified Acquisition Threshold ($150,000 as of Jan 1, 2011):**

52.203-6 Restrictions On Subcontractor Sales To The Government

52.203-17 Contractor Employee Whistleblower Rights and Requirement To Inform Employees of Whistleblower Rights

52.215-2 Audit and Records-Negotiation

52.215-14 Integrity of Unit Prices

52.227-1 Authorization and Consent

52.227-2 Notice and Assistance Regarding Patent and Copyright Infringement

vii. **FAR Clauses Incorporated if this Purchase Order equals or exceeds $150,000:**

52.203-7 Anti-Kickback Procedures

52.203-12 Limitation on Payments to Influence Certain Federal Transactions

viii. **FAR Clauses Incorporated if this Purchase Order equals or exceeds $650,000:**

52.230-2 Cost Accounting Standards.

52.230-3 Disclosure and Consistency of Cost Accounting Practices.

52.230-5 Cost Accounting Standard - Educational Institution.

ix. **FAR Clauses Incorporated if this Purchase Order equals or exceeds $700,000:**

52.214-26 Audit and Records-Sealed Bidding

52.214-28 Seller Cost or Pricing Data-Modifications Sealed Bidding

52.215-12 Seller Certified Cost or Pricing Data

52.215-13 Seller Cost or Pricing Data - Modifications

x. **FAR Clauses Incorporated for all Purchase Orders (except small businesses) where the Purchase Order exceeds the flow down threshold as specified in the Buyer's approved Small Business Subcontracting Plan:**

52.219-9 Small Business Subcontracting Plan

**SMALL BUSINESS SUBCONTRACTING PLAN**
a. Seller shall adopt and comply with a Small Business Subcontract Plan (SBSP) similar to the Buyer's SBSP.

b. Seller shall submit its SBSP to the Buyer for the Buyer's review prior to execution of this Purchase Order. The Seller shall not sign this Purchase Order until the Seller's SBSP has been approved by Buyer; however, the Buyer's execution of the Purchase Order is not deemed an acceptance of the Seller's SBSP. The Seller's SBSP shall be reviewed by the Buyer to assure all minimum requirements of an acceptable SBSP have been satisfied.

c. The Seller's approved SBSP is explicitly incorporated into, and is made a material part of, this Purchase Order. Lack of an approved SBSP is a material breach of the Purchase Order. The Seller's approved SBSP is an express pre-requisite for payment by Buyer to Seller.

d. The acceptability of percentage goals shall be determined on a case-by-case basis depending on the supplies/services involved, the availability of potential Small Business (SB), Small Disadvantaged Business (SDB), Women-Owned Small Business (WOSB), Historically Underutilized Business Zone Small Business (HUBZoneSB), Veteran-Owned Small Business (VOSB), and Service-Disabled Veteran-Owned Small Business (SD-VOSB) concerns.

e. Once approved and implemented, Seller's SBSPs will be monitored through the Seller's submission of periodic reports (using the Federal government's electronic Subcontract Reporting System - eSRS at www.esrs.gov).

ZION JACKSONVILLE,LLC
Agreement Number: 216063P02

f. Prior to award of lower-tier Purchase Orders and Start of Work, Seller shall coordinate with the Buyer's Project Manager or Designated Small Business Project Coordinator, and Seller shall organize a Small Business project orientation. Seller's approved SBSP shall be reviewed with Buyer and Seller's PM and procurement professionals, to assure compliance with SBSP.

(End of clause)

xi. **FAR Clauses Incorporated if this Purchase Order equals or exceeds $5,000,000:**

52.203-13 Contractor Code of Business Ethics and Conduct

52.203-14 Display of Hotline Poster(s)

xiI. **FAR Clauses Incorporated if this Purchase Order equals or exceeds $10,000,000:**

52.222-24 Preaward On-Site Equal Opportunity Compliance Evaluation

c. Any other FAR or agency specific regulation required to be included and flowed down in this Purchase Order pursuant to the Prime Contract.

**End of Exhibit K**

CON_PET'S 1ST RFP_0002222

FILED DATE: 6/15/2026 5:13 PM 2026CH05725

ZION JACKSONVILLE,LLC
Agreement Number: 216063P02

# EXHIBIT M

## SUBCONTRACTOR / SELLER QUALITY REQUIREMENTS

Archer Western Contractors LLC
Contractor for: FLORIDA DEPT. OF TRANSPORTATION

"Project": Jax I-95/I-295 North Interchange DB
Archer Western Contractors LLC Project No.: 216063.

The following Quality Assurance/Quality Control provisions are to supplement other Quality Assurance/Quality Control related requirements of this Agreement.

A:      This Subcontractor/Supplier warrants they are properly qualified to perform this Scope of Work.

B.      Subcontractor/Supplier shall work to the Contractors Quality Control Program documenting all installations and testing records in addition to/or supplementing the requirements of the Specifications. A copy of which will be submitted to the Contractor as completed for review and approval.

   1) Subcontractor shall develop a project specific Quality Control Plan for its work which must be approved by the Contractor prior to the Subcontractor beginning work.

   2) Subcontractor shall develop work plans for its Scope(s) of Work.

   3) Subcontractor shall work with Contractor to use the Three Phases of Control process for its Defined Features of Work.

C.      Subcontractor/Supplier is responsible to meet material and installer qualifications in accordance with the applicable Specification Sections included with this Scope of Work.

D.      Subcontractor/Supplier to provide all certifications, including mill test reports certifying compliance of all products supplied with Contract requirements, if applicable, to this Scope of Work.

E.      Subcontractor will hold pre-installation (Preparatory) conferences for work items in accordance with the requirements of the Contract Documents or as requested by the Contractor.

F.      Subcontractor shall provide all Quality Control required of this Subcontract Agreement in accordance with the requirements of the Contract Documents and this exhibit.

G.      Subcontractor shall furnish, install and demolish mock-ups as required of the Contract Documents for work included with this Subcontract Agreement where required. Where allowed, and approved in writing by the Contractor, mock-ups may be constructed in field with finished products.

H.      Contractor will assemble the Quality Control team required of the Contract Documents. Subcontractor will designate personnel to be responsible for the Quality Control work of this Subcontract Agreement and to coordinate all Quality Control requirements of Subcontractor's scope of work.

End of Exhibit M

CON_PET'S 1ST RFP_0002223

Case: 1:26-cv-08262 Document #: 1-1 Filed: 07/14/26 Page 130 of 251 PageID #:137
FILED DATE: 6/15/2026 5:13 PM 2026CH05725

# EXHIBIT 2

FILED DATE: 6/15/2026 5:13 PM    2026CH05725

## AMERICAN ARBITRATION ASSOCIATION

CASE NO:

ZION JACKSONVILLE, LLC, a
Delaware limited liability company;
FIRST ZION HOLDINGS, LLC, a
Delaware limited liability company;
DAJJ, LP, a Delaware limited
partnership; GOJAX LP, a Delaware
limited partnership; and NUJAX LP, a
Delaware limited partnership

       Claimants,

v.

ARCHER WESTERN
CONTRACTORS, LLC, a Delaware
limited liability company,

       Respondent.

_____/

## STATEMENT OF CLAIM

Claimant, ZION JACKSONVILLE, LLC; FIRST ZION HOLDINGS, LLC; DAJJ, LP;

GOJAX LP; and NUJAX LP (hereinafter collectively "Zion"), by and through undersigned

counsel, sues Respondent ARCHER WESTERN CONTRACTORS, LLC, a Delaware limited

liability company ("Archer Western"), and alleges as follows:

### SUMMARY OF CLAIM

This claim arises from the intentional, deceptive dumping and concealment practices by

a commercial contractor (Respondent) and its affiliates engaged in the construction of the I-

95 North Interchange Operational Improvements Project under a $176.8 million design-build

contract with the State of Florida, Department of Transportation, in violation of "Florida Litter

Law" §403.413, Florida Statutes.

Although having a Purchase Order Contract to p u r c h a s e and remove approximately 850,000 cubic yards of high-quality fine sand to an elevation of EL + 10.0 with the landowner of a 913-acre tract of land situated between the Broward River and Dunn Creek along the St. Johns River, Duval County, it is alleged that the contractor and its related affiliates knowingly and deceptively used the property without consent of the landowner to dump imported, unsuitable, non-native fill material and construction debris from existing, half-century old stormwater ponds associated with the demolition of both the I-95/I-295 and U.S. 17 (Main Street)/I-295 Interchanges. The highest and best use of the 913-acre tract is for the development of a master-planned industrial intermodal park or port related uses. It is alleged that the imported materials dumped and buried on the property result in the degradation of the property and stigmatization concerning the property's subgrade soil profile which is of significant importance to potential purchasers or joint venture partners.

In violating Florida's Litter Law, the landowner alleges that the contractor employed what was a legitimate purpose for being present upon and using their private property as a "front" or "cover" for what was an illegitimate purpose in importing and dumping pond-bottom material and deliberately concealing the dumped material by burying it so that it would remain hidden. Both the contractor and its affiliates acted under commercial purpose and for their own economic gain. The landowner alleges such intentional deceptive dumping and concealment practice stigmatizes the property or makes the use of the property uncertain so as to cause damages.

The claim sets forth seven counts for relief pursuant to the Florida Litter Law, §403.413, Florida Statutes, violation of private property rights sounding in trespass, organized fraud, gross negligence, breach of contract, unjust enrichment, and punitive damages.

FILED DATE: 6/15/2026 5:13 PM    2026CH05725

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

## JURISDICTION AND VENUE

1.      This is an action for damages up to $50,000,000.00, exclusive of interest, costs, attorney fees, treble damages, and punitive damages that Claimant is seeking.

2.      This action concerns, or otherwise relates to, Zion's real property that is located in Jacksonville, Duval County, Florida (the "Subject Property").

3.      At all material times, the parties resided and/or conducted business in Duval County, Florida.

4.      Zion Jacksonville, LLC is a foreign limited liability company with a place of business located in Duval County, Florida and is engaged in business activity in Jacksonville, Duval County, Florida.

5.      First Zion Holdings, LLC is a foreign limited liability company engaged in business activity in Jacksonville, Duval County, Florida.

6.      DAJJ, LP is a foreign limited partnership engaged in business activity in Jacksonville, Duval County, Florida.

7.      GOJAX LP is a foreign limited partnership engaged in business activity in Jacksonville, Duval County, Florida.

8.      NUJAX LP is a foreign limited partnership engaged in business activity in Jacksonville, Duval County, Florida.

9.      First Zion Holdings, LLC; DAJJ, LP, GOJAX LP, and NUJAX LP are successors in interest to Zion Jacksonville, LLC.

10.     Respondent Archer Western is a foreign limited liability company with a place of business in Tampa, Florida and is engaged in and doing business in Jacksonville, Duval County, Florida.

FILED DATE: 6/15/2026 5:13 PM    2026CH05725

11.     Archer Western, which is a division of The Walsh Group, is a contractor providing construction services for a broad range of project types, including civil, transportation, water treatment, and industrial projects.

12.     Jurisdiction and venue are proper in Jacksonville, Duval County, Florida given that each cause of action arose and/or accrued in Duval County, and the Subject Property is located in Duval County.

13.     Zion and Archer Western entered into a Purchase Agreement, as discussed more fully herein, that the Fifth District Court of Appeal has decided includes a mandatory arbitration provision. Therefore, AAA has jurisdiction.

## COMMON FACTUAL ALLEGATIONS

### The Subject Property

14.     Zion owns and has exclusive possession of the Subject Property located at 0 Kraft Road, Jacksonville, Duval County, Florida 32218.

15.     During the pertinent time, the Subject Property was approximately 913 total acres and consists of approximately 190 acres of wetland, as well as some submerged land, and the remaining approximately 723 acres are uplands.

16.     The Subject Property's road frontage includes both State Road 105, known locally as Hecksher Drive or Zoo Parkway, and Eastport Road which are within close proximity to two nearby interchanges with I-295 at Pulaski Road and State Road 105. The northern portion of the property has rail connectivity with CSX Railroad. The southern portion of the property fronts the deep-water channel of the St. Johns River. The entire Subject Property forms a peninsula with abutting waterways that include the Broward River, Dunn Creek, and the St. Johns River.

17.     The Subject Property is well-positioned and presently zoned for industrial

FILED DATE: 6/15/2026 5:13 PM    2026CH05725

development of all types, but offers the characteristics of intermodal connection and critical mass that other competing properties lack.

18.    Ultimately, the Subject Property's target market included end-users who seek to develop the largest of distribution warehouses with floor slabs areas of 1,000,000 square feet or more with high static and dynamic load bearing capacities needed for block stacking and material handling equipment operation.

19.    Another fairly rare site characteristic of the Subject Property is that its subgrade soils predominantly consist of high-quality fine sand to a significant depth. The deposits of high-quality fine sand have a consistent gray to bleached-white or gold-tan appearance that show, once vegetative cover is removed, on the surface of the land and in soil borings.

20.    From a geotechnical perspective, such high-quality fine sand is desirable for construction due to its granular-size distribution, dense and uniform proportion, permeability, compressibility, and shear strength.

21.    These characteristics all relate to high-quality fine sand's ability to uniformly hold heavy structural loads. Subgrade soils are considered problem soils when they are highly expansive or highly compressible such as silts, clays, or organic soils that do not provide reasonable uniform support.

22.    For development purposes, high-quality fine sand is considered to have a premium over other soil types such as stone, gravel, silt, clay, or organic materials.

23.    For example, high-quality fine sand is classified by the American Association of State Highway and Transportation Officials ("AASHTO") to be A-3, Select-Fill. Within AASHTO's seven classified soil groups, A-3 soil rates higher than A-1-a soil consisting of stone fragments or gravel or A-2-4 soil consisting of silty or clayey gravel sand.

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

24. The Subject Property had substantial subgrade deposits of this high-quality A-3, Select Fill above the normal groundwater table in certain interior portions of the overall 913- acre tract.

### FDOT Design-Build Contract

25. In late 2016, Archer Western contracted with the Florida Department of Transportation ("FDOT") for Archer Western to complete a large-scale construction project to reconfigure the north interchange of I-95 and I-295 which is referred to by FDOT as the "I-95 North Interchange Operational Improvements Project" or "North I Project" (the "North I Project").

26. The scope of the North I Project, which had a Design-Build Contract value of $176.8 million, included ramp demolition and reconstruction, bridge construction, and road work.

27. In securing its Design-Build Contract with FDOT, Archer Western competed with two other design-build consortiums to construct the public infrastructure project and, to advance its competitive score, Archer Western touted its "proven experience in soil remediation" by identifying past projects in which geotechnical challenges were overcome with innovative soil improvement techniques.

28. To advance its competitive position, Archer Western also based its technical proposal and estimated project bid price, in part, on reducing the volume of fill material exported from FDOT's North I Project site and, instead of exporting fill material away from the North I Project, Archer Western contemplated re-using fill material from the existing stormwater ponds of both the I-95/I-295 and U.S. 17 (Main Street)/I-295 Interchanges within FDOT's North I Project site. As such, Archer Western repeatedly referred to the North I Project as being an "import project" rather than an "export project."

29. FDOT maintains standards for the materials used in its projects. For example,

FILED DATE: 6/15/2026 5:13 PM    2026CH05725

FDOT requires the usage of A-3 Select Fill, a type of structural fill resembling fine sand and free from roots and debris, at its sites, including the North I Project.

### Purchase Order Contract

30.    In order to fulfill its obligations related to the North I Project, Archer Western sub-contracted with additional parties for labor and/or materials, including, but not limited to, Zion.

31.    On February 6, 2017, Archer Western entered into a Purchase Order Contract with Zion to obtain fill materials for the North I Project. A true and correct copy of the Purchase Order Contract between Zion and Archer Western is attached hereto as **Exhibit A**.

32.    Specifically, Archer Western agreed to purchase approximately 850,000 cubic yards of A-3 Select Fill and be responsible for the excavation of that fill material. *See* **Exhibit A**.

33.    Pursuant to the contract, Archer Western would excavate the fill materials to an elevation of EL + 10.0, which is approximately three feet above groundwater. *See* **Exhibit A**.

34.    Zion agreed to designate and make available approximately 150 acres of the Subject Property containing a sufficient amount of fill material. *See* **Exhibit A**.

35.    Both Zion and Archer Western agreed that Zion would remove the fill material in sections of approximately 20 acres. *See* **Exhibit A**.

36.    These sections of the Subject Property were designated as Phase I, Phase II, Phase III, Phase IV, Phase V, and Phase VI, respectively.



FILED DATE: 6/15/2026 5:13 PM   2026CH05725

37.     Zion considered that the finished condition of the Subject Property, following Archer Western's removal of fill material, would advance potential development and marketing of the property for master-planned industrial park and potential port-related uses.

38.     By clearing the former vegetative cover and creating a level topography with expanded silviculture plantings, it was anticipated that the property's site characteristics would be better "showcased" to potential buyers or joint venture partners.

39.     Moreover, Zion would receive market-based compensation for exported A-3, Select Fill removed by Archer Wester for use in FDOT's North I Project.

40.     In order to verify the suitability of the fill material, FDOT performed pre-excavation testing of the fill material on the Subject Property for quality control purposes. *See* **Exhibit A**.

41.     Once Archer Western removed the fill material from the Subject Property, the fill material was not subject to return or refund. *See* **Exhibit A, Articles 7.6 and 7.7**.

42.     Archer Western and employees, representatives, subcontractors, and/or agents of Archer Western, were not authorized to enter to Subject Property for any purpose other than what was explicitly spelled out in the contract.

43.     Archer Western and employees, representatives, subcontractors, and/or agents of Archer Western, were never authorized, by contract or otherwise, to bring onto, dispose of, or leave any materials on the Subject Property. This includes importing, disposing of, or otherwise leaving non-native materials on the Subject Property.

44.     The contract between Archer Western and Zion never contemplated that Archer Western and employees, representatives, subcontractors, and/or agents of Archer Western, would bring any materials to, much less dump any materials, non-native or other, on, Zion's property.

45. Zion never agreed, through contract or otherwise, to provide disposal services to Archer Western and employees, representatives, subcontractors, and/or agents of Archer Western, or to allow the Subject Property to serve as a dump site.

46. Archer Western and employees, representatives, subcontractors, and/or agents of Archer Western, were never authorized to excavate and/or remove from the Subject Property fill material below the elevation of EL + 10.0.

47. Archer Western contracted with various subcontractors for the North I Project, including but not limited to, Florida Roads Trucking, LLC, GEC Trucking & Construction, Inc., Capps Land management and Trucking, Inc., Jason's Hauling, Inc., and Murugan Trucking & Excavating, Inc. (individually and collectively "the Subcontractors").

48. Archer Western's contracts with the Subcontractors included a scope of services whereby the Subcontractors would, among other responsibilities, haul dirt from a site identified by Archer Western. That site was the Zion Property.

49. Archer Western had its own trailer on the Zion Property and Archer Western's employees were on site at the Zion Property to direct the Subcontractors' drivers and sign the Subcontractors' hauling tickets indicating the work performed each day.

50. The Subcontractors followed directions provided by Archer Western and its employees, agents, and/or representatives.

### Geotechnical Analysis

51. Prior to Archer Western excavating and removing fill material from the Subject Property, FDOT required that extensive geotechnical analysis, including over 100 soil borings, be accomplished to ensure that the fill material from the Subject Property was of sufficient quality for use on its North I Project.

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

52. The pre-excavation soil borings on the Subject Property confirmed a predominance of A-3, Select Fill material for elevations both above and below EL + 10.0.

53. Prior to commencing construction of its North I Project, FDOT also required extensive geotechnical analysis, including soil borings, be performed on existing stormwater ponds at both the I-95/I-295 and U.S. 17 (Main Street)/I-295 Interchanges.

54. As part of its consortium which was awarded the FDOT design-build contract, Archer Western's geotechnical consultant, Universal Engineering Services ("UES") also performed its own geotechnical analysis, including soil borings, that identified soil types within the existing stormwater ponds at both the I-95/I-295 and U.S. 17 (Main Street)/I-295 Interchanges.

55. UES concluded that some of the fill material in the existing stormwater ponds could potential be used for the North I Project as suitable for construction *if and only if* a variety of methods or techniques to surcharge and monitor any soil settlement were implemented; however, without application of such methods or techniques, UES considered the fill material originating from the existing stormwater ponds to be *unsuitable* for construction within FDOT's North I Project.

### Subject Property's Master-Planning and Marketing

56. In order to advance the master-planning and marketing of the Subject Property, Zion vetted and engaged a team of highly reputable and experienced land developers, land planners, and engineers.

57. Zion's development consultants recommended Zion begin master environmental and stormwater permitting for the entirety of the site once Archer Western's earthwork project was completed.

58. Timing was of the essence in relation to the economic and market conditions

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

relating to both the property's master-planned industrial intermodal park and potential port uses.

59.     The real-estate market for master-planned industrial intermodal park, particularly, has been vibrant and strong.

### Discovery of Deception and Concealment

60.     By December 2020, Archer Western was in the process of excavating Phase VI of the Subject Property.

61.     On or about December 15, 2020, Zion discovered dump trucks bearing the name and USDOT number of one of Archer Western's Subcontractors, Florida Roads Trucking, LLC ("Florida Roads"), dumping unknown, non-native, sludge-like materials on Phase VI of the Subject Property.



FILED DATE: 6/15/2026 5:13 PM   2026CH05725




FILED DATE: 6/15/2026 5:13 PM    2026CH05725

62. These unknown, non-native materials were markedly different in color and consistency than the fine, light tan, A-3 Select Fill Material that Archer Western was excavating from the Zion's property.





FILED DATE: 6/15/2026 5:13 PM   2026CH05725

63. Additionally, Zion discovered that an enormous pit had been excavated on Phase VI, apparently below EL + 10.00, breaching the water table, and that construction excavating equipment bearing the insignia of Archer Western were being operated so as to deposit and spread the non-native, sludge-like materials in and about the pit.

64. Since Zion's discovery, the area in and about the pit within Phase VI has been prone to flooding several acres of the Subject Property. Zion believes the area to be perched by the non-native, sludge-like materials Archer Western deposited into the pit.



FILED DATE: 6/15/2026 5:13 PM   2026CH05725



65.     Immediately following Zion's discovery of the unauthorized dumping and unauthorized excavation, Archer Western's geotechnical engineers, UES, conducted soil testing on Phase VI later that same week.

66.     Subsequently, UES issued a report confirming that "clean fine sand is being exported out of the site and being replaced with imported clay to very clayey fine sand and variable amounts of organics." UES further concluded, "it is our opinion that the imported material observed **is not considered suitable** for use as structural fill nor has the potential to be blended to form a suitable soil." A true and correct copy of the UES field report is attached hereto as **Exhibit B** (emphasis added).

67.     After confronting Archer Western with its discovery, Archer Western – acting without notice, approval, or authority from Zion – began pumping water from the pit it had excavated into an adjacent wetland on the Subject Property.

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

68.     Later, after further questioning from Zion, Archer Western responded to Zion that dewatering was required in order to remove the non-native, sludge-like materials from the pit.

69.     Consequently, Archer Western sought permission and authorization from Zion to pump vast quantities of water into wetland areas within the Subject Property outside of Phase VI.

70.     At the time, Archer Western confirmed that the imported non-native fill material on Phase VI appeared to have been exported from an existing stormwater pond within FDOT's North I Project, but that such importing and dumping practices resulted from the independent rogue actions of one of Archer Western's project managers who was no longer with the company.

71.     Zion also began questioning Archer Western on whether similar practices had been undertaken with respect to Phases I-V prior to Archer Western commencing its excavating on Phase VI.

72.     Archer Western initially denied having any knowledge of whether it had imported and dumped non-native fill material during its earthwork project on Phases I-V.

73.     In light of the foregoing, after further investigation and research with its own retained consultants, Zion declined to give Archer Western permission or authorization to dewater the pit on Phase VI and further gave notice to Archer Western to cease and desist all further activities on its earthwork project on the Subject Property until further notice.

74.     From interviews with several knowledgeable sources and review of available public resource data bases over the internet, Zion became aware that Archer Western may have engaged in similar importing and dumping practices with respect to prior Phases I-V.

75.     It was suspected that the non-native, sludge-like fill materials originated from the bottom of several of the stormwater ponds within the I-95/I295 and U.S 17 (Main Street)/I-295 Interchanges withing FDOT's North I Project.

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

76.     For example, Zion discovered aerial photographs below which show the condition of Phase I before Archer Western commenced its activities and during the course of its activities.







FILED DATE: 6/15/2026 5:13 PM    2026CH05725

77.    From interviews with several knowledgeable sources and review of available public resource data bases over the internet, Zion considered that Archer Western may have engaged in a deceptive practice of importing non-native fill materials and then covering up the imported non-native fill materials with native A-3, Select Fill with an intent to conceal. Archer's practice of dumping and concealing non-native material was not limited to Phase VI.

## Stigma and Uncertainty

78.    While Zion's chief motivation for entering into a Purchase Order Contract with Arther Western was to advance potential development and pursue the marketing of the Subject Property for master-planned industrial intermodal park and potential port uses and, upon completion of Archer Western's earthwork project to "showcase" the property's site characteristics to potential purchasers or joint venture partners, the importing and dumping practices discovered on Phase VI and the potential that similar importing and dumping practices may have occurred on Phases I-V, resulted in leaving the Subject Property degraded with a negative market perception, risk, uncertainty, and/or stigma.

79.    On a practical basis, considering reasonable and prudent expectations in the real estate market, Zion's efforts to develop or market the Subject Property, including advancing master environmental and stormwater permitting on the Subject Property, were held in check and were substantially impaired as a result of negative market perception, risk, uncertainty, and/or stigma.

80.    Additionally, the impaired condition of Phase VI and the questions raised concerning Phases I-V both handicapped and suspended marketing and the ability to respond to the more serious inquiries from sophisticated market participants including representatives of potential purchasers or joint venture partners relating to the development potential of any parcels that would include Phases I-VI. One of the primary areas of inquiry for such market participants

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

is the quality of subgrade soils.

## Due Diligence Programs and Protocols

81.     Initial site inspections of each of the respective Phases I-V revealed instances where debris were found at shallow surface levels including chunks of concrete, asphalt, or rebar.

82.     Photographs below are representative of those taken to document the field observations occurring in and about August 2021.

  

83.     Having witnessed dumping activities relating to the imported, unsuitable, non-native fill material on Phase VI and then discovering public-resource database aerial photographs that seem to indicate similar importing and dumping practices on Phases I-V, Zion established a due diligence program and protocol with its own geotechnical consultant, Meskel & Associates Engineering, Inc. ("MAE") to conduct soil borings according to a pattern of testing for each of the respective Phases I-V.

84.     Zion and Archer Western both participated in the soil borings occurring in and about September 2021 with both MAE and UES performing the actual soil borings including the taking of grab samples.

85.     To a varying extent, the soil borings showed the presence of imported, non-native fill material throughout Phases I-V. Although not as egregious as what was discovered to have occurred on Phase VI, there appeared to be distinct layers of imported, non-native fill material

FILED DATE: 6/15/2026 5:13 PM    2026CH05725

among the native A-3, Select Fill. These layers or pockets presented potential subgrade soil problems with respect to uniform compression and ultimate load bearing capacities.

86.     Without Archer Western or any of its subcontractors admitting to or otherwise informing Zion of any similar importing or dumping practices occurring with respect to Phases I-V and with Zion knowing that in any substantive negotiations with potential purchasers or joint venture partners would include examination of the quality of subgrade soils and include disclosure of any questionable soil conditions, Zion established a further due diligence program and protocol with MAI for a pattern of exploratory trenching for each of Phases I-V.

87.     Zion proceeded to perform exploratory trenching in and about January 2022 with MAE performing the actual trenching on behalf of Zion.

88.     The exploratory trenching further exposed, in some places, layers or seams of imported, non-native fill materials and, in some other places, distinct layers of imported, non-native fill materials among the native A-3, Select Fill sand.



89.     Daily project logs recently obtained by Zion confirm that Archer Western indeed hauled "unsuitable clay material," "embankment and muck material," and "stockpiled clay/muck" from the North I project site and dumped it on the Zion Property.

90.     In some places, trenching revealed pockets of more deeply buried construction debris with imported, non-native fill materials including concrete, asphalt, rebar, wood, tires, and

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

metal strapping characteristic of FDOT's highway embankments.



91.     The results of the exploratory trenching evidences an intention to conceal what was buried within areas that were over-excavated and then backfilled.

92.     To further identify likely origin or source areas from which Archer Western

FILED DATE: 6/15/2026 5:13 PM 2026CH05725

exported non-native fill materials from FDOT's North I Project for import to the Subject Property, Zion requested public records from FDOT concerning its North I Project.

93. Copies of certain invoices and truck tickets associated with Archer Western's subcontractors were made available to Zion in response to its public records requests submitted to FDOT under Chapter 119, Florida Statutes.

94. For example, certain invoices and truck tickets evidence "exporting" loads originating from FDOT's North I Project site to a destination synonymous with the Subject Property (like "Eastport Pit") and "importing" loads originating from the Subject Property to FDOT's North I Project site.

95. Accordingly, such "exporting" of loads from FDOT's North I Project site to the Zion Property include descriptions of work like "Haul Demo Concrete/Unsuitable Material Off-Site" or descriptions of contents like "Unsuitable," "Broken Asphalt," "Clay," "Strippings," or "Mud."

96. All of this, of course, is contrary to and departs from Archer Western's earlier representations to FDOT when competing for the Design-Build Contract that the project was to be an "import project" rather than an "export project."

97. In fact, Archer Western did not put its "proven experience in soil remediation" to work when confronted with the geotechnical challenges in FDOT's North I Project and did not implement "innovative soil improvement techniques" like surcharging or monitoring any soil settlement when excavating and re-using fill material from the existing stormwater ponds within the I-95/I-295 and U.S. 17 (Main Street)/I-95 Interchanges.

98. Instead, Archer Western and its subcontractors exported non-native fill material from the existing stormwater ponds and other areas within the I-95/I-295 and U.S. 17 (Main

Street)/I-95 Interchanges for import to the Zion Property where the non-native fill materials were dumped below EL + 10.0 and backfilled. Archer Western then dressed the top layer of soil at the surface in each phase with native A-3, Select Fill so as to complete the deception and concealment.

## Winners and Losers

99.     Through its importing and dumping of non-native fill materials and debris, and its deception and concealment relating thereto, Archer Western both avoided millions of dollars of expense of hauling costs and disposal charges for exporting unsuitable materials elsewhere and also avoided paying Zion for A-3, Select Fill sand excavated and removed below EL + 10.0.

100.     The scope and scale of such deception and concealment over Archer Western's earthwork project on the Subject Property did not result from some plan hatched by a single, rogue project manager (who in any event was the employee and responsibility of Archer Western).

101.     Rather, the scope and scale of such deception and concealment over Archer Western's earthwork project on the Subject Property reflect both organization and coordination between Archer Western and its trucking subcontractors and their respective employees, agents, or others within their respective control.

102.     Such was the *modus operandi* of Archer Western, including its Subcontractors, over the course of its provision of contracting and construction services for FDOT's North I Project.

103.     Archer Western used the Subject Property for more than just the borrow of A-3, Select Fill, but as a hidden dump site for non-native fill materials and debris from FDOT's North I Project.

104.     When it comes to contractors who dump building or construction materials in such an unauthorized manner, the Florida Legislature adopted the "Florida Litter Law" §403.413, Florida Statutes, to hold accountable those who dump, throw, discard, place, deposit, or dispose

of building construction materials on private property without the consent of the owner and to provide relief to those whose private property is so taken advantage of by providing a means by which monies to remove or render harmless the litter, repair, or restore the property damaged, or pay triple damages arising out of dumping litter may be recovered from the offending party. The penalty is significant, in part, to provide a deterrence to illegal dumping.

105.     Archer Western and its Subcontractors littered when importing and dumping non-native fill materials and debris on the Subject Property without the *consent* of the property owner. Such actions were taken by Archer Western and its Subcontractors to advance their commercial purposes and seek economic gain.

106.     The Purchase Order Contract was strictly limited to the the *export* of A-3, Select Fill from the Subject Property. Instead of *enhancing* the use and value of the Subject Property through Archer Western's performance of the Purchase Order Contract, Zion received the *exact opposite* through Archer Western's deception and concealment.

107.     Archer Western and its Subcontractors engaged in conduct that was *ultra vires* from its Purchase Order Contract, without Zion's *consent,* and in violation of Zion's *private property rights.* In fact, Archer Western and its Subcontractors used its Purchase Order Contract, with its authorization to be present and use the Subject Property in order to export A-3, Select Fill from the Subject Property, as a *front* or *cover* to use the Subject Property as a hidden dump site for disposal of unsuitable materials and debris from FDOT's North I Project that Archer Western could not use.

108.     Under such false pretense, Archer Western and its Subcontractors cheated FDOT and the taxpaying public when being awarded the $176.8 million Design-Build Contract with FDOT.

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

109.    Because neither Archer Western nor its Subcontractors admitted to or otherwise informed Zion of their importing and dumping practices on Phases I-V, Zion lost time and suffered delay as it implemented its own due diligence programs and protocols to discover and determine whether or not non-native fill materials had been imported and dumped and buried on the Subject Property and, if so, to what extent.

110.    As a direct result of Archer Western and its subcontractors violating Zion's property rights by importing and dumping non-native fill materials and debris from the North I Project on the Subject Property, Zion has been (a) frozen and held in check in being able to proceed with environmental and stormwater permitting on the entire Zion Property, (b) handicapped and suspended in its efforts to both develop its master-planned industrial intermodal park and market the Subject Property to potential purchasers or joint venture partners, (c) required to expend monies for due diligence programs and protocols to determine whether or not non-native fill materials had been imported and dumped and buried on the Subject Property and, if so, to what extent, and finally, (d) if determining that same is economically feasible, Zion will be required to expend further monies to establish and implement a plan to remove or remediate the non-native fill materials and debris so as to restore the Subject Property.

111.    Regarding Phases I-V, it appears that Zion will have to implement a plan to first remove or remediate the non-native fill materials and debris by first separating non-native fill material and debris from native A-3, Select Fill with a track excavator, determine whether non-native fill material should be removed and exported from the Subject Property or properly blended with native A-3, Select Fill, and, finally, import A-3, Select Fill to replace any of the non-native fill materials and debris removed so as to restore the Subject Property to EL + 10.0.

112.    Regarding Phase VI, it appears Zion will have to implement a plan to dewater the

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

pit and remove all non-native, sludge-like materials, resolve the apparent perching problem regarding the water table, import A-3, Select Fill to replace all non-native, sludge-like materials so as to restore the Subject Property to EL + 10.0.

113. Far from being able to "showcase" the Subject Property, Zion has lost both *time* and *money* as a direct result of the deception and concealment accomplished by Archer Western and its Subcontractors.

114. Zion has retained the law firms of Murphy & Anderson, P.A. and Brigham Property Rights Law Firm, PLLC to represent it in connection with this action and have agreed to pay reasonable fees and expenses, for which Respondents are liable pursuant to applicable Florida law.

115. Zion's investigation into the extent of the dumping on Phases V and VI, as well as the potential dumping in other areas of the Subject Property, remains ongoing.

116. All conditions precedent to the bringing of this action, both legal and contractual, have been performed, excused, or waived.

## COUNT I
### Violation of Florida Statutes 403.413 (2020)

117. Zion reasserts, realleges and incorporates by reference Paragraphs 1-116 as though set forth fully herein.

118. This is an action pursuant to the Florida Litter Law, §403.413 Florida Statutes.

119. Archer Western, through its employees, agents, subcontractors, representatives, or others within its control, intentionally and illegally dumped and disposed of litter, garbage, rubbish, trash, refuse, building or construction materials, and unknown materials on the private property of Zion for economic gain.

120. The amount of the litter and unknown materials illegally dumped on Zion's private property exceeds 500 pounds in weight or 100 cubic feet in volume and was dumped for

commercial purposes.

121. Archer Western dumped and disposed of the litter and unknown materials for economic gain, including but not limited to, economic gain related to the North I Project.

122. Zion never granted Archer Western permission to dump or dispose of the litter and unknown materials on its property.

123. As a result of Archer Western's illegal dumping of litter and unknown materials on its property, Zion has suffered damages, including the loss of value to its property, loss of enjoyment of its property, loss of use of its property, attorneys' fees, experts' fees, and costs.

WHEREFORE, Claimant, Zion Jacksonville, LLC, requests this Panel enter judgment in its favor against Respondent, Archer Western Contractors, LLC, for all damages resulting from the violation of the Florida Litter Law, including treble damages and attorneys' fees, costs, and interest pursuant to Florida Statute §403.413, and such other relief as this Panel deems just and proper.

## COUNT II
### Trespass

124. Zion reasserts, realleges and incorporates by reference Paragraphs 1-123 as though fully set forth herein.

125. On multiple occasions, Archer Western, through its employees, agents, subcontractors, representatives, or others within its control, intentionally entered the Subject Property for reasons other than removal of the A3 sand and without Zion's knowledge or consent and caused unknown materials to be dumped, disposed of, and/or buried on the Subject Property.

126. In addition, on multiple occasions, Archer Western, through its employees, agents, subcontractors, representatives, or others within its control, intentionally entered the Subject Property without Zion's knowledge or consent and excavated areas of the Subject Property below

the acceptable elevation.

127. As a result of the trespass, Zion has suffered damages, including the loss of value to its property, loss of enjoyment of its property, loss of use of its property, injury to the property, attorneys' fees, experts' fees, and costs.

WHEREFORE, Claimant, Zion Jacksonville, LLC, requests this Panel enter judgment against Respondent, Archer Western Contractors, LLC, for all damages resulting from the trespass, attorneys' fees, costs, and such other relief as this Panel deems just and proper. In addition, Zion respectfully requests this Panel permit Claimant leave to amend this claim to seek punitive damages in the event record evidence is presented which would satisfy an award of such damages.

## COUNT III
### Organized Fraud

128. Zion reasserts, realleges, and incorporates by reference Paragraphs 1-123 as though set forth fully herein.

129. This is an action for Organized Fraud pursuant to Florida Statutes, §817.034.

130. Archer Western, through its systematic, ongoing course of conduct, engaged in a scheme to defraud Zion.

131. In order to carry out its scheme to defraud Zion, Archer Western communicated through the transfer of signs, signals, writing, sounds, images, data, or intelligences, in whole or in part by mail, wire, radio, electromagnetic, photoelectronic, or photo-optical systems, with known and unknown individuals, including representatives, employees, or agents, of the Subcontractors, including but not limited to, Florida Roads.

132. Through its scheme to defraud Zion, Archer Western used the Subject Property, without the knowledge or consent of Zion, as a dumping ground, and thereby obtained disposal services without paying for said services.

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

133. The aggregate value of the disposal services Archer Western obtained through its Organized Fraud is $50,000.00 or more.

134. As a result of Archer Western's scheme to defraud, Zion has suffered damages.

WHEREFORE, Claimant, Zion Jacksonville, LLC, requests this Panel enter judgment against Respondent, Archer Western Contractors, LLC, for all damages resulting from the organized fraud, including attorneys' fees, costs, and such other relief as this Panel deems just and proper.

## COUNT IV
### Gross Negligence

135. Zion reasserts, realleges, and incorporates by reference Paragraphs 1-123 as though set forth fully herein.

136. In addition to the obligations imposed by the terms of the contract between Archer Western and Zion, Archer Western owed a heightened duty of care to Zion because Archer Western was in actual or constructive control of the instrumentality that caused the harm and/or the person or persons who committed the unauthorized dumping and/or trespassing.

137. Archer Western breached its legal duty to Zion and failed to exercise reasonable care and acted with reckless, willful, and wanton disregard for Zion by dumping non-native, unsuitable materials and litter on the Subject Property, breaching the water table on the Subject Property, pumping excess water into other areas within the Subject Property, and/or entering the Subject Property for those unauthorized purposes.

138. Archer Western knew or should have known that its willful and reckless conduct would result in the foreseeable damages to the Subject Property.

139. As a direct and proximate result of Archer Western's reckless conduct, Zion has suffered damages, including the cost of repairing and remediating the property, loss of value of its

FILED DATE: 6/15/2026 5:13 PM    2026CH05725

property, the loss of enjoyment of its property, the loss of use of its property, attorneys' fees, and costs.

WHEREFORE, Claimant, Zion Jacksonville, LLC, requests this Panel enter judgment against Respondent, Archer Western Contractors, LLC, for all damages resulting from the gross negligence, including attorneys' fees, costs, and such other relief as this Panel deems just and proper. In addition, Zion respectfully requests this Panel permit Claimant leave to amend this claim to seek punitive damages in the event record evidence is presented which would satisfy an award of such damages.

<div align="center">

**COUNT V**
**Breach of Contract**

</div>

140. Zion reasserts, realleges, and incorporates by reference Paragraphs 1-123 as though set forth fully herein.

141. On or about February 6, 2017, Zion and Archer Western entered into a contract, Agreement No. 216063P02 (the "Subject Contract"), for Archer Western to purchase fill material from Zion. *See* **Exhibit A**.

142. As more accurately stated in the terms, conditions, and specifications of the Subject Contract, Archer Western purchased approximately 850,000 cubic yards of fill material and was authorized to excavate that fill material only from designated areas and only to specified elevations.

143. Archer Western breached its contract with Claimant by failing to remove the fill material in accordance with the contractual provisions, specifically, by over excavating the specified phases below the elevations of EL +10.0 and by backfilling the over excavated areas with non-native and unsuitable material, thereby causing damage to Zion.

144. As a direct and proximate cause of Archer Western's breach, Zion has suffered

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

damages and will continue to suffer damages. These damages include, but are not limited to, loss of value of its property, the loss of enjoyment of its property, the loss of use of its property, the costs of retaining consultants to investigate and provide remedial recommendations, the costs to correct and/or remediate the damage/defects, and delay damages and lost profits resulting from Zion's inability to develop and sell the Subject Property.

WHEREFORE, Claimant, Zion Jacksonville, LLC, requests this Panel enter judgment against Respondent, Archer Western Contractors, LLC, for all damages resulting from the breach of contract, attorneys' fees, costs, and such other relief as this Panel deems just and proper.

## COUNT VI
### Unjust Enrichment

145.    Zion reasserts, realleges, and incorporates by reference Paragraphs 1-123 as though set forth fully herein.

146.    This is an action, in the alternative, for unjust enrichment.

147.    On or about February 6, 2017, Zion conferred certain benefits on Archer Western, specifically, the benefit of the use of the Subject Property to obtain fill material based on specification agreed upon by both parties.

148.    Archer Western was authorized to excavate that fill material only from designated areas and only to specified elevations.

149.    Archer Western voluntarily accepted and retained this benefit.

150.    Archer Western excavated and obtained fill material from Zion below the elevations of EL +10.0, which was contrary to the specifications agreed upon by both parties.

151.    Archer Western obtained and used the fill material for its economic gains associated with the Project.

152.    Zion and its real property, the Subject Property, have been damaged by Archer

Western's excavation and removal of fill material below the specified elevation.

153. The circumstances are such that it is inequitable for Archer Western to retain the benefits of its improper excavation without paying the value thereof to Zion.

WHEREFORE, Claimant, Zion Jacksonville, LLC, requests this Panel enter judgment against Respondent, Archer Western Contractors, LLC, for all damages resulting from the unjust enrichment, and such other relief as this Panel deems just and proper.

## COUNT VII
## Punitive Damages

154. Zion reasserts, realleges, and incorporates by references paragraphs 1-123 as set forth fully herein.

155. Defendant Archer Western recklessly, willfully, and in callous disregard for the safety of the public, illegally dumped or directed its agents to dump unsuitable materials on the Zion Property.

156. Defendant Archer Western's conduct was in willful and conscious violation of its duties under the law, industry standards, and federal regulations, including environmental protections.

157. At all times relevant, Defendant Archer Western had actual knowledge of the wrongfulness of its conduct and the high probability of injury or damage would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in the injury to Plaintiff Zion.

158. Alternatively, at all times relevant, Defendant Archer Western's conduct was so reckless or wanton in care that it constitutes a conscious disregard or indifference to the safety or rights of persons exposed to such conduct.

159. As a result, Plaintiff Zion suffered the damages alleged herein.

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

WHEREFORE, Plaintiff demands judgment against Defendant Archer Western for punitive damages to the extent allowed by law, together with costs of suit, and such other relief as the Panel deems just and proper.

Dated: June 27, 2025.

**BRIGHAM PROPERTY RIGHTS LAW FIRM, PLLC**

/s/ Andrew Prince Brigham
**ANDREW P. BRIGHAM**
Florida Bar No. 903930
abrigham@propertyrights.com
blaing@propertyrights.com
**TREVOR S. HUTSON**
Florida Bar No. 106017
thutson@propertyrights.com
111 Nature Walk Parkway, Suite 104
St. Augustine, FL 32092
904-730-9001 (phone)
904-733-7633 (fax)
*Attorneys for Claimant Zion Jacksonville, LLC*

**MURPHY & ANDERSON, P.A.**

/s/ Niels P. Murphy
**NIELS P. MURPHY**
Florida Bar No. 0065552
nmurphy@murphyandersonlaw.com
**DAVIS D. BALZ**
Florida Bar No. 0099285
dbalz@murphyandersonlaw.com
valic@murphyandersonlaw.com
1501 San Marco Boulevard
Jacksonville, Florida 32207
904-598-9282 (phone)
904-598-9283 (fax)
*Attorneys for Claimant Zion Jacksonville, LLC*

FILED DATE: 6/15/2026 5:13 PM 2026CH05725

**Exhibit A**

FILED DATE: 6/15/2026 5:13 PM   2026CH05725



## Attachment A

Archer Western Contractors, LLC and Zion Jacksonville, LLC
PROJECT: Jax I-95/I-295 North Interchange DB
AGREEMENT NUMBER: 216063P02

The following line items shall be incorporated into and supersede the language related to the specific provisions within.

### SPECIFIC PROVISIONS TO EXHIBIT "A" - TERMS AND CONDITIONS

1. **Article 1.1: Scope of Work Conditions.** Notwithstanding anything contained in this Agreement to the contrary, Buyer acknowledges and agrees that Seller is not furnishing equipment or performing work, but instead making fill material available to Buyer for removal from Seller's property by Buyer pursuant to the terms of this Agreement. Buyer is responsible for excavating and removing the fill material and confirming that the fill material is suitable for Buyer's purposes and suitable to the Owner. Accordingly, Seller shall have no responsibility to Owner with respect to the fill material excavated and removed by Buyer pursuant to this Agreement. The third paragraph of Sub-Article 1.1 of the Agreement is hereby deleted in its entirety.

2. **Article 2: Schedule of Work:** Nothing in Sub-Article 2.1 shall require Seller to agree to change the timing of Seller's obligations to obtain permitting and provide acreage for Buyer's excavation activities as set forth in this Agreement. A work schedule for making property available to Buyer for excavation is inapplicable, and, accordingly, Sub-Article 2.2 is deleted and its entirety.

3. **Article 3.2: Progress Payment Application:** Buyer agrees that it will not require progress payment applications from Seller.

4. **Article 3.3: Retainage:** Strike the Sub-Article and replace with "No retainage shall be withheld from payments to Seller."

5. **Article 3.5: Stored Materials:** This Sub-Article is not applicable and hereby deleted.

6. **Article 3.8: Tariffs, Surcharges, Taxes, and Duties:** Buyer agrees to pay any sales tax which may be due on the sale of the fill material pursuant to this Agreement.

7. **Article 3.13: Final Payment Requirements:** Buyer acknowledges and agrees that provisions related to lien waivers, closeout procedures, and other requirements are not relevant to the supply of fill material, and Buyer agrees not to limit Buyer's payment requirements accordingly.

8. **Article 4.2: Claims:** The procedures and timing with respect to Claims in this Sub-Article shall not prevent the ability for Seller to conduct an independent survey of the site to verify Buyer's before and after cross-section survey. Seller shall have 30 days after receipt of Buyer's survey in which to perform Seller's own survey.

PURCHASE ORDER #216063P02

CON_PET'S 1ST RFP_0002199

FILED DATE: 6/15/2026 5:13 PM   2026CH05725



**Article 4.3: Delay:** Seller shall not have liability for delays in providing a location for Buyer's fill extraction arising from delays of permitting agencies in approving permits required for Seller's land clearing operations.

**Article 7.6: Provision For Inspection:** Notwithstanding anything contained in this Sub-Article to the contrary, Buyer shall be deemed to have accepted the fill material at such time as the fill material is removed from Seller's property. Buyer shall not be entitled to return any such fill material Buyer later determines is unsuitable, nor shall Buyer be entitled to not pay for such removed fill material or obtain a refund.

**Article 7.7: Warranty Provisions:** Notwithstanding anything contained in this Agreement to the contrary, Seller makes no representation or warranty whatsoever with respect to the quantity, quality, condition, and ease of removal of any of the fill material being sold pursuant to this Agreement. Once the fill material has been removed from the Seller's property, the fill material is not subject to return or refund, even if Buyer or Owner later determines that it is not of the quality desired. In no event shall Seller be obligated to remove hazardous materials from excavation sites or remedy existing contamination. If environmental problems are encountered during Buyer's excavation operations with respect to a particulate site, Seller shall be entitled to cause Buyer to cease excavation operations and relocate such operations to a different site as designated by Seller.

**Article 7.8: Safety:** The following sentence is hereby added at the end of Sub-Article 7.8: "Buyer shall indemnify, defend and hold harmless Seller (including its officers, directors, managers, members, agent and employees) from claims, damages, costs, attorney's fees, liability and loss, and including claims pertaining to injury, death, or property, caused or alleged to have been caused by: (i) a violation or infraction by Buyer, or any party Buyer is responsible for, of any law, order, regulation or statute relating to safety, of (ii) Buyer's entry onto the Seller's property and activities undertaken thereon pursuant to this Agreement."

**Article 7.9: Compliance With Laws:** The following sentence is hereby added at the end of Sub-Article 7.9: "Buyer agrees to be bound by, and at its own cost, comply with all federal, state and local laws, ordinances and regulations applicable to Buyer's entry onto the property of Seller and the removal of the fill material."

**Article 7.10: Bond and Letter of Credit:** Seller shall not be obligated to obtain and furnish surety bonds or a letter of credit pursuant to Sub-Article 7.10.

**Article 8.1: Failure of Performance and Default:** Sub-Articles 8.1 and 8.2 are hereby replaced with: "If the Seller fails to make acreage available to Buyer for Buyer's excavation activities in violation of the terms of this Agreement, Buyer shall be entitled to provide Seller with notice of default. If Seller does not take commercially reasonable steps to remedy such default and such default remains uncured for 30 days, Buyer shall be entitled to terminate this Agreement as Buyer's sole remedy. Buyer acknowledges and agrees that Seller's inability to obtain permits and approvals for the fill removal activities after making commercially reasonable efforts shall not be a default under this Agreement."

PURCHASE ORDER #216063P02

CON_PET'S 1ST RFP_0002200



16.   **Article 8.6: Termination for Convenience by Buyer:** Notwithstanding anything contained in Sub-Article 8.6 and Sub-Article 8.7 to the contrary, Buyer shall not be entitled to terminate this Agreement if Buyer intends to do so in order to obtain fill material from another source unless Seller has failed to make excavation sites available to Buyer in accordance with the terms of this Agreement. In addition, in the event of a termination by Buyer for convenience, Seller shall be entitled to recover from Buyer all costs and expenses incurred in connection with this Agreement.

17.   **Article 9.1: Indemnification:** Strike Paragraph One in its entirety and replace with **"TO THE EXTENT DIRECTLY CAUSED BY A PARTY'S NEGLIGENT ACTS OR OMISSIONS, SUCH PARTY SHALL INDEMNIFIY, AND SHALL HAVE THE RIGHT BUT NOT THE DUTY TO DEFEND, THE OTHER PARTY FOR DAMAGES, EXCLUDING SPECIAL, INCIDENTAL, CONSEQUENTIAL, AND/OR LIQUIDATED, RESULTING FROM THIRD PARTY CLAIMS FOR BODILY INJURY AND PROPERTY DAMAGE."**

18.   **Article 10 – Insurance:** Notwithstanding anything contained in Article 10 to the contrary, Seller shall not be required to maintain insurance pursuant to this Agreement. In addition, Buyer shall be obligated to maintain insurance with respect to Buyer's entry up on Seller's property and the excavation of the material meeting the requirements set forth in Article 10 with "Buyer" being substituted for "Seller" and "Seller" being substituted for "Buyer" where such terms appear in Article 10.

19.   **Article 11.3: Owner Related Disputes:** Notwithstanding anything contained in Sub-Article 11.3 to the contrary, Seller shall have no liability to Owner pursuant to this Agreement. Any claims Seller may have against Buyer pursuant to this Agreement are unrelated to and not contingent upon Buyer's agreement with Owner. Any claims that Buyer has against Owner shall not reduce, impair, or otherwise affect Buyer's obligations to Seller under this Agreement and claims Seller may have against Buyer.


**SPECIFIC PROVISIONS TO EXHIBIT "B" -SCOPE, CLARIFICATION, ALTERNATES and UNIT PRICES**

20.   **Inclusions, Line Item 15:** Add "Such payment will be due thirty (30) days after the end of each month. Notwithstanding anything contained herein or in the Agreement to the contrary, Buyer's obligation to pay Seller is not contingent upon Buyer's receipt of payment from Owner."

PURCHASE ORDER #216063P02

CON_PET'S 1ST RFP_0002201

FILED DATE: 6/15/2026 5:13 PM   2026CH05725



## GENERAL PROVISIONS

Notwithstanding anything contained in this Agreement to the contrary, Seller shall not be required to comply with the terms and conditions of the Prime Contract and the Contract Documents unless such terms and conditions are specifically set forth in this Agreement.

If either party breaches this Agreement, the prevailing party in any action or arbitration related to or arising out of this Agreement shall be entitled to its attorney's fees and costs incurred in seeking to enforce this Agreement.

| SELLER: | BUYER: |
|---|---|
| Zion Jacksonville, LLC | Archer Western Contractors, LLC |
| Signature: | Signature: |
| Printed Name: Joshua Zion | Printed Name: |
| Title: Managing Member | Title: BGL |
| Date: 1-26-17 | Date: 2/6/17 |

PURCHASE ORDER #216063P02

FILED DATE: 6/15/2026 5:13 PM   2026CH05725



**Archer Western Contractors LLC**
929 W. Adams
Chicago IL 60607

# PURCHASE ORDER ("Agreement" or "Purchase Order")    Agreement No. 216063P02

| | | | |
|---|---|---|---|
| "Seller" | ZION JACKSONVILLE, LLC | Date of Agreement: | November 04, 2016 |
| | 220 MAHOPAC ACENUE | "Project": | Jax I-95/I-295 North Interchange DB |
| | YORKTOWN HEIGHTS, NY 10598 | | |
| | Phone: 239-848-8408 | Project Address: | |
| | Fax: | | Jacksonville, FL |
| Job #: 216063 | | Owner: | FLORIDA DEPT. OF TRANSPORTATION |
| | | Architect/Engineer: | RS&H, INC |

Archer Western Contractors LLC ("Buyer") and Seller hereby agree as follows:
Furnish all materials, equipment, insurance, and taxes as required to fully fabricate, deliver F.O.B. to project location, unless other destination specified, all **A-3 Select Fill** as more completely described in the exhibits attached hereto, in strict compliance with the plans and specifications and as directed by Buyer.

Unless noted otherwise, the estimated amount of this Agreement is in US Dollars.
The estimated total Agreement Amount of : **$4,955,550.00**

| The following documents are attached and hereby expressly incorporated into this Agreement: | EXHIBIT A - TERMS & CONDITIONS<br>EXHIBIT B - SCOPE, CLARIFICATION, ALTERNATES and UNIT PRICES<br>EXHIBIT C - CONTRACT DOCUMENTS<br>EXHIBIT D - INTENTIONALLY OMITTED<br>EXHIBIT E - STANDARD OPERATING PROCEDURES (NOT USED)<br>EXHIBIT F - PROCEDURES FOR PROGRESS PAYMENTS (NOT USED)<br>EXHIBIT G - SAFETY REQUIREMENTS (NOT USED)<br>EXHIBIT H - PAYMENT and PERFORMANCE BOND FORMS (NOT USED)<br>EXHIBIT H.1 - DUAL OBLIGEE BOND (NOT USED)<br>EXHIBIT I - PARTIAL and FINAL WAIVER and RELEASE FORMS<br>EXHIBIT J - BUILDING INFORMATION MODELING (NOT USED)<br>EXHIBIT K - FEDERAL ACQUISITIONS REGULATIONS (FAR)<br>EXHIBIT L - DAVIS-BACON and RELATED ACTS (NOT USED)<br>EXHIBIT M - SUBCONTRACTOR / SELLER QUALITY REQUIREMENTS |
|---|---|

By executing this Agreement, the Seller certifies that it is fully familiar with all the terms of the Agreement. The Seller also understands that this Agreement is expressly contingent on both the Buyer executing a contract with the Owner for the Project, and the Owner approving the Seller. Seller is not authorized to perform any Work under this Agreement until Buyer enters into a Prime Contract with Owner and any Work performed or preparations to perform Work by Seller prior to such time shall be at the sole expense of the Seller.

Accepted By: ZION JACKSONVILLE, LLC ("Seller")          Archer Western Contractors LLC ("Buyer")

| | | | |
|---|---|---|---|
| Signed by: | | Signed by: | |
| Printed Name: | Joshua Zion | Printed Name: | Kevin McGlinchey |
| Title: | Managing Member | Title: | Business Group Leader |
| Date: | 1-26-17 | Date: | 2/6/17 |

Invoices Received Without Purchase Order Number Will Be Returned Unpaid.

**PLEASE SIGN AND RETURN ALL ORIGINALS**

CON_PET'S 1ST RFP_0002203

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

ZION JACKSONVILLE, LLC
Agreement Number: 216063P02

## EXHIBIT A

## TERMS and CONDITIONS
### Archer Western Contractors LLC
**Contractor for: FLORIDA DEPT. OF TRANSPORTATION**
"Project": Jax I-95/I-295 North Interchange DB
Archer Western Contractors LLC Project No. 216063

### ARTICLE 1 - SCOPE OF WORK CONDITIONS
**1.1 Seller's Work.** This Agreement is contingent upon the Buyer entering into the Prime Contract with the Owner for the project ("Prime Contract") and contingent upon the Owner's approval and acceptance of the Seller. Seller is not authorized to perform any Work under this Agreement until Buyer enters into a Prime Contract with Owner and any work performed or preparations to perform work by Seller prior to such time shall be at the sole expense of Seller.

The Seller agrees to be bound by the following Prime Contract documents: (i) the contract drawings and (ii) the requirements of the specific technical sections of the specifications pertaining to Seller's work and (iii) the general conditions, as they apply to the material and equipment being provided by Seller, including but not limited to, testing, start up, delay, owner-related dispute/claim procedures, warranties, shop drawings and samples (collectively referred to as the "Contract Documents").

Seller shall perform fully the work and furnish the materials describe herein within the general classification of the work to the same extent that Buyer is required to perform such work under the Prime Contract. Seller shall perform the work at the price or prices set forth opposite each item of work within the times required by Buyer. These prices shall remain firm for the duration of this Project unless specifically stated otherwise on the face hereof.

Commencing performance or making shipments or deliveries hereunder or any acknowledgement hereof by Seller, notwithstanding any proposals or terms and conditions additional to or different from those contained herein, shall be deemed an acceptance by Seller hereof and Buyer shall be bound only be the terms and conditions of this purchase order. Whenever Buyer is not the ultimate user of the materials or equipment to be furnished hereunder, all rights, benefits and remedies conferred upon Buyer shall accrue and be available to and are for the express benefit of the successors in interest to the materials, including the Owner. Seller is not, and shall not, be deemed to be a third-party beneficiary of the Prime Contract between the Owner and Buyer or any other agreement relating to the Project to which it is not a party.

### ARTICLE 2 - SCHEDULE OF WORK
**2.1 THE TIME OF SELLER'S PERFORMANCE IS OF THE ESSENCE.** Seller shall proceed with Seller's Work in accordance with Buyer's schedules as amended by Buyer from time to time. Buyer shall have the right to direct the sequence and pace of Seller's Work, including overtime, without monetary compensation to Seller, except as compensation is provided for herein. Failure of the Seller to make timely and prompt delivery of the materials as directed by the Buyer will be a material breach by the Seller.

**2.2 Work Schedules.** Seller shall, immediately after the award of the Purchase Order, prepare and submit for Buyer's information an estimated progress schedule for the Seller's Work in a form acceptable to Buyer. The schedule shall be revised as required by the status and conditions of the Seller's Work and the overall Project, and shall be subject to Buyer's approval. Seller shall promptly inform Buyer of any delays encountered or anticipated in the schedule and shall be presented at the project meetings. Buyer's receipt, review and/or acceptance of Seller's schedules shall not constitute an amendment to this Agreement nor satisfy any notice requirements of this Agreement or of the Contract Documents.

### ARTICLE 3 - PAYMENT
**3.1 Schedule of Values.** If required by the Buyer, the Seller shall provide a schedule of values satisfactory to the Buyer and the Owner no more than fifteen (15) days, unless Buyer agrees otherwise, from the date of execution of this Agreement. Unless stated otherwise, the prices in the Purchase Order are in United States dollars.

**3.2 Progress Payment Application.** If required by the Buyer, the Sellers' progress payment application shall be submitted to the Buyer in a form and with content and documentation acceptable to Buyer and Owner.

**3.3 Retainage.** The amount of retainage shall be the amount retained from the Buyer's payment from Owner for the Seller's Work. Such retainage shall be in addition to such other sums which Buyer has a right to withhold pursuant to this Agreement and the Contract Documents. If any materials are specially manufactured to meet the specific requirements of this order, payment for such material is subject to a 100% retainage until such time as the Buyer can determine that such specially manufactured materials will satisfactorily meet the specific requirement of this order.

**3.4 Cash Discounts.** When invoices, subject to cash discount, are offered by the Seller, the discount period will begin at the time the material is accepted by the Buyer.

**3.5 Stored Materials.** If approved in advance by the Owner, applications for payment may include materials and equipment not incorporated in the Seller's Work, conditioned upon the satisfaction of procedures satisfactory to the Owner and Buyer. Approval and payment by the Owner to the Buyer for said stored material and stored equipment is an absolute express condition precedent to payment by Buyer to Seller. The Buyer, at its sole discretion, shall require one of the following from the Seller as part of the Stored Material process:

   1. **Warehouse Agreement and Non-Negotiable Warehouse Receipt.** The goods to be stored shall be placed into the possession of a warehouseman subject to a warehouse lease or agreement, which document shall be provided by the Buyer. The warehouseman shall not be in the business of buying and selling the goods of the nature to be stored. The liability of the warehouseman for failure to deliver shall be covered by insurance or a performance bond acceptable to the Buyer. Upon placing the goods into the possession of the warehouseman, a non-negotiable warehouse receipt, in a form acceptable to the Buyer, shall be issued to the Buyer. The warehouse receipt must provide the goods are to be delivered only at the Buyer's written direction and follow the Buyer's written instruction.

CON_PET'S 1ST RFP_0002204

FILED DATE: 6/15/2026 5:13 PM 2026CH05725

**2. Bill of Sale with Additional Storage Provisions.** Although less desirable, at its sole discretion, the Buyer may allow, in lieu of a Warehouse Agreement and Non-Negotiable Warehouse Receipt, the Seller to provide Buyer a Bill of Sale for the material to be stored and not in the possession of the Buyer, in a form provided by the Buyer. Seller shall separate the stored material from any other goods in the possession of Seller which are of the identical or of a similar nature. Seller shall maintain the separate and exclusive storage of the stored material in an open and notorious manner providing public notice that the stored material is the property of Buyer. Seller shall maintain the stored material in a condition such that at all times the stored material are ready for immediate delivery and incorporation into the construction project upon demand of Buyer. Seller represents and warrants that the stored material shall remain free and clear from any security interest, lien, pledge, encumbrance, option, conditional sales contract, lease or other title retention agreement, or any other adverse claim whatsoever. Seller shall specifically, permanently, mark the stored material covered by the Bill of Sale as the exclusive property of the Buyer. Seller shall procure insurance on the goods for the full value of the stored material, in a form satisfactory to the Buyer, naming the Buyer and Owner as insured.

**3. UCC Financing Statement.** At a minimum and least desirable to the Buyer, in lieu of a Warehouse Agreement and Non-Negotiable Warehouse Receipt or a Bill of Sale with Additional Storage Provisions, and in the event title to the stored material will not pass to the Buyer at the time of payment to the Seller, the Buyer may require the Seller to properly file a UCC Financing Statement Form 1 with the Secretary of State's Office.

If required by the Buyer, Seller shall submit a separate invoice for the quantity of material and equipment placed in storage. The Owner and/or Buyer shall determine, at their sole discretion, the acceptability of the storage conditions and Seller shall correct any noted deficiencies. By submitting its invoice for stored materials or equipment to Buyer, Seller expressly represents and warrants that no security interest by a lending institution or any other entity exists in the stored materials or equipment covered by such invoice.

Regardless of any dispute between Buyer and Seller, if Buyer has partially or fully paid Seller for material or equipment as part of this Agreement, either as stored material or otherwise, upon written demand by Buyer, Seller shall immediately ship, as directed by the Buyer, the material or equipment to be purchased under this Agreement. The Seller acknowledges and agrees that the Buyer may have no adequate remedy at law for Seller's refusal to immediately ship the material or equipment as directed by Buyer, and that Buyer shall be entitled to enforce its demand for immediate shipment against Seller by temporary or permanent injunctive relief or mandamus obtained in any court of competent jurisdiction, without posting any bond or other security, and without prejudice to or diminution of any other rights or remedies which may be available to Buyer at law or in equity, and any attorneys' fees and costs incurred by Buyer in such instance shall be due from Seller.

Invoicing for stored material or equipment off-site must reflect a minimum of ten percent (10%) withholding for transportation costs associated with delivery to the jobsite, which shall be withheld until the stored material or equipment has been incorporated into the Project and accepted by the Owner. Regardless of any payment, the risk of loss for stored materials or equipment at all times shall remain upon Seller until final acceptance of the Project by Owner. Notwithstanding that the risk of loss for stored materials or equipment remains upon Seller, and regardless of which entity maintains or controls any location(s) where materials or equipment are stored, Seller acknowledges and agrees that Buyer and/or Owner have and shall be deemed to have exclusive possession of all stored materials or equipment included within any invoice submitted by Seller. Seller shall defend, indemnify, and hold harmless Buyer, Buyer's surety, and Owner against all claims, judgments, settlements, damages, losses, demands, suits, actions, liability, fines, penalties, costs and expenses (including but not limited to attorneys and expert fees and costs of litigation, arbitration, or mediation) arising out of or relating in any way to any third party's assertion of a lien, encumbrance or interest in stored materials or equipment.

**3.6 Time of Payment.** Without impairing Seller's mechanic's lien and payment bond rights, if any, to the fullest extent permitted by law, if Seller is in compliance with this Purchase Order, and if, and only if, Owner pays Buyer, which is an express condition precedent to Buyer's duty to pay Seller, Progress Payments shall be due to Seller no later than fifteen (15) days after receipt of payment from Owner by Buyer provided Seller remains in compliance with the terms of this Agreement. Should the forgoing condition precedent be unenforceable in the jurisdiction where the Project is located, Seller agrees that Buyer shall have a reasonable period of time within which to tender payment, and such "reasonable period" includes, but is not limited to, the time necessary for the Owner to process and make a progress or final payment, to fully adjudicate any disputes, claims, causes of action or other matters associated with or related to this Agreement and/or the Prime Contract. For purposes of this section "fully adjudicate" means the completion of mediations, arbitrations, trials or any combinations thereof, together with such appeals as may be taken from any decisions, orders, judgments, opinions or such similar rulings as may result therefrom. The Seller shall file no mechanics lien nor make any claim on the Buyer's payment bond for which the Owner has not paid the Buyer whether in regards to progress payments, final payments, claims, or owner related disputes. No Final or Progress Payment made under this Agreement shall be considered an acceptance of Seller's Work, in whole or in part. Buyer may, at its sole discretion, pay all or any part of the Purchase Order price in a greater amount or at an earlier time than otherwise allowed, required, or specified herein, either as an advance or otherwise, in which event, all other terms and conditions hereof, and any bonds furnished hereunder by the Seller, even if such payment is prejudicial to the Seller's surety, shall be unaffected thereby and shall remain in full force and effect.

Payment will be made by Buyer only after (i) inspection and acceptance of the goods or services; (ii) receipt by Buyer of the executed original copy of this Purchase Order and insurance and bond required from the Seller and warehouseman if payment is for Stored Material; (iii) receipt of Seller's invoice; (iv) receipt of waivers and affidavits from Seller and Seller's lower tiers as required elsewhere by this Agreement; (v) consent of surety to payment, if required by Buyer; and (vi) receipt by Buyer, of payment from Owner, for Seller's work.

**3.7 Unit Price Work.** Where this Agreement anticipates that the Seller's Work, or a portion thereof, shall be paid for at an agreed rate per unit of work, then the Seller agrees that unit prices stated herein shall represent full payment for the Work covered including Seller's overhead and profit and that the Owner, Engineer or Buyer may make a final and binding determination of the quantity of Work to be paid for. All quantities stated herein are approximate. Actual payment quantities are subject to field verification by Owner and/or Buyer and acceptance of required documentation, and may vary significantly from original estimated quantities. Quantity variation will not be reason to renegotiate a unit price, unless required by Owner. Buyer's rights shall also include the right to increase or decrease quantities at the unit price shown prior to receipt of the complete order at the job site. In the event of any overpayments, Seller shall reimburse Buyer for any such overpayments after final quantities have been determine by Buyer or Owner.

**3.8 Tariffs, Surcharges, Taxes, & Duties.** The prices herein specified shall, unless otherwise expressly stated, include all permits, fees, licenses, tariffs, surcharges, taxes and duties of any kind levied by federal, state, municipal, or other governmental authority, which either party is required to pay with respect to the production, sale or shipment of the materials or equipment covered by this Agreement. In the event of the imposition of any tax on the goods and services herein furnished which must be borne by the Buyer, Seller agrees to remit to the Buyer any taxes collected by the Seller that should be borne by the Buyer. In addition, the Seller agrees to remit to the Buyer any refund which Seller might receive by reason of the collection of such tax.

**3.9 Payment Use Restriction.** All payments made by Buyer, its surety, or the Owner, to Seller are made to, and accepted by Seller as trustee for the benefit of Seller's employees, material suppliers and lower tier subcontractors. All payments received by the Seller shall first be used to satisfy any indebtedness owed by the Seller to persons or entities furnishing labor or materials for use in performing or incorporation into the Seller's Work. The Buyer shall have the right at all times to contact the Seller's subcontractors and suppliers to ensure that they are being paid by the Seller.

FILED DATE: 6/15/2026 5:13 PM    2026CH05725

ZION JACKSONVILLE, LLC
Agreement Number: 216063P02

**3.10 Waivers and Affidavits.** When required by the Buyer, and as a prerequisite for payment, the Seller shall provide, waivers and affidavits from the Seller in a form as shown in an Exhibit of this Agreement and as specified by applicable statute, and as required by the Owner and Owner's lender, and consent from Seller's surety. When required by the Buyer, Seller must present unconditional waivers, in a form as shown in an Exhibit to this Agreement, from all of its lower tier subcontractors, suppliers, or other entities arising from the Seller's work for the immediately preceding pay estimate before the Seller is entitled to be paid by Buyer for the current pay estimate.

Seller and Seller's surety shall indemnify, defend and hold Buyer, the Owner, the Project funds, Project site and Buyer's surety harmless from and against any claim for, or notice of, lien, encumbrance, payment bond claim, or other claim for payment or notice of non-payment (collectively "Lien"), and from any costs, which arises in connection with Seller's Work ("Seller's Lien Costs"). Buyer may discharge the Lien or withhold from Seller's Progress or Final Payment any Seller's Lien Costs incurred or anticipated to be incurred to defend and discharge any Lien and Seller and Seller's surety shall reimburse Buyer for any Seller's Lien Costs incurred to discharge or defend any Lien.

**3.11 Seller Payment Failure.** In the event Buyer has reason to believe that labor, material or other obligations incurred in the performance of the Seller's Work are not being, or may not be, paid, the Buyer may take any steps Buyer deems necessary to ensure that such obligations are paid including, but not limited to direct payment to such person or entity unless Seller supplies evidence to the satisfaction of the Buyer that such obligations have been satisfied. Any such payments made by the Buyer shall be credited against funds otherwise due Seller under this Agreement.

**3.12 Right of Set Off.** Buyer may withhold and unilaterally deduct amounts otherwise due under this Agreement or any other agreement between the parties to cover Buyer's reasonable estimate of any costs, damages, or liability Buyer has incurred or may incur for which Seller may be responsible or have caused, including any agreement between Seller and any joint venture or other entity in which Buyer has an ownership interest or corporate affiliation.

**3.13 Final Payment Requirements.** Before the Buyer shall be required to make final payment to the Seller, the Seller shall submit to the Buyer: (i) an affidavit that all payrolls, bills for materials and equipment, and other indebtedness connected with the Seller's Work have been paid, and unconditional final waivers, in a form as shown in an Exhibit to this Agreement, from all of Seller's lower tier subcontractors, suppliers, or other entities arising from the Seller's work; (ii) consent of surety to final payment, if required by Buyer; (iii) satisfaction of required close-out procedures and documentation; and (iv) other data if required by the Buyer or Owner, such as receipts, releases, and waivers of liens to the extent and in such form as may be designated by the Buyer or Owner.

## ARTICLE 4 - CHANGES, CLAIMS AND DELAYS

**4.1 Changes.** When the Buyer so orders in writing, the Seller shall make changes in the Seller's Work which are within the general scope of this Agreement. Adjustments in the Purchase Order Amount or Schedule of Work, if any, resulting from such changes shall be set forth in a Change Order. Buyer shall make an appropriate equitable adjustment therefore in the price and time of performance. No such adjustment shall be made for any such changes performed by the Seller that have not been so ordered by the Buyer in writing. An express condition precedent to payment to Seller on account of changes made or directed by Owner, shall be that Buyer shall have received such payment from Owner for Seller's changed Work.

**4.2 Claims.** A "Claim" is a Seller's demand or assertion seeking an increase in Purchase Order Amount, an extension in the time for performance of Seller's Work, coverage under an insurance policy related to the Project, or relief with respect to the terms of the Contract Documents. All Claims must be made by written notice to the Buyer at least one (1) week prior to the beginning of the Seller's affected or additional work, or by two (2) days prior to the date by which Buyer is obligated to give notice to the Owner with respect to such claim, or within one (1) week of the Seller's first knowledge of the event giving rise to the Claim, whichever shall first occur, otherwise, such claims shall be deemed waived. With respect to written notice required for a Claim, Seller's written notice must be via letter, email or fax is not sufficient notice. Seller expressly acknowledges and agrees that the preceding notice requirements are a material term of this Purchase Order, and are necessary for the Buyer to mitigate adverse consequences arising out of or related to Seller's Claim, and that the Buyer will be prejudiced if the notice requirements are not followed by the Seller. Pending final resolution of a Claim or any other dispute between Seller and Buyer, unless otherwise agreed in writing, the Seller shall proceed diligently with performance of the Seller's Work, disputed or otherwise, and without interruption, deficiency, or delay. If Buyer is the prevailing party, even partially, against the Seller's Claim, Seller shall reimburse all of the Buyer's attorneys' fees and costs incurred to defend against the Seller's Claim. Seller shall permit Buyer to inspect and copy any of Seller's documents pertaining to Claim, failure of which shall be deemed a waiver of such Claim. Seller waives its right to recover incidental and consequential damages, legal fees and interest arising from this Project or a Claim.

**4.3 Delay.** If the progress of the Seller's Work is substantially delayed, hindered or interfered with through no fault or responsibility of the Seller, or if Buyer fails to take delivery or accept performance of services or portions thereof when due, then the Buyer shall either (i) extend the time for the performance of Seller's Work by Change Order, but such extension shall be limited to that amount of time which will enable Buyer to meet its obligation to Owner to complete the Project in accordance with the Contract Documents, or (ii) require Seller to accelerate or complete its Work with additional manpower and the expediting of materials, but Buyer shall be obligated to pay only for the costs of expediting material and costs recovered under the Owner-Related Disputes provisions of this Agreement.

Except for the costs of expediting materials at the order of Buyer pursuant to the previous paragraph, and except for acts of the Owner or third party for which the Seller's remedy shall be as stated in the Owner-Related Dispute provisions of this Agreement, the Buyer and its surety shall not be liable to the Seller for any damages or additional compensation for a Claim or otherwise, as a consequence of delay, inefficiency, schedule revisions, hindrance, interference or other similar event, caused by Buyer, or by reason of fire, casualty, act of God or any other reason beyond the Buyer's control. Seller and Buyer agree that the language in this article shall not be interpreted as no damages for delay.

## ARTICLE 5 - INTENTIONALLY OMITTED

## ARTICLE 6 - INTENTIONALLY OMITTED

## ARTICLE 7 - PURCHASE ORDER PROVISIONS

**7.1 Assignment.** The Seller shall not assign this Agreement or its proceeds nor subcontract the whole or any part of the Seller's Work without prior approval of the Buyer which shall not be unreasonably withheld, and any assignment not approved by the Buyer is void, and the assignees in such cases shall acquire no rights to the proceeds pertaining to this Purchase Order. Assignment by the Seller without the consent of the Buyer is a material breach of this Purchase Order.

**7.2 Submittals.** Approval of submittals by Buyer will not relieve Seller of its obligation to perform the Seller's Work in strict compliance with the Contract Documents or the proper matching and fitting of the contiguous work.

**7.3 Labor Conditions.** Seller shall not use any class of workmen, materials, or methods, including improper classification of employees as independent contractors, which may cause strikes, bannering, labor disturbances, labor demonstrations, project delay, or which do not comply with the Contract Documents and applicable law.

CON_PET'S 1ST RFP_0002206

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

ZION JACKSONVILLE, LLC
Agreement Number: 216063P02

**7.4 Deliveries.** If Seller is delivering material as part of this Purchase Order to a port, included in the Seller's scope, are: (i) shipping to a port as directed by the Buyer; (ii) fumigation of shipping containers; (iii) all customs fees and bonds; (iv) insurance for all material in transit to said port. Buyer shall be the loss payee; evidence of insurance shall be given by Seller within 10 days of execution of this Purchase Order, or such failure to provide such insurance may be deemed by the Buyer to be a Default by the Seller. The prices herein specified shall, unless otherwise expressly stated, include transportation charges, packing, loading and shipping.

**7.5 Substitutions.** No substitutions shall be made in the Seller's Work unless permitted in the Contract Documents and only then upon the Seller first receiving all approvals required under the Contract Documents for substitutions. In the event a substitution results in additional cost to the Buyer or other entities, Seller shall be responsible for such additional costs.

**7.6 Provision for Inspection.** Buyer and Owner shall have the right to inspect and test the materials at Seller's plant any time prior to shipment, and to final inspection at the jobsite. The materials shall not be deemed accepted until after such final inspection. The making or failure to make any inspection of, or payment for, or acceptance of the material shall in no way relieve Seller from its obligations to perform its Work in strict accordance with the Contract Documents, or impair Buyer's right to reject nonconforming goods, to recover damages or exercise any other remedies to which Buyer may be entitled, notwithstanding Buyer's knowledge of the nonconformity, its substantiality, or the ease of its discovery. Seller shall be liable for all inspection, reshipment, return, and re-inspection costs on nonconforming goods. The risk of loss shall pass to Buyer only after Buyer makes its final inspection of the materials; Seller's delivery to a carrier or to an intermediate party shall not be deemed actual delivery of goods to the Buyer.

Damage found during the inspection will be deemed to have occurred prior to or during shipment by the Seller unless substantial evidence to the contrary proves otherwise. In the event materials or equipment are delivered to the job site in a damaged condition, Buyer may accept the damaged materials and equipment if Buyer determines that portions of the materials and equipment are usable and advantageous to the progress of the work. In accepting damaged materials and equipment, in addition to set-off, Buyer may repair the damage or any part thereof at Seller's expense and/or demand replacement of the damaged parts from Seller, at Seller's expense. Buyer may purchase the damaged parts elsewhere at Seller's expense in event Seller does not replace the damaged parts within fifteen (15) calendar days after notice is given by the Buyer.

**7.7 Warranty Provisions.** [illegible]

**7.8 Safety.** [illegible]

[illegible paragraph]

**7.9 Compliance with Laws.** [illegible]

[illegible paragraph]

[illegible paragraph]

[illegible paragraph]

**7.10 Bond and Letter of Credit.** [illegible]

CON_PET'S 1ST RFP_0002207

FILED DATE: 6/15/2026 5:13 PM    2026CH05725

ZION JACKSONVILLE, LLC
Agreement Number: 216063P02

If (i) the bank issuing the Letter of Credit (the "Issuing Bank") ceases to remain a "Qualified Bank" (as defined herein) or (ii) Buyer has reasonable grounds to believe that Issuing Bank may cease to remain a Qualified Bank, Buyer may draw on the Letter of Credit immediately. The term "Qualified Bank" means a federally insured state or national bank which is well capitalized under FDIC capital adequacy guidelines and is not under any supervisory order or subject to supervisory proceedings and is otherwise acceptable to Buyer as reasonably determined by it.

Seller's failure to comply with any of the terms of this Article shall be deemed a material breach of this Agreement.

**7.11 Small or Disadvantaged Business Enterprises.** For the purposes of this Agreement, "Small or Disadvantaged Business Enterprise" includes, but is not limited to, small business enterprise, small business concern, minority business enterprise, women owned business enterprise, disadvantaged business enterprise and any other socio-economically disadvantaged entity or enterprise identified within the Contract Documents. Seller hereby acknowledges that it is thoroughly familiar with all Small or Disadvantaged Business Enterprise requirements pertaining to the Project. If the Seller claims status as a Small or Disadvantaged Business Enterprise, the Seller shall take all steps necessary and shall make all necessary records available to the Buyer and the Owner to assure that Seller is in compliance with such requirements, including but not limited to, the performance of a commercially useful function on the Project. In the event that any lower tier subcontractor or supplier of the Seller is designated as or is required to be a Small or Disadvantaged Business Enterprise, Seller agrees to be responsible for ensuring that said lower tier subcontractor or supplier meets all applicable requirements. Seller acknowledges that Buyer is relying upon Seller's representations regarding the validity of Seller's status, if any, as a Small or Disadvantaged Business Enterprise and that misrepresentation of the status of Seller or any of its lower tier subcontractors or material suppliers is a material breach of this Agreement and grounds for immediate termination. In the event of termination as the result of material misrepresentation of the status of the Seller as a Small or Disadvantaged Business Enterprise, Seller shall not be entitled to any compensation not already paid, and shall be liable for all damages to Buyer caused by Seller's misrepresentation and breach.

## ARTICLE 8 - RECOURSE BY BUYER

**8.1 Failure of Performance and Default.** If the Buyer determines at its sole discretion that the Seller has: (i) refused or failed to supply enough proper materials, or maintain the Schedule of Work; (ii) failed to make prompt payment for, or failed to prevent claims of non-payment from, its workers, subcontractors or suppliers of any tier; (iii) disregarded Laws or orders of any public authority having jurisdiction; (iv) otherwise materially breached, a provision of this Agreement; or (v) if Buyer has a reasonable doubt that this Agreement can be completed for the balance then unpaid, the Seller shall be in default of this Agreement. If the Seller fails within seventy-two (72) hours after receipt of written notice (facsimile, email, or letter, shall constitute sufficient written notice and declaration of default) to commence and continue satisfactory correction of such default with diligence and promptness, the Seller shall have materially breached this Agreement, and the Buyer, without prejudice to any other rights or remedies, shall have the right to any or all of the following remedies: (i) supply such quantity of materials, equipment and other facilities as the Buyer deems necessary for the completion of the Seller's Work, or any part thereof, and charge the cost thereof to the Seller; (ii) contract with one or more additional contractors to perform such part of the Seller's Work as the Buyer shall determine will provide the most expeditious completion of the total Work and charge the cost thereof to the Seller; (iii) discharge the claim of non-payment; (iv) withhold payment of any moneys due the Seller pending corrective action; and/or (v) cover. Any costs or damages incurred by Buyer under this article, including attorney fees, shall be unilaterally deducted from funds otherwise due Seller under this Agreement. Buyer may use any materials, implements, equipment, appliances or tools furnished by or belonging to the Seller to complete the Seller's Work. Seller shall provide its surety with all notices, letters, or email, from the Buyer referred to in this paragraph.

If Buyer shall have reasonable grounds to question Seller's intent or ability to perform, Buyer may, in writing, demand that Seller give adequate assurance, in writing, of its intent or ability to perform. If such a demand is made and no written assurance adequate to the Buyer is given within five (5) calendar days, Buyer may treat this failure to give such adequate assurance as a default or an anticipatory repudiation of the contract.

**8.2 Failure of Performance-Termination for Default by Buyer.** If the Seller fails to commence and satisfactorily continue correction of a default within seventy-two (72) hours after the notice of default is received, then the Buyer may terminate this Agreement or a portion thereof, and use any materials, implements, equipment, appliances or tools furnished by or belonging to the Seller to complete the Seller's Work. All of the costs incurred by the Buyer in so performing the Seller's Work shall be deducted from any moneys due or to become due the Seller.

**8.3 Insolvency, Receivership, Changes in Title to Assets, Bankruptcy - Termination.** Upon the Seller becoming insolvent, upon the appointment of a receiver for the Seller, or upon the Seller making an assignment for the benefit of creditors, this Agreement shall, without notice or right to cure, be terminated unless Buyer waives its right to such automatic termination and Buyer shall be deemed to have declared, and Seller agrees, that Seller is in default of this Agreement.

**8.4 Bankruptcy-Interim Remedies.** If the Seller is not performing in accordance with the Schedule of Work at the time of entering an order for relief, or at any subsequent time, the Buyer may avail itself of such remedies under this Article as are reasonably necessary to maintain the Buyer's Schedule. The Buyer has the right of recoupment and may also offset against any sums due or to become due the Seller all costs incurred in pursuing any of the remedies provided herein. The Seller and/or any successor(s) thereto, including any estates, Bankruptcy or otherwise, and Seller's surety shall be liable to Buyer for the payment of any amount by which such expense may exceed the unpaid balance of the Purchase Order Amount.

**8.5 Suspension/Termination of Prime Contract.** Should any part of the Buyer's work which includes the Seller's Work be suspended or terminated, or should Owner direct the Buyer to terminate the Seller's Agreement, the Buyer shall so notify the Seller in writing, and the Seller shall immediately stop that portion of the Seller's Work. In the event of such Owner suspension or termination, the Buyer's liability to the Seller is limited to the extent of the Buyer's recovery on the Seller's behalf as provided in the Owner-Related Dispute section of this Agreement.

**8.6 Termination for Convenience by Buyer.** Buyer shall have the right to terminate for convenience Seller's performance of all or a part of the Seller's Work by providing Seller with a written notice of termination for convenience, which shall be effective upon receipt by Seller. If Buyer's contract with Owner has not been terminated and the Seller is not in default on any provision of this Agreement, Seller shall be paid the reasonable value to Buyer of Seller's Work performed prior to termination plus reasonable direct close-out costs, less set offs, but in no event shall Seller be entitled to unabsorbed overhead, lost profits, or indirect or consequential damages of any kind.

**8.7 Wrongful Exercise of Termination.** If Buyer wrongfully exercises Buyer's remedy options under this Article, that action shall be treated as a deductive change. If Buyer wrongfully exercises Buyer's termination options under this Article, that termination for default shall be treated as a deductive change order, and shall be considered a termination for Buyer's convenience and Seller shall be entitled to the applicable compensation provided for in the Termination for Convenience by Buyer provisions of this Agreement. Seller's remedies under this paragraph shall be exclusive.

CON_PET'S 1ST RFP_0002208

FILED DATE: 6/15/2026 5:13 PM    2026CH05725

ZION JACKSONVILLE, LLC
Agreement Number: 216063P02

8.8 Conditional Assignment. Seller, by execution of this Agreement, contingently assigns to Buyer all Seller's subcontracts and purchase orders relating to the Project, and consents to this Purchase Order being assigned to the Owner in accordance with the terms of the Prime Contract. The assignment of each of Seller's subcontracts and purchase orders shall take effect only upon Buyer's affirmative acceptance of the assignment of the specific subcontract or purchase order by written notice to Seller and Seller's subcontractor or material supplier.

8.9 Buyer's Rights Survive Termination. Termination of this Agreement by Buyer or abandonment by Seller shall not relieve Seller from Seller's obligations in connection with Seller's Work performed prior to termination or abandonment nor will such termination or abandonment abrogate any obligations of Seller under, or rights or remedies afforded to Buyer by this Agreement or the Contract Documents including without limitation, Seller's indemnity obligations.

## ARTICLE 9 - INDEMNIFICATION

9.1 Indemnification. To the fullest extent permitted by law, Seller shall indemnify, defend (with counsel reasonably satisfactory to Buyer), and save harmless Owner, Owner's Representative, Architect/Engineer, Buyer, and Buyer's surety, as well as any individual and/or entity that Buyer is required by contract to indemnify, defend and/or hold harmless, and their partners, insurers, parents, members, subsidiaries, related corporations, officers, directors, agents and employees, and each of them, (hereafter collectively "Indemnified Parties" and individually "Indemnified Party"), against claims, costs and expenses which are in any manner caused, or claimed to be caused, through any act, or omission of Seller, anyone acting under its direction, control, or on its behalf, or for which it is legally responsible, in connection with the Seller's Work. Seller's obligation to provide a defense for an Indemnified Party shall arise regardless of the merits of the matter and shall continue until a final determination of fault is made.

Seller, however, shall be relieved of and shall have no further obligation to indemnify an Indemnified Party under this Agreement upon a final determination that the Seller was not liable or any determination by the court that any single indemnitee is solely negligent, which shall not include any dismissal pursuant to settlement regardless of the entry of an order of dismissal pursuant to said settlement. Buyer shall be entitled to recover actual attorney fees and court costs and all other costs, expenses and liabilities incurred by Buyer in an action brought to enforce all or any part of this Article. Seller's indemnity obligations shall be limited to the extent necessary to comply with governing state and federal law ("Governing Law") and to the extent any such Governing Law limits the indemnity provided herein, Sellers' obligations shall be deemed to be limited so as to comply with such Governing Law. Seller shall maintain such insurance as is necessary to fully cover Seller's indemnity obligations hereunder.

9.2 Indemnification Independent from Insurance and Survive Termination. Seller's indemnification obligations shall survive termination of this Purchase Order, shall extend to claims occurring after termination of this Purchase Order, and are independent from, and not limited in any manner by the Seller's insurance coverage required by this Agreement.

## ARTICLE 10 - INSURANCE

10.1 Seller's Insurance. In the event that Seller or its employees, agents, sub-subcontractors/sellers, carriers, or material delivery vendors are required to come onto a jobsite or project of Buyer in connection with the sale of goods or the rendering of services under this Purchase Order, including delivery of materials, unless other limits are required herein or required of the Seller in the Owner Agreement, which are hereby incorporated, Seller agrees to carry and maintain, and require its sub-subcontractors/sellers, carriers, and material delivery vendors to carry and maintain at a minimum: (i) comprehensive general liability insurance covering personal injury (including death) and damage to property in an amount not less than $ 1 million per occurrence, $2 million aggregate; (ii) and automobile liability insurance in an amount not less than $1,000,000 per occurrence Seller further agrees to provide and maintain Worker's Compensation Insurance in conformity with the laws of any state in which their employees perform services on their behalf. Prior to Seller's entrance on the jobsite or delivery of materials, Certificate(s) of Insurance stating the limits and coverages required by Buyer shall be executed by Seller's insurance carrier(s) and provided to the Buyer. Should the Buyer allow entry onto the site prior to the execution and receipt of such certificate, such entry shall not constitute a waiver by the Buyer of the requirements. If the work of the Seller requires entry onto the project site by employees of the Seller, Seller shall provide Additional Insured status to the Buyer for such entry, and as a condition of license to enter the property. Such Additional Insurance shall be in the form of ISO CG 20 10 10 01 and ISO CG 20 37 10 01, or equivalent coverage, on a Primary and Non-Contributory basis. The insurance requirements set out herein or by exhibit hereto, are independent from all other obligations of Seller under this Purchase Order and apply whether or not required by any other provision of this Purchase Order.

10.2 Cancellation, Renewal or Modification. The Seller shall maintain in effect all insurance coverage required under this Agreement at the Seller's sole expense and with insurance companies acceptable to the Buyer. Coverage shall be maintained without interruption until date of final payment and shall maintain Completed Operations coverage for a minimum of three years subsequent to Final Payment. Seller shall ensure that any cancellation or non-renewal of the policies required by the Agreement or the Contract Documents shall not occur unless the Seller has first given thirty (30) days notice to the Buyer of such cancellation, non-renewal or change in policy. Failure to provide the necessary notice will be constitute as a material breach of this Agreement.

Certificates of insurance, or certified copies of policies acceptable to the Buyer shall be filed with the Buyer prior to the Seller's Work arriving on the jobsite and again with any renewal, extension or alteration of all or any part of the insurance, by way of a Certificate of Insurance or Certified Copy of the Policy. Buyer's failure to request a Certificate of Insurance shall not be a waiver of Seller's duty to procure insurance. Seller shall produce a certified copy of the applicable insurance policy within (15) days of any request by Buyer. In the event the Seller fails to obtain or maintain any insurance coverage required under this Agreement, the Buyer may purchase such coverage and charge the expense thereof to the Seller, or terminate this Agreement.

10.3 Waiver of Subrogation. Seller waives all rights against Buyer, Owner, and the Architect/Engineer and their agents, officers, directors and employees for recovery of damages to the extent these damages are covered by commercial general liability, automobile liability insurance, contractual liability insurance and worker's compensation insurance. The policies shall provide such similar waivers of subrogation by endorsement or otherwise. Seller shall remain solely responsible for the deductible or Self-insured Retention on any and all policies, including on any Builder's Risk policy in pro rata to their interests on any loss.

10.4 Carrier Qualifications. All insurance policies purchased shall be maintained with insurance companies licensed to do business in the state where the Project is located and shall have a policyholder rating of "A" or better in the most current Best's Key Rating Guide.

CON_PET'S 1ST RFP_0002209

FILED DATE: 6/15/2026 5:13 PM    2026CH05725

ZION JACKSONVILLE, LLC
Agreement Number 21606SP02

## ARTICLE 11 - LAWS AND DISPUTE RESOLUTION

**11.1 Law and Effect.** This Agreement shall be governed by the law of the state, Washington, D.C., or United States territory, (collectively called the "State") in which the Project is situated. The Seller hereby agrees to submit jurisdiction of and service of process in the State in which the Project is situated and any action or proceeding under or in connection with the Purchase Order or bond issued pursuant to the Project shall, unless stated otherwise in this Agreement, be brought in the local state courts or United States Courts within the State in which the Project is situated. Seller further agrees to consent to the recognition and enforcement of any final claim or final judgment issued by a court of competent jurisdiction as described herein in any other state, country, territory, tribal or other legal system, without resort to reopen the merits or other issues. If the Project is located in more than one State, both the Buyer shall solely decide the said applicable for purposes of this paragraph. FURTHER, THE PARTIES HEREBY WAIVE THEIR RIGHTS TO A TRIAL BY JURY IN ANY AND ALL DISPUTES OR CLAIMS ARISING OUT OF OR IN RELATION TO THIS AGREEMENT OR BOND PROVIDED BY THE BUYER. In the event of a material breach of this Agreement by one party, the other party possession, independent and distinct breach of contract and breach of warranty actions against the breaching party. The Seller also consents that the Buyer has standing to bring first parties all cause of judgments in the court system of the Seller's home country, and that the Seller waives all statutory defenses which the Seller may have in the court system of his home country against Buyer gaining jurisdiction on the judgment, including, but not limited to, Buyer's standing, jurisdiction, venue, Seller's lack of due process, lack of notice, or inability to defend in previous proceeding in the United States court system. All provisions pertaining to Laws and Dispute Resolution in this Agreement shall apply to, and bind, Seller's surety to the same extent the provision applies to, and binds, Seller.

**11.2 Arbitration.** Any controversy or claim of Buyer against Seller or Seller against Buyer or its surety shall, at the option of Buyer or Buyer's surety and at any time, be resolved by arbitration pursuant to rules determined by Buyer. The Buyer and Seller agree to equally split the administrative costs, fees, and other similar expenses charged by the arbitrator or arbitration agency. At the Buyer's option, the arbitration may be consolidated with any arbitration between the Buyer and Owner or other entity associated with the Project.

Seller waives to the fullest extent permitted by law any objection that they may now or may hereafter have to having arbitration proceedings conducted in the state or United States territory in which the Project is located, including any claim that it is an inconvenient forum for such arbitration or court proceedings. The award rendered by the arbitrator(s) shall be conclusive and binding upon the parties and shall be enforceable in any court of competent jurisdiction of any Contracting State pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (330 UNTS 3; 9 U.S.C. 201, et seq.).

**11.3 Owner Related Disputes.** In case of any dispute between Buyer and Seller, which in the Buyer's reasonable opinion, is in any way relating to or arising from any act or omission of the Owner or third-party or involving the Contract Documents, Seller agrees to be bound to Buyer to the same extent that Buyer is bound to Owner or third-party, by the terms of the Contract Documents, and by any and all preliminary and final decisions, determinations or agreements made by or between Buyer, third-party or Owner or so authorized in the Contract Documents or by the court or arbitrator designated in the Contract Documents whether or not Seller is a party to such agreement or proceeding. In the event of any such dispute, Seller shall continue to perform the Seller's Work, disputed or otherwise, without interruption, deficiency or delay in a diligent manner. The Seller shall certify its Claim in the same manner that the Buyer is required to certify a claim to the Owner. Seller shall defend, indemnify, and hold harmless Buyer and Buyer's surety from allegations of false claim or similar allegations arising out of Seller's Claims, regardless of whether the Buyer has certified the Seller's Claims. If the Buyer cannot in good faith certify or submit the Seller's Claims, Buyer shall not be required to submit the Seller's Claims, and in such case Seller waives its right to seek compensation from Buyer or Buyer's surety for the Seller's Claims. Buyer and Buyer's surety shall not be liable to Seller in excess of any sum actually received from Owner or third-party on behalf of Seller and Buyer and Buyer's surety shall only be required to pay Seller if, and only if, Owner or third-party pays Buyer, which is an express condition precedent to Buyer's and its surety's duty to pay Seller. Buyer shall have the sole and full authority to settle, prosecute, or appeal the Seller's Claim.

In the event the Buyer has a claim with the Owner or third-party which includes the Seller's Claim, and which is resolved on a global basis, Seller's recovery for the Seller's Claim will be computed on a pro-rata basis after the Buyer's costs (including but not limited to attorney, consultant, and expert fees and costs) arising from pursuing the Buyer's claim with the Owner or third-party, and Buyer's overhead and profit markup on the Seller's Claim are subtracted from the offer or award. In the event Buyer's contract balance is included in the global offer or award, the Buyer's contract balance will be subtracted from the global offer or award prior to the pro-rata computation. In the event the Seller's Claim is resolved for a specific dollar amount, Seller's recovery for the Seller's Claim will be computed after the Buyer's costs (including but not limited to attorney, consultant, and expert fees and costs) arising from pursuing the Seller's Claim with the Owner or third-party, and Buyer's overhead and profit markup on the specific dollar amount are subtracted from the specific dollar amount. Seller agrees to toll and stay its rights under the Buyer's bond and this Agreement until such time as the Buyer has exhausted its dispute provisions with the Owner or third-party.

Buyer may, at Buyer's option, (i) present to the Owner, third-party or any court or arbitrator, in Buyer's name, or (ii) authorize Seller to present to the Owner, third-party or any court or arbitrator in Buyer's name, all or some of Seller's Claims, and to answer the claims of third-party or the Owner involving Seller or Seller's Work. If the Seller's Claim is presented, prosecuted or defended by Buyer, the Seller, at Seller's own expense, agrees to furnish all documents, statements, witnesses, and other information required by Buyer and to pay or reimburse Buyer for all costs incurred by Buyer in connection with the dispute including, without limitation, attorneys', experts' and consultants' fees.

## ARTICLE 12 - INTENTIONALLY OMITTED

## ARTICLE 13 - MISCELLANEOUS PROVISIONS

**13.1 Inconsistencies and Omissions.** Any of the Seller's Work shown in the specifications and not on the drawings, or shown on the drawings and not in the specifications shall be performed by the Seller as part of this Agreement. Dimensions given on the drawings and the specifications are approximations only, and the Seller shall take such measures of the Project site as will insure the proper matching and fitting of the work covered by this Agreement with contiguous work.

Seller represents and warrants that it has received and has reviewed all of the Contract Documents in advance of the execution of this Agreement. Any error, ambiguity, inconsistency or omission therein, of which Seller had, or should have had knowledge, may not be a basis for an increase in the Purchase Order Amount or time to perform the Seller's Work or any other relief under the Contract Documents.

**13.2 Severability and Waiver.** The partial or complete invalidity of any one or more provisions of this Agreement shall not affect the validity or continuing force and effect of any other provision, and any invalid provision shall be modified so as to be valid but give the Buyer the maximum protection allowed by law pertaining to the provision. The failure of either party hereto to insist, in any one or more instances, upon the performance of any of the terms, covenants or conditions of this Agreement, or to exercise any right herein, shall not be construed as a waiver or relinquishment of such term, covenant, condition or right as respects further performance.

**13.3 Interpretation.** In the event of a conflict between or among modifications to any of the body of this Agreement, any exhibit thereto, or a Contract Document, the later in date shall prevail; in the event of a conflict between or among the terms of this Agreement, the higher standard, shorter notice period, or greater requirement for Seller shall prevail; and in the event of a conflict between or among the terms of the Contract Documents, the higher standard, shorter notice period, or greater requirement for Seller shall prevail. The deletion of any printed, typed, or other portion of this Agreement shall not evidence an intention to contradict such deleted portion, and such contradictory language to the deletion shall not be deemed to have been inserted into this Agreement.

**13.4 Titles.** The titles given to the Articles of this Agreement are for ease of reference only and shall not be relied upon or cited for any other purpose.

**13.5 Entire Agreement.** This Agreement represents the entire and integrated agreement between the parties hereto and supersedes all prior negotiations, representations, or agreements, either written or oral. The terms in this Purchase Order can only be modified by written Change Order. Terms on any other written documents, whether signed by representatives of the parties or not, such as signed delivery tickets, etc., are not binding on the Buyer and Seller.

CON_PET'S 1ST RFP_0002210

FILED DATE: 6/15/2026 5:13 PM    2026CH05725

*ZION JACKSONVILLE, LLC*
**Agreement Number:  216063P02**

**13.6 Buyer's Surety and Third Party Beneficiaries.** Except as expressly provided herein, no party is a third-party beneficiary to this Agreement. Notwithstanding the preceding sentence, the Buyer's surety is an express third-party beneficiary to this Agreement, and said surety has, notwithstanding any statutes or laws to the contrary, all defenses, rights and remedies the Buyer has toward the Seller. Seller's execution of this Agreement evidences Seller's awareness of any and all statutes, laws or judicial opinions that may prevent said surety from relying upon all defenses, rights and remedies of the Buyer, and Seller nonetheless knowingly consents to said surety's reliance upon such defenses, rights and remedies.

**END OF EXHIBIT A**

CON_PET'S 1ST RFP_0002211

FILED DATE: 6/15/2026 5:13 PM 2026CH05725

ZION JACKSONVILLE, LLC
Agreement Number: 216063P02

# EXHIBIT B

## SCOPE, CLARIFICATION, ALTERNATES and UNIT PRICES
### Archer Western Contractors LLC
Contractor for: FLORIDA DEPT. OF TRANSPORTATION
"Project": Jax I-95/I-295 North Interchange DB
Archer Western Contractors LLC Project No. 216063

**Scope of Work:**

Furnish A-3 Select Fill

**Inclusions:**

| LINE | DESCRIPTION |
|---|---|
| 1 | The Buyer will purchase approximately 850,000 CY of A-3 Select Fill, to the extent suitable fill material is available at such site as of the date of this Agreement, from the Seller's borrow site property located off Eastport Road and Heckscher Drive for the referenced project. |
| 2 | The Buyer will be responsible for the excavation of the Select Fill material from the site, constructing and maintaining all hauls roads into the site, and the trucking of the material to the project. |
| 3 | The Seller will be responsible for obtaining all Federal, State and Local permits required for the excavation of the Select Fill material. The Buyer will be responsible for obtaining FDOT approval for the site as a job specific Borrow Site. |
| 4 | The Seller will be responsible for the investigation of endangered species on the site, including the Gopher Tortoise. If tortoises are found, the Seller will be responsible for their removal. |
| 5 | The Seller will make available to the Buyer approximately 150 acres, with an estimated 1,000,000 cy of material, for the Buyer's use. The Seller will designate such limits to the Buyer. Additionally, it is agreed between the Buyer and the Seller that the work will be performed in approximate 20-acre sections. Upon completion of the excavation of Select Fill and the restoration of the removed topsoil in a 20-acre section, the Buyer shall proceed to the next 20-acre section. |
| 6 | The Seller is responsible for all taxes associated with the property. |
| 7 | Buyer shall provide not less than 60 days prior written notice to Seller that Buyer wishes to enter Seller's property and excavate fill therefrom, or that the current excavation site will be depleted and another site will become necessary in 60 days. During such 60 day period, Seller shall make commercially reasonable efforts to obtain the required permits in connection therewith and to clear an approximately 20 acre section for Buyer's excavation activities. Upon completion of such permitting and clearing, Seller shall provide written notice to Buyer that such parcel is available for Buyer's excavation activities. |
| 8 | Upon notification by the Seller to the Buyer that a 20-Acre section is clear of Gopher Tortoises; and before excavation begins, the Buyer will install perimeter Silt Fencing to prevent the migration of Tortoises into the work area. |
| 9 | The Buyer will excavate the Select Fill to an anticipated Elevation of EL. +10.0, which is approximately 3' above groundwater. The Seller and Buyer will mutually agree to a Final Elevation based on field conditions. The Buyer will grade each 20-acre site to the agreed elevation +/- 3" before proceeding to the next 20-acre section. |
| 10 | The Seller will be responsible for Clearing of each 20-acre site prior to the Buyer's use. The Seller will also be responsible for the replanting of trees as each area is completed. |
| 11 | The Buyer will access the site off Eastport Road. The Buyer will be required to construct a haul road to the designated excavation areas for trucking. The Buyer will maintain such roads throughout the life of use. |
| 12 | The Seller will allow the Buyer to stage a small amount of construction materials and equipment on the property inside of the designated entrance gate. Additionally, the Buyer may also be allowed to place a small construction trailer on the site for the utilization of the Buyer's personnel working the site. |
| 13 | Quantities listed in the Unit Price Schedule (below) are approximate and are subject to change. The final quantity of Select Fill to be purchased by the Buyer will be determined by the Final Design requirements of the project. |
| 14 | The final quantity of Select Fill for payment will be based on a Before and After cross-section survey taken of the borrow site. The Seller may at his discretion conduct an independent survey of the site to verify the Buyer's survey. |
| 15 | The Seller will be paid Monthly for Select Fill material removed from the site. Basis of payment will be by truck load count. It is assumed that each truckload hauls 11.0 cy of material. The Buyer will periodically verify the 11.0 cy capacity, and make adjustments if necessary. The Buyer and Seller will mutually agree to such adjustments. |
| 16 | The Buyer will perform Quarterly cross-section surveys, if deemed necessary, to verify the accuracy of the Select Fill material removed by load counts. Such surveys performed by Buyer are subject to verification by Seller and Seller's performance of its own surveys. The Buyer will make adjustments to the Pay Quantity based on those surveys, and compensate the Seller accordingly. |
| 17 | The Buyer will record on a daily basis the number of truckloads of Select Fill removed from the borrow site. The Buyer will provide the Seller with copies of those daily load counts on a weekly basis. |
| 18 | It is anticipated, based on the Buyer's preliminary construction schedule, that the majority of the Select Fill material will be removed from the site within a three-year period beginning in Spring 2017. In no event shall the term of this Agreement extend beyond the fourth anniversary of the effective date hereof, unless extended by mutual agreement of Seller and Buyer, which may be withheld at either party's discretion. |
| 19 | Unit Prices shown in the Unit Price Schedule are firm for the duration of the project and will not be subject to escalation. |
| 20 | Sales Tax shall be billed on a separate line item on each invoice, and such sales tax shall be paid by the Buyer. |
| 21 | The applicable requirements of form FHWA 1273 (revised May 1, 2012) - Required Contract Provisions for Federal Aid Construction Contracts, are hereby incorporated by reference into this agreement. |

**Exclusions:**

| LINE | DESCRIPTION |
|---|---|
| 1 | The Seller will not be responsible for any Maintenance of Traffic (MOT) either within or beyond the Seller's property. |
| 2 | The Seller will not be responsible for any Erosion Control located either within or beyond the Seller's property. The Buyer will install Soil Tracking Devices, if deemed necessary, to prevent soil tracking onto local streets. |
| 3 | The Seller will not be responsible for maintaining the Buyer's entrance gate into the property off Eastport Road. However, the Seller will be responsible for maintaining the other gates which currently front Eastport Road. |
| 4 | The Seller will not be responsible for any damage that may occur to equipment and/or materials working within or leaving the Seller's property. |

CON_PET'S 1ST RFP_0002212

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

**Alternates:**

The Alternates listed herein shall be considered as options to the Buyer. Seller shall be bound to perform any or all of the Alternates for the price or prices indicated if the Buyer, in Buyer's sole discretion, exercises his right to Seller's performance of any or all of the Alternates listed.

| LINE | DESCRIPTION | TYPE | AMOUNT |
|---|---|---|---|
|  |  |  |  |

**Unit Price Schedule:**

If this is a unit price Agreement, quantities provided are estimates only and may vary. There is no guarantee that any or all quantity of any item will be realized.

Subject to Retention of:          0%                                              Unless noted otherwise, the Amounts shown are listed in US Dollars

| ITEM NUMBER | DESCRIPTION | PHASE CODE | U.O.M. | QTY. | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|---|
| 001 | Purchase A3 Select Fill | 32.3200.00.10 - 08 | CY | 850,000.000 | $5.500 | $4,675,000.00 |
| 002 | Florida State Sales Tax | 32.3200.00.10 - 08 | % | 4,675,000.00 0 | $0.060 | $280,500.00 |
| 003 | Duval County Sales Tax | 32.3200.00.10 - 08 | % | 5,000.000 | $0.010 | $50.00 |

| **Total Estimated Value of Unit Price Purchase Order** |  | **$4,955,550.00** |
|---|---|---|

End of Exhibit B – except see following attachments as described in this Exhibit.

CON_PET'S 1ST RFP_0002213

FILED DATE: 6/15/2026 5:13 PM    2026CH05725

ZION JACKSONVILLE LLC
Agreement Number: 216063P02

# EXHIBIT C

## CONTRACT DOCUMENTS

**Archer Western Contractors LLC**
Contractor for: FLORIDA DEPT. OF TRANSPORTATION
"Project": Jax I-95/I-295 North Interchange DB
Archer Western Contractors LLC Project No. 216063

**Addenda**
ID#                    DESCRIPTION

**Project Specifications**
ID#                    DESCRIPTION

**Project Drawings**
ID#                    DESCRIPTION

End of Exhibit C - except see following Attachments if described in this Exhibit C.

Report EXHIBIT C Ver. Date: 14-APR-2010
Printed on: 11-04-2016

Page 1

CON_PET'S 1ST RFP_0002214

FILED DATE: 6/15/2026 5:13 PM 2026CH05725

ZION JACKSONVILLE, LLC
Agreement Number: 216063P02

# EXHIBIT I

## PARTIAL and FINAL WAIVER and RELEASE FORMS

**Archer Western Contractors LLC**
Contractor for: FLORIDA DEPT. OF TRANSPORTATION
"Project": Jax I-95/I-295 North Interchange DB
Archer Western Contractors LLC Project No. 216063

As stated in Article 3.10 - Waivers and Affidavits, in Exhibit A, attached are the project specific waivers and affidavits, subject to change at the Contractors option.

End of Exhibit I - except PARTIAL and FINAL WAIVER and RELEASE FORMS are attached hereafter and/or available upon request

Report EXHIBIT I3 Ver. Date: 07-OCT-2014
Printed on: 11-04-2018

Page 1

CON_PET'S 1ST RFP_0002215

FILED DATE: 6/15/2026 5:13 PM 2026CH05725

## FINAL WAIVER AND RELEASE OF CLAIMS FOR PAYMENT
### UNCONDITIONAL – ARCHER WESTERN CONSTRUCTION, LLC

STATE OF _____

COUNTY OF _____

TO WHOM IT MAY CONCERN:

WHEREAS, the undersigned ("Undersigned") has been employed by _____ ("Contractor") to furnish and install _____ for the project known as I-95 and I-295 North Interchange, Jacksonville, FL ("Project") of which Florida Department of Transportation, District 2 is the owner ("Owner") and on which Archer Western Contractors, LLC is a contractor (herein referred to as the "General Contractor").

The Undersigned, for and in consideration of _____ ($ _____) Dollars and in consideration of such and other good and valuable considerations, the receipt whereof is hereby acknowledged, do(es) for it heirs, executors, and administrators, hereby waive and release the General Contractor, the General Contractor's surety, the Owner, and each of their insurers, parents, subsidiaries, affiliates, members, past and present officers, directors, heirs, and administrators, from any and all suits, debts, demands, torts, charges, causes of action and claims for payment, including claims under the laws or statutes of the municipality, State or Federal Government relating to Payment Bonds, the Miller Act, or other Act or statute including Prompt Payment statutes, or Bonds relating to the Project, and in addition all lien, or claim of, or right to, lien under municipal, State or Federal alws or statutes, relating to Mechanics' Liens, with respect to and on said above-described Project, and the improvements thereon; and on the material relating to Mechanics' Liens, Payment Bonds, the Miller Act or other law, Act or statue, with respect to and on said above-described premises, and on the material, fixtures, apparatus or machinery furnished, and on the moneys, funds or other considerations due or to become due from the Owner, on account of, arising out of or relating in any way to the labor, services, material, fixtures, equipment, apparatus or machinery furnished by the Undersigned, on the above-described Project from the beginning of time or any time hereafter, including extras* The Undersigned certifies, warrants, and guarantees that all work it has performed on the Project has been performed in accordance with its contract documents on the Project.

Date: _____                 Name of Company: _____

                                                    (Undersigned)

Signature: _____     Subscribed and sworn before me this ____ day of _____, 20____

Printed Name: _____     Notary Signature and Seal: _____

Title of Person Signing: _____

NOTE: *Extras include but are not limited to changes, both oral and written, to the contract, and Claims as defined in the Undersigned's contract with the Prime Contractor or Contractor. All waivers and releases must be for the full amount paid. If waiver and release is for a corporation, corporate name should be used, corporate seal affixed and title of officer signing waiver and release should be set forth. If waiver and release is for a partnership, the partnership name should be used, partner should sign and designate himself as partner.

## CONTRACTOR'S AFFIDAVIT

STATE OF _____

COUNTY OF _____

TO WHOM IT MAY CONCERN:

THE Undersigned, being duly sworn, deposes and says that (s)he X_____ of _____, who is the Contractor for the _____ work on the project ("Project") located at I-95 and I-295 North Interchange, Jacksonville, FL, owned by Florida Department of Transportation, District 2 ("Owner") and on which Archer Western Contractors, LLC is also a contractor (known herein as the "Prime Contractor").

That the total amount of the contract including extras is $ _____ on which it has received payment of $ _____ prior to this payment. That all waivers and releases are true, correct, and genuine and delivered unconditionally and that there is no claim either legal or equitable to defeat the validity of said waivers or releases. That the following are the names of all parties who have furnished material, equipment, services, or labor for said work and all parties having contracts or subcontracts for specific portions of said work or for material entering into the construction thereof and the amount due or to become due each and that the items mentioned included all labor, equipment services, and material required to complete said work according to plans and specifications. The Contractor agrees to indemnify, defend, and hold harmless, the General Contractor, the General Contractor's surety, and the Owner from any and all claims for alleged payment made by the Contractor's suppliers or subcontractors pertaining to the Project, whether or not listed below.

| NAMES | WHAT FOR | CONTRACT PRICE | PREVIOUSLY PAID | THIS PAYMENT | BALANCE DUE |
|-------|----------|----------------|-----------------|--------------|-------------|
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
| TOTAL LABOR, EQUIPMENT, SERVICES, AND MATERIAL TO COMPLETE |  |  |  |  |  |

That there are no other contracts for said work outstanding, and that there is nothing due or to become due to any person for material, labor or other work of any kind done or to be done upon or in connection with said work other than above stated.

Date: _____                 Name of Company: _____

                                                    (Undersigned)

Signature: _____     Subscribed and sworn before me this ____ day of _____, 20____

Printed Name: _____     Notary Signature and Seal: _____

Title of Person Signing: _____

Revised September 1, 2011

FILED DATE: 6/15/2026 5:13 PM 2026CH05725

## PARTIAL WAIVER AND RELEASE OF CLAIMS FOR PAYMENT
## UNCONDITIONAL – ARCHER WESTERN CONSTRUCTION, LLC

STATE OF _____

COUNTY OF _____

TO WHOM IT MAY CONCERN:

WHEREAS, the undersigned ("Undersigned") has been employed by _____ ("Contractor") to furnish and install _____ for the project known as I-95 and I-295 North Interchange, Jacksonville, FL "Project" of which Florida Department of Transportation, District 2 is the owner ("Owner") and on which Archer Western Contractors, LLC is a contractor (herein referred to as the "General Contractor").

The Undersigned, for and in consideration of ($ ) Dollars, and in consideration of such sum and other good and valuable considerations, the receipt whereof is hereby acknowledged, do(es) for its heirs, executors, and administrators, hereby waive and release the General Contractor, the General Contractor's surety, the Contractor, the Contractor's surety, the Owner and each of their insurers, parents, subsidiaries, related entities, affiliates, members, past and present officers, directors, heirs, and administrators from any and all suits, debts, demands, torts, charges, causes of action and claims for payment, including claims under the laws or statutes of the municipality, state or federal government relating to payment bonds, the Miller Act, or other act or statute including prompt payment statutes, or bonds relating to the Project, and in addition all lien, or claim of, or right to lien, under municipal, state or federal laws or statutes, relating to mechanics' liens, with respect to and on said above described Project, and the improvements thereon, and on the material relating to mechanics' liens, payment bonds, the Miller Act or other law, act or statute, with respect to and on said above described premises, and on the material, fixtures, apparatus or machinery furnished, and on the moneys, funds or other considerations due or to become due from the Owner, on account of, arising out of or relating in any way to the labor, services, material fixtures, equipment, apparatus or machinery furnished by the Undersigned on the above described Project from the beginning of time through the date indicated below, including extras*.

The Undersigned certifies, warrants, and guarantees that all work it has performed on the Project has been performed in accordance with its contract documents on the Project.

Date _____           Name of Company _____
                                                 (Undersigned)

Signature _____      Subscribed and sworn before me this _____ day of _____ , 20___

Printed Name _____   Notary Signature and Seal _____

Title of Person Signing _____

NOTE: *Extras include but are not limited to changes, both oral and written, to the contract, and Claims as defined in the Undersigned's contract with the General Contractor or Contractor. All waivers and releases must be for the full amount paid. If waiver and release is for a corporation, corporate name should be used, corporate seal affixed and title of officer signing waiver and release should be set forth. If waiver and release is for a partnership, the partnership name should be used, partner should sign and designate himself as partner.

## CONTRACTOR'S AFFIDAVIT

STATE OF _____

COUNTY OF _____

TO WHOM IT MAY CONCERN:

THE Undersigned, being duly sworn, deposes and says that (s)he X_____ of _____ , who is the Contractor for the _____ work on the project ("Project") located at I-95 and I-295 North Interchange, Jacksonville, FL owned by Florida Department of Transportation, District 2 ("Owner") and on which Archer Western Contractors, LLC is also a contractor (known herein as the "General Contractor").

That it has received payment of $ _____ prior to this payment.

That all waivers and releases are true, correct and genuine and delivered unconditionally and that there is no claim either legal or equitable to defeat the validity of said waivers or releases. That the following are the names of all parties who have furnished material, equipment, services, or labor for said work and all parties having contracts or subcontracts for specific portions of said work or for material entering into the construction thereof and the amount due or to become due each, and that the items mentioned include all labor, equipment, services, and material required to complete said work according to plans and specifications. The Undersigned agrees to indemnify, defend, and hold harmless, the General Contractor, the General Contractor's surety, and the Owner from any and all alleged payment made by the Undersigned's suppliers or subcontractors pertaining to the Project, whether or not listed below.

| NAMES | WHAT FOR | CONTRACT PRICE | PREVIOUSLY PAID | THIS PAYMENT | BALANCE DUE |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
| TOTAL LABOR, EQUIPMENT, SERVICES, AND MATERIAL TO COMPLETE |  |  |  |  |  |

That there are no other contracts for said work outstanding, and that there is nothing due or to become due to any person for material, labor or other work of any kind done or to be done upon or in connection with said work other than above stated.

Date _____           Name of Company _____
                                                 (Undersigned)

Signature _____      Subscribed and sworn before me this _____ day of _____ , 20___

Printed Name _____   Notary Signature and Seal _____

Title of Person Signing _____

Revised September 1, 2011

CON_PET'S 1ST RFP_0002217

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

ZION JACKSONVILLE, LLC
Agreement Number: 216063P02

# EXHIBIT K

## FEDERAL ACQUISITION REGULATIONS (FAR) – PURCHASE ORDERS

**Archer Western Contractors LLC**
Buyer for: FLORIDA DEPT. OF TRANSPORTATION
"Project": Jax I-95/I-295 North Interchange DB
Archer Western Contractors LLC Project No. 216063

### INCORPORATION OF FAR CLAUSES

If this Purchase Order involves funds from a Federal government contract, or funds at any tier relating to a Federal government contract, the following clauses from the Federal Acquisition Regulation and Code of Federal Regulations (collectively referred to herein as "FAR") are incorporated into the Purchase Order by reference where applicable and form a part of the terms and conditions of the Purchase Order. The full text of the FAR clauses may be found at http://www.acquisition.gov/far/. Seller agrees to flow down all applicable FAR clauses to lower-tier suppliers.

FAR clause 52.233-1 ("Disputes") shall only apply to any dispute between Buyer and Seller in any way relating to or arising from any act or omission of the Owner or its agents; Seller agrees to be bound to Buyer to the same extent that Buyer is bound to Owner, by the terms of the Contract Documents.

FAR 52.232-17 Interest, if incorporated into this Purchase Order, is incorporated only with respect to payments from the Owner which flow down to the Seller.

Where necessary to make the language of the FAR clauses applicable to the Seller, the term "contractor" or "offeror" in FAR shall mean "Seller", the term "contract" or "offer" in FAR shall mean "Purchase Order", and the terms "government", "contracting officer", and equivalent terms and phrases in FAR shall mean "Buyer".

If the date or substance of any of the FAR clauses listed below is different from the date or substance of the FAR clauses actually incorporated in the Prime Contract (meaning the contract between Buyer and the U.S. Government or between Buyer and its higher-tier contractor who has a contract with the U.S. Government), the date and/or substance of the clause incorporated by said Prime Contract shall apply instead.
In the event any of the listed FAR clauses specifically do NOT apply to Seller's Work or this Purchase Order, Buyer may, at its sole and exclusive option, waive the requirements of the specific FAR clause, but only after written notice from Seller seeking such waiver.

It is the specific intent of Buyer and Seller to include in this Purchase Order all FAR clauses, and any agency specific regulations (such as Defense Department, NASA FARS, and other agency specific regulations) applicable to the Work of this Purchase Order, performed by Seller as required by the Prime Contract and the FAR. Seller acknowledges and represents to Buyer that it is familiar with the FAR (and any agency specific regulations) and its application to the Work of Seller and this Purchase Order. Therefore, to the extent the below non-exhaustive list of FAR clauses does not include all the FAR clauses required to be incorporated and flowed down in the Purchase Order in accordance with the Prime Contract and/or FAR, **SELLER SPECIFICALLY AGREES THAT ANY NON-LISTED AND REQUIRED FAR (OR OTHER AGENCY REGULATIONS) CLAUSES ARE DEEMED INCORPORATED BY REFERENCE INTO, AND ARE A FULLY INTEGRATED PART OF, THIS PURCHASE ORDER.**

1. FAR FLOWDOWN CLAUSES INCORPORATED BY REFERENCE INTO THIS PURCHASE ORDER (in order of Precedence in case of any conflict between FAR's):

    a. All FAR and agency specific regulations incorporated by reference into Prime Contract;

    b. If this Purchase Order involves funds from a Federal government contract, or funds at any tier relating to a Federal government contract, the following FAR clauses:

        **i. FAR Clauses Incorporated Into All Purchase Orders**
        52.203-3 Gratuities

        52.203-5 Covenant Against Contingent Fees

        52.203-8 Cancellation, Rescission, and Recovery of Funds for Illegal or Improper Activity

        52.203-10 Price or Fee Adjustment for Illegal or Improper Activity

        52.204-9 Personal Identity Verification of Contractor Personnel

CON_PET'S 1ST RFP_0002218

FILED DATE: 6/15/2026 5:13 PM    2026CH05725

*ZION JACKSONVILLE, LLC*
**Agreement Number: 216083P02**

52.219-8 Utilization of Small Business Concerns. (Seller also agrees, as part of this Purchase Order, to submit a Small Business Self-Certification specific to this Purchase Order. A blank, project specific, Small Business Certification form can be obtained from the Buyer upon request.)

52.222-4 Contract Work Hours and Safety Standards Act-Overtime Compensation

CONTRACT WORK HOURS AND SAFETY STANDARDS ACT - OVERTIME COMPENSATION (JULY 2005)
(a) Overtime requirements. No Contractor or subcontractor employing laborers or mechanics (see Federal Acquisition Regulation 22.300) shall require or permit them to work over 40 hours in any workweek unless they are paid at least 1 and 1/2 times the basic rate of pay for each hour worked over 40 hours.

(b) Violation; liability for unpaid wages; liquidated damages. The responsible Contractor and subcontractor are liable for unpaid wages if they violate the terms in paragraph (a) of this clause. In addition, the Contractor and subcontractor are liable for liquidated damages payable to the Government. The Contracting Officer will assess liquidated damages at the rate of $10 per affected employee for each calendar day on which the employer required or permitted the employee to work in excess of the standard workweek of 40 hours without paying overtime wages required by the Contract Work Hours and Safety Standards Act.

(c) Withholding for unpaid wages and liquidated damages. The Contracting Officer will withhold from payments due under the contract sufficient funds required to satisfy any Contractor or subcontractor liabilities for unpaid wages and liquidated damages. If amounts withheld under the contract are insufficient to satisfy Contractor or subcontractor liabilities, the Contracting Officer will withhold payments from other Federal or federally assisted contracts held by the same Contractor that are subject to the Contract Work Hours and Safety Standards Act.

(d) Payrolls and basic records.
   (1) The Contractor and its subcontractors shall maintain payrolls and basic payroll records for all laborers and mechanics working on the contract during the contract and shall make them available to the Government until 3 years after contract completion. The records shall contain the name and address of each employee, social security number, labor classifications, hourly rates of wages paid, daily and weekly number of hours worked, deductions made, and actual wages paid. The records need not duplicate those required for construction work by Department of Labor regulations at 29 CFR 5.5(a)(3) implementing the Davis-Bacon Act.
   (2) The Contractor and its subcontractors shall allow authorized representatives of the Contracting Officer or the Department of Labor to inspect, copy, or transcribe records maintained under paragraph (d)(1) of this clause. The Contractor or subcontractor also shall allow authorized representatives of the Contracting Officer or Department of Labor to interview employees in the workplace during working hours.

(e) Subcontracts. The Contractor shall insert the provisions set forth in paragraphs (a) through (d) of this clause in subcontracts that may require or involve the employment of laborers and mechanics and require subcontractors to include these provisions in any such lower tier subcontracts. The Contractor shall be responsible for compliance by any subcontractor or lower-tier subcontractor with the provisions set forth in paragraphs (a) through (d) of this clause.

(End of clause)

52.222-21 Prohibition of Segregated Facilities

52.222-22 Previous Contracts and Compliance Reports

52.222-26 Equal Opportunity

52.222-38 Compliance with Veterans' Employment Reporting Requirements

52.222-50 Combating Trafficking in Persons.

52.222-54 Employment Eligibility Verification

52.223-6 Drug-Free Workplace

52.223-18 Contractor Policy to Ban Text Messaging While Driving

52.224-2 Privacy Act

52.225-1 Buy American Act - Supplies

52.225-3 Buy American Act- Free Trade Agreements - Israeli Trade Act

52.225-5 Trade Agreements

CON_PET'S 1ST RFP_0002219

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

ZION JACKSONVILLE, LLC
Agreement Number: 216063P02

52.225-8 Duty-Free Entry

52.225-9 Buy American Act Construction Materials

52.225-13 Restriction on Certain Foreign Purchases

52.225-20 Prohibition on Conducting Restricted Business Operations in Sudan - Certification

52.225-21 Required Use of American Iron, Steel, and Manufactured Goods-Buy American Act-Construction Materials

52.225-23 Required Use of American Iron, Steel, and Manufactured Goods-Buy American Act-Construction Materials Under Trade Agreements

52.225-25 Prohibition on Engaging in Sanctioned Activities Relating to Iran-Certification

52.227-9 Refund of Royalties

52.227-10 Filing of Patent Applications - Classified Subject Matter.

52.232-27 Prompt Payment for Construction Contracts

52.232-40 Providing Accelerated Payments to Small Business Subcontractors

52.233-1 Disputes

52.236-13 Accident Prevention

52.242-13 Bankruptcy

52.245-1 Government Property

52.247-63 Preference for U.S. Flag Air Carriers

52.247-64 Preference for Privately Owned U.S. Flag Commercial Vessels

**II. FAR Clauses incorporated if this Purchase Order equals or exceeds $10,000:**

52.222-23 Notice of Requirement for Affirmative Action to Ensure Equal Employment Opportunity for Construction.

52.222-27 Affirmative Action Compliance Requirements for Construction

52.222-40 Notification of Employee Rights Under the National Labor Relations Act

29 CFR Part 471, Appendix A to Subpart A: Notification of Employee Rights Under Federal Labor Laws

**III. FAR Clauses incorporated if this Purchase Order equals or exceeds $15,000:**

52.222-36 Affirmative Action for Workers with Disabilities

**iv. FAR Clauses incorporated if this Purchase Order equals or exceeds $25,000:**

52.204-10 Reporting Executive Compensation and First-Tier Subcontract Awards

**v. FAR Clauses incorporated if this Purchase Order equals or exceeds $100,000:**

52.222-35 Equal Opportunity for Special Disabled Veterans, Veterans of the Vietnam Era and Other Eligible Veterans

52.222-37 Employment Reports on Special Disabled Veterans, Veterans of the Vietnam Era and Other Eligible Veterans

52.223-13 Certification of Toxic Chemical Release Reporting

52.223-14 Toxic Chemical Release Reporting

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

*ZION JACKSONVILLE,LLC*
**Agreement Number: 216063P02**

vi. **FAR Clauses incorporated if this Purchase Order equals or exceeds the Simplified Acquisition Threshold ($150,000 as of Jan 1, 2011):**

52.203-6 Restrictions On Subcontractor Sales To The Government

52.203-17 Contractor Employee Whistleblower Rights and Requirement To Inform Employees of Whistleblower Rights

52.215-2 Audit and Records-Negotiation

52.215-14 Integrity of Unit Prices

52.227-1 Authorization and Consent

52.227-2 Notice and Assistance Regarding Patent and Copyright Infringement

vii. **FAR Clauses incorporated if this Purchase Order equals or exceeds $150,000:**

52.203-7 Anti-Kickback Procedures

52.203-12 Limitation on Payments to Influence Certain Federal Transactions

viii. **FAR Clauses incorporated if this Purchase Order equals or exceeds $650,000:**

52.230-2 Cost Accounting Standards.

52.230-3 Disclosure and Consistency of Cost Accounting Practices.

52.230-5 Cost Accounting Standard - Educational Institution.

ix. **FAR Clauses incorporated if this Purchase Order equals or exceeds $700,000:**

52.214-26 Audit and Records-Sealed Bidding

52.214-28 Seller Cost or Pricing Data-Modifications Sealed Bidding

52.215-12 Seller Certified Cost or Pricing Data

52.215-13 Seller Cost or Pricing Data - Modifications

x. **FAR Clauses incorporated for all Purchase Orders (except small businesses) where the Purchase Order exceeds the flow down threshold as specified in the Buyer's approved Small Business Subcontracting Plan:**

52.219-9 Small Business Subcontracting Plan

**SMALL BUSINESS SUBCONTRACTING PLAN**
a. Seller shall adopt and comply with a Small Business Subcontract Plan (SBSP) similar to the Buyer's SBSP.

b. Seller shall submit its SBSP to the Buyer for the Buyer's review prior to execution of this Purchase Order. The Seller shall not sign this Purchase Order until the Seller's SBSP has been approved by Buyer; however, the Buyer's execution of the Purchase Order is not deemed an acceptance of the Seller's SBSP. The Seller's SBSP shall be reviewed by the Buyer to assure all minimum requirements of an acceptable SBSP have been satisfied.

c. The Seller's approved SBSP is explicitly incorporated into, and is made a material part of, this Purchase Order. Lack of an approved SBSP is a material breach of the Purchase Order. The Seller's approved SBSP is an express pre-requisite for payment by Buyer to Seller.

d. The acceptability of percentage goals shall be determined on a case-by-case basis depending on the supplies/services involved, the availability of potential Small Business (SB), Small Disadvantaged Business (SDB), Women-Owned Small Business (WOSB), Historically Underutilized Business Zone Small Business (HUBZoneSB), Veteran-Owned Small Business (VOSB), and Service-Disabled Veteran-Owned Small Business (SD-VOSB) concerns.

e. Once approved and implemented, Seller's SBSPs will be monitored through the Seller's submission of periodic reports (using the Federal government's electronic Subcontract Reporting System - eSRS at www.esrs.gov).

CON_PET'S 1ST RFP_0002221

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

*ZION JACKSONVILLE,LLC*
**Agreement Number: 216063P02**

f. Prior to award of lower-tier Purchase Orders and Start of Work, Seller shall coordinate with the Buyer's Project Manager or Designated Small Business Project Coordinator, and Seller shall organize a Small Business project orientation. Seller's approved SBSP shall be reviewed with Buyer and Seller's PM and procurement professionals, to assure compliance with SBSP.

(End of clause)

**xi. FAR Clauses Incorporated if this Purchase Order equals or exceeds $5,000,000:**

52.203-13 Contractor Code of Business Ethics and Conduct

52.203-14 Display of Hotline Poster(s)

**xii. FAR Clauses Incorporated if this Purchase Order equals or exceeds $10,000,000:**

52.222-24 Preaward On-Site Equal Opportunity Compliance Evaluation

c. Any other FAR or agency specific regulation required to be included and flowed down in this Purchase Order pursuant to the Prime Contract.

**End of Exhibit K**

CON_PET'S 1ST RFP_0002222

FILED DATE: 6/15/2026 5:13 PM 2026CH05725

ZION JACKSONVILLE.LLC
Agreement Number: 216063P02

# EXHIBIT M

## SUBCONTRACTOR / SELLER QUALITY REQUIREMENTS

**Archer Western Contractors LLC**
Contractor for: FLORIDA DEPT. OF TRANSPORTATION

"Project": Jax I-95/I-295 North Interchange DB
Archer Western Contractors LLC Project No. 216063

The following Quality Assurance/Quality Control provisions are to supplement other Quality Assurance/Quality Control related requirements of this Agreement.

A. This Subcontractor/Supplier warrants they are properly qualified to perform this Scope of Work.

B. Subcontractor/Supplier shall work to the Contractors Quality Control Program documenting all installations and testing records in addition to/or supplementing the requirements of the Specifications. A copy of which will be submitted to the Contractor as completed for review and approval.

    1) Subcontractor shall develop a project specific Quality Control Plan for its work which must be approved by the Contractor prior to the Subcontractor beginning work.

    2) Subcontractor shall develop work plans for its Scope(s) of Work.

    3) Subcontractor shall work with Contractor to use the Three Phases of Control process for its Defined Features of Work.

C. Subcontractor/Supplier is responsible to meet material and installer qualifications in accordance with the applicable Specification Sections included with this Scope of Work.

D. Subcontractor/Supplier to provide all certifications, including mill test reports certifying compliance of all products supplied with Contract requirements, if applicable, to this Scope of Work.

E. Subcontractor will hold pre-installation (Preparatory) conferences for work items in accordance with the requirements of the Contract Documents or as requested by the Contractor.

F. Subcontractor shall provide all Quality Control required of this Subcontract Agreement in accordance with the requirements of the Contract Documents and this exhibit.

G. Subcontractor shall furnish, install and demolish mock-ups as required of the Contract Documents for work included with this Subcontract Agreement where required. Where allowed, and approved in writing by the Contractor, mock-ups may be constructed in field with finished products.

H. Contractor will assemble the Quality Control team required of the Contract Documents. Subcontractor will designate personnel to be responsible for the Quality Control work of this Subcontract Agreement and to coordinate all Quality Control requirements of Subcontractor's scope of work.

End of Exhibit M

CON_PET'S 1ST RFP_0002223

FILED DATE: 6/15/2026 5:13 PM   2026CH05725



**Exhibit B**

FILED DATE: 6/15/2026 5:13 PM    2026CH05725



**UNIVERSAL ENGINEERING SCIENCES**

Consultants In: Geotechnical Engineering • Environmental Sciences
Geophysical Services • Construction Materials Testing • Threshold Inspection
Building Inspection • Plan Review • Building Code Administration

LOCATIONS:
- Atlanta
- Daytona Beach
- Fort Myers
- Fort Pierce
- Gainesville
- **Jacksonville**
- Miami
- Ocala
- Orlando (Headquarters)
- Palm Coast
- Panama City
- Pensacola
- Rockledge
- Sarasota
- St. Petersburg
- Tampa
- Tifton
- West Palm Beach

December 21, 2020

LG2 Environmental Solutions, Inc.
10475 Fortune Parkway, Suite 201
Jacksonville, Florida 32256

Attention:     Mr. Rick McCann, P.G.

Reference:     **FIELD REPORT**
Zion Project
Jacksonville, Duval County, Florida
UES Report No. 1826507

Dear Mr. McCann:

Universal Engineering Sciences, LLC has completed a field visit at the subject site located in Jacksonville, Duval County, Florida. This letter contains a description of our site observations and opinion relating to soil suitability.

The purpose of this site visit was to evaluate the soils being imported to the site. The site is currently under earthwork construction, it appears that clean fine sand is being exported out of the site and being replaced with imported clay to very clayey fine sand and variable amounts of organics. It was not the purpose of this exploration to interpret and review the subsurface conditions with respect to the existing construction. We will be pleased to provide these services if requested.

This report presents an evaluation of the site on the basis of traditional geotechnical procedures for site characterization. The recovered sample was not examined, either visually or analytically, for chemical composition or environmental hazards. Universal Engineering Sciences would be pleased to perform these services if you desire.

A site visit was conducted on December 16, 2020. The soils being imported to the site were visually classified in general accordance with ASTM D 2488 (Unified Soil Classification System). One (1) fines content test, one (1) moisture content test, and one (1) Atterberg Limits Test were conducted on a grab sample from the site which appeared most representative of the soils being imported to the site. The tests were performed to aid in classifying the soils and to help quantify and correlate engineering properties. The results of these tests are presented below and a brief description of the laboratory procedures used is provided in Appendix A.

5561 Florida Mining Boulevard South • Jacksonville, FL 32257 • (904)-296-0757 • FAX (904)-296-0748
www.UniversalEngineering.com

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

| Summary of Laboratory Testing | | | | |
|---|---|---|---|---|
| Sample | Index Tests | | Atterberg Limits Test | |
| | Fines (%) | Moisture (%) | Liquid Limit | Plasticity Index |
| Grab Sample 1 | 50.4 | 34.2 | 31 | 18 |

The soils being imported to the site were visually classified as very clayey fine sand (SC), clay (CL, CH), and clayey fine sand with organics (SC, PT). These soils were scattered in several large areas throughout the site. Please refer to the photos in Appendix A.

It should be noted that soils with less than 12% fines are considered suitable for use as structural fill. Soils with fines between 12 to 15% are considered marginal for use as structural fill. The marginal fill soils will not be suitable if the moisture contents are excessive. The above sample was collected in an area which mostly represented the soils being imported to the site. However, based on a visual inspection of the soils it appears the imported soils range from approximately 25 to 75% in fines content. Based on a visual inspection and limited laboratory tests it is our opinion that the imported material observed is not considered suitable for use as structural fill nor has the potential to be blended to form a suitable soil.

We trust this report meets your needs and addresses the geotechnical issues associated with the proposed construction. We appreciate the opportunity to have worked with you on this project and look forward to a continued association. Please do not hesitate to contact us if you should have any questions, or if we may further assist you as your plans proceed.

Respectfully submitted,

**UNIVERSAL ENGINEERING SCIENCES, LLC**

Stephen R. Weaver, P.E.
Geotechnical Services Manager
FL. P.E. Number 37389
Date: 12/21/20

Hayton W. Mann, E.I.
Project Engineer
Date: 12/21/20



FILED DATE: 6/15/2026 5:13 PM 2026CH05725

## <u>APPENDIX A</u>

**LABORATORY TESTING PROCEDURES
PHOTOGRAPHS**

FILED DATE: 6/15/2026 5:13 PM  2026CH05725

## LABORATORY TESTING PROCEDURES

### Natural Moisture Content

The water content of the sample tested was determined in general accordance with the latest revision of ASTM D 2216. The water content is defined as the ratio of "pore" or "free" water in a given mass of material to the mass of solid material particles.

### Percent Fines Content

The percent fines or material passing the No. 200 mesh sieve of the sample tested was determined in general accordance with the latest revision of ASTM D 1140. The percent fines are the soil particles in the silt and clay size range.

### Atterberg Limits

The Atterberg Limits consist of the Liquid Limit (LL) and the Plastic Limit (PL). The LL and PL were determined in general accordance with the latest revision of ASTM D 4318. The LL is the water content of the material denoting the boundary between the liquid and plastic states. The PL is the water content denoting the boundary between the plastic and semi-solid states. The Plasticity Index (PI) is the range of water content over which a soil behaves plastically and is denoted numerically by as the difference between the LL and the PL. The water content of the sample tested was determined in general accordance with the latest revision of ASTM D 2216. The water content is defined as the ratio of "pore" or "free" water in a given mass of material to the mass of solid material particles.

FILED DATE: 6/15/2026 5:13 PM 2026CH05725



**Photo 1:** Very clayey fine sand (SC) to clay (CL, CH) soil observed

| REFERENCE: TEST PIT PHOTOGRAPHS<br>LG2 Environmental Solutions, Inc. | UNIVERSAL ENGINEERING SCIENCES, LLC<br>5561 FLORIDA MINING BOULEVARD SOUTH<br>JACKSONVILLE, FL 32257<br>(904) 296-0757 |
|---|---|
|  | **PHOTOGRAPHS**<br>**ZION PROJECT**<br>**EASTPORT ROAD**<br>**JACKSONVILLE, FLORIDA** |
| SITE VISIT ON 12/16/20 | DRAWN: PM · DATE: 12/21/20 · SCALE: N.T.S.<br>REVIEW: SW · RPT NO.: 1826507 · PHOTO: 1 |

FILED DATE: 6/15/2026 5:13 PM   2026CH05725



**Photo 2:** Clayey to very clayey fine sand with organics (SC, PT)

| REFERENCE: TEST PIT PHOTOGRAPHS LG2 Environmental Solutions, Inc. | | UNIVERSAL ENGINEERING SCIENCES, LLC 5561 FLORIDA MINING BOULEVARD SOUTH JACKSONVILLE, FL 32257 (904) 296-0757 | | |
|---|---|---|---|---|
| | | PHOTOGRAPHS ZION PROJECT EASTPORT ROAD JACKSONVILLE, FLORIDA | | |
| SITE VISIT ON 12/16/20 | | DRAWN: PM | DATE: 12/21/20 | SCALE: N.T.S. |
| | | REVIEW: SW | RPT NO.: 1826507 | PHOTO: 2 |

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

# EXHIBIT 3

FILED DATE: 6/15/2026 5:13 PM   2026CH05725



**Berkshire Hathaway**
Specialty Insurance

**United States**

# CLAIMS REPORTING

All claims under policies underwritten by Berkshire Hathaway Specialty Insurance should be reported to our centralized Loss Processing Center. Claims will be assigned to our technical staff or to one of our preferred service providers.

Our 24-hour toll free number: **855.453.9675**

Claims may be reported via email to: **claimsnotice@bhspecialty.com**

To report claims via mail or overnight mail refer to our website: **www.bhspecialty.com/claims**

## EXPECT A PERSONAL APPROACH

While technology adds speed and efficiencies, it is top quality people that drive top quality claims handling. That's why we continue to grow our industry leading claims team with the most experienced claims professionals in the business.

Moreover, at Berkshire Hathaway Specialty Insurance, our claims team makes communicating proactively with you throughout the claims process a priority. Should you face a claim, you will quickly see our response is not about drafting letters. It's about having a dialogue and responding to your particular needs and concerns.

Whether you face a D&O claim, a property loss or a large scale casualty crisis, you will have the experts you need at your service. Putting your policy to work for you.

FILED DATE: 6/15/2026 5:13 PM   2026CH05725


**Berkshire Hathaway
Specialty Insurance**

## National Fire & Marine Insurance Company
1314 Douglas Street, Suite 1400
Omaha, NE 68102-1944

# Contractor's Pollution Legal Liability Occurrence
## Common Policy Declarations
This Declarations Page is attached to and forms part of the Policy

| | |
|---|---|
| **Policy No.: 42-CPL-305322-03** | **Renewal of: 42-CPL-305322-02** |

| | | |
|---|---|---|
| **Item 1.** | **Named Insured:** | The Walsh Group, Ltd. |
| | **Mailing Address:** | 929 W Adams St<br>Chicago, IL 60607 |
| **Item 2.** | **The Named Insured is:** | ☐ Individual  ☐ Partnership  ☐ Joint Venture  ☐ Limited Liability Company<br>☒ Organization (other than a Partnership or Joint Venture)  ☐ Trust |
| | **The Business of the Named Insured Is:** | General Contractor |
| **Item 3.** | **Policy Period:** | From:  06/01/2020  to  06/01/2021<br><br>Both days at 12:01 a.m. local standard time at Mailing Address listed in Item 1, above. |

| | | | |
|---|---|---|---|
| **Item 4.** | **Limits of Insurance:** | Per "Occurrence" of Pollution Limit: | $15,000,000 |
| | | Pollution Aggregate Limit: | $15,000,000 |
| | | Pollution Emergency Response Cost Limit: | $15,000,000 |
| **Item 5.** | **Self-Insured Retention:** | | $500,000 |
| **Item 6.** | **Premium:** | Total Advance: | $ |
| | | Total Minimum Annual: | $ |
| | | Minimum Earned: | % |
| | | Terrorism Premium Included in the Advanced: | $ |
| | | Estimated Total of Annual Exposure: | $          Cost/Construction Value |

FILED DATE: 6/15/2026 5:13 PM    2026CH05725

| Rate | $0.0449 Per $1,000 of Cost/Construction Value |
|---|---|

| **Audit Premium:** | Not Auditable |
|---|---|

| **Endorsements:** | Per Schedule |
|---|---|

This policy is comprised of this Declarations page, the policy form and endorsements, if any, attached at inception or during the Policy Period.

Service of Suit may be made upon: Counsel, Legal Department, National Fire & Marine Insurance Company, 1314 Douglas Street, Suite 1400, Omaha, NE 68102-1944

| In the event of a claim, please notify the following: | **By Phone:** 855-453-9675 |
|---|---|
| | **By Fax:** 617-507-8259 |
| | **By Email:** claimsnotice@bhspecialty.com |

**Signatures:**



_____
**Brian G. Snover, Secretary**

_____
**Donald Wurster, President**

**06/26/2020**
*Dated*

Page 2 | CL-CPL-DEC-12/2016

 **Berkshire Hathaway Specialty Insurance**

# FORMS SCHEDULE

**Named Insured:** The Walsh Group, Ltd.

**Policy No.:**     42-CPL-305322-03

| Form Number | Title |
| --- | --- |
| CL-CPL-DEC-12/2016 | Contractor's Pollution Legal Liability Occurrence Common Policy Declarations |
| CLP-UN-016-07/2013 | Forms Schedule |
| CL-CPO-POL-12/2016 | Contractor's Pollution Legal Liability Policy - Occurrence |
| CL-UN-075-12/2016 | Cap On Losses From Certified Acts of Terrorism (ISO Based) |
| CL-CPL-001-12/2016 | Reduced Self-Insured Retention Indemnity |
| CL-CPL-002-12/2016 | Amendment of Annual Limits Endorsement |
| CL-CPL-004-12/2016 | Business Crisis Event Cost Coverage Endorsement |
| CL-CPL-005-12/2016 | Cancellation Amendatory With Designated Entity Endorsement |
| CL-CPL-007-12/2016 | ERC Amendment Endorsement |
| CL-CPL-008-12/2016 | Foreign Liability Endorsement |
| CL-CPL-009-12/2016 | Waiver of Subrogation Endorsement |
| CL-CPL-013-08/2017 | Defense Expense Amendatory Endorsement |
| CL-CPL-020-08/2017 | Naturally Occuring Pollutants Endorsement |
| CL-CPL-023-08/2017 | Pollution Definition Endorsement |
| CL-CPL-025-08/2017 | Cancellation Amendatory Endorsement |
| CL-CPL-026-09/2017 | Insured Location Pollution Legal Liability Endorsement |
| CL-CPL-028-10/2017 | Additional Named Insured Endorsement |
| CL-UN-208-12/2016 | Pollution Linking Of Limits Endorsement |
| Manuscript | Definition of Notice Insured Amendatory Endorsement |
| Manuscript | Self-Insured Retention Amendatory Endorsement |
| Manuscript | Insured vs Insured Amendatory Endorsement |

FILED DATE: 6/15/2026 5:13 PM   2026CH05725


**Berkshire Hathaway**
**Specialty Insurance**

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

| | |
|---|---|
| Manuscript | Who is an Insured Amendatory Endorsement |
| Manuscript | Additional Insured Endorsement |
| Manuscript | Blanket Primary Coverage and Non-Contributory Endorsement |


Berkshire Hathaway
Specialty Insurance

FILED DATE: 6/15/2026 5:13 PM 2026CH05725

# Contractor's Pollution Legal Liability Policy - Occurrence

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the "named insured" shown in the Declarations and any other person or organization qualifying as a "named insured" under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under **SECTION II – WHO IS AN INSURED**.

Other words and phrases that appear in quotation marks have special meaning. Refer to **SECTION V – DEFINITIONS**.

## SECTION I – COVERAGES

### A. COVERAGE A – CONTRACTOR'S POLLUTION LEGAL LIABILITY

#### 1. Insuring Agreement

a. We will pay those sums in excess of the Self-Insured Retention that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" or "clean-up costs" because of "environmental damage" that result from an "occurrence" of "pollution" caused by "covered operations" to which this insurance applies. We will have the right and duty to defend the insured against any "claim", even if groundless, false or fraudulent, seeking those damages or "clean-up costs". However, we will have no duty to defend the insured against any "claim" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any "claim" that may result. However:

(1) The amount we will pay for damages, "clean-up costs" and "defense expenses" is limited as described in **SECTION III – LIMITS OF INSURANCE AND SELF-INSURED RETENTION**; and

(2) Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments, settlements or "defense expenses" under this policy.

b. This insurance applies to "bodily injury", "property damage" or "environmental damage" only if:

(1) The "bodily injury", "property damage" or "environmental damage" is caused by an "occurrence" of "pollution" caused by "covered operations" and

(2) The "bodily injury", "property damage" or "environmental damage" occurs during the "policy period".

c. "Bodily injury", "property damage" or "environmental damage" that occurs during the "policy period" and was not, prior to the "policy period", known to have occurred by any "notice insured", includes any continuation, change or resumption of that "bodily injury", "property damage" or "environmental damage" after the end of the "policy period".

d. "Bodily injury", "property damage" or "environmental damage" will be deemed to have been known to have occurred at the earliest time when any "notice insured":

(1) Reports all, or any part, of the "bodily injury", "property damage" or "environmental damage" to us or any other insurer;

Page 1 | CL-CPO-POL-12/2016

(2) Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage" or "clean-up costs" because of "environmental damage"; or

(3) Becomes aware by any other means that "bodily injury", "property damage" or "environmental damage" has occurred or has begun to occur.

e. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

f. In the event an "occurrence" of "pollution" causes "bodily injury", "property damage" or "environmental damage" during the "policy period" of this policy and any other policy of insurance issued by us all such "bodily injury", "property damage" and "environmental damage" resulting from that "occurrence" of "pollution" shall be deemed to have taken place on the date of first exposure resulting in that "bodily injury", "property damage" or "environmental damage". Only that policy of insurance and its available applicable Limits of Insurance, in effect on the date of such first exposure, will respond with respect to that "bodily injury", "property damage" and "environmental damage", subject to all of the terms and conditions of that policy. Under no circumstances, however, shall more than one policy of insurance issued by us apply, stack or cumulate over multiple policy periods, irrespective of the amount of persons or property injured or damaged, or the amount of time over which the "bodily injury", "property damage" or "environmental damage" takes place.

If the first exposure date precedes the effective date of the earliest policy issued by us, then solely for purposes of insurance issued by us, the "bodily injury", "property damage" or "environmental damage" will be deemed to have occurred during the "policy period" of that first policy issued by us. Under no circumstances shall this provision restrict our right to seek contribution from any other insurers.

## B. COVERAGE B – EMERGENCY RESPONSE COSTS

### 1. Insuring Agreement

a. We will pay "emergency response costs" in excess of the Self-Insured Retention incurred by the insured during the "policy period" resulting from an "occurrence" of "pollution" during the "policy period" caused by "covered operations".

b. For this coverage to apply, all of the following conditions must be satisfied:

(1) The "emergency response costs" are incurred by the insured with our written consent in response to an "occurrence" of "pollution" that necessitated an immediate response;

(2) The insured must report the "emergency response costs" to us in writing, as provided in **SECTION IV – CONDITIONS,** Paragraph **B. Loss Conditions** of the policy; and

(3) Such "occurrence" of "pollution" must be unexpected and unintended from the standpoint of the insured. This condition does not apply to an "occurrence" of "pollution" caused by the insured's reasonable attempt to mitigate or prevent substantial third party "bodily injury" or "property damage".

Page 2 | CL-CPO-POL-12/2016

## C. EXCLUSIONS – COVERAGES A AND B

This insurance does not apply to:

1. **Contractual Liability**

   "Bodily injury", "property damage", "environmental damage" or "emergency response costs" for which the insured is obligated to pay damages, "clean-up costs" or "emergency response costs" by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages because of "bodily injury" or "property damage" or "clean-up costs" because of "environmental damage":

   a. That the insured would have in the absence of the contract or agreement; or

   b. Caused by "covered operations" performed by your subcontractors, provided such liability is assumed by you in a written contract with your client for such "covered operations" and the "bodily injury", "property damage" or "environmental damage" occurs subsequent to the execution of the contract.

   c. Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury", "property damage" or "environmental damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorneys' fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage" or "clean-up costs" because of "environmental damage", provided:

      (1) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

      (2) Such attorneys' fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

2. **Criminal Fines, Penalties and Assessments**

   Any criminal fines, criminal penalties or criminal assessment.

3. **Employer's Liability**

   "Bodily injury" to:

   a. An "employee" of the insured arising out of and in the course of:

      (1) Employment by the insured; or

      (2) Performing duties related to the conduct of the insured's business; or

   b. The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph a. above.

   This exclusion applies whether the insured may be liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

   This exclusion does not apply to liability assumed by the insured under an "insured contract".

4. **Expected or Intended Injury**

   "Bodily injury", "property damage", "environmental damage" or "emergency response costs" expected or intended from the standpoint of the insured.

5. **Insured vs. Insured**

   "Claims" brought by an insured against another insured. However, this exclusion does not apply to "claims" brought by clients of the "named insured", who constitute insureds pursuant to **SECTION II – WHO IS AN INSURED, Paragraph 5.**

FILED DATE: 6/15/2026 5:13 PM 2026CH05725

6. **Intentional Non-Compliance**

An "occurrence" of "pollution" directly or indirectly arising out of or in any way related to any "notice insured's" intentional, willful or deliberate noncompliance with any statute, regulation, ordinance, administrative complaint, notice of violation, notice letter, executive order or instruction of any governmental agency or body.

7. **Nuclear Liability**

"Bodily injury", "property damage", "environmental damage" or "emergency response costs" arising out of any form of nuclear or radioactive material or radiation, nuclear detonation, nuclear reaction, radioactive contamination or by-products where any insured under this policy is, has been or will be indemnified:

a. By the United States Department of Energy, or any other government authority, or for which the Price-Anderson Act has provided or will provide protection for the insured; or

b. Under a contract of nuclear energy liability insurance (whether the insured is unnamed in such a contract and whether or not it is legally enforceable by the insured) issued by the Nuclear Insurance Association of Canada or any other insurer or group or pool of insurers or would be insured under any such policy but for its termination upon exhaustion of its limits of liability.

However, this exclusion does not apply to "low level radioactive waste".

8. **Owned Property**

"Bodily injury", "property damage", "environmental damage" or "emergency response costs" arising from or in connection with any real property or facility which is, or was, at any time, owned, operated or rented by you or by any entity that:

a. Wholly or partially owns, operates, manages, or otherwise controls you; or

b. Is wholly or partially owned, operated, managed or otherwise controlled by you.

However, this exclusion does not apply to any real property occupied, operated, managed, rented or leased by you, or other entities defined above in subparagraphs **a.** or **b.** of this exclusion, where that real property is utilized in support of "covered operations", including temporary storage of equipment and materials at any associated staging or storage areas. Under no circumstances does this exception apply to real property owned by any insured.

9. **Product Liability**

"Bodily injury", "property damage", "environmental damage" or "emergency response costs" arising out of the sale, distribution, design or manufacture of a product unless installed, applied or fabricated as part of "covered operations".

10. **Professional Liability**

"Bodily injury", "property damage", "environmental damage" or "emergency response costs" arising out of any act, error or omission with respect to professional services rendered or failed to be rendered by the "named insured" or others for whom the "named insured" is legally liable, including, but not limited to, recommendations, opinions or strategies for architectural, consulting, design or engineering work, such as drawings, designs, maps, reports, surveys, change orders, plan specifications, assessment work, remedy selections, site maintenance, equipment selection, or related construction management, supervisory, inspection or engineering service. This exclusion does not apply to any "claims" alleging liability against the "named insured" on the basis of:

a. Improper supervision or lack of supervision of any subcontractors performing "covered operations"; or

b. Construction means, methods, techniques, sequences and procedures in connection with "covered operations" performed by or on behalf of the "named insured" in its capacity as a specialty trade contractor.

## 11. Property Damage

"Property damage":

a. To the "named insured's products"; or

b. To that particular part of real property on which the "named insured", or any persons or entities acting on the "named insured's" behalf, are performing "covered operations", including any "property damage" caused by materials, parts or equipment furnished in connection with such "covered operations". However, this Paragraph **11.b.** does not apply to "property damage" arising out of "completed operations" or if the damaged work or the work out of which the damage arises was performed on behalf of the insured by a sub-contractor.

## 12. Property Damage to Motor Vehicle

"Property damage" to any "motor vehicle" utilized during "transportation". This exclusion does not apply to "claims" made by third party carriers of the insured for "property damage" arising from an "occurrence" of "pollution" caused by the insured's negligent act.

## 13. Prior Knowledge / Non-Disclosure

An "occurrence" of "pollution" that commenced prior to the inception date of this policy and was known by a "notice insured" and not disclosed to us prior to the inception date of this policy or any previous policy for which this policy is a renewal thereof.

## 14. Transfer, Storage or Disposal Facility

"Bodily injury", "property damage", "environmental damage" or "emergency response costs" arising out of any waste, products or materials that have been delivered to a transfer, storage or disposal facility located away from the job site where "covered operations" are being performed. This exclusion shall not apply if:

a. The waste, products or materials are part of "covered operations"; and

b. The transfer, storage or disposal facility is not managed, operated, owned or leased by an insured or any subsidiary of an insured; and

c. The transfer, storage or disposal facility is permitted or licensed by applicable Federal, State or Local authorities to accept such waste, products or materials as of the date the insured has delivered such waste, products or materials; and

d. The transfer, storage or disposal facility is not listed on a proposed or final Federal National Priorities List, an equivalent State Priority List or Superfund or Hazardous Waste List as of the date the insured has delivered such waste, products or materials.

## 15. War

"Bodily injury", "property damage", "environmental damage" or "emergency response costs", however caused, arising, directly or indirectly, out of:

a. War, including undeclared or civil war;

b. Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

c. Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

FILED DATE: 6/15/2026 5:13 PM    2026CH05725

### 16. Workers' Compensation and Similar Laws

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

## SECTION II – WHO IS AN INSURED

Each of the following is an insured:

1. The "named insured";

2. Any person who is or was a director, officer, partner, member, "employee" or shareholder of the "named insured" while acting on behalf of the "named insured" and within the scope of his or her duties as such;

3. Any joint venture in which the "named insured" is named as a co-venturer pursuant to a written contract or agreement but only to the extent of the "named insured's" legal liability arising out of the "named insured's" "covered operations" as performed by the joint venture(s);

4. Any limited liability company in which the insured is a member but only to the extent of the "named insured's" legal liability arising out of the "named insured's" "covered operations"; and

5. The client for whom the "named insured" performs or performed "covered operations" pursuant to the terms of a written contract or agreement between the "named insured" and the client. Under no circumstances shall this paragraph extend to include any of the client's related organizations unless such organization is specifically named as a party to the contract between the "named insured" and its client. Such client(s) are covered under this policy solely with respect to such client's vicarious liability for "bodily injury", "property damage" or "environmental damage" arising out of an "occurrence" of "pollution" caused by the "named insured's" "covered operations".

## SECTION III – LIMITS OF INSURANCE AND SELF-INSURED RETENTION

1. The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:
   a. Insureds;

   b. "Claims" made; or

   c. Persons or organizations making "claims".

2. The Pollution Aggregate Limit shown in the Declarations is the most we will pay for the sum of damages, "clean-up costs", "defense expenses" and "emergency response costs" under Coverages A and B.

3. Subject to the Pollution Aggregate Limit in Paragraph 2. above, the Per Occurrence of Pollution Limit shown in the Declarations is the most we will pay for the sum of all damages and "clean-up costs", including any covered "defense expenses", arising out of any one "occurrence" of "pollution".

4. Subject to the Pollution Aggregate Limit in Paragraph 2. above, the Per Occurrence of Pollution Emergency Response Costs Limit shown in the Declarations is the most we will pay for all such "emergency response costs" arising out of any one "occurrence" of "pollution".

5. The Limit of Insurance under this policy for insureds listed in Paragraphs 3. or 4. of **SECTION II – WHO IS AN INSURED** shall be no more than the "named insured's" percentage ownership in the joint venture or Limited Liability company multiplied by the applicable limit of insurance as described here in **SECTION III – LIMITS OF INSURANCE AND SELF-INSURED RETENTION.**
   The Limit of Insurance under this policy for an insured listed in Paragraph 5. of **SECTION II – WHO IS AN INSURED** shall be the amount required by the written contract or agreement between the "named insured" and the client or the applicable Limit of Insurance as stated herein, whichever amount is less.

Under no circumstances shall the Limit of Insurance for a person or organization listed in Paragraph **3.**, **4.** or **5.** of **SECTION II – WHO IS AN INSURED** be greater than the applicable Limit of Insurance as stated here in **SECTION III – LIMITS OF INSURANCE AND SELF-INSURED RETENTION.**

6. The amount stated as the Self-Insured Retention in the Declarations is the most you will pay in retention arising out of one "occurrence" of "pollution". The Self-Insured Retention applies to "occurrences" of "pollution" under both Coverages **A.** and **B.** The Self-Insured Retention shall be paid by you and remain uninsured. The Limits of Insurance shall apply excess of the Self-Insured Retention.

7. We shall have no obligation or responsibility to pay amounts owed within the Self-Insured Retention, and our obligations under this policy shall only attach once all of the terms and conditions of this policy have been satisfied, and the insured has paid the Self-Insured Retention amount, both of which are conditions precedent to coverage under this policy.

   We may advance payment of part or all of the Self-Insured Retention amount and, upon notification of such payment made, you shall promptly reimburse us for the Self-Insured Retention amounts advanced by us.

   The Limits of Insurance of this policy apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the "policy period" shown in the Declarations, unless the "policy period" is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

## SECTION IV – CONDITIONS

### A. General Policy Conditions

1. **Bankruptcy**

   Your bankruptcy, insolvency or inability to pay will not relieve us from the payment of loss covered by this policy.

2. **Cancellation**

   a. You may cancel this policy. You must mail or deliver advance written notice to us stating when the cancellation is to take effect.

   b. We may cancel this policy. If we cancel because of non-payment of premium, we must mail or deliver to you not less than fifteen (15) days advance written notice stating when the cancellation is to take effect. If we cancel for any other reason, we must mail or deliver to you not less than sixty (60) days advance written notice stating when the cancellation is to take effect. Mailing that notice to you at your mailing address shown in the Declarations will be sufficient to prove notice.

   The "policy period" will end on the day and hour stated in the cancellation notice.

   If we cancel, final premium will be calculated pro rata based on the time this policy was in force. Final premium will not be less than the pro-rata share of the Minimum Premium shown in the Declarations.

   If you cancel, final premium will be more than pro rata; it will be based on the time this policy was in force and increased by our short rate cancellation table and procedure. Final premium will not be less than the short rate share of the Minimum Premium shown in the Declarations.

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

c. Premium adjustment may be made at the time of cancellation or as soon as practicable thereafter, but the cancellation will be effective even if we have not made or offered any refund of unearned premium. Our check or our representative's check, mailed or delivered, will be sufficient tender of any refund due you.

d. The "named insured" shown in the Declarations will act on behalf of all other insureds with respect to the giving and receiving of notice of cancellation and the receipt of any refund that may become payable under this policy.

e. Any of these provisions that conflict with a law that controls the cancellation of the insurance in this policy is changed by this statement to comply with that law.

3. **Change in Control**

If during the "policy period":

a. The "named insured" shown in the Declarations consolidates with or merges into or sells all or substantially all of its assets to any person or entity; or

b. Any person or entity acquires an amount of the outstanding ownership interests representing more than fifty percent (50%) of the voting or designation power for the election of directors of the "named insured" shown in the Declarations, or acquires the voting or designation rights of such an amount of ownership interests;

this policy will continue in full force and effect as to "bodily injury", "property damage" or "environmental damage" that occurs prior to the effective date of such transaction and to "emergency response costs" incurred by an insured prior to the effective date of such transaction.

Coverage will be afforded by this policy for "bodily injury", "property damage" or "environmental

damage" that occurs on or after the effective date of such transaction and for "emergency response costs" incurred by an insured on or after the effective date of such transaction if the "named insured" shown in the Declarations notifies us of the transaction no later than ninety (90) days after the effective date of the transaction.

If the "named insured" shown in the Declarations fails to notify us within ninety (90) days of the effective date of such transaction coverage afforded by this policy will cease on the ninetieth (90th) day after the effective date of such transaction at 12:01 am standard time of the address of the "named insured" shown in the Declarations or the end of the "policy period", whichever is earlier.

The provisions of Paragraph 3. shall only apply to transactions with third parties not under control or ownership of the "named insured" shown in the Declaration on the inception date of this policy.

4. **Changes**

Notice to any agent or knowledge possessed by any agent or any other person will not effect a waiver or change in any part of this policy. This policy can be changed only by a written endorsement that we make to this policy.

5. **Concealment Or Fraud**

This policy shall be void if:

a. The insured reports any "claim" or "emergency response costs" knowing such "claim" or "emergency response costs" are false or fraudulent; or

b. The insured willfully conceals or misrepresents:

(1) Any material fact relating to any matter hereunder; or

(2) Any information concerning the "covered operations".

6. **Enforceability**

If any part of this policy is deemed invalid or unenforceable, it shall not affect the validity or enforceability of any other part of this policy, which shall be enforced to the full extent permitted by law.

7. **Headings**

The descriptions in the headings of this policy are solely for convenience and form no part of the terms and conditions of coverage.

8. **Inspection**

We have the right, but are not obligated, to inspect your "covered operations", including, but not limited to, your documents and premises related thereto, at any time. Our inspections are not safety inspections. They relate only to the insurability of your "covered operations" and the premiums to be charged. We may give you reports on the conditions that we find. We may also recommend changes. We do not, however, undertake to perform the duty of any person or organization to provide for the health or safety of your "employees" or the public. We do not warrant the health and safety conditions of your premises or operations or represent that your premises or operations comply with laws, regulations, codes or standards.

9. **Legal Action Against Us**

No person or organization has a right under this policy:

a. To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

b. To sue us on this policy unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured, but we will not be liable for damages that are not payable under the terms of this policy or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

10. **Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under this policy, our obligations are limited as follows:

a. **Primary Insurance**

This insurance is primary except when Paragraph **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary, then, we will share with all that other insurance by the method described in Paragraph **c.** below.

b. **Excess Insurance**

(1) This insurance is excess where the "named insured" is an insured on a pollution liability policy for "covered operations" performed by or on behalf of the "named insured" at a specific job site, and the pollution liability policy applies to a specific job site. We will pay only our share of the amount of loss, if any, that exceeds the total amount of all such other valid insurance.

(2) When this insurance is excess, we will have no duty under this policy to defend the insured against any "claim" if any other insurer has a duty to defend the insured against that "claim". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

(3) When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

(a) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

(b) The total of all deductible and Self-Insured amounts under all that other insurance.

(4) We will share the remaining loss, if any, with any other insurance that is not described in this excess insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this policy.

**c.   Method of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach, each insurer contributes equal amounts until it has paid its applicable Limit of Insurance or none of the loss remains, whichever comes first.
If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable Limit of Insurance to the total applicable Limits of Insurance of all insurers.

**11. Policy Territory**

This policy and any coverage provided hereunder is only applicable to "occurrences" of "pollution" occurring in the United States of America, its territories and possessions, and Canada, its provinces and territories.

**12. Punitive or Exemplary Damages and Civil Fines, Penalties or Assessments**

Punitive or exemplary damages awarded against an insured shall be covered under this policy where such damages are awarded in a judgment that also awards compensatory damages and where such punitive or exemplary damages are insurable under applicable law, which shall be liberally construed in favor or insurability of such, subject to all other terms, conditions, definitions, and exclusions of this policy.

Civil fines, penalties or assessments against an insured shall also be covered under this policy, subject to all other terms, conditions, definitions, and exclusions of this policy.

Coverage for such shall erode and not be in addition to the limits of insurance set forth in the Declarations.

**13. Representations**

By accepting this policy, you agree:

a.   The statements in the Application, including any and all materials provided with your submission for this policy, are accurate and complete;

b.   Those statements are based upon representations you made to us; and

c.   We have issued this policy in reliance upon your representations.

**14. Separation of Insureds**

Except with respect to the Limits of Insurance and any rights or duties specifically assigned in this policy to the "named insured" shown in the Declarations, this insurance applies:

a.   As if each "named insured" were the only "named insured"; and

b.   Separately to each insured against whom "claim" is made.

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

### 15. Service of Suit

It is agreed that in the event of our failure to pay any amount claimed to be due hereunder, we, at the request of the "insured", will submit to jurisdiction of a court of competent jurisdiction within the United States of America. Nothing in this condition constitutes or should be understood to constitute a waiver of our rights to commence an action in any court of competent jurisdiction in the United States of America, to remove an action to a United State District Court or to seek a transfer of a case to another court as permitted by the laws of the United States of America or any state in the United States of America. It is further agreed that service of process may be made upon us as provided in the Declarations with respect to Service of Suit, and that any suit instituted against us, upon this policy, we will abide by the final decision of such court or of an appellate court in the event of an appeal.

Further, pursuant to any statute of any state, territory or district of the United States of America which makes provision therefore, we hereby designated the Superintendent, Commissioner, Director of Insurance, or other officer specified for that purpose in the statute, or his or her successor or successors in office as our true and lawful attorney upon whom may be served any lawful process in any action, "suit" or proceeding instituted by or on behalf of the "insured" or any beneficiary hereunder arising out of this contract of insurance and hereby designate Counsel listed in the Declarations with respect to Service of Suit as the person to whom the said officer is authorized to mail such process or a true copy thereof.

### 16. Sole Agent

The "named insured" shown in the Declarations shall act on behalf of all insureds for all purposes, including, but not limited to, the payment or return of premium, payment of any Self-Insured Retention, receipt and acceptance of any endorsement issued to form a part of this policy, complying with all applicable claim provisions, giving and receiving notice of cancellation or nonrenewal and exercising rights as detailed below in Paragraph **17. Subrogation and Transfer of Rights of Recovery**.

### 17. Subrogation and Transfer of Rights of Recovery

If we make any payment under this policy, we shall be subrogated to all insured's rights against any person or entity, including the right to participate with the insured in the exercise of the insured's rights of recovery. You shall execute and deliver instruments and papers to us and do whatever else is necessary to secure such rights. No insured shall do anything to prejudice such rights as described in this paragraph.

We shall not exercise any such rights against the "named insured's" client, as described in Paragraph **5.** of **SECTION II – WHO IS AN INSURED** if the written contract or agreement between the "named insured" and client includes a specific agreement to waive such rights and the written contract or agreement was entered into prior to the "claim".

If, prior to the time of an "occurrence", you waive any right of recovery against a specific person or organization for injury or damage as required under an "insured contract", we will also waive any rights we may have against such person or organization.

Any recovery obtained through subrogation, after expenses, incurred in such subrogation are deducted by the party bearing the expense, reimbursement will be made in the following order:

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

a. First, to an interest who has paid any amount in excess of the Limit of Insurance provided under this policy;

b. Next, to us; and

c. Then to any interest as are entitled to claim the remainder, if any.

Expenses incurred in the exercise of rights of recovery will be apportioned among the persons or organizations, including the insured, in the ratio of their respective recoveries as finally settled.

### 18. Transfer of your Rights and Duties

Your rights and duties under this policy may not be transferred without our written consent. If you die or are legally declared bankrupt, your rights and duties will be transferred to your legal representative, but only while acting within the scope of duties as your legal representative. However, notice of cancellation sent to the "named insured" shown in the Declarations and mailed to the address designated in the Declarations of this policy will be sufficient notice to effect cancellation of this policy.

### 19. Unintentional Failure to Disclose

Your failure to disclose all hazards existing as of the inception date of the policy will not prejudice you with respect to the coverage afforded by this policy, provided that any such failure or omission is not intentional.

### 20. Violation of Economic or Trade Sanctions

If coverage for a "claim" under this policy is in violation of any United States of America economic or trade sanctions, including, but not limited to, sanctions administered and enforced by the United States Treasury Department's Office of Foreign Assets Control ("OFAC"), then coverage for that "claim" will be null and void.

### 21. Voluntary Payments

No insured shall voluntarily enter into any settlement, or make any payment or assume any obligation, without our consent, which shall not be unreasonably withheld, except at the insured's own cost. This condition shall not apply if such payment or obligation is an "emergency response cost" or is pursuant to "environmental laws" that require immediate remediation of an "occurrence" of "pollution".

### B. Loss Conditions

**1. Duties In The Event Of Occurrence, Offense, Claim or Suit**

a. You must see to it that we are notified as soon as practicable of an "occurrence" of "pollution" which may result in a "claim" or request for "emergency response costs". To the extent possible, notice should include:

   (1) How, when and where the "occurrence" of "pollution" took place;

   (2) The names and addresses of any injured persons and witnesses; and

   (3) The nature and location of any injury, damage, "clean-up costs" or "emergency response costs" arising out of the "occurrence" of "pollution".

b. If a "claim" is made against any insured, you must:

   (1) Immediately record the specifics of the "claim" and the date received; and

   (2) Notify us in writing as soon as practicable.

   (3) Written notice should be mailed, delivered, faxed or e-mailed to us at the location noted in the Declarations page.

c. You and any other involved insured must:

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

(1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "claim";

(2) Authorize us to obtain records and other information;

(3) Cooperate with us, and provide to us all information, which we reasonably request, including, but not limited to, attending hearings, depositions and trials and assistance in effecting settlements, securing and giving evidence, obtaining attendance of witnesses and conducting the defense of any "claim" covered by this policy. The insured shall do nothing that may prejudice our position; and

(4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

d. When "emergency response costs" have been incurred, the insured shall forward to us within seven (7) days of the commencement of the "occurrence" of "pollution" for which the "emergency response costs' have been incurred all information, including, but not limited to, the cause and location of the "occurrence" of "pollution", technical reports, laboratory data, field notes, expert reports, investigations, data collected, invoices, regulatory correspondence or any other documents relating to such "emergency response costs".

## SECTION V – DEFINITIONS

1. "Biological matter" means:

   a. Fungi, including mold and mildew; and

   b. Legionella pneumophila.

2. "Bodily injury" means:

   a. Physical injury, sickness or disease sustained by any person, including death resulting therefrom. "Bodily injury" shall extend to include medical monitoring but only when the medical monitoring is a direct result of physical injury caused by an "occurrence" of "pollution"; or

   b. Mental anguish, emotional distress, or shock.

3. "Claim" means any "suit" or written demand for damages to which the insurance provided by this policy applies.

4. "Clean-up costs" means the reasonable and necessary costs and expenses, including "defense expenses" and "restoration costs", that are incurred with our written consent in the investigation, removal and remediation of "pollutants", including the associated monitoring or disposal of soil, surface water, groundwater or other contamination, but only to the extent:

   a. Required by "environmental law" or specifically mandated by court order, the government or any political subdivision of the United States of America, including any state, county, city, town, territory or possession thereof or Canada, including any province or territory; or

   b. With respect to "biological matter", in the absence of any applicable "environmental law", to the extent recommended in writing by a certified industrial hygienist (as licensed or certified by the American Board of Industrial Hygiene or the Canadian Registration Board of Occupational Hygienists); or

   c. Incurred by the government or any political subdivision of the United States of America, including any state, county, city town, territory or possession or Canada, including any province or territory thereof, or by third parties.

However, "clean-up costs" do not, under any circumstances, include any costs or expenses incurred with respect to actions or property that are intended to prevent a future "occurrence" of "pollution".

5. "Completed operations" means work from "covered operations" that has been completed, including materials, parts or equipment furnished in connection with such work or operations.

   "Completed operations" will be deemed completed at the earliest of the following times:

   a. When all of the work called for in the insured's contract has been completed;

   b. When all of the work to be done at the job site has been completed if the insured's contract calls for work at more than one job site; or

   c. When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

   Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

6. "Conveyance" means a "motor vehicle", railcar, train, watercraft or aircraft. A "conveyance" does not include pipelines.

7. "Covered operations" means:

   a. Those activities performed by the "named insured" or on the "named insured's" behalf for a third party for a fee at a job site, or

   b. Project estimating, service response and operations tied to a client by the "named insured" or in the "named insured's" behalf.

   "Covered operations" includes "completed operations" and "transportation".

8. "Defense expense" means:

a. Reasonable and necessary fees charged by any lawyer designated by us; and

b. All other reasonable and necessary fees, costs and expenses resulting from the investigation, adjustment, defense and appeal of a "claim", if authorized by us.

"Defense expense" shall not include:

a. The salaries of our "employees";

b. Costs, charges or other expenses incurred by the insured for goods supplied or services performed by or on behalf of the staff or salaried employees of the insured, or its parent, subsidiary or affiliate, unless such costs, charges or other expenses are incurred with our prior written approval; or

c. Interest on the full amount of any judgement that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in the count the amount available for the judgement under this policy.

9. "Emergency Response Costs" means reasonable and necessary expenses, including "defense expenses", incurred by the insured:

   a. For the purpose of remediating soil, surface water, groundwater or other contamination; and

   b. Within thirty-six (36) hours of the "occurrence" of "pollution" or as approved by us in writing.

10. "Employee" includes a "leased worker" and "temporary worker".

11. "Environmental damage" means physical damage to soil, surface water or groundwater, atmosphere, structures or plant or animal life caused by "pollution" and giving rise to "clean-up costs". "Environmental damage" does not include "property damage".

Page 14 | CL-CPO-POL-12/2016

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

12. "Environmental law" means any federal, state, municipal or local law(s), including, but not limited to, statutes, rules, regulations, ordinances, guidance documents, standards and governmental, judicial or administrative orders and directives that are applicable to "pollutants" or "pollution". "Environmental law" also includes any written clean-up criteria or a Canada-wide standard that is related to remediation of "pollutants" or "pollution" in soil.

13. "Insured contract" means:

   a. An obligation pertaining to the "named insured's" "covered operations", and as required by ordinance, to indemnify a municipality, except in connection with work for a municipality; or

   b. That part of any other contract or agreement pertaining to the "named insured's" "covered operations" (including an indemnification of a municipality in connection with work performed for a municipality) whereby the "named insured" assumes the tort liability of another party to pay for "bodily injury", "property damage" or "environmental damage" caused by the "named insured's" "covered operations" to a third person or organization. Tort liability means liability that would be imposed by law in the absence of any contract or agreement.

14. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

15. "Low level radioactive waste" means:

   a. Waste as defined in Title 10 Code of Federal Regulations, Part 61.2 (including any amendments thereto); or

   b. Material regulated by the United States Nuclear Regulatory Commission or an Agreement State under a Type A, B or C Specific License of Broad Scope as defined in Title 10 Code of Federal Regulations, Part 33.11 (including any amendments thereto).

16. "Motor vehicle" means an automobile, van, truck, trailer or semi-trailer designed and registered for travel on public roads.

17. "Named insured" means the person or entity designated as such in the Declarations.

18. "Named insured's products" means goods, products or pieces of equipment, including component parts thereof and including other products in which such goods, products or pieces of equipment are incorporated, which are manufactured, sold, furnished, or supplied by the "named insured", any subsidiary of the "named insured", any entity that wholly or partly owns, operates or manages that "named insured" or any subsidiary of such entity, or any person under license from the "named insured".

19. "Natural resource damage" means physical injury to or destruction of, including the resulting loss of value of, land, fish, wildlife, biota, air, water, groundwater, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by any federal or municipal government or any agency board or commission thereof, any foreign government, any Indian band or council or tribe, or, if such resources are subject to a trust restriction on alienation, any member of an Indian band or council or tribe.

20. "Notice insured" means:

   a. Any officer, director, partner, member, manager or supervisor of any insured; or

   b. Any "employee" of an insured with responsibility, in whole or in part, for environmental affairs, control or compliance, risk management, risk control or health and safety;

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

who is authorized to give or receive notice of an "occurrence" of "pollution" or "claim".

21. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions. All such exposure to substantially the same general harmful conditions will be deemed to arise out of one "occurrence".

22. "Policy period" means the period listed on the Declarations or any shorter period resulting from cancellation of the Policy.

23. "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, electromagnetic fields, "low level radioactive waste", silt and sediments, "biological matter" and waste. Waste includes medical, infectious and pathological waste, as well as, materials to be recycled, reconditioned or reclaimed.

24. "Pollution" means:

   a. The discharge, emission, dispersal, seepage, migration, release or escape of "pollutants"; or

   b. The presence of "biological matter" in or on a building or structure.

25. "Property damage" means:

   a. Physical injury to or destruction of tangible property of parties other than the insured, including the resulting loss of use and diminution in value thereof. All such loss of use shall be deemed to occur at the same time of the physical injury that caused it; or

   b. Loss of use of tangible property of parties other than the insured that has not been physically injured or destroyed; or

   c. "Natural resource damage".

   However, "property damage" does not include "clean-up costs".

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

26. "Restoration costs" means reasonable and necessary costs incurred by the insured, with our written consent, to repair, replace or restore real property or personal property to substantially the same condition it was in prior to being damaged as a direct result of "covered operations" that is the subject of, and for which you incur, covered "clean-up costs". However, "restoration costs" do not include costs associated with any improvements or betterments unless the improvement or betterment of the damaged property is the use, at a reasonable cost, of materials that are environmentally preferable to those materials that originally comprised the damaged property. Such use must be certified as environmentally preferable by an applicable independent certifying body or in the absence of such certifying body at our sole discretion.

27. "Suit" means a civil proceeding in which damages because of "bodily injury" or "property damage" or "clean-up costs" because of "environmental damage" to which this insurance applies are alleged. "Suit" includes:

   a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

   b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

28. "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

29. "Transportation" means the movement of goods, including loading and unloading of products, merchandise, supplies or waste beyond the boundaries of a job site in a "conveyance" by the insured or a third-party carrier properly licensed to transport such goods, products, merchandise, supplies or waste from the time of movement from the point of origin until delivery to the final destination.



FILED DATE: 6/15/2026 5:13 PM   2026CH05725

**ENDORSEMENT**

| | |
|---|---|
| This endorsement, effective 12:01AM: | **06/01/2020** |
| Forms a part of Policy No.: | **42-CPL-305322-03** |
| Issued to: | **The Walsh Group, Ltd.** |
| By: | **National Fire & Marine Insurance Company** |

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM
## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**This endorsement modifies insurance provided under the following:**

COMMERCIAL GENERAL LIABILITY POLICY
HEALTHCARE PRIMARY LIABILITY POLICY
COMMERCIAL UMBRELLA LIABILITY POLICY
HEALTHCARE UMBRELLA LIABILITY POLICY
COMMERCIAL RETAINED LIMIT LIABILITY POLICY
FOLLOW FORM EXCESS LIABILITY POLICY
PRODUCTS/COMPLETED OPERATIONS LIABILITY POLICY
CONTRACTOR'S POLLUTION LEGAL LIABILITY POLICY
POLLUTION LEGAL LIABILITY POLICY

If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a Calendar Year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

"Certified act of terrorism" means any act that is certified by the United States Secretary of the Treasury, in consultation with the United States Secretary of Homeland Security, and the United States Attorney General, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

1. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

All other terms and conditions of this policy remain unchanged.



FILED DATE: 6/15/2026 5:13 PM   2026CH05725

## ENDORSEMENT

This endorsement, effective 12:01AM: **06/01/2020**
Forms a part of Policy No.: **42-CPL-305322-03**
Issued to: **The Walsh Group, Ltd.**
By: **National Fire & Marine Insurance Company**

# REDUCED SELF-INSURED RETENTION INDEMNITY
## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**This endorsement modifies insurance provided under the following:**

**CONTRACTOR'S POLLUTION LEGAL LIABILITY POLICY**

It is hereby understood and agreed that in the event a "claim" is made against the insured by any person, firm or organization to whom you have issued a Certificate of Insurance which indicates a Self-Insured Retention amount less than the amount stated in the Declarations, then the Self-Insured Retention applicable to the "claim" shall be such lesser amount, provided however, you hereby agree to indemnify us for the difference between the lesser Self-Insured Retention amount and the Self-Insured Retention amount stated in the Declarations, and to promptly reimburse us for all costs, expenses and attorney's fees which may be incurred by us in enforcing this indemnity agreement

All other terms and conditions of this policy remain unchanged.

Page 1 | CL-CPL-001-12/2016



Berkshire Hathaway
Specialty Insurance

**ENDORSEMENT**

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

| | |
|---|---|
| This endorsement, effective 12:01AM: | **06/01/2020** |
| Forms a part of Policy No.: | **42-CPL-305322-03** |
| Issued to: | **The Walsh Group, Ltd.** |
| By: | **National Fire & Marine Insurance Company** |

## AMENDMENT OF ANNUAL LIMITS ENDORSEMENT
### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**This endorsement modifies insurance provided under the following:**

**CONTRACTOR'S POLLUTION LEGAL LIABILITY POLICY**

I.  **SECTION III – LIMITS OF INSURANCE AND SELF-INSURED RETENTION**, is deleted and replaced with the following:

**SECTION III – LIMITS OF INSURANCE AND SELF-INSURED RETENTION**

1.  The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

    a.  Insureds;

    b.  "Claims" made or "suits" brought; or

    c.  Persons or organizations making "claims" or bringing "suits".

2.  The Pollution Aggregate Limit shown in the Declarations is the most we will pay for the sum of damages, "clean-up costs", "defense expenses" and "emergency response costs" under **Coverages A.** and **B.**

    The Limits of Insurance of this policy apply to the entire policy period shown in the Declarations, beginning with the inception date of the policy period. If the policy period is extended after issuance the additional period will be deemed part of the preceding period for the purposes of determining the limits of insurance of this policy.

3.  Subject to the Pollution Aggregate Limit in Paragraph **2.** above, the Per Occurrence of Pollution Limit shown in the Declarations is the most we will pay for the sum of all damages and "clean-up costs", including any covered "defense expenses", arising out of any one "occurrence" of "pollution".

4.  Subject to the Pollution Aggregate Limit in Paragraph **2.** above, the Per Occurrence of Pollution Emergency Response Costs Limit shown in the Declarations is the most we will pay for all such "emergency response costs" arising out of any one "occurrence" of "pollution".

5.  The Limit of Insurance under this policy for insureds listed in Paragraphs **3.** or **4.** of **SECTION II – WHO IS AN INSURED** shall be no more than the "named insured's" percentage ownership in the joint venture or Limited Liability company multiplied by the applicable limit of insurance as described here in **SECTION III – LIMITS OF INSURANCE AND SELF-INSURED RETENTION.**

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

The Limit of Insurance under this policy for an insured listed in Paragraph **5.** of **SECTION II – WHO IS AN INSURED** shall be the amount required by the written contract or agreement between the "named insured" and the client or the applicable Limit of Insurance as stated herein, whichever amount is less.

Under no circumstances shall the Limit of Insurance for a person or organization listed in Paragraph **3., 4.** or **5.** of **SECTION II – WHO IS AN INSURED** be greater than the applicable Limit of Insurance as stated here in **SECTION III – LIMITS OF INSURANCE AND SELF-INSURED RETENTION**.

6. The amount stated as the Self-Insured Retention in the Declarations is the most you will pay in retention arising out of one "occurrence" of "pollution". The Self-Insured Retention applies to "occurrences" of "pollution" under both **Coverages A.** and **B.** The Self-Insured Retention shall be paid by you and remain uninsured. The Limits of Insurance shall apply excess of the Self-Insured Retention.

7. We shall have no obligation or responsibility to pay amounts owed within the Self-Insured Retention, and our obligations under this policy shall only attach once all of the terms and conditions of this policy have been satisfied, and the insured has paid the Self-Insured Retention amount both of which are conditions precedent to coverage under this policy.

   We may advance payment of part or all of the Self-Insured Retention amount and, upon notification of such payment made, you shall promptly reimburse us for the Self-Insured Retention amounts advanced by us.

All other terms and conditions of this policy remain unchanged.



FILED DATE: 6/15/2026 5:13 PM    2026CH05725

**ENDORSEMENT**

This endorsement, effective 12:01AM: **06/01/2020**
Forms a part of Policy No.: **42-CPL-305322-03**
Issued to: **The Walsh Group, Ltd.**
By: **National Fire & Marine Insurance Company**

# BUSINESS CRISIS EVENT COST COVERAGE ENDORSEMENT
## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**This endorsement modifies insurance provided under the following:**

**CONTRACTOR'S POLLUTION LEGAL LIABILITY POLICY**

The following is added to **SECTION I - COVERAGES**:

**Business Crisis Event Cost Coverage**

A. Subject to the terms and conditions of this endorsement, we will pay "business crisis event costs" to third parties at the request of and on behalf of the "named insured". The "business crisis event costs" must arise from a "business crisis event" that first commences during the "policy period", or after the retroactive date, if applicable.

B. A "business crisis event" will be deemed to first commence when a "key executive" first becomes aware of an "occurrence" of "pollution" that gives rise to the "business crisis event" and will end when we determine that any one of the necessary elements listed in the definition of a "business crisis event" no longer exists. In no event, however, will we have any obligation under this coverage once the limit of insurance described in paragraph **C.** below has been exhausted.

C. The most we will pay for all "business crisis event costs" in any one policy period is $250,000. Payment of "business crisis event costs" will not be applied to or erode any other limit or aggregate limit of the policy.

D. Any payment of "business crisis event costs" that we make under the coverage provided by this endorsement will not:

1. Be a determination of any other rights or obligations under this policy;

2. Create any duty to defend any "suit" under any other part of this policy; or

3. Operate as a waiver of any right or defense we have with respect to the coverage under the policy, including those contained in Paragraph **B.1. Duties In The Event Of Occurrence, Offense, Claim or Suit** in **SECTION IV - CONDITIONS.**

E. For purposes of coverage provided by this endorsement, the following is added to **SECTION IV - CONDITIONS, Paragraph B.1. Duties In The Event Of Occurrence, Offense, Claim Or Suit:**

You must see to it that we are notified of any "business crisis event" within seventy-two (72) hours of the time that a "key executive" first becomes aware of an "occurrence" of "pollution" that gives rise to a "business crisis event" or as soon as reasonably practicable, in order to be eligible for the advancement of "business crisis event costs."

Page 1 | CL-CPL-004-12/2016

Notice of a "business crisis event" shall be given by calling **1-855-453-9675** or by written notice made to us as provided in the Declarations with respect to notice in the event of a claim.

**F.** For purposes of coverage provided by this endorsement, the following are added to **SECTION V - DEFINITIONS**:

1. "Adverse media coverage" means national or regional news exposure in television, radio, print or internet media that is reasonably likely to have a negative impact on the "named insured" with respect to its income, reputation, community relations, public confidence or good will.

2. "Business crisis event" means an "occurrence" that, in the good faith opinion of a "key executive" of the "named insured", has resulted in or is reasonably likely to result in:

   a. "Bodily injury", "property damage" or "clean-up costs" because of "environmental damage"; and

   b. A need for "business crisis management services" due to "adverse media coverage". "Business crisis event" will include, but is not limited to, "occurrences" of "pollution" regarding: explosions and other man-made disasters; serious accidents resulting in death, burns, or dismemberment injuries; traumatic brain injuries; permanent paralysis injuries; or injuries from contamination of food, drink or pharmaceuticals.

3. "Business crisis event consulting firm" means any firm that is approved by us and hired by you or us to perform "business crisis management services" in connection with a "business crisis event". Any "business crisis event consulting firm" which has been retained by you on a continuous and uninterrupted basis from a date preceding the "business crisis event" for which coverage is sought under this endorsement up until the date of the "business crisis event", shall be deemed approved by us.

4. "Business crisis management services" means those services performed by a "business crisis event consulting firm" in advising the "named insured" on minimizing potential harm to the "named insured" from a covered "business crisis event" by managing "adverse media coverage" and maintaining and restoring public confidence in the "insured".

5. "Business crisis event costs" means the following reasonable and necessary fees and expenses incurred during a "business crisis event" and directly caused by the "business crisis event", but only to the extent that the "named insured", the "business crisis event consulting firm" or a third party authorized by us or the "business crisis event consulting firm", arranges for such services resulting in these fees and expenses and the fees and expenses are pre-approved by us:

   a. Fees charged by a "business crisis event consulting firm" for the performance of "business crisis management services" for the "named insured";

   b. Expenses incurred by a "business crisis event consulting firm" in the performance of "business crisis management services" for the "named insured";

   c. Fees and expenses for printing, advertising, mailing of materials or travel by directors, officers, employees or agents of the "named insured" or the "business crisis event consulting firm" incurred at the direction of the "business crisis event consulting firm";

   d. Fees and expenses to secure the scene of a "business crisis event";

   e. Medical expenses; funeral expenses; expenses for psychological counseling; travel expenses; temporary living expenses or other necessary response costs approved by us, incurred by or advanced to third parties directly harmed by the "business crisis event."

   "Business crisis event costs" do not include any defense costs.

6. "Insured" shall have the same meaning as provided in **SECTION II - WHO IS AN INSURED**, including any amendments to that section by endorsement.

FILED DATE: 6/15/2026 5:13 PM    2026CH05725

7. "Key executive" means the Chief Executive Officer, Chief Operating Officer, Chief Financial Officer, President, Risk Manager, General Counsel or general partner (if the "named insured" is a partnership) or sole proprietor (if the "named insured" is a sole proprietorship) of the "named insured".

8. "Named insured" shall mean the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy.

All other terms and conditions of this policy remain unchanged.



**Berkshire Hathaway**
**Specialty Insurance**

FILED DATE: 6/15/2026 5:13 PM    2026CH05725

## ENDORSEMENT

This endorsement, effective 12:01AM: **06/01/2020**
Forms a part of Policy No.: **42-CPL-305322-03**
Issued to: **The Walsh Group, Ltd.**
By: **National Fire & Marine Insurance Company**

# CANCELLATION AMENDATORY WITH DESIGNATED ENTITY ENDORSEMENT
## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

**CONTRACTOR'S POLLUTION LEGAL LIABILITY POLICY**

I.   The following is added to Sub-paragraph **2. Cancellation** under Paragraph **A. General Policy Conditions** under **SECTION IV - CONDITIONS:**

In the event that we cancel this policy for any reason other than non-payment of premium, we will mail or deliver to the designated entity scheduled below no less than thirty (30) days advance written notice stating when the cancellation is to take effect. Mailing that notice to such designated entity will be sufficient proof of notice.

### DESIGNATED ENTITIES

| Name | Address |
| --- | --- |
| Massachusetts Bay Transportation Authority (MBTA) | 10 Park Plaza, Room 6720 Boston, MA 02116 |
| Chicago Transit Authority Department of Risk Management | P.O. Box 7564 Chicago, IL 60680 |
| City of Chicago Department of Procurement Services | 121 N. LaSalle Street, #403 Chicago, IL 60602 |
| Massachusetts Department of Transportation | 10 Park Plaza, Room 6260 Boston, MA 02116 |
| The Pennsylvania Department of Transportation | 8th Floor Commonwealth Keystone Building, 400 N. Street Harrisburg, PA 17120-0041 |
| U.S. Bank National Association, As Collateral Agent Attn: Global Corporate Trust Services | 10 West Market Street, Suite 150 Indianapolis, IN 46204 |
| City of Indianapolis | 200 East Washington Street Indianapolis, IN 46204 |

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

| Name | Address |
|---|---|
| U.S. Bank National Association Attn: Global Corporate Trust Services | Two Liberty Place, 50 South 16th Street Suite 2000 Mail Station: EX-PA-WBSP Philadelphia, PA 19102 |

All other terms and conditions of this policy remain unchanged.

FILED DATE: 6/15/2026 5:13 PM 2026CH05725



**Berkshire Hathaway
Specialty Insurance**

## ENDORSEMENT

This endorsement, effective 12:01AM: **06/01/2020**
Forms a part of Policy No.: **42-CPL-305322-03**
Issued to: **The Walsh Group, Ltd.**
By: **National Fire & Marine Insurance Company**

# ERC AMENDMENT ENDORSEMENT
## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**This endorsement modifies insurance provided under the following:**

**CONTRACTOR'S POLLUTION LEGAL LIABILITY POLICY**

I. Subparagraph **d.** of **Paragraph B.1. Duties in The Event of Occurrence, Offense, Claim or Suit** under **SECTION IV – CONDITIONS** is deleted and replaced with the following:

    **d.** When "emergency response costs" have been incurred, the insured shall forward to us within 14 days of the commencement of the "occurrence" of "pollution" for which the "emergency response costs" have been incurred all information, including, but not limited to: the cause and location of the "occurrence" of "pollution", technical reports, laboratory data, field notes, expert reports, investigations, data collected, invoices, regulatory correspondence or any other documents relating to such "emergency response costs".

II. Paragraph **9.** under **SECTION V – DEFINITIONS** is deleted and replaced with the following:

    **9.** "Emergency response costs" means the reasonable and necessary expenses, including "defense expenses", incurred with our written consent incurred in the remediation of soil, surface water, groundwater or other contamination that must be incurred:

        **a.** In response to an "occurrence" of "pollution" that necessitated immediate action; and

        **b.** Within 168 hours of the "occurrence" of "pollution", or as approved by us in writing.

All other terms and conditions of this policy remain unchanged.



## Berkshire Hathaway Specialty Insurance

### ENDORSEMENT

FILED DATE: 6/15/2026 5:13 PM 2026CH05725

| | |
|---|---|
| This endorsement, effective 12:01AM: | **06/01/2020** |
| Forms a part of Policy No.: | **42-CPL-305322-03** |
| Issued to: | **The Walsh Group, Ltd.** |
| By: | **National Fire & Marine Insurance Company** |

## FOREIGN LIABILITY ENDORSEMENT
### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**This endorsement modifies insurance provided under the following:**

**CONTRACTOR'S POLLUTION LEGAL LIABILITY POLICY**

I. Paragraph **11. Policy Territory** under **SECTION IV – CONDITIONS** is deleted and replaced with the following:

**11. Policy Territory**

This policy and any coverage provided hereunder is only applicable to "occurrence" of "pollution" occurring in the United States of America, including its territories and possessions, Canada, its territories and possessions, and Puerto Rico, and subject to the following conditions, all other countries or jurisdictions elsewhere in the world:

a. No insurer shall be deemed to provide cover and no insurer shall be liable to pay any "claim" or provide any benefit hereunder to the extent that the provision of such cover, payment of such "claim" or provision of such benefit would expose that insurer to any sanction, prohibition or restriction under United Nations resolutions or the trade or economic sanctions, laws or regulations of the European Union, United Kingdom or United States of America; and

b. All limits and retentions in this policy are in United States currency, and all amounts payable pursuant to this policy shall be paid in, and with the currency of, the United States, with any necessary currency conversion for such amounts payable converted based on the New York foreign exchange selling rate for conversion to United States currency that is published in The Wall Street Journal on the date of our payment; and

c. Notwithstanding anything in this policy or elsewhere to the contrary, it is agreed and understood that the exclusive jurisdiction and venue for any claim, arbitration, suit, or other proceeding to which we may be a party shall be in such State(s) or Province(s) in the United States of America or Canada, as applicable based on the country from which this policy was issued, with jurisdiction and venue over us, this policy, and any such claim, arbitration, suit, or other proceeding; and

d. If you are domiciled in a state or province within the United States or Canada, as applicable based on the country from which this policy was issued, then with our consent, you will investigate, defend or settle any "claim" brought in any country or jurisdiction where we are prohibited by law from paying damages or providing a defense on behalf of the insured for such "claim" insured by this policy. We will reimburse you for reasonable costs incurred in the investigation, defense or settlement of such "claim" to the extent insured by, and as provided in, this policy, including, but not limited to, **(b)** above; and

e. You must maintain all coverage required by law, regulation or other governmental authority in full force and effect during the "policy period", and any failure to maintain such coverage will not invalidate this insurance, however this insurance will apply as if all such coverage required by law, regulation or other governmental authority was in full force and effect; and

f. Any insurance available pursuant to this definition is excess over any other insurance, whether such other insurance is primary, excess, contingent, or provided on any other basis.

All other terms and conditions of this policy remain unchanged.



**Berkshire Hathaway Specialty Insurance**

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

### ENDORSEMENT

This endorsement, effective 12:01AM: **06/01/2020**
Forms a part of Policy No.: **42-CPL-305322-03**
Issued to: **The Walsh Group, Ltd.**
By: **National Fire & Marine Insurance Company**

## WAIVER OF SUBROGATION ENDORSEMENT
### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

**CONTRACTOR'S POLLUTION LEGAL LIABILITY POLICY**

I.    The following is added to Sub-paragraph **17. Subrogation and Transfer of Rights of Recovery** of Paragraph **A. General Policy Conditions** under **SECTION IV - CONDITIONS**:

We shall not exercise such rights against the person or organization shown in the Waiver of Subrogation Schedule below because of payments made for injury or damage arising out of "covered operations" performed on behalf of that person or organization.

**WAIVER OF SUBROGATION SCHEDULE**

| |
|---|
| As required by written contract prior to the "occurrence" of "pollution". |

All other terms and conditions of this policy remain unchanged.

Page 1  |  CL-CPL-009-12/2016

 **Berkshire Hathaway Specialty Insurance**

**ENDORSEMENT**

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

| | |
|---|---|
| This endorsement, effective 12:01AM: | **06/01/2020** |
| Forms a part of Policy No.: | **42-CPL-305322-03** |
| Issued to: | **The Walsh Group, Ltd.** |
| By: | **National Fire & Marine Insurance Company** |

# DEFENSE EXPENSE AMENDATORY ENDORSEMENT
## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**This endorsement modifies insurance provided under the following:**

**CONTRACTOR'S POLLUTION LEGAL LIABILITY POLICY**

I.  The following is added to **SECTION III – LIMITS OF INSURANCE AND SELF-INSURED RETENTION** of this policy and supersedes anything to the contrary:

"Defense expenses" incurred to defend or investigate any "claim" shall be in addition to the applicable limit of insurance, as described in **SECTION III – LIMITS OF INSURANCE AND SELF-INSURED RETENTION**, until "defense expenses" in the aggregate total $3,000,000. Upon payment of "defense expense" in this aggregate amount, "defense expense" shall reduce the applicable limit of insurance, as described in **SECTION III – LIMITS OF INSURANCE AND SELF-INSURED RETENTION.**

All other terms and conditions of this policy remain unchanged


Berkshire Hathaway
Specialty Insurance

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

**ENDORSEMENT**

| | |
|---|---|
| This endorsement, effective 12:01AM: | **06/01/2020** |
| Forms a part of Policy No.: | **42-CPL-305322-03** |
| Issued to: | **The Walsh Group, Ltd.** |
| By: | **National Fire & Marine Insurance Company** |

# NATURALLY OCCURING POLLUTANTS ENDORSEMENT
## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**This endorsement modifies insurance provided under the following:**

**CONTRACTOR'S POLLUTION LEGAL LIABILITY POLICY**

I.  Paragraph **23.** under **SECTION V – DEFINITIONS** is deleted and replaced with the following:

23. "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, electromagnetic fields, "low level radioactive waste", silt and sediments, "biological matter" and waste, provided such conditions are not naturally present in the environment in the concentration or amounts discovered, unless such natural condition(s) are released or dispersed as a result of the performance of "covered operations", and such release or dispersal is unexpected and unintended from the standpoint of the insured. Waste includes medical, infectious and pathological waste, as well as, materials to be recycled, reconditioned or reclaimed.

All other terms and conditions of this policy remain unchanged.


**Berkshire Hathaway**
**Specialty Insurance**

FILED DATE: 6/15/2026 5:13 PM 2026CH05725

**ENDORSEMENT**

This endorsement, effective 12:01AM: **06/01/2020**
Forms a part of Policy No.: **42-CPL-305322-03**
Issued to: **The Walsh Group, Ltd.**
By: **National Fire & Marine Insurance Company**

# POLLUTION DEFINITION ENDORSEMENT
## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**This endorsement modifies insurance provided under the following:**

**CONTRACTOR'S POLLUTION LEGAL LIABILITY POLICY**

I. Paragraph **24.** under **SECTION V – DEFINITIONS** is deleted and replaced with the following:

24. "Pollution" means:

   a. The discharge, emission, dispersal, seepage, migration, release, escape, or the illicit abandonment on or after the inception date or this policy by a third party without the insured's consent and while the job site is under the insured's control, of "pollutants; or

   b. The presence of "biological matter" in or on a building structure.

II. Paragraph **1.** under **SECTION V – DEFINITIONS** is deleted and replaced with the following:

1. "Biological matter" means:

   a. Fungi, including mold and mildew; and

   b. Bacterial matter, including Legionella pneumophila, viruses; and

   c. Solely with respect to any "claim" arising as a result of " terrorism", "bioterrorism agents"

III. The following is added to **SECTION V – DEFINITIONS**:

"Bioterrorism agents" means viruses, bacteria or toxins, as defined by the U.S. Center for Disease Control or equivalent Agency in Canada, whether or not such viruses, bacteria or other agents are living, provided such matter was deliberately released, discharged or dispersed intentionally by a third party.

"Terrorism" means the use or threatened use of force or violence against person or property, or commission of an act dangerous to human life or property, or commission or an act that interferes with or disrupts an electronic communication system, undertaken by any person or group, whether or not acting on behalf of or in connection with any organization, government, power, authority or military force, when the effect is to intimidate, coerce or harm a government, the civilian population or any segment thereof, or to disrupt any segment of the economy. "Terrorism shall include any act which is verified or recognized by the United States or Canadian Government as an act of terrorism.

All other terms and conditions of this policy remain unchanged.



**Berkshire Hathaway
Specialty Insurance**

FILED DATE: 6/15/2026 5:13 PM    2026CH05725

## ENDORSEMENT

| | |
|---|---|
| This endorsement, effective 12:01AM: | **06/01/2020** |
| Forms a part of Policy No.: | **42-CPL-305322-03** |
| Issued to: | **The Walsh Group, Ltd.** |
| By: | **National Fire & Marine Insurance Company** |

# CANCELLATION AMENDATORY ENDORSEMENT
## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**This endorsement modifies insurance provided under the following:**

**CONTRACTOR'S POLLUTION LEGAL LIABILITY POLICY**

I.  Sub-paragraph **b.** of Paragraph **2. Cancellation** under **SECTION IV – CONDITION A. General Policy Conditions** is deleted and replaced with the following:

   b.  We may cancel this policy. If we cancel because of non-payment of premium, we must mail or deliver to you not less than fifteen (15) days advance written notice stating when the cancellation is to take effect. If we cancel for any other reason, we must mail or deliver to you not less than ninety (90) days advance written notice stating when the cancellation is to take effect. Mailing that notice to you at your mailing address shown in the Declarations will be sufficient to prove notice.

   The "policy period" will end on the day and hour stated in the cancellation notice.

   If we cancel, final premium will be calculated pro rata based on the time this policy was in force. Final premium will not be less than the pro-rata share of the Minimum Premium shown in the Declarations.

   If you cancel, final premium will be more than pro rata; it will be based on the time this policy was in force and increased by our short rate cancellation table and procedure. Final premium will not be less than the short rate share of the Minimum Premium shown in the Declarations.

All other terms and conditions of this policy remain unchanged.



Berkshire Hathaway
Specialty Insurance

**ENDORSEMENT**

This endorsement, effective 12:01AM:   **06/01/2020**
Forms a part of Policy No.:   **42-CPL-305322-03**
Issued to:   **The Walsh Group, Ltd.**
By:   **National Fire & Marine Insurance Company**

# INSURED LOCATION POLLUTION LEGAL LIABILITY ENDORSEMENT
## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

**CONTRACTOR'S POLLUTION LEGAL LIABILITY POLICY**

I.   The following is added to **Item 4. Limits of Insurance** of the **Declarations**:

Limit of Liability – Insured Location Pollution Legal Liability:

Coverage C:  $2,000,000           Insured Location Per Occurrence of Pollution Limit

Coverage D:  $2,000,000           Insured Location Emergency Response Costs Limit

II.   The following is added to **Item 5. Self-Insured Retention** of the **Declarations**:

Insured Location Pollution Legal Liability Self Insured Retention: $500,000  Each Occurrence of Pollution

III.   The following is added to **SECTION I - COVERAGES**:

A.   **COVERAGE C INSURED LOCATION POLLUTION LIABILITY COVERAGE (Claims Made and Reported)**

1.   **Insuring Agreement**

a.   We will pay those sums in excess of the Insured Location Pollution Legal Liability Self-Insured Retention that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" or "clean-up costs" caused by an "occurrence" of "pollution" on, at, under or migrating from an "insured location".

We will have the right and duty to defend the insured against any "claim", even if groundless, false or fraudulent, seeking damages or "clean-up costs" as described in the paragraph above.  However, we will have no duty to defend the insured against any "claim" seeking such damages or "clean-up costs" to which this insurance does not apply.  We may, at our discretion, investigate any "occurrence" of "pollution" and settle any "claim" that may result.  However:

(1) The amount we will pay for damages, "clean-up costs" and "defense expenses" is limited as described in **SECTION III – LIMITS OF INSURANCE AND SELF-INSURED RETENTION**; and

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

**(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of damages, "clean-up costs", judgments, settlements or "defense expenses" under this policy.

**b.** **COVERAGE C INSURED LOCATION POLLUTION LIABILITY COVERAGE** only applies if:

**(1)** "Bodily injury", "property damage" or "clean-up costs" results from a covered "occurrence" of "pollution" that first commences:

**(a)** on or after the applicable "insured location pollution legal liability retroactive date"; and

**(b)** prior to the end of the "policy period"; and

**(2)** The "claim" for damages because of "bodily injury" or "property damages" and "clean-up costs" is:

**(a)** first made against any insured as provided in **c.** below; and

**(b)** first reported to us in writing by any insured;

during the policy period or any applicable Extended Reporting Period we provide.

**c.** A "claim" shall be deemed to have been first made when notice of such "claim" is received and recorded by:

**(1)** A "notice insured"; or

**(2)** Us, whether or not we make settlement;

whichever is earlier.

**d.** Notwithstanding anything in this policy or endorsement to the contrary, all "related claims" that are made during this "policy period", the "policy period" of any subsequent renewal of ours or any Extended Reporting Period of our policy shall be deemed to have been made during the "policy period" of the first policy issued by us during which one of the "related claims" was made such that only that policy of insurance, including, but not limited to, its Limits of Insurance, will respond with respect to all such "related claims", subject to all of the terms and conditions of that policy.

Under no circumstances shall more than one policy of insurance, nor their Limits of Insurance, apply, stack or cumulate over multiple "policy periods", irrespective of the number of insureds, "claims" or persons or organizations making or bringing "claims".

All "related claims" shall be considered part of the single "claim" to which they relate and be deemed to be a single "occurrence" of "pollution" and only one Per "Occurrence" of "Pollution" Limit of Insurance and only one Self-Insured Retention shall be applicable to such single "claim" regardless of the number of "related claims".

For purposes of this endorsement, "Related claims" means all "claims" that are logically or causally connected to a "claim" by any actual or alleged fact, circumstance, situation, event, transaction, condition, cause, defect, hazard, act, omission, warning or failure to warn, or series or group thereof, regardless of the number of insureds, "claims", or persons or organizations making or bringing "claims" or "suits".

B. **COVERAGE D INSURED LOCATION EMERGENCY RESPONSE COSTS**

1. **Insuring Agreement**

   a. We will pay "emergency response costs" in excess of the applicable Insured Location Pollution Legal Liability Self-Insured Retention incurred by the insured during the "policy period" and resulting from an "occurrence" of "pollution" on or under an "insured location" during the "policy period".

   b. **COVERAGE D EMERGENCY RESPONSE COSTS** only applies if the conditions as stated at Paragraph **b.** and its subparts of **B. COVERAGE B – EMERGENCY RESPONSE COSTS** under **SECTION I – COVERAGES** of the policy to which this endorsement is attached are satisfied.

IV. Solely for purposes of this endorsement, **C. EXCLUSIONS – COVERAGES A** and **B** is amended as follows:

Exclusion **1. Contractual Liability** exclusion is deleted in its entirety and replaced with the following:

1. **Contractual Liability**

   Liability of other assumed by an insured through contract or agreement, except if the liability would have attached to the insured in the absence of such contract or agreement or if the agreement is a "scheduled insured contract".

Exclusion **5. Insured vs. Insured** is deleted in its entirety and replaced with the following:

5. **Insured vs. Insured**

   "Claims" brought by an insured against another insured.

Exclusion **14. Transfer, Storage or Disposal Facility** is deleted in its entirety and replaced with the following:

14. **Transfer, Storage or Disposal Facility**

   Any "claim" arising out of any waste, products or materials that have been delivered to a transfer, storage or disposal facility.

V. Solely for purposes of this endorsement, the following exclusions are added to **C. EXCLUSIONS COVERAGES A** and **B**:

This insurance does not apply to:

**Divested Property**

Any property that was sold, given away, abandoned or where the insured relinquished operational or management control.

**Insured's Internal Expenses**

Expenses incurred by you for services performed by salaried staff or "employees".

**Asbestos and Lead**

"Clean-up costs" arising directly or indirectly from asbestos, or any asbestos containing materials or products or lean-based paint, installed, applied or present in, on or to any building or other structure, including its contents. This exclusion does not apply to "clean-up costs" for the remediation of soil, surfacewater or groundwater.

FILED DATE: 6/15/2026 5:13 PM    2026CH05725

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

**Underground Storage Tank**

Any "claim" arising from an "occurrence" of "pollution" resulting directly or indirectly from an "underground storage tank", unless that "underground storage tank" is listed in the SCHEDULE OF UNDERGROUND STORAGE TANKS as found in the **INSURED LOCATION POLLUTION LIABILITY COVERAGE** endorsement.

**VI.** Solely for purposes of this endorsement, the following is added to **SECTION III – LIMITS OF INSURANCE AND SELF-INSURED RETENTION:**

Subject to the Pollution Aggregate Limit in Paragraph **2.**, the Insured Location Per Occurrence of Pollution Limit shown in the Declarations is the most we will pay for the sum of all damages and "clean-up costs", including any covered "defense expenses", arising out of any one "occurrence" of "pollution" as provided for under **COVERAGE C INSURED LOCATION POLLUTION LIABILITY COVERAGE.**

Subject to the Pollution Aggregate Limit in Paragraph **2.**, the Insured Location Emergency Response Cost Limit shown in the Declarations is the most we will pay for all such "emergency response costs" arising out of any one "occurrence" of "pollution" under **COVERAGE D INSURED LOCATION EMERGENCY RESPONSE COSTS.**

With respect to **Coverage C** and **Coverage D**, we shall have no obligation or responsibility to pay amounts owed within the Insured Location Pollution Legal Liability Self-Insured Retention, and our obligations under this policy shall only attach once all of the terms and conditions of this policy have been satisfied, and the insured has paid the Insured Location Pollution Legal Liability Self-Insured Retention amount, both of which are conditions precedent to coverage under this policy.

We may advance payment of part or all of the Insured Location Pollution Legal Liability Self-Insured Retention amount and, upon notification of such payment made, you shall promptly reimburse us for the Self Insured Location Pollution Legal Liability Self-Insured Retention amounts advanced by us.

**VII.** Solely for purposes of this endorsement, **SECTION V – DEFINITIONS** is amended as follows:

Definition **13.** "Insured contract" is deleted in its entirety and replaced with the following:

> **13.** "Insured contract" means a contract or agreement submitted to us, and listed in the Schedule of Insured Contracts as found in the **INSURED LOCATION POLLUTION LIABILITY COVERAGE ENDORSEMENT.**

**VIII.** Solely for purposes of this endorsement, the definitions following are added to **SECTION V – DEFINITIONS:**

"Insured location" means each location identified on the SCHEDULE OF INSURED LOCATIONS AND RETROACTIVE DATE as found in the **INSURED LOCATION POLLUTION LIABILITY COVERAGE ENDORSEMENT.**

"Insured location pollution legal liability retroactive date" means the corresponding retroactive date listed shown in the SCHEDULE OF INSURED LOCATIONS AND RETROACTIVE DATE as found in the **INSURED LOCATION POLLUTION LIABILITY COVERAGE ENDORSEMENT.**

"Scheduled insured contract" means a contract listed on the SCHEDULE OF INSURED CONTRACTS below.

"Underground storage tank system" means any storage tank, including associated underground piping connected to the storage tank, which has at least ten (10) percent of its volume below ground.

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

**IX.** Solely for purposes of this endorsement, the following is added to **SECTION IV - CONDITIONS:**

Subject to all of the terms and conditions set forth in the **INSURED LOCATION POLLUTION LIABILITY COVERAGE ENDORSEMENT** and the policy to which this endorsement is attached, we will provide the following Extended Reporting Period if this policy is cancelled or not renewed.

However, if this coverage is immediately succeeded by similar claims-made insurance coverage, the succeeding insurance shall be deemed to be a renewal hereof and, in consequence, no insured shall have a right to the Extended Reporting Period.

**Extended Reporting Period:**

1. This Extended Reporting Period applies if this insurance is canceled or not renewed by the first "named insured" or by us for a reason other than non-payment of premium or the Insured Location Pollution Legal Liability Self Insured Retention or noncompliance with terms and conditions of this policy. Coverage under the Extended Reporting Period shall not be canceled.

2. Where applicable, the Extended Reporting Period of sixty (60) days shall commence with the end of the "policy period". The first "named insured" must report to us in writing any "claims" first made against the insured during the Extended Reporting Period. Such "claims" must be because of "pollution" that first commenced on or subsequent to the applicable "retroactive date" and before the end of the "policy period".

3. This Extended Reporting Period does not extend the "policy period" or change the scope of coverage provided. We shall consider any "claim" first made against an "insured" and reported to us in writing during the Extended Reporting Period to have been made on the last day of this "policy period".

4. A Extended Reporting Period is automatically provided without additional charge. The Extended Reporting Period does not apply to "claims" that are covered under any subsequent insurance you purchase, or that would be covered but for exhaustion of the amount of insurance applicable to such "claims".

5. The limits of insurance that apply at the end of the policy period are not increased or reinstated for "claim" first made against the insured and reported to us during the Extended Reporting Period.

### SCHEDULE OF INSURED LOCATIONS AND RETROACTIVE DATES

| Insured Location(s) | Retroactive Date |
|---|---|
| 929 West Adams St. Chicago, IL | 06/01/2011 |
| 955 West Jackson Blvd., Chicago, IL 60607 | 06/01/2011 |
| 3710 S. Western Ave., Chicago IL 60609 | 06/01/2011 |
| 5106 S. Oakley, Chicago, IL 60609 | 06/01/2011 |
| 2711 E. 112 St. Chicago, IL 60617 | 06/01/2011 |
| 925 W. Jackson, Chicago, IL 60607 | 06/01/2011 |
| 13401 S. Indiana, Chicago, IL 60827 | 06/01/2011 |

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

| Insured Location(s) | Retroactive Date |
|---|---|
| 515 S. Financial, Chicago, IL 60607 | 06/01/2011 |
| 641-44 S. LaSalle, Chicago, Il 60605 | 06/01/2011 |
| 235 Allatoona Rd., Cartersville, GA 30120 | 06/01/2011 |
| 1260 E. Summit, Crown Point, IN 46307 | 06/01/2011 |
| 801 Lowhill Rd. Brownsville, PA 15417 | 06/01/2011 |
| 73 Dieters Hill Rd., Lehighton, PA 18235 | 06/01/2011 |
| FM 1384 (22 acres farm land), Justin TX 76247 | 06/01/2011 |
| 307 S. Sangamon St. Chicago, IL 60607 | 06/01/2011 |

## SCHEDULE OF UNDERGROUND STORAGE TANKS

| Underground Storage Tank | Insured Location(s) |
|---|---|
| N/A | N/A |

## SCHEDULE OF INSURED CONTRACTS

| Contract Name | Contract Date |
|---|---|
| N/A | N/A |

All other terms and conditions of this policy remain unchanged.

Page 6 | CL-CPL-026-09/2017



## Berkshire Hathaway Specialty Insurance

FILED DATE: 6/15/2026 5:13 PM 2026CH05725

## ENDORSEMENT

| | |
|---|---|
| This endorsement, effective 12:01AM: | **06/01/2020** |
| Forms a part of Policy No.: | **42-CPL-305322-03** |
| Issued to: | **The Walsh Group, Ltd.** |
| By: | **National Fire & Marine Insurance Company** |

# ADDITIONAL NAMED INSURED ENDORSEMENT
## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

### CONTRACTOR'S POLLUTION LEGAL LIABILITY POLICY

I. Paragraph **17.** "named insured" under **SECTION V – DEFINITIONS** is deleted and replaced with:

**17.** "Named insured" means:

a. The person or entity designated as such in the Declarations;

b. Any organization in which the person or entity described in **17.a.** has an ownership interest during the "policy period" of 50% or more;

c. The entities listed below in the Additional Named Insured Schedule:

### ADDITIONAL NAMED INSURED SCHEDULE

The Walsh Group, Ltd., Walsh Construction Group, LLC; including any and all affiliates, divisions, subsidiary corporations, or subsidiary limited liability companies thereof, of any tier, in the past, as now or hereafter constituted; and any other legal entity in which you have more than fifty percent ownership or over which you exercise management or financial control or have contractually agreed to provide insurance for such an entity. It is further agreed, all partnerships or joint ventures, including all tiers of ownership of said partnerships or joint ventures, in which the Named Insured or any other Named Insured entity, of any tier, in the past, as now or hereafter constituted has more than fifty percent ownership, shall be included as Named Insured, but this policy shall apply as excess of any other valid and collectible insurance available to the partnership or joint venture.

The entities listed per the Schedule included in the Submission dated 6/1/2020 – 6/1/2021 and on file with Us as of Policy Inception.

All other terms and conditions of this policy remain unchanged.


## Berkshire Hathaway
## Specialty Insurance

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

## ENDORSEMENT

This endorsement, effective 12:01AM:  **06/01/2020**
Forms a part of Policy No.:  **42-CPL-305322-03**
Issued to:  **The Walsh Group, Ltd.**
By:  **National Fire & Marine Insurance Company**

# POLLUTION LINKING OF LIMITS ENDORSEMENT
## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**This endorsement modifies insurance provided under the following:**

**CONTRACTOR'S POLLUTION LEGAL LIABILITY POLICY
POLLUTION LEGAL LIABILITY POLICY**

It is hereby understood and agreed that regardless of the number of insureds under this policy and the policies included in the Linking of Limits Schedule below, our combined total limit of liability under this policy and the policies included in the Linking of Limits Schedule below shall not exceed $15,000,000 per "occurrence" of "pollution" limit and $15,000,000 pollution aggregate limit. The combined total limit of liability above shall not operate the increase the limit of liability as shown in the Declarations of this policy or the policies included in the Linking of Limits Schedule below.

### LINKING OF LIMITS SCHEDULE

| Insurer | Policy Number |
|---------|---------------|
| National Liability & Fire Insurance Company | 43-CPL-305331-03 |



Berkshire Hathaway
Specialty Insurance

**ENDORSEMENT**

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

This endorsement, effective 12:01AM: **06/01/2020**
Forms a part of Policy No.: **42-CPL-305322-03**
Issued to: **The Walsh Group, Ltd.**
By: **National Fire & Marine Insurance Company**

# DEFINITION OF NOTICE INSURED AMENDATORY ENDORSEMENT
## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

**CONTRACTOR'S POLLUTION LEGAL LIABILITY POLICY**

**I. SECTION V – DEFINITIONS,** Paragraph **20.** "Notice Insured" is deleted in its entirety and replaced with the following:

**20.** "Notice Insured" means any "employee" of an insured with responsibility, in whole or in part, for risk management or legal counsel.

All other terms and conditions of the policy remain unchanged.

FILED DATE: 6/15/2026 5:13 PM   2026CH05725



Berkshire Hathaway
Specialty Insurance

**ENDORSEMENT**

| | |
|---|---|
| This endorsement, effective 12:01AM: | **06/01/2020** |
| Forms a part of Policy No.: | **42-CPL-305322-03** |
| Issued to: | **The Walsh Group, Ltd.** |
| By: | **National Fire & Marine Insurance Company** |

# SELF-INSURED RETENTION AMENDATORY ENDORSEMENT
## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### This endorsement modifies insurance provided under the following:

### CONTRACTOR'S POLLUTION LEGAL LIABILITY POLICY

I.   Item 5. Self-Insured Retention of the Declarations is deleted and replaced by the following:

| | |
|---|---|
| $500,000 | Per Occurrence of Pollution Self-Insured Retention. |
| $100,000 | Per Occurrence of Pollution – Transportation – Self-Insured Retention. |
| $500,000 | Per Occurrence of Pollution – Emergency Response Costs – Self-Insured Retention. |
| $1,000,000 | Pollution Aggregate Self-Insured Retention. |
| $100,000 | Trailing Self-Insured Retention. |

II.  II. Paragraph **6. of SECTION III - LIMITS OF INSURANCE** is deleted and replaced with the following:

**6.** Application of Self-Insured Retention Amounts

**a.** Subject to the Pollution Aggregate Self-Insured Retention, the amount stated as the Per Occurrence of Pollution Self-Insured Retention in Item 5. of the Declarations is the most you will pay in self-insured retention amounts arising out of all "bodily injury", "property damage" or "environmental damage" resulting from any one "occurrence" of "pollution" caused by "covered operations".

**b.** Subject to the Pollution Aggregate Self-Insured Retention, the amount stated as the Per Occurrence of Pollution – Transportation – Self-Insured Retention in Item 5. of the Declarations is the most you will pay in self-insured retention amounts arising out of all "bodily injury", "property damage" or "environmental damage" resulting from any one "occurrence" of "pollution" caused by "transportation" operations included within the definition of "covered operations".

The Per Occurrence of Pollution – Transportation – Self-Insured Retention shall also apply with respect to any "occurrence" of "pollution" for which coverage is provided pursuant to the exception to exclusion **14. Transfer, Storage or Disposal Facility** under **C. EXCLUSIONS – COVERAGES A AND B.**

**c.** Subject to the Pollution Aggregate Self-Insured Retention, the amount stated as the Per Occurrence of Pollution – Emergency Response Costs – Self-Insured Retention in Item 5. of the Declarations is the most you will pay in self-insured retention amounts arising out of all "emergency response costs" resulting from any one "occurrence" of "pollution" caused by "covered operations".

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

**d.** The Pollution Aggregate Self-Insured Retention is the most you will pay in self-insured retention amounts because of all "bodily injury", "property damage", "environmental damage" and "emergency response costs" arising out of all "occurrences" of "pollution" to which this policy applies.

**e.** Upon exhaustion of the Pollution Aggregate Self-Insured Retention, the Trailing Self-Insured Retention amount will apply and take the place of the original self-insured retention amount.

With respect to those "claims" pending at the time the Pollution Aggregate Self-Insured Retention is exhausted, then for purposes of applying the Trailing Self-Insured Retention, we will recognize payments made by you in excess of the original Pollution Aggregate Self-Insured Retention.

If the amount of any of those respective payments is greater than the required Trailing Self-Insured Retention amount, then no additional payment shall be required as respects that particular "claim"; otherwise, where such payment is less than the Trailing Self-Insured Retention amount, you shall be required to pay the difference between those payments made in excess of the original Pollution Aggregate Self-Insured Retention and the Trailing Self-Insured Retention amount.

With respect to all subsequent "occurrence(s)" of "pollution" and "claim(s)" following the exhaustion of the Pollution Aggregate Self-Insured Retention amount, the Trailing Self-Insured Retention amount applies as written above.

The Trailing Self-Insured Retention is not subject to any aggregate retention amount.

All other terms and conditions of this policy remain unchanged.

Page 2 | Manuscript



Berkshire Hathaway
Specialty Insurance

**ENDORSEMENT**

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

This endorsement, effective 12:01AM: **06/01/2020**
Forms a part of Policy No.: **42-CPL-305322-03**
Issued to: **The Walsh Group, Ltd.**
By: **National Fire & Marine Insurance Company**

# INSURED VS INSURED AMENDATORY ENDORSEMENT
## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

**CONTRACTOR'S POLLUTION LEGAL LIABILITY POLICY**

I.   Paragraph **5.** under **C. EXCLUSIONS – COVERAGES A AND B** is deleted and replaced with the following:

5.   **Insured vs. Insured**

"Claims" brought by an insured against another insured. However, this exclusion does not apply to:

a.   "claims" brought by clients of the "named insured", who constitute insureds pursuant to **SECTION II – WHO IS AN INSURED, Paragraph 5.** or **6.**; or

b.   "claims" based upon an indemnification agreement between two or more insureds under this policy as specified in a contract that was submitted and approved by us and added in writing to the Schedule of this endorsement below.

### SCHEDULE:

| Contract # | Entity: |
|---|---|
| N/A | N/A |

All other terms and conditions of this policy remain unchanged.


Berkshire Hathaway
Specialty Insurance

FILED DATE: 6/15/2026 5:13 PM  2026CH05725

**ENDORSEMENT**

| | |
|---|---|
| This endorsement, effective 12:01AM: | **06/01/2020** |
| Forms a part of Policy No.: | **42-CPL-305322-03** |
| Issued to: | **The Walsh Group, Ltd.** |
| By: | **National Fire & Marine Insurance Company** |

# WHO IS AN INSURED AMENDATORY ENDORSEMENT
## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

**CONTRACTOR'S POLLUTION LEGAL LIABILITY POLICY**

II.   Paragraph 5. under **SECTION II – WHO IS AN INSURED** is deleted and replaced with the following:

5.   The client for whom the "named insured" performs or performed "covered operations" pursuant to the terms of a written contract or agreement between the "named insured" and the client. Under no circumstances shall this paragraph extend to include any of the client's related organizations unless such organization is specifically named as a party to the contract between the "named insured" and its client. Such client(s) are covered under this policy solely with respect to such client's liability for "bodily injury", "property damage" or "environmental damage" arising out of an "occurrence" of "pollution" caused by the "named insured's" "covered operations".

III.   The following is added to **SECTION II – WHO IS AN INSURED:**

6.   Any person or organization, but only to the extent that you are required to include them as an additional insured under this policy because of a written contract that:

(1) Is in effect during this policy period; and
(2) Was executed prior to the "occurrence" of "pollution".

Such person or organization, however, is an additional insured only with respect to liability arising out of the "named insured's" "covered operations", and the coverage provided hereunder shall be no broader than that required by the written contract, subject always to the terms and conditions of this policy.

All other terms and conditions of this policy remain unchanged.


**Berkshire Hathaway
Specialty Insurance**

## ENDORSEMENT

| | |
|---|---|
| This endorsement, effective 12:01AM: | **06/01/2020** |
| Forms a part of Policy No.: | **42-CPL-305322-03** |
| Issued to: | **The Walsh Group, Ltd.** |
| By: | **National Fire & Marine Insurance Company** |

# ADDITIONAL INSURED ENDORSEMENT
## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**This endorsement modifies insurance provided under the following:**

**CONTRACTOR'S POLLUTION LEGAL LIABILITY POLICY**

I.  The entity(s) listed below on the Additional Insured Schedule is included as an additional insured(s). Coverage for such additional insured(s) applies under this Endorsement:

  a. Solely to the additional insured(s) liability arising out of the "named insured's" "covered operations"

**ADDITIONAL INSURED SCHEDULE**

As required by a written contract executed prior to the "occurrence" of "pollution".

All other terms, conditions and exclusions remain the same.

Page 1  |  Manuscript



## Berkshire Hathaway Specialty Insurance

### ENDORSEMENT

FILED DATE: 6/15/2026 5:13 PM   2026CH05725

| | |
|---|---|
| This endorsement, effective 12:01AM: | **06/01/2020** |
| Forms a part of Policy No.: | **42-CPL-305322-03** |
| Issued to: | **The Walsh Group, Ltd.** |
| By: | **National Fire & Marine Insurance Company** |

# BLANKET PRIMARY COVERAGE AND NON-CONTRIBUTORY ENDORSEMENT

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

**CONTRACTOR'S POLLUTION LEGAL LIABILITY POLICY**

The following condition is added to Section **IV. CONDITIONS** of the policy:

**Primary Noncontributory – Other Insurance**

Solely with respect to persons or organizations made insureds under this policy pursuant to Paragraph **5.** under **SECTION II – WHO IS AN INSURED**, the insurance provided by this policy is primary, and will not seek contribution from any insurance available to such an insured under this policy, provided that:

**(a)** The additional insured is a named insured under such other insurance; and

**(b)** Prior to an "occurrence" of "pollution" you agreed, in a fully executed written contract or agreement, that remains in effect during the policy period of this insurance, that this insurance would be primary and would not seek contribution from any insurance available to that additional insured.

Where this Primary Noncontributory – Other Insurance condition applies, it shall supersede Condition **10. Other Insurance** under Section **IV. CONDITIONS** of the policy.

All other terms, conditions and exclusions remain the same.